# Exhibit 18-A

1

1      IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
            IN AND FOR BREVARD COUNTY, FLORIDA

2                  Case No:   89-4942-CF-A

3
STATE OF FLORIDA,

4           Plaintiff,

5
vs.

6
CROSLEY ALEXANDER GREEN,

7
_____Defendant._____/

8

9                              May 31, 1990
                              Brevard Branch Courthouse
10                             Melbourne, Florida

11              TRANSCRIPT OF PROCEEDINGS

12          This cause came on to be heard at the time and

13   place aforesaid, before the Honorable JOHN ANTOON II,

14   Circuit Judge, when and where the following proceedings wer

15   had, to wit:

16              APPEARANCES FOR THE STATE

17              PHILIP WILLIAMS, ESQUIRE
                      - and -
18              ROBERT W. HOLMES, ESQUIRE
                Assistant State Attorney
19              551 South Apollo Boulevard
                      Suite 203
20              Melbourne, Florida   32901

21           APPEARANCES FOR THE DEFENDANT

22              JOHN R. PARKER, ESQUIRE
                805 S. Washington Avenue
23              Titusville, Florida   32780

24           DEPUTY OFFICIAL COURT REPORTF

25              ELIZABETH WILSON

ORIGINAL

2

                        I N D E X

                    STATE v. GREEN
                                              PAGE NO.
STATE WITNESSES

    Kim Hallock
DIRECT EXAMINATION BY MR. WILLIAMS              11
CROSS EXAMINATION BY MR. PARKER                 39
REDIRECT EXAMINATION BY MR. WILLIAMS            82
RECROSS EXAMINATION BY MR. PARKER               85

    Robert Hallock
DIRECT EXAMINATION BY MR. WILLIAMS              86
CROSS EXAMINATION BY MR. PARKER                 88

    Thomas Fair
DIRECT EXAMINATION BY MR. WILLIAMS              94
CROSS EXAMINATION BY MR. PARKER                100

    Scott Nyquist
DIRECT EXAMINATION BY MR. WILLIAMS             108
CROSS EXAMINATION BY MR. PARKER                113
REDIRECT EXAMINATION BY MR. WILLIAMS           121

DEFENSE WITNESSES
********** N O N E **********

SUMMATION BY MR. WILLIAMS                       125
SUMMATION BY MR. PARKER                         135
REBUTTAL BY MR. WILLIAMS                        149

CERTIFICATE OF REPORTER                         161

            I N D E X   O F   E X H I B I T S

                    STATE EXHIBITS

NO.                    DESCRIPTION              PAGE NO.

  1                      Sketch                  38
  2                     Line-up                  38

                  DEFENDANTS EXHIBITS

NO.                    DESCRIPTION              PAGE NO.

            ********** N O N E **********

001993

STATE V. GRE   ; .5/31/90                                        3

1   MAY 31, 1990; MELBOURNE, FLORIDA

2   WHEREUPON:

3            THE COURT:  We are now on the record in

4       the case of State of Florida versus Crosley

5       Green.  This is Case No. 89-4942-CF-A.

6            The defendant has filed a waiver of

7       appearance.  It's my understanding that that

8       is being done as a part of the defendant's

9       . trial strategy because identification is an

10      issue in this case; is that correct?

11           MR. PARKER:  That's correct, Your

12      Honor.

13           THE COURT:  The defendant is

14      represented by Mr. Rob Parker, who is

15      present, and the state is represented by Mr.

16      Wayne Holmes and Mr. Phil Williams, who are

17      also present.

18           We are going to take up three of nine

19      pending motions.  Notice having been given on

20      a motion to suppress on May 8th, 1990 and on

21      May 29th notice was given on a motion in

22      limine with regard to the defendant's past

23      criminal history and a motion to dismiss

24      based on -- it's a C-4 motion.

25           It's my understanding the state is

001994

STATE V. GRE    5/31/90                                    4

1          prepared to go on those two motions

2          notwithstanding short notice; is that

3          correct?

4               MR. WILLIAMS:  Yes, Your Honor.

5               THE COURT:  Maybe it would be easiest

6          just to take care of those to start with.

7               Mr. Parker, what are you asking with

8          regard to the motion in limine pertaining to

9          defendant's past criminal history?

10               MR. PARKER:  Your Honor, at this time

11          I'm requesting the Court restrict any

12          introduction of evidence having to do with my

13          client's past criminal history on the grounds

14          that it would be so prejudicial as to

15          outweigh any probative value at this time.

16               I believe that there is no showing that

17          there is any real probative value as far as

18          it being an actual issue in this cause.

19               MR. WILLIAMS:  Your Honor, we will

20          agree to the extent that in the guilt phase,

21          unless the defendant takes the stand, under

22          90.608(2) it would not be relevant as we

23          perceive the trial taking place.

24               If it should, we would argue to the

25          Court it is now relevant and make a proffer

001995

1        outside the presence of the jury.

2               THE COURT:  The motion is granted so

3        long as the defendant does not take the stand

4        in the guilt phase -- through that guilt

5        phase.

6               If you wish to make further argument at

7        the penalty phase should we get there, Mr.

8        Parker, you will have to file an additional

9        motion.

10              MR. PARKER:  Yes, sir.

11              THE COURT:  Now there is also a motion

12       to dismiss.

13              What happened with your motions is they

14       were brought here but apparently taken

15       downstairs and filed.  They wound up in the

16       loop.  So I don't have that motion.

17              THE CLERK:  They are going to be faxed.

18              THE COURT:  We will get them faxed but

19       they are not here.

20              MR. PARKER:  I have a copy.

21              THE COURT:  May I see that?

22              MR. PARKER:  Yes, sir.  (Hands

23       documents.)

24              THE COURT:  Do you have the C-4 motion?

25       Is this the C-4 motion?

001996

1           MR. PARKER:  It's a C-4.  Judge,

2    basically it's a fundamental grounds argument

3    that there does not exist a prima facie case

4    or probable cause to sustain the indictment

5    in this cause.

6           I can appreciate the fact that an

7    indictment is generated by a grand jury in

8    this county and that probable cause is

9    presumed in those circumstances.

10           However, I believe that if the

11    testimony is as I perceive it to be and will

12    be today, the Court will have grounds to

13    dismiss the indictment for lack of probable

14    cause.

15           Actually, Judge, I'm in error.  I would

16    move the Court at the close and depending on

17    the Court's ruling today may make that

18    motion.  It may make it moot because I

19    believe it's a prima facie case argument

20    whether or not the state can prove

21    identification and at that point in time I

22    believe the motion to dismiss would be well

23    taken.

24           But it depends on the Court's ruling in

25    the suppression hearing.

001997

STATE V. GRE   ; .5/31/90                                                    7

```
 1                    THE COURT:  Let me finish reading it.
 2                              (PAUSE)
 3                    THE COURT:  Let's proceed then with the
 4          motion to suppress photographic line-up.
 5                    MR. WILLIAMS:  Your Honor, if I may,
 6          for the record I need to file with the clerk
 7          the state's traverse to the motion to
 8          dismiss, reserving a right to bring to the
 9          Court's attention legal infirmities as to it
10          since the Court did read the motion.  I will
11          file it with the Court.
12                    I also this morning at approximately
13          8:32 a.m. did file the original downstairs.
14          It was stamped in with the criminal law
15          clerk.
16                    And there are several matters outside
17          the traverse I would like to address in the
18          motion to dismiss.
19                    THE COURT:  Okay.  Let's go on to the
20          motion to suppress photographic line-up.
21                    MR. PARKER:  I just have one other
22          matter, Judge.  Excuse me, ma'am, what is
23          your name?
24                    MS. FLYNN:  Peggy Flynn.
25                    MR. PARKER:  I'm going to ask that the
```

001998

STATE V. GRE  5/31/90                                      8

1          rule be invoked in this cause, particularly

2          because Mr. and Mrs. Hallock, Kim Hallock's

3          parents, have been disclosed as material

4          witnesses in this cause.

5               Because they are family members and

6          because potentially they will be called in

7          the trial of this cause, I would like an

8          instruction from the Court as regards this

9          particular hearing.

10              MR. WILLIAMS:  No objection.  I have

11         told them out in the hall Mr. Parker was

12         going to invoke the rule and that Mr. and

13         Mrs. Hallock -- Mr. Hallock is the only one

14         present -- Sergeant Fair and Agent Nyquist

15         and Kim Hallock not to discuss the case, and

16         talk about anything else but that from this

17         point forward.  That was some twenty minutes

18         ago.

19              To ensure Mr. Parker's position, I

20         would be glad to ask them to step in if the

21         Court would like to so instruct them.

22              THE COURT:  Okay.  Would you ask the

23         witnesses to come in in this case?

24              (Whereupon, the witnesses entered.)

25              THE BAILIFF:  This is it?

001999

STATE V. GRE    : 5/31/90                                                9

1              MR. WILLIAMS:  That's it.

2              THE COURT:  All of you raise your right

3         hands.

4              (Whereupon, the witnesses were duly

5         sworn by the court.)

6              THE COURT:  The rule of sequestration

7         as applies to witnesses has been requested in

8         this case and the Court grants that motion.

9              The law enforcement officers already

10        understand the rule, but let me explain it to

11        the rest of you.  It means that you are to

12        wait outside the courtroom or the chambers

13        until such time as you are called to testify.

14             During that time you're not to discuss

15        your testimony, the testimony you are about

16        to give or the testimony you have given with

17        anyone.

18             The only people with whom you should

19        talk about this case are the attorneys.  And

20        if you discuss the case with the attorneys,

21        it should be out of the hearing of the other

22        witnesses.

23             It may sound like a formality, but the

24        rule is a very important rule and the

25        sanctions are serious if it's violated.  So

002000

1            please abide by that.

2                    If you will remove yourselves now.

3                    (Whereupon, the witnesses exit.)

4                    THE COURT:  Is this lady also a

5            witness?

6                    MR. WILLIAMS:  This is the decedent's

7            mother.

8                    THE COURT:  Is she a witness?

9                    MR. WILLIAMS:  No.

10                    MR. PARKER:  I have no objection.

11                    THE COURT:  Are you comfortable there,

12            ma'am?

13                    MS. FLYNN:  Yes, I'm fine.

14                    THE COURT:  I really thought we would

15            be doing more legal argument and I just

16            stayed here; otherwise, I would have probably

17            gone into the courtroom.  But I think this is

18            comfortable.

19                    Is everyone comfortable?

20                    MR. WILLIAMS:  We are fine.  Judge, if

21            I may, are you going to consider the motion

22            to dismiss at a later time?  I need to

23            reserve for the record some objections to it.

24                    THE COURT:  All objections are

25            preserved.  I haven't really addressed it

002001

1                yet.  I read it thinking maybe it was the

2          next thing I should do, but Mr. Parker's

3          comments I think are appropriate.

4                So after the motion to suppress

5          photographic line-up, I will take up the

6          motion. ,

7                MR. WILLIAMS:  We will proceed then on

8          the motion to suppress the photo line-up?

9                THE COURT:  Right.

10               MR. WILLIAMS:  I guess our first

11         witness will be Kim Hallock.  I will go get

12         her.

13                    KIM SUE HALLOCK,

14    a witness herein, having been previously duly sworn,

15    testified upon her oath as follows:

16               THE COURT:  What is your full name,

17         ma'am?

18               THE WITNESS:  Kim Sue Hallock.

19               THE COURT:  You may inquire.

20               MR. WILLIAMS:  Thank you, Your Honor.

21                    DIRECT EXAMINATION

22    BY MR. WILLIAMS:

23         Q.    Ms. Hallock, would you tell the Court your

24    address please?

25         A.    1310 Polyanna Drive, Titusville, Florida.

002002

1          Q.      And did you know Chip Flynn during his

2     lifetime?

3          A.      Yeah, I met him a couple years before.

4          Q.      Let me direct your attention to April 3rd, 1989

5     in the late evening hours.  Did you have occasion at that

6     time to meet with Chip and go somewhere?

7          A.      Yes.

8          Q.      Where did you meet?

9          A.      He came to my house.

10         Q.      And you left together; is that right?

11         A.      Yes.

12         Q.      Where did you go first?

13         A.      We went to the little Jiffy store on Dairy and

14     Singleton.

15         Q.      And what did you do there?

16         A.      I went in and got him a Mountain Dew.

17         Q.      How were you traveling?

18         A.      His truck.

19         Q.      Describe the truck for us?

20         A.      It's a Chevrolet stepside four-by-four.

21         Q.      Pick-up truck?

22         A.      Yes.

23         Q.      And from the Step Saver you went where?

24         A.      To Holder Park.

25         Q.      Are you familiar with Holder Park?

002003

1        A.    Yes.

2        Q.    Do you live in that area or have lived there?

3        A.    Somewhat, yes.

4        Q.    What did you do when you got to Holder Park?

5        A.    He went up on the dunes and parked under some

6    trees.

7        Q.    Tell the Court what that area is like?

8        A.    It's just a bunch of trees and then next to us

9    is the woods and out in front is the ball fields, baseball

10   fields.

11       Q.    Is Holder Park basically a compilation of

12   softball and baseball fields?

13       A.    Yes.

14       Q.    Lighted?

15       A.    Yes.

16       Q.    What time of day did you get there?

17       A.    Got there around a little after eleven.

18       Q.    Were there any ball games being played at that

19   time?

20       A.    No, sir.

21       Q.    Do you know whether or not there had been some

22   playing?

23       A.    I have no idea.

24       Q.    You pull up into this wooded area; is that

25   right?

00200ქ

STATE V. GRE   5/31/90                                          14

1      A.    Yes.

2      Q.    What do you do when you are sitting there?

3      A.    We were talking and we smoked some pot.

4      Q.    How much pot did you smoke?

5      A.    Not even a half of a joint.

6      Q.    Did you feel the effects of it?

7      A.    A little bit, yes.

8      Q.    Have you smoked marijuana prior to that?

9      A.    Yes.

10     Q.    Can you describe the effect that that marijuana

11  you smoked that night had on you in relationship to previous

12  times?

13     A.    Not -- yeah, it did but not real bad.

14     Q.    Where were you seated and where was Chip

15  seated?

16     A.    I was in the middle of the truck and he was by

17  the driver's side.

18     Q.    Were the lights on in the truck or was it

19  running?

20     A.    No, it was turned off.

21     Q.    How long were you there before you noticed

22  someone?

23     A.    About fifteen minutes.

24     Q.    And after that fifteen minutes went by, what

25  did you notice?

002005

1          A.    A sheriff's car come through the baseball

2    field.

3          Q.    Is that a road that's perimeter to around the

4    field or runs alongside the field?

5          A.    Yeah, it runs along the fields.

6          Q.    How do you know it was a sheriff's car?

7          A.    Because I saw him.  He had a spotlight and he

8    was going through all the bushes and stuff.

9        . Q..   Could you see the car itself?

10         A.    Yes.

11         Q.    Markings on it?

12         A.    Yeah, I could see the car.

13         Q.    How far away was that approximately?

14         A.    Distance?  I'm not good at distances.

15         Q.    He didn't drive right up to your truck or

16   anything?

17         A.    No.

18         Q.    After the sheriff's car went by, what, if

19   anything, happened next?

20         A.    I saw a black man walking up towards the front

21   of the truck.

22         Q.    How far from the truck was the black man when

23   you first saw him?

24         A.    A few feet.

25               THE COURT:  How far?

002006

1                    THE WITNESS:  A few feet.

2  BY MR. WILLIAMS:

3          Q.    As you were looking at him when you first saw

4  him, were you looking through the front windshield?

5          A.    Yes.

6          Q.    Where did he walk?

7          A.    In front of the truck on the driver's side,

8  down the side of it.

9          Q.    Coming toward the front of the truck and then

10  he veers off to his right, your left, and comes down the

11  driver's side of the truck?

12          A.    Yes.

13          Q.    Did you watch him continuously from when you

14  first saw him to when he walked up?

15          A.    When he passed, yes.  After he got back here, I

16  didn't look no more.

17          Q.    Did you say anything when you saw him?

18          A.    Yeah, I told Chip that there was a black man

19  walking by the truck.

20          Q.    What did the black man do when he walked by?

21          A.    He said:  "You all better watch out because    —

22  there is a sheriff going through."

23          Q.    At that point in time what did you notice about

24  the black man?

25          A.    He had a green jacket on.

STATE V. GREE    ·5/31/90                                              17

1                    THE COURT:  He had what?

2                    THE WITNESS:  A green jacket on.

3     BY MR. WILLIAMS:

4            Q.    Anything else?

5            A.    That's all I noticed then.

6            Q.    What did you do next?

7            A.    We sat there for a few more minutes.  Then Chip

8     got out to go to the bathroom.

9            Q.    What door did he get out of?

10           A.    The driver's door.

11           Q.    When he opened the driver's door -- did the

12    truck have a light in the inside of the truck?

13           A.    I think so.

14           Q.    Where was the light located?

15           A.    His was on the floor.

16           Q.    So it illuminated the floorboard of the truck?

17           A.    Um-hum.

18           Q.    Do you know what an inside dome light that's

19    mounted on the ceiling of a car or truck is like?

20           A.    Um-hum.

21           Q.    It was different to that; is that right?

22           A.    There wasn't one up there.

23           Q.    It's down at the feet?

24           A.    Yeah.

25           Q.    When he got out, did he say he was going to go

002008

1   to the bathroom?

2          A.   Yes, because I asked him what he was doing.

3          Q.   So did you see him, Chip, at that point?

4          A.   Yes.

5          Q.   Where was he?

6          A.   He was standing in the drivers door.

7               MR. WILLIAMS:  Your Honor, if I may.

8   BY MR. WILLIAMS:

9          Q.   Would you just pretend this is the driver's

10  seat of the car and step out as you saw Chip.  If you were

11  seated here, where am I now?

12         A.   He was like this (indicating) and he opened the

13  door and he stepped out and he turned this way (indicating).

14         Q.   Is the driver door of the truck open at this

15  time?

16         A.   Yes.

17         Q.   And you are seated where?  You were in the

18  middle?

19         A.   Yeah, I was in the middle.

20         Q.   Then what did you notice?

21         A.   I just turned around and looked at Chip.  And

22  when I did, I saw him going:  "Wait a minute.  Hold on, man.

23  Calm down."

24              That was all I noticed.

25         Q.   You saw Chip speak those words?

002009

STATE V. GREEN   5/31/90                                                    19

1       A.    Yes.

2       Q.    Did you see who he was speaking to?

3       A.    No.

4       Q.    Not at that time?

5       A.    No.

6       Q.    What did you do?

7       A.    I got his gun from his glove box and put it

8   under some jeans or something that was next to me.

9       Q.    Did you know who he was talking to?

10      A.    No.

11      Q.    What did you do after you got the gun out of

12  the glove box and put it under the jeans?

13      A.    I turned around and looked at him.  And when I

14  did, he had walked -- the black guy had walked around and

15  got behind him -- and then he walked around behind him and

16  then I saw that it was a black man with a gun.

17      Q.    Let me stop you for a second.  At this point

18  you see the black man walk around Chip?

19      A.    Um-hum.

20      Q.    Was that the same black man that you saw walk

21  up to the truck originally?

22      A.    Yes.

23      Q.    Now was Chip still standing at that point?

24      A.    Yes.

25      Q.    After the black man walked around -- he did not

002010

1    .walk between Chip and you?

2              A.    No.

3              Q.    Around Chip to the rear of Chip; right?

4              A.    Yeah.

5              MR. PARKER:  Respectfully, I'm going to

6         interject an objection.  The prosecutor is

7         leading the witness and these questions are

8         very, very critical.

9              I would ask counsel for the prosecution

10        be admonished not to lead the witness.

11             THE COURT:  The objection to the last

12        question is sustained.

13   BY MR. WILLIAMS:

14             Q.    Where did the black male walk?

15             A.    He walked around the outside of Chip and got

16   behind him, in between the door and him.

17             Q.    And would you tell the Court from your position

18   as you looked out the driver's door what did you see in the

19   immediate foreground and then one, two, three?

20             A.    I turned around and looked, and he was telling

21   Chip to get down.

22             Q.    Who was telling Chip?

23             A.    The black man.  And then he looked at me, saw

24   me, and he told me to scoot over and I scooted over.

25             Q.    Which direction?

1        A.    Towards the driver's door.

2              And he kept telling Chip to get down, to get

3    down on his knees.

4        Q.    What was Chip doing?

5        A.    He was trying to get down but the black man was

6    stepping on his feet or something and he couldn't move or

7    something because he was asking him to please get off his

8    feet.

9        Q.    Okay.

10       A.    Then he -- okay, he made him get down.  And he

11   asked if we had any money.

12       Q.    Who did?

13       A.    The black man.

14       Q.    When the black man asked that question, who did

15   he direct that question to?

16       A.    Both of us.

17       Q.    Who responded, if either one of you did?

18       A.    Me.

19       Q.    What did you say?

20       A.    I said I had five dollars.

21       Q.    Okay.

22       A.    When he was telling Chip to get down, he was

23   calling him cracker the whole time.  Wait a minute.  Back

24   up.  I skipped a part.

25             He looked in the truck.

002012

1        Q.    Who looked?

2        A.    The black man looked in the truck.

3        Q.    Truck or trunk?

4        A.    Truck.  And he saw Chip's tennis shoes and he

5    made him pick the tennis shoes up.  He picked them up and he

6    looked at them.  He threw them at me and told me to take the

7    shoe lace out.

8              So I took the shoe lace out.  And he tied

9    Chip's hands up.

10       Q.    How was Chip positioned when he tied his hands?

11       A.    He was on his knees on the ground.

12       Q.    How was the black man positioned when he was

13   tying Chip's hands?

14       A.    He was bent down standing up tying his hands.

15       Q.    Where were you during that time?

16       A.    I was still sitting in the driver's seat.

17       Q.    If you would -- Your Honor, if the Court can

18   see this -- would this accurately represent how the black

19   man was behind Chip (indicating)?

20       A.    Yes.

21       Q.    Where was the light on inside the truck?

22       A.    Down on the floor and it was going out the

23   window.

24       Q.    What did the light illuminate while the black

25   man tied up Chip's hands?

002013

1             MR. PARKER:  Again, I'm going to object

2      to the leading nature of the question.

3             MR. WILLIAMS:  What did the light

4      illuminate, Your Honor.

5             THE COURT:  Overruled.

6  BY MR. WILLIAMS:

7             Q.    What did the light illuminate while the black

8  man tied up Chip's hands?

9             A.    You could see his face and you could see -- you

10  could see all of him and you could see Chip, the back of

11  Chip.

12            Q.    What happened after he tied him up?

13            A.    Then he asked for some money, if we had any

14  money, the black man.  And I told him I did.  And I gave him

15  my money.  And he asked Chip and Chip told him he didn't

16  have his wallet.

17            And then after he -- his gun went off once

18  while he was trying to tie Chip's arms together.

19            Q.    Whose gun went off?

20            A.    The black man's.

21            Q.    When was the first time you saw the black man's

22  gun?

23            A.    When he got around behind Chip, in between the

24  door and Chip.  And then he stood him up.

25            Q.    Who stood who up?

002014

1          A.     The black man stood Chip up and reached in his

2    pocket and pulled out his wallet.

3          Q.     What did the black man do?

4          A.     He opened it up and threw it at me.  I had

5    jumped out in between while he was doing that.  I jumped out

6    of the truck and he had asked me what I was doing and I just

7    said:  "I'm just standing here."

8          Q.     Can you stand up and show me where you, Chip

9    and the black man were when you were all outside the truck?

10   Just position me.

11         A.     I was here (indicating), Chip was about right

12   here (indicating) and then the black man was right here

13   (indicating).

14         Q.     What did he do?

15         A.     He looked at me and asked me what I was doing

16   and I said I was just getting out of the truck.

17         Q.     What did he do next?

18         A.     He had the wallet.  He opened it.  I kind of

19   stepped this way a little bit (indicating).  He threw it at

20   me and asked me to count the money.

21         Q.     Did you count the money?

22         A.     Yes.

23         Q.     How did you count it?

24         A.     As in?

25         Q.     Well, what kind of money was it?  Paper?

002015

1    Coins?

2           A.    It was paper money.   They were bills.

3           Q.    How much was there?

4           A.    A hundred and eighty-five dollars.

5           Q.    What denominations?

6           A.    Twenties, a ten -- mostly twenties, tens and I

7    think there was a five.

8           Q.    Could you see them?

9           A.    Yes.

10          Q.    After you counted the money, what did you do?

11          A.    I handed it to him.   Then I -- he told me to

12   get in the truck -- told me to get in and start the truck.

13   And I --

14          Q.    Who told you?

15          A.    The black man.

16          Q.    Did you do that?

17          A.    I reached in -- I just reached in, took it out

18   of gear and started it.   Then I kind of stepped back and got

19   behind Chip and Chip was just asking him to please let me

20   go.   Take him, take the truck, take the money, take whatever

21   you want, just let her go.

22                Then the black man made us both get in the

23   truck.

24          Q.    How did he do that?

25          A.    He told us to get in the truck.   And I tried to

1    get in first and he yanked me back and had Chip get in

2    first.

3             Q.    So Chip got in; is that right?

4             A.    Right.  And then I got in and then the black

5    man got in.

6             Q.    Who was seated where?

7             A.    Chip was in the passenger seat, I was in the

8    middle and the black man was driving.

9             Q.    What happened?

10            A.    He asked Chip if it was four gears or something

11   to that effect.  And he got out -- the black man got out --

12   just as we got on the dirt road he told us to put our heads

13   down.

14            Q.    Now he drove how far?  How far did the black

15   man drive before he told you to put your heads down?

16            A.    Not very far.  I would say from me to him

17   (indicating).

18            Q.    From you to the Judge?

19            A.    Yes.

20            Q.    Indicating about fifteen feet?

21            A.    Yeah.

22            Q.    When he told you to put your head down, what

23   did you do?

24            A.    I put my head down and Chip put his head down.

25   And then he drove.  And he was driving and Chip had found

1   the gun while we were riding in the truck.

2              And we were going and I put my head up and I

3   saw we passed the Niven's Orange Company.

4       Q.    That's locate where?

5       A.    On Parrish Road.

6       Q.    When you looked up, which window did you look

7   out of?

8       A.    The driver's.

9       Q.    Who was driving?

10      A.    The black man.

11      Q.    Then what happened?

12      A.    Then Chip put his head up.  And he yelled at us

13   to -- "Put your damn heads down."  And we put our heads down

14   and he drove us to -- I had no idea where we were at.

15              When he stopped, he yanked me out of the truck

16   and Chip scooted over.

17      Q.    Let me stop you there for a second.  How long,

18   if you can remember, how long did it take to drive from

19   Holder Park to wherever you stopped?

20      A.    Just a few minutes.

21      Q.    When you stopped the truck, could you tell --

22   you said you couldn't tell where you were.  Can you describe

23   the general type of area where you were?

24      A.    We were in an open spot but it was woods all

25   around.

002016

STATE V. GRE  ; 5/31/90                                    28

1      Q.   What happened?

2      A.   Oh, while we were riding in the truck, Chip

3  tried to put the gun behind me and against the seat and I

4  think he was going to try and shoot at him.  But I couldn't

5  move without him noticing.

6           Then he had yanked me out of the truck -- the

7  black man did.  He had Chip scooted all the way over and he

8  kind of shut the door so Chip couldn't get out and Chip kind

9  of --.

10     Q.   Which door?

11     A.   The driver's door.

12     Q.   What did the black man do with his gun while he

13 was traveling?

14     A.   He had it in my side.  He would shift and then

15 put it back to my side.

16     Q.   You were able to see that?

17     A.   Yes.

18     Q.   When he dragged you out of the truck, which

19 door did he drag you out of?

20     A.   The driver's side.

21     Q.   And what did Chip do?

22     A.   He scooted all the way over to the driver's

23 seat and he kind of stuck his foot out so when he shut it it

24 didn't shut.  His foot was stuck holding it open.

25           And he was telling Chip to stay in the truck.

002019

STATE V. GRE    5/31/90                                              29

1    And when he was doing that, I yanked away from him and I ran

2    around behind the truck.

3            Q.    You ran from what point on the truck to where?

4            A.    About right behind the driver's door -- I ran

5    behind the truck.  I got all the way to the driver's door.

6    I opened the door and I stuck one foot in.  When I did, he

7    caught me and yanked me back out.

8            Q.    You ran from the driver's side around to which

9    side?  The passengers?

10           A.    The passenger's side.

11           Q.    How far did you get?

12           A.    I got all the way to the door with one foot in

13   and then he yanked me back out.

14           Q.    Which door?

15           A.    The passenger's door.

16           Q.    When he yanked you, where did he grab you?

17           A.    By the arm.

18           Q.    What did that do to you?

19           A.    It jerked me out of the truck and I kind of

20   fell to the ground a little bit.

21           Q.    Where was he?

22           A.    Right next to me.

23           Q.    Which side or face-to-face?

24           A.    He was on the right side of me.

25           Q.    What did you see at that point?

002020

1          A.    The gun at my head because he had put the gun

2     to my head and he told me that I was going to do what he

3     wanted.   I was a slut and I was going to do what he wanted

4     or he was going to blow my brains out.

5               And when I -- I looked up and Chip was at the

6     passenger's door and he shot behind his back at the black

7     man.

8               When he did, the black man let me go and

9     stepped back.   Chip dove out of the truck.   I jumped in the

10    truck and I shut the door and locked it.

11              And I scooted over to the driver's door and I

12    locked it.   And I turned around and I looked and all I saw

13    was the black man going like this (indicating) and then I

14    saw fire going through the air.

15         Q.    And what did you do?

16         A.    I sat there for a minute and then I heard Chip

17    yell go and I left.

18              And then I went to -- I went to his best

19    friend's house because it was the closest person I could

20    think of that was closest to where I was at.

21              Then I got there and I got him up.   And I went

22    in and I just went in and I just didn't even really say

23    anything to him.   I called 911.

24         Q.    When you called 911, did you give a description

25    of the black man to them over the phone at any time?

1      A.    I'm not sure.

2      Q.    Did you see the black man anymore that evening?

3      A.    No.

4      Q.    Ultimately, later on that evening -- let me

5   direct your attention forward in time.  Did you have an

6   occasion to meet with the sheriff's deputies at the precinct

7   in Titusville, their office?

8      A.    The ones that came out there?

9      Q.    Yes.  Or specifically Agent Fair, Agent

10  Nyquist?

11     A.    Yes, I saw them.

12     Q.    Sergeant Bo West?

13     A.    When do you mean?  At what time?

14     Q.    Later on that morning did you go there and make

15  a statement?

16     A.    Yes.

17     Q.    And later on that morning were you shown any

18  photographs at any time?

19     A.    Yes.

20     Q.    Tell us how many photographs you looked at and

21  how they were displayed to you?

22     A.    Around eighty.

23     Q.    Eighty?

24     A.    Eighty.

25     Q.    How did that happen?  Tell us how that

1    happened.

2         A.    Tom Fair got -- I guess they have a box of

3    them.  I'm not sure.  And he went through them and he took

4    out all the black males and he handed them -- just in piles

5    and handed them to me and told me to look through them.

6              If I couldn't find him in there, don't worry

7    about it.

8         Q.    Did you look through eighty photographs

9    approximately?

10        A.    Approximately.

11        Q.    How did you look at them?

12        A.    I just looked at them and then I would go to

13   the next one.  I would look at them for a while before I

14   moved on.

15        Q.    Of those eighty photographs, was the person who

16   came up to the truck, drove the truck away, the black man,

17   was he in those eighty photographs?

18        A.    No.

19        Q.    Out of those eighty photographs were any of

20   them similar in some feature or another?

21        A.    Yes.

22        Q.    Did you bring that to the attention of the

23   sheriff's department?

24        A.    Yes.

25        Q.    What did you tell them?

002023

STATE V. GRE__.; 5/31/90                                                33

1          A.     I said:  "This is a maybe."  I said:  "There is

2   something about his nose that looks familiar."

3          Q.     How was that?  By a particular feature?

4          A.     Yeah, features on their face.

5          Q.     But you didn't select any of them?

6          A.     No.

7          Q.     The next thing you did -- did you sit down with

8   the police artist either that night or later --

9          A.     That night I did.

10          Q.     And tell the Court how that happened.

11          A.     I went in there with him.  He told me -- he did

12   from the chin up and I went through all the features with

13   him.  And I changed things and he -- I would skip and go

14   ahead and he would get mad at me and tell me to slow down

15   because he goes up.  He doesn't go and do one thing.  He

16   starts from the bottom and goes up.

17               And he did that.  I liked everything about it

18   but the hair.

19          Q.     As soon as I can find it, I'm going to show you

20   a copy of that.

21               MR. WILLIAMS:  Would you mark that

22          please as State's A for identification.

23               (Whereupon, State's Exhibit A was

24          Marked for Identification)

25   BY MR. WILLIAMS:

002024

1          Q.    Ms. Hallock, I will show you what's been marked

2    State's Exhibit A for identification for the purposes of

3    this hearing and ask you if you recognize that?

4          A.    Yes, I do.

5          Q.    What is it?

6          A.    That's the composite that I told the man to

7    draw.

8          Q.    You said you liked everything except for the

9    hair. Can you explain to the Court what you mean by that?

10         A.    It was a little bit longer.

11         Q.    The description that is written here -- black

12   male; mid to late twenties; approximately five foot ten;

13   muscular build; short, cropped hair -- that information was

14   supplied by who to the sheriff's department?

15         A.    That was from what I told them.

16         Q.    The green jacket, possible fatigue type,

17   T-shirt, jeans?

18         A.    That was all that I had told them.

19         Q.    So this is what he came up with?

20         A.    Right.

21         Q.    Is that all the contact you had with the

22   sheriff's department that particular night or morning?

23         A.    Just the questioning, that and the pictures,

24   yes.

25         Q.    The eighty pictures?

002025

STATE V. GREEN, 5/31/90                                              35

1          A.    Yes.

2          Q.    At some point in time were you called by the

3    sheriff's department again?

4          A.    Yes, Wednesday in the morning or afternoon.

5          Q.    Let me go back a minute.  Chip picked you up

6    late Monday night?

7          A.    Yes.

8          Q.    Early Tuesday morning is when this happened; is

9    that right?

10         A.    Yes.

11         Q.    You looked at the photographs the same Tuesday

12   morning?

13         A.    Yes.

14         Q.    And made the sketch the same Tuesday?

15         A.    Yes.

16         Q.    And then the following Wednesday, is that when

17   the sheriff's department contacted you again?

18         A.    Yes.

19         Q.    How did they get a hold of you?

20         A.    They called by phone.

21         Q.    What did they talk to you --

22         A.    They talked to my sister.

23         Q.    As a result of that phone call what did you do?

24         A.    They just wanted -- I had went down to the

25   sheriff's department about seven o'clock -- it might have

002026

1   been later than that.

2        Q.    Seven p.m. on Wednesday?

3        A.    It might have been a little later.  I'm not

4   quite sure about that.

5        Q.    Who did you see when you went there?

6        A.    Scotty Nyquist and Tom Fair.

7        Q.    Who was with you?

8        A.    My father.

9        Q.    What happened?

10       A.    He --

11       Q.    He who?

12       A.    Scotty Nyquist asked me -- they took my dad in

13  and they talked to him.  And then I went in and they told me

14  they had a line-up with a suspect in it and they wanted me

15  to look at it.

16       Q.    And did they show you a line-up?

17       A.    Yes.

18            MR. WILLIAMS:  Would you mark this as

19       State's B.  It already has a number on it.

20            (Whereupon, State's Exhibit B was

21       Marked for Identification)

22  BY MR. WILLIAMS:

23       Q.    I'm going to show you first in this hearing

24  what's been marked as State's B for identification and ask

25  you if you recognize that photo line-up?

002027

STATE V. GREEN. 5/31/90                                              37

1          A.    Yes.

2          Q.    Is that the photo line-up that you were shown

3    by the sheriff's department on Wednesday the 5th of April,

4    1989?

5          A.    Yes.

6          Q.    Does it appear to be in the same or

7    substantially the same condition as it was when you looked

8    at it?

9          A.    Yes.

10         Q.    Did you select a person off of that line-up as

11   being the person who you saw walk up to the truck, tie up

12   Chip, drive the truck, have the gun, do the shooting?

13         A.    Yes.

14         Q.    Which person did you select?

15         A.    Number two.

16         Q.    When you looked at the line-up, how did you

17   look at it?

18         A.    I looked at number one.  I looked at number two

19   and I stopped and looked at number two.

20              Then I went down and I looked through three,

21   four, five and six; and then I went back up to number two.

22              Then I went through them all again and then I

23   looked at number two.  Then I said it was number two.

24         Q.    And when you say it was number two, did they

25   ask you to do anything like sign the back of it?

002028

1        A.    They asked me if I was sure and then I said yes

2   and then they asked me to initial it.

3        Q.    And did you do that?

4        A.    Yes.

5        Q.    Are those your initials on the back of the

6   line-up?

7        A.    Yes.

8              MR. WILLIAMS:  Your Honor, for the

9         purposes of this hearing I would move State's .

10        A and State's B into evidence.

11             MR. PARKER:  No objection.

12             THE COURT:  They will be received as

13        Exhibits 1 and 2 for the purposes of this

14        hearing.

15             (Whereupon, State's Exhibit 1 and 2

16        were received into evidence.)

17  BY MR. WILLIAMS:

18        Q.    What instruction did you receive other than "We

19   have a line-up and there is a suspect in here"?

20             Did you receive any instruction from the

21   sheriff's department as to which selection, if any, to make?

22        A.    No.

23        Q.    You said your father went in and they talked

24   with him briefly and then you went in?

25        A.    Yes.

002029

STATE V. GREEN; 5/31/90                                              39

1           Q.    When you were brought in the room, did you have

2    a conversation with your father prior to looking at the

3    line-up?

4           A.    No.

5           Q.    Did you have a conversation with anybody?

6           A.    He just told me:  "It's all right.  Just do

7    your best."  He did say that.

8           Q.    Okay.  But that's all?

9           A.    Yes.

10              MR. WILLIAMS:  Your Honor, I don't have

11              any other questions of this witness at this

12              time.

13              THE COURT:  Mr. Parker?

14              MR. PARKER:  May I proceed?  May I see

15              the exhibits?

16              THE COURT:  Did you get them marked

17              yet?

18              THE CLERK:  Yes

19                        CROSS EXAMINATION

20   BY MR. PARKER:

21          Q.    Kim, you remember me.  I'm Rob Parker.  We met

22   at the deposition some time ago?

23          A.    Yes.

24          Q.    Are you okay to go forward?

25          A.    Yes.

002030

1           Q.     Are you sure?

2           A.     Um-hum.

3                  THE COURT:  Mr. Parker, for your

4           information, I'm probably going to stop in

5           about thirty minutes.  We will have to pick

6           up again' this afternoon.

7                  ·Does that cause any serious problems

8           for anyone?  It's off the record.

9                         (OFF THE RECORD)

10                 THE COURT:  Go ahead.

11  BY MR. PARKER:

12           Q.    Kim, originally when you talked to the police,

13  when you first -- didn't you tell the law enforcement

14  officials when you first saw this person approach the truck

15  that evening -- is it a true statement that you told them

16  when you saw this person walk by the truck it was just a

17  blur to you and you weren't paying attention? ·

18           A.    Yes.

19           Q.    So as far as this individual you have

20  identified as a black male walking by the truck, other than

21  ·knowing he was a black male you had no idea what his facial

22  features were; is that correct?

23           A.    When he walked by, no.

24           Q.    Now it was approximately 11:30 in the evening

25  as I recall, is that correct, on the 3rd?

002031

1        A.    Yes.

2        Q.    And that's the time that you and Chip were

3   parked at Holder Park; is that correct?

4        A.    Yes.

5        Q.    Now I would presuppose there was no natural

6   lighting out at that time.  The sun wasn't out.  Do you

7   recall whether there was a moon?

8        A.    I'm not sure.

9        Q.    You just don't know?  You are just not sure?

10       A.    I don't think I looked up to see.

11       Q.    My question is --

12       A.    I don't know.

13       Q.    Were there any lights on at the ball park?

14       A.    There might have been a spotlight up at the

15   concession stand, but that was a ways away.

16       Q.    When you say there might have been, are you

17   sure or are you not sure?

18       A.    I'm not sure.

19       Q.    Now how far was the first ball park, the actual

20   ball field, from where the truck was located?  You can stand

21   up and point to a tree.  I don't have a problem with that.

22       A.    I a need bigger room.  See that tree right

23   there, the first one?

24       Q.    The small oak tree there by the cars parked in

25   the row?

002032

1       A.    Yes, that one.

2       Q.    Can you give us any best guess as to how many

3  feet you might think that lies from here from where you are?

4       A.    Seventy-five to a hundred feet.

5       Q.    You're not real sure?

6       A.    (Witness nodding.)

7       Q.    You testified earlier you're not real good

8  about distances?

9       A.    No.

10      Q.    Now you had -- and I appreciate that you

11 admitted it -- smoked marijuana prior to seeing this black

12 male?

13      A.    Yes.

14      Q.    How long were you and Chip smoking marijuana

15 prior to this black male coming up?

16      A.    About five minutes.

17      Q.    As I recall your testimony at deposition,

18 correct me if I'm wrong, you said that you and Chip at the

19 time that the black male first accosted Chip remained at

20 Holder Park somewhere around approximately five minutes; is

21 that correct?

22      A.    When we saw the black man?

23      Q.    From the time you first saw the black male

24 until you left Holder Park.  Did you not tell me at

25 deposition it was approximately five minutes?

U02033

1              MR. WILLIAMS:  I'm going to object to

2         the form of the question, Your Honor.

3              The question should be:  How long were

4         you at Holder Park?  If the answer is

5         different than a deposition, then he should

6         point the witness to the deposition.

7              MR. PARKER:  I don't have a problem

8         with that.

9    BY MR. PARKER:

10         Q.    How long were you there?

11         A.    From the time the black man drove us away?

12         Q.    Yes, ma'am.

13         A.    I think it was a little longer than that.

14         Q.    How much longer?

15         A.    I'm going to say about ten minutes.

16         Q.    Is that a little bit different -- are you sure?

17         A.    I'm trying to think.  I'm going to say around

18    ten minutes.

19         Q.    Is that a little different than what you told

20    me at deposition?

21         A.    I think so.  I'm not sure.

22         Q.    Do you recall telling me that it took maybe

23    four to five minutes at Holder Park?

24              MR. WILLIAMS:  What line and page?

25              MR. PARKER:  Page one hundred and two.

002034

STATE V. GRE.  , .5/31/90                                      44

1           That would be lines five through seven.

2                 THE WITNESS:  I'm trying to think of

3           the time after he passed and Chip got out of

4           the truck.

5    BY MR. PARKER:

6           Q.    What I want you to focus on is from the time

7    that the black male first accosted Chip.

8           A.    Oh, when he first got up to him?

9           Q.    Yes.

10          A.    I thought you meant when he passed.

11          Q.    No, ma'am.

12          A.    Yes, that was four to five minutes.

13          Q.    So you were actually there at Holder Park from

14   the time that the black male first accosted Chip

15   approximately four to five minutes, as you recall?

16          A.    Yes.

17          Q.    There was no lighting other than what you

18   believe to be an interior light?

19          A.    Yes.

20          Q.    As I understand your testimony, you are not

21   sure whether that interior light came on; is that correct?

22          A.    Yes.

23          Q.    Yes, you're not sure or you are certain that

24   that interior light came on?

25          A.    I'm not sure.

1          Q.    You don't know whether that light even came on

2     that entire evening, are you?

3          A.    Yes.

4          Q.    Yes, you're not sure?

5          A.    Yes.

6          Q.    So, when Mr. Williams talked about the

7     illumination of the face of the black male, that may not

8     necessarily be true, is it?

9          A.    I did see the black man.

10         Q.    It wasn't illuminated by any light as you

11    recall, was it?

12         A.    I don't remember if the light was working or

13    not.

14         Q.    Now, Kim, when this all began and the black

15    male accosted Chip were you scared?

16         A.    Yes.

17         Q.    Were you very scared?

18         A.    Yes.

19         Q.    You were so scared you immediately removed a

20    revolver from the glove box; is that correct?

21         A.    Yes.

22         Q.    Now during that four to five minutes that you

23    were there at the park, you said that you looked at this

24    man; is that correct?

25         A.    Yes.

002036

1          Q.    Did you look at his face at any time?

2          A.    Yes.

3          Q.    Have you ever testified in any Court proceeding

4     before?

5          A.    No.

6          Q. .  Do·you have any law enforcement training?

7          A.    No.

8          Q.    Other than what we are doing here today, have

9     you ever been called on to identify another human being?

10          A.    Besides this?

11          Q.    Besides this.

12          A.    No.

13          Q.    That night were you thinking:  "I need to look

14     at this person because I'm going to need to identify him"?

15          A.    In this or that night?

16          Q.    At that time, yes, ma'am.

17          A.    No, I was not thinking about that.

18          Q.    Now as I understand your testimony here today,

19     you actually looked at the face of the black male two times?

20          A.    Yes.

21          Q.    One of those times you were standing out of the

22     truck; is that correct?

23          A.    Yes.

24          Q.    And the other time you were seated in the

25     truck; is that correct?

002037

1        A.    Yes.

2        Q.    This is before you all left?

3        A.    Yes.

4        Q.    Now the time that you were seated in the truck,

5    is it a fair statement to say that you looked at the black

6    male's face while he was tying Chip?

7        A.    Yes.

8        Q.    Now earlier Mr. Williams performed a

9    demonstration where the entire time he was questioning you

10   he was looking at you.  Do you remember that just a few

11   minutes ago?

12       A.    Yes.

13       Q.    The black male wasn't doing that when he was

14   tying Chip, was he?

15       A.    No.

16       Q.    So when you were looking at him at that time

17   you were looking at basically a profile of this black man?

18       A.    Yes.

19       Q.    So you didn't look at his face squarely at that

20   time, did you?

21       A.    No.

22       Q.    The other time you say that you looked at

23   him -- believe me I'm going to give you a chance -- during

24   that time that you were looking at him, do you know how long

25   you actually looked at him?

002038

STATE V. GRE    5/31/90                                              48

1          A.    I'd say a minute.

2          Q.    You were focused on the side of his face for

3    sixty seconds?  Is that what your testimony is here today?

4          A.    Maybe not quite sixty seconds.

5          Q.    Was he saying anything?

6          A.    When he was tying his hands?

7          Q.    Yes, ma'am.

8          A.    (Witness nodding.)

9          Q.    The black man?

10         A.    No, sir.

11         Q.    Now you testified earlier that when you got out

12   of the truck you had an opportunity to look at his face?

13         A.    Yes.

14         Q.    How long did you look at him at that time?

15         A.    Ten seconds, maybe fifteen.

16         Q.    And did you have a chance to look him square in

17   the face?

18         A.    Yes.

19         Q.    Did he say anything to you then other than

20   "What are you doing?"

21         A.    No.

22         Q.    Now at the time the black male had Chip on the

23   ground, he also had a handgun; is that correct?

24         A.    Yes.

25         Q.    Your testimony is that the handgun discharged

002039

1     at that time?

2              A.    When he was tying his hands, yes.

3              Q.    Did the handgun discharge prior to you looking

4     at him or after you looked at him?

5              A.    While I was looking at him.

6              Q.    When the handgun discharged, what did you do?

7              A.    I just looked down and saw the fire.

8              Q.    And then what did you do?

9              A.    Then I looked back up at him.

10             Q.    Do you ever recall at the deposition telling us

11    when the handgun fired you immediately turned away and you

12    didn't want to look anymore?  Page seventy-nine, line

13    twenty-one.

14             A.    I did jerk away but I did see the fire, and

15    then I looked up at him and then I jerked away.

16                   Yes, I do remember telling you that.

17             Q.    You saw the fire of the gun?

18             A.    Yes.

19                   MR. PARKER:  I'm sorry, page eighty-one

20             through four, Phil.

21    BY MR. PARKER:

22             Q.    Kim, do you remember telling me:  "The shot

23    went off and I just kind of turned my head and I heard Chip

24    say something and I looked back up because I didn't know if

25    he had shot himself or shot Chip or what"?

002040

STATE V. GREE..; 5/31/90                                          50

1        A.    Yes.

2        Q.    When the gun fired, did that scare you?

3        A.    Yes.

4        Q.    Now would it be a fair statement to say that

5    the first time you looked at the black male, his face or

6    head or side view, was when he was tying Chip?

7        A.    No, because I wanted -- I just wanted to say a

8    minute ago when he first got up I saw his face, when he was

9    behind Chip, when he first walked around Chip.

10       Q.    How long did you look at him then?

11       A.    About fifteen seconds.

12       Q.    Fifteen seconds is a long time.  We start now.

13                        (PAUSE)

14             That's five seconds.  It's your testimony that

15   you stood fixed on this man for fifteen seconds at that

16   time?

17       A.    Yes.

18       Q.    At that time can you tell me what kind of

19   facial hair he had, if any?

20       A.    I don't think he had any.

21       Q.    You don't know whether he had any?

22       A.    I'm pretty sure he didn't have any.

23       Q.    My question is:  Are you sure or are you not

24   sure?

25       A.    He didn't have any.

002041

1        Q.    Did you ever tell the police that you just

2    don't recall whether he had hair, facial hair, or not?

3        A.    Yes.

4        Q.    Why did you tell the police that and now you

5    tell me you're sure today that he didn't have any?

6        A.    Because I have had time to think about that

7    night.

8        Q.    Have you also had time to talk with the

9    prosecutors about the upcoming suppression hearing?

10       A.    This hearing right here?

11       Q.    Yes, ma'am.

12       A.    Yes.

13       Q.    How many times have you talked with them prior

14   to coming here today and after our deposition?

15       A.    Once.

16       Q.    And where did you talk with them at?

17       A.    The state attorney's office.

18       Q.    Did they explain to you the significance of

19   your testimony in terms of how important your identification

20   was?

21       A.    Yes.

22       Q.    Do you feel a certain amount of pressure now,

23   Kim, that you have to be certain about the identification?

24       A.    Yes.

25       Q.    And do you know that if you are not certain

STATE V. GREEN; 5/31/90                                                52

1   that my client could walk away?

2        A.   Yes.

3        Q.   And you don't want that to happen, do you?

4        A.   No.

5        Q.   When you were in the truck moving from Holder

6   Park to what turned out to be the orange grove, you never

7   looked at his face again during that period of time, did

8   you?

9        A.   No, I had my head down.

10       Q.   And for the period of time while you were at

11  the orange grove, you never looked at his face there either,

12  did you?

13       A.   No, I didn't.  I did when I turned around and

14  looked and saw him shooting like this (indicating).  I saw

15  the side view.

16       Q.   How far away was he from you when you saw that?

17       A.   About to him (indicating).

18       Q.   You were in the truck preparing to drive away?

19       A.   Yes.

20       Q.   Was there any lights on?

21       A.   No.

22       Q.   Would it be a fair statement to say that you

23  couldn't see anything other than a form at that time in the

24  fire or flash from the gun?

25       A.   Yes.

STATE V. GREEN; 5/31/90                                          53

1      Q.    So when we talk about actual identification of

2   this black male, we are talking about a time period for four

3   to five minutes at Holder Park?

4      A.    Yes.

5      Q.    You have never seen my client, Mr. Crosley

6   Green, before April the 3rd, 1989?

7      A.    No.

8      Q.    And would it be a fair statement to say that in

9   person you have never seen Mr. Crosley Green since that

10  time?

11     A.    Yes.

12     Q.    It's a fair statement to say that?

13     A.    I did see him.  I forgot all about it when I

14  was reading the deposition.  I took a tour with my drugs,

15  alcohol and crime class to the jail and I saw him through

16  the glass, but you couldn't really see him.

17     Q.    When did that occur?

18     A.    Last term.  I'm not sure.

19     Q.    Ms. Hallock, you are telling me that prior to

20  our deposition back on February the 13th of 1990 when I

21  asked you specifically the question as to whether or not you

22  have seen my client, Crosley Green, since April 3rd of

23  1989 -- is your testimony here today that that's not true?

24     A.    I had forgotten about going to the jail.

25     Q.    You had forgotten about going to the jail and

002044

STATE V. GREEN; 5/31/90                                      54

1   actually viewing the person who is alleged to have shot your

2   boyfriend?

3        A.   I'm sure it was him, but I didn't say for

4   positive that was the person I saw.

5        Q.   What is your testimony here today?  Who did you

6   see?

7             MR. WILLIAMS:  Objection, Your Honor.

8             THE COURT:  Re-ask the question.

9   BY MR. PARKER:

10       Q.   Who did you see that day?

11       A.   I'm not sure if it was him or not.  It looked

12   like him.

13       Q.   Well, did it look like the man in this picture?

14       A.   Yes, it did.

15       Q.   Was his hair --

16       A.   He looked a little different.

17       Q.   How different?

18       A.   His hair was different and he did have facial

19   hair -- I'm sorry, hair on his face.

20       Q.   Did you also see a photograph of Mr. Green in

21   the newspaper when he was arrested?

22       A.   Yes.

23       Q.   Did you tell the prosecutors that you had seen

24   this person you thought was my client at the jail?

25       A.   I told Christopher White.

002045

1        Q.    When did you tell him that?

2        A.    After I called him.  Before it happened I think

3   I called him and asked him if I could go.

4        Q.    And they gave you permission to go to the jail?

5        A.    They said it's up to me.

6        Q.    And you chose to go?

7        A.    Yes.

8        Q.    And where did you see Mr. Green or this person

9   you thought was Mr. Green?

10       A.    In one of the cells I guess.

11       Q.    Was he with anyone?

12       A.    There was a bunch of them.

13       Q.    How did you pick him out?

14       A.    I was just looking down and it looked like him.

15   I can't say for sure that it was him.

16       Q.    How long did you look at him at the jail?

17       A.    Not for very long.  They didn't have us up

18   there for very long.

19       Q.    Who is they?

20       A.    The teacher.

21       Q.    Who was that?

22       A.    Ms. Baird (phonetic), Barbara Baird.

23       Q.    Now do you recall this person that accosted

24   Chip and you at Holder Park -- describe the shirt he had on,

25   would you please?

002046

```
 1              A.    I wasn't sure about the shirt.  The jacket?

 2              Q.    No, the shirt.

 3              A.    I wasn't sure about the shirt.  I think it

 4    was --

 5              Q.    Did you tell the police he had a dark shirt on?

 6              A.    I said he could have had a dark shirt on.

 7              Q.    You said this was the description you gave the

 8    police (indicating)?

 9              A.    Yes.

10              Q.    And what does it say about dark T-shirt?

11              A.    Possible fatigue type, dark T-shirt.

12              Q.    Take another look at it, clothing.

13              A.    Green jacket.

14              Q.    Okay.

15              A.    Possible fatigue type, dark T-shirt.

16              Q.    Is there a comma after type?

17              A.    I paused after type.

18              Q.    Then there is dark T-shirt?

19              A.    Yes.

20              Q.    It doesn't say possible dark T-shirt, does it?

21              A.    No.

22              Q.    Do you remember testifying at deposition you

23    don't know whether he had a shirt on or not?

24              A.    Yes, I do.

25              Q.    Yes, you do remember testifying to that?
```

002047

1          A.     I said I wasn't sure if he had one on.

2          Q.     And to this day are you sure whether or not he

3    had a T-shirt on at all?

4          A.     I'm not sure he had a T-shirt on at all.

5          Q.     Other than it was a green jacket, possible

6    fatigue type, can you describe whether or not it had any

7    zippers on it?

8          A.     I'm not sure.

9          Q.     Can you tell me whether or not it had any

10   buttons on it?

11         A.     I'm not sure.

12         Q.     Snaps?

13         A.     Not sure.

14         Q.     Large pockets?

15         A.     Yes, I think it had large pockets right here

16   (indicating).

17         Q.     Did it have any patches on it or places where

18   patches went?

19         A.     I'm not sure.

20         Q.     Did you notice any scars or unusual marks on

21   this black man's face?

22         A.     No.

23         Q.     Could he have had a scar?

24         A.     Yes, he could have.

25         Q.     So you don't know whether he had a scar or not?

002048

1       A.    No.

2       Q.    This intelligence bulletin, which has been

3  marked as State's Exhibit 1 and moved into evidence, gives a

4  description of this particular black male you said you saw

5  that night?

6       A.    Yes.

7       Q.    It says:  "Muscular build; short, cropped

8  hair;" is that correct?

9       A.    Yes.

10      Q.    Now what does short, cropped hair mean to you?

11      A.    He said cropped.  I have really no idea what

12 cropped is.  I just kind of meant loose.

13      Q.    The police officer who drew this, you told him

14 that was wrong and he still drew it that way, didn't he?

15      A.    I told him:  "The hair looks funny."  And he

16 did it some more and I just couldn't -- the hair does not

17 look right.

18      Q.    At deposition, Ms. Hallock, didn't you tell us

19 this fellow had a permanent of some type, some ringlets in

20 his hair?

21      A.    Yes.

22      Q.    And he had some afro-sheen or some type of gel

23 in his hair?

24      A.    Yes, it was greasy.

25      Q.    It doesn't say a thing about that on this

002049

STATE V. GREE   5/31/90                                                59

1    description, does it?

2         A.    No.

3         Q.    Why not?

4         A.    I don't know.

5         Q.    The photograph number two that you picked out,

6    there is no ringlets or afro-sheen in that man's hair?

7         A.    No.

8         Q.    That hair is cut very, very short?

9         A.    Yes.

10        Q.    It's cut a whole heck of a lot shorter than it

11   is in the BOLO, wouldn't you say?

12        A.    Yes.

13        Q.    Now you said that they took you to the Brevard

14   County Sheriff's Department and that you looked through a

15   box of photographs I believe?

16        A.    Yes.

17        Q.    And did you sit in a room by yourself and look

18   at these photos?

19        A.    No.

20        Q.    Who was in there with you?

21        A.    Tom Fair.  Some of them walked in and walked

22   out.  I wasn't paying attention to them, but you could hear

23   them walk in behind me.

24        Q.    And how long did it take you to look through

25   these photographs?

002050

1          A.     I would say about an hour.

2          Q.     And they were loose; is that correct?  They

3     were just loose?

4          A.     Yes.

5          Q.     They weren't in this particular form; is that

6     right?

7          A.     No.

8          Q.     Other than this particular what we call

9     photographic line-up, did you look at any other photographic

10    line-ups?

11         A.     No.

12         Q.     This is the only one?

13         A.     Yes.

14         Q.     And you were called, as I understand your

15    testimony, the following --  In other words, this event

16    occurred or terminated somewhere around a little after one

17    a.m. on April the 4th; is that correct?

18         A.     Yes.

19         Q.     And you looked at photos sometime immediately

20    thereafter for a period of time?

21         A.     It was a while after.

22         Q.     Sometime?

23         A.     Yeah, sometime after.

24         Q.     I believe it's your testimony that the next

25    evening, which would have been the 5th, is when they

002051

1   contacted you to come to the sheriff's department?

2       A.   Yes.

3       Q.   And at that point in time you knew that they

4   had a photographic line-up for you to look at?

5       A.   Yes.

6       Q.   Did you know at that time that the sheriff's

7   department had put the suspect in there?

8       A.   No.

9       Q.   When did you find that out?

10       A.   When they put me in the room and sat me down.

11   I didn't know it was photographs.  I just knew it was a

12   line-up.  I didn't know if it was a photograph.

13       Q.   You didn't know if it was a photographic

14   line-up or an actual line-up?

15       A.   Yeah, I didn't know.  I just knew it was a

16   line-up.

17       Q.   In any event, you arrived at the sheriff's

18   department and they told you a suspect was in the line-up?

19       A.   Yes.

20       Q.   Who told you that?

21       A.   I think it was Scotty Nyquist.

22       Q.   So is it a fair statement to say that you knew

23   at that time that the person the police thought did this was

24   in that line-up?

25       A.   Yes.

002052

STATE V. GREE.  5/31/90                                              62

1          Q.    Would it be a fair statement to say that

2    knowing that, you felt an awful lot of pressure to pick

3    somebody?

4          A.    No, I didn't.

5          Q.    You felt no pressure at all to pick somebody?

6          A.    No:

7          Q.    Knowing that person might be in here?

8          A.    No, I did not.

9          Q.    Who all was in the room when they actually

10   showed you the line-up?

11         A.    Tom Fair, Scotty Nyquist and my father.

12         Q.    Are you sure about that?

13         A.    Tom Fair came in -- I'm not sure.  I'm pretty

14   sure about that.  Those were the three that I knew were in

15   there besides me.

16         Q.    If Scotty Nyquist had testified that you were

17   in there alone with Mr. Fair, that would be in error?

18         A.    I'm pretty sure he was in there?

19         Q.    Well, are you sure?

20         A.    I'm sure because he is the one that taped me.

21         Q.    Scotty Nyquist taped you?

22         A.    Yes, he did.

23         Q.    So you're saying Scotty was in there?

24         A.    Yes.

25         Q.    Would you be surprised if he testified under

002053

1    oath that he wasn't in there?

2         A.    Yes, I would be surprised.

3         Q.    Would you be surprised to know that Scotty

4    Nyquist testified under oath that you were in there alone

5    with Tom Fair?

6         A.    He is the one that did the taping.  I could be

7    thinking of the taping of the statement.

8         Q.    Is it possible that you could have come out of

9    the room and then met with Scotty and he held the line-up

10   and that's when he taped you?

11        A.    I'm pretty sure he was in there.

12        Q.    You say you are pretty sure.  Do you know?  Are

13   you certain?

14        A.    I think he was in there.  I think he was.  I'm

15   going to say, yes, he was.

16        Q.    Can you describe this black man's ears that

17   night when you saw him at Holder Park?

18        A.    No.

19        Q.    Why not?

20        A.    Because the hair kind of hung a little bit over

21   them and I really wasn't paying attention to his ears.

22        Q.    Now when they showed you the photographic

23   line-up, how long did you actually look at it?

24        A.    For a few minutes.

25        Q.    How long is a few minutes?

002054

1       A.    Three to four minutes.

2       Q.    And when they showed you the line-up, how long

3  was it before you actually picked somebody in there?

4       A.    Three to four minutes.

5       Q.    And when you picked the person that you picked,

6  what did you tell the law enforcement officers in the room?

7       A.    "I'm pretty sure it was number two."

8       Q.    Those were your exact words?

9       A.    I'm not sure if they were my exact words.

10      Q.    You didn't say, "I'm absolutely positive, a

11  hundred percent," did you?

12      A.    No.

13      Q.    You said "I'm pretty sure"?

14      A.    Yes.

15      Q.    And then they had to ask you again, didn't

16  they, about how certain you were?

17      A.    Yes.

18      Q.    And you said you were pretty positive?

19      A.    And I said:  "I'm sure."

20      Q.    They asked you how many times before you said

21  you were sure that's him?

22      A.    They asked me I think twice.

23      Q.    Could it have been three times?

24      A.    Could have been, yes.

25      Q.    In any event, they asked you a few times before

002055

1   you finally said:  "Yes, I'm positive.  I'm sure;" is that

2   correct?

3         A.    When I said -- they asked me and then finally I

4   said:  "I'm sure," and they asked me to sign the back.

5         Q.    And you did that?

6         A.    And put the time and date and the number.

7         Q.    Now is it at that point in time that either

8   Agent Nyquist or Mr. Fair told you that that was the suspect

9   they had put in there?

10        A.    After I signed it, put the number and dated it,

11  then they told me that was the suspect.

12        Q.    So you knew at that point in time that this is

13  the person that the police thought actually committed this

14  crime?

15        A.    Yes.

16        Q.    And that made you feel better?

17        A.    Yes.

18              THE COURT:  That's a good point to

19        break.  I will see you all here about 1:45.

20        I've got a 1:15 hearing and a 1:30 hearing.

21        It shouldn't take long.

22              (Whereupon, a recess was had in these

23        proceedings.)

24              THE COURT:  I think Ms. Hallock was on

25        the stand.

002056

1              Mr. Parker, I don't think you completed

2       your cross examination.

3              MR. PARKER:  May I proceed, Judge?

4              THE COURT:  Yes, sir.

5    BY MR. PARKER:

6       Q.    Kim, when we finished up we were talking about,

7    correct me if I'm wrong, the police officers telling you

8    after you had viewed the photographic line-up and after they

9    had asked you a few times whether or not you were sure, you

10   finally said:  "Yes, I'm sure number two is it."

11              And the question I put to you next was:  Did

12   you feel better when they told you that was the suspect?

13   And you said yes?

14       A.    Yes.

15       Q.    The reason you felt better, Kim, isn't it

16   because then is when you really knew that's the person that

17   did this?

18       A.    I knew when I saw the picture.

19       Q.    Is that why you said you were pretty sure?

20       A.    By pretty sure I meant I was sure.  It's just a

21   form of how I say it.

22       Q.    I see.  Why did the police have to ask you

23   several times if you were sure?

24              MR. WILLIAMS:  I'm going to object,

25       Your Honor.  That calls her to have to

002057

1          speculate on what the police --

2              THE COURT:  Sustained.

3   BY MR. PARKER:

4      Q.    Why did you feel better when they told you that

5   was him, that was the suspect?

6      A.    I just felt more secure.  I don't know.

7      Q.    You have testified earlier that you believe

8   that this jacket that you testified this black man had on

9   had some pockets on it?

10     A.    Like in the sides.

11     Q.    You remember that?

12     A.    Yes.

13     Q.    Do you recall telling me at the deposition back

14  in February that you didn't recall any pockets?

15     A.    I'm not sure.

16     Q.    You're not sure whether or not you told me back

17  in February?

18     A.    Yeah.

19             MR. PARKER:  Page ninety-seven and

20         ninety-eight, Phil.

21             Page ninety-seven, line twenty-five.

22         On page ninety-eight it will be one through

23         eleven.

24  BY MR. PARKER:

25     Q.    Kim, do you recall me asking you the question:

002058

STATE V. GRE_  , 5/31/90                                          68

1      "Okay.  No zippers or jangly things on the jacket that you

2    can recall?"  And your answer was:  "Not sure."

3              A.    Yes.

4              Q.    "Question:  Big pockets?

5                    "Answer:  Not sure.

6                    "Question:  Snaps?  Anything that sticks out in

7    your mind?

8                    "Answer:  No.  I'm not sure.

9                    "Question:  Do you remember any kind of zipper

10   that was in the collar of the jacket?

11                   "Answer:  I'm not sure.

12                   "Question:  Just don't know?

13                   "Answer:  No."

14                   Do you remember saying that?

15             A.    Yes.

16             Q.    You're not sure whether it had pockets in the

17   jacket; is that correct?

18             A.    Excuse me, I'm sorry?

19             Q.    Did you tell the police that this black man had

20   on some work boots?

21             A.    Yes.

22             Q.    Did you tell them he had on work boots because

23   you were bent over and he was driving and it made a real

24   heavy thud sound?

25             A.    I didn't say they were work boots.  I said they

002059

1   .were something heavy that reminded me of work boots because

2   he walked kind of heavy.

3           Q.   Do you remember at the deposition back in

4   February my question on page ninety-eight, line twelve:

5   "Okay.  What kind of shoes did he have on?

6               "Answer:  Heavy leather like work boots.  Heavy

7   shoes.  A heavy shoe."

8               Do you remember that?

9         A.   Yes.

10          Q.   Did the police try and tell you that they

11  weren't heavy boots or heavy shoes, that they were in fact

12  tennis shoes that this person probably had on?

13          A.   I don't recall.

14          Q.   Do you remember my question back to you in

15  February at the deposition:  "And did the police suggest to

16  you that it might have been a tennis shoe?

17              "Answer:  Yes.

18              "Question:  Okay.  Is that correct?  Was it a

19  tennis shoe?

20              "Answer:  I'm not sure."

21              Do you recall that?

22          A.   Can you repeat that last thing you said?  I'm

23  sorry.

24          Q.   Kim, do you remember the deposition we were at

25  in February?

002060

1      A.    Yes, I do.

2      Q.    Do you remember the question that I put to you:

3    "And did the police suggest to you that it might have been a

4    tennis shoe?"  Do you remember that question?

5           Would you like me to show it to you?

6           MR: PARKER:  May I approach, Judge?

7           THE COURT:  Any objection?

8           MR. WILLIAMS:  No objection.

9    BY MR. PARKER:

10     Q.    (Indicating).

11     A.    Okay.

12     Q.    Did you say that?

13     A.    Yes, I did.

14     Q.    And when I asked you:  "Okay.  Is that correct?

15   Was it a tennis shoe?", you answered "I'm not sure."

16     A.    Yes.

17     Q.    So you're not sure whether it was a work boot

18   or a tennis shoe?

19     A.    Right.

20     Q.    Right, now you're not sure?

21     A.    Right.

22     Q.    When you looked at this individual, the time

23   that you looked at his face, how would you describe his

24   nose?

25     A.    Wide.

002061

STATE V. GRE1  .5/31/90                                              71

1          Q.    Did you tell the police that?

2          A.    I think so.

3          Q.    And how did you describe his lips?

4          A.    Kind of, kind of -- I'm not sure how I

5    described it to him.

6          Q.    How were his lips?

7          A.    They were --

8          Q.    Just how.

9          A.    Kind of not great big.  They were average, a

10   little bit big.  I'm not talking great big.

11         Q.    Was there anything unusual about his lips?

12         A.    Not that I recall, no.

13         Q.    Kim, did you and Chip have any black friends,

14   close acquaintances?

15         A.    Not close, no.  I knew black people.

16         Q.    Would you occasionally socialize with

17   particular black people?

18         A.    Yes.

19         Q.    Go to parties?

20         A.    No.

21         Q.    You never went to a party with, say, a black

22   boy or a black girl?

23         A.    No.

24         Q.    Did you ever have black people into your house?

25         A.    A long time ago.

002062

STATE V. GREI    5/31/90                                          72

1          Q.    How old were you then?

2          A.    Had to be -- I'd say seven.

3          Q.    Seven years of age?

4          A.    Yeah, maybe a little younger or older.  I'm not

5     quite sure.

6          Q.    How old are you now?

7          A.    I'm twenty.

8          Q.    How about his eyes?  Describe his eyes to us?

9          A.    They had -- they were --

10         Q.    Do you recall how you described his eyes to Mr.

11    West?

12         A.    As being -- his face and stuff and eyes being

13    like he had kind of like a mean look to his face.

14         Q.    But the eyes, did you describe them as big,

15    small, squinty, brown, green?

16         A.    Kind of just average.  Not wide-open.  Not shut

17    real closed.

18         Q.    When you looked at him, Kim, it was dark out.

19    It was pitch dark out, wasn't it?

20         A.    It wasn't -- I don't think it was pitch dark

21    out.

22         Q.    It was 11:30 at night?

23         A.    I counted money in the dark.

24         Q.    You turned back into the truck to do that,

25    didn't you?

002063

STATE V. GREI    5/31/90                                      73

1        A.    No, I did not.

2        Q.    Are you sure?

3        A.    I'm positive.

4        Q.    When we talked at the deposition I asked you

5   that same question how it was you counted the money; isn't

6   that correct?

7        A.    Yes.

8        Q.    And you said that they handed you the wallet

9   and that you turned so the light from the truck --

10       A.    I turned towards the back end of the truck.

11       Q.    Why did you do that?

12       A.    I just turned this way (indicating) and set the

13  wallet on the truck and took the money out and counted it.

14       Q.    Hold it up close looking at it down?

15       A.    Just like this (indicating).

16       Q.    Was there anything unusual about this man's

17  teeth?  The fact is you didn't even notice his teeth?  Isn't

18  that what you told us before?

19       A.    Yes.

20       Q.    This person who had a mean look, you don't know

21  whether he had braces, gold teeth, silver teeth, whether he

22  had any teeth at all?

23       A.    I didn't really look at his teeth, no.

24       Q.    You didn't really look at his teeth.  If you

25  didn't really look at his teeth, you probably really didn't

002064

STATE V. GREF    5/31/90                                          74

1   look at his mouth, did you?

2        A.   I saw his face.

3        Q.   Did you look at his mouth?

4        A.   Yes.

5        Q.   How about his eyebrows, Kim?  Can you describe

6   them to us please?

7        A.   Kind of full.

8        Q.   Kind of full?  What do you mean?

9        A.   Kind of --

10       Q.   Bushy?

11       A.   Not real bushy but full.

12       Q.   Was he dark complected?  Light complected?

13   Medium complected?

14       A.   Dark.

15       Q.   You told the police that he had afro-sheen in

16   his hair?

17       A.   Something to that effect.  Like greasy.

18       Q.   And that his hair was curled like a permanent?

19       A.   Yeah.

20       Q.   Do you know why that didn't find its way into

21   the intelligence bulletin?

22       A.   No, I don't.

23       Q.   You said earlier that you couldn't describe his

24   ears although you looked right at the side of his head at

25   one point in time, and you said you couldn't describe the

                                                        002065

STATE V. GRE˙   5/31/90                                                  75

1   ears because the hair --

2          A.    Was kind of -- it wasn't long.

3          Q.    Did it cover his ears?

4          A.    Part of it.

5          Q.    Is the hair covering any of the ears on the be

6   on the lookout bulletin?

7          A.    No.

8          Q.    Was the hair covering the ears in number two

9   that you picked out for the police?

10         A.    No.

11         Q.    I want to show you what's been marked as

12  Defendant's Exhibit 1 for identification purposes.

13                THE CLERK:  It's D.

14  BY MR. PARKER:

15         Q.    Defendant's Exhibit D for identification

16  purposes.  Have you ever seen that guy before?

17         A.    Nope.

18         Q.    Would you say that fellow has greasy skin?

19         A.    Yes.

20         Q.    Would you say that fellow has curls and grease

21  in his hair?

22         A.    Yes.

23         Q.    And a permanent-like hairdo?

24         A.    Yes.

25         Q.    Would you say that fellow has a wide nose?

002066

STATE V. GRE    5/31/90                                            76

1           A.    Yes.

2           Q.    Would you say that fellow, the hair comes over

3     the ears?

4           A.    Yes.

5           Q.    Would you say that fellow looked mean?

6           A.    Yes.

7                 THE COURT:  Let me see that.

8                 MR. PARKER:  (Hands Exhibit D.)

9     BY MR. PARKER:

10          Q.    You have never seen that man before?

11          A.    No.

12          Q.    Are you sure?

13          A.    I'm sure.

14          Q.    Let me show you what's been marked as

15    Defendant's Exhibit C for identification purposes.  Do you

16    recognize that photograph of that individual?

17          A.    No.

18          Q.    Would you say that person has a wide nose?

19          A.    Yes.

20          Q.    Would you say he has a mean look?

21          A.    Yes.

22          Q.    Did you look at any of these photographs that I

23    just showed you -- Kim, are you okay with the coughing and

24    all?  Do you want to take a break?

25          A.    No, I just have a cold.  I could have seen him

1    that night going through the pictures.

2         Q.    Do you remember seeing him that night going

3    through the pictures?

4         A.    I went through a lot of pictures.

5         Q.    About eighty you said?

6         A.    Yes.

7         Q.    Did you ever stop going through those

8    photographs and look at one and take your time with it?

9         A.    Yes, I did.

10         Q.    And would you pull one aside and say:  "That

11    nose looks pretty similar to me"?

12         A.    Yes.

13         Q.    Would you like some water?

14         A.    He got me some.

15         Q.    While you were looking at the photographs in

16    the box, was anybody in there looking over your shoulder?

17         A.    In the -- no, he was just sitting there and

18    they were telling me to take my time.

19         Q.    Did anybody tell you the suspect was in that

20    box of photographs?

21         A.    The box that they brought out that night?

22         Q.    Yes, ma'am.

23         A.    No.

24         Q.    The only time you were ever told that the

25    suspect was in there was when they showed you the

002068

STATE V. GREEN, 5/31/90                                    78

1    photographic line-up isn't that correct?

2              A.    Yes.

3                    THE COURT:  That was after you made the

4         identification, though, wasn't it?

5                    THE WITNESS:  No.  They told me before

6         that they had a suspect.

7                    THE COURT:  That they had a suspect?

8                    THE WITNESS:  Yes.

9                    THE COURT:  Did they tell you the

10        suspect was one of the people in the

11        photographic line-up before you picked out

12        number two?

13                   THE WITNESS:  They may have.

14                   MR. PARKER:  I believe my question to

15        her earlier was:  Did they tell you the

16        suspect was in there?  And she answered yes.

17                   THE COURT:  They did?  It was my

18        understanding it was after the identification

19        had been made.

20                   MR. PARKER:  No, sir.

21                   THE COURT:  She just said something

22        different.

23   BY MR. PARKER:

24              Q.    They told you that before you looked at the

25        line-up, didn't they?

002069

1      A.    Yes.

2      Q.    And my questions to you previously were:  So
3   when you looked at that photographic line-up, you knew the
4   guy probably was in there, didn't you?

5      A.    Yes.

6      Q.    And Mr. Fair was there or Mr. Nyquist or
7   whoever was there, and they were looking at you and you felt
8   pressured to pick the guy, didn't you?

9      A.    No, I did not feel pressured.

10     Q.    Not at all?

11     A.    I did not feel pressured.

12     Q.    Why did you feel better when they told you that
13  was him after you picked number two?

14     A.    Because I just felt a lot better.

15     Q.    Isn't it true, Kim, you felt a lot better
16  because now you knew that you picked the right one and they
17  told you it was the right one?

18     A.    No, I knew who it was when I saw him.

19     Q.    Kim, you didn't tell the police that, did you?
20  You said:  "I'm pretty sure."  It took you -- two or three
21  times you said:  "I'm pretty sure."

22            MR. WILLIAMS:  I'm going to object.

23       That's been asked and answered three times.

24            THE COURT:  Sustained.

25            MR. PARKER:  May I have just a moment?

002070

STATE V. GREEN, 5/31/90                                          80

1           THE COURT:  Yes, sir.

2                       (PAUSE)

3           THE COURT:  Do you remember what they

4      told you about the suspect before you looked

5      at the line-up?

6           THE WITNESS:  Before they got me in the

7      room?

8           THE COURT:  Well, when they told you

9      they had a picture of the suspect, exactly

10     what was said, if you remember?

11          THE WITNESS:  That they have one for me

12     to look at.  They have a suspect.  I'm pretty

13     sure they said within the line-up.

14   BY MR. PARKER:

15          Q.   Getting back to your earlier testimony, when

16   the black male had Chip on the ground, you said that was one

17   of the times you got to look at the black male and you got

18   to look at the side of his head that time?

19          A.   Um-hum.

20          Q.   And I believe you said -- well, tell me how

21   long did you actually look at the black male during that

22   period?

23          A.   When he was tying him up?

24          Q.   Yes, ma'am.

25          A.   About ten, fifteen seconds.

002071