# Exhibit 18-B

1      Q.      Is that the time when you were looking at Chip,

2   the gun, the black male, Chip, the gun, the black male?

3      A.      Yes.

4      Q.      So would it be fair to say your attention

5   wasn't concentrated on the black male, but as it was you

6   were focusing on the whole picture?

7      A.      Yes.

8      Q.      So ten to fifteen seconds there.  And the only

9   other time you looked at his face was when you were out of

10  the truck?

11     A.      Yes.

12     Q.      When you went to the jail, you testified that

13  you called the state attorney's office and talked with Mr.

14  White I believe; is that correct?

15     A.      Yes.

16     Q.      How do you know it was Mr. White you spoke

17  with?

18     A.      Because I called and asked for him.

19     Q.      And did he get on the phone and identify

20  himself as Chris White?

21     A.      Yes, he did.

22     Q.      And you told Mr. White that you were going on

23  this field trip to the county jail?

24     A.      Yes.

25     Q.      And you specifically asked him whether or not

002072

1   he thought it was wise or he approved of you going?

2        A.    Yes, I did.

3        Q.    And was the point of that conversation because

4   you knew you could possibly come into contact with the

5   accused in this case?

6        A.    Yes.

7        Q.    And it's your testimony, as I understand it,

8   that after you told Mr. White this, that his reaction was

9   whatever you want to do basically?

10       A.    It was up to me if I wanted to do that or not.

11       Q.    And that you did go and that you did see

12  somebody you recognized to be the defendant in this case?

13       A.    Yes.  I can't say for sure it was him, though.

14       Q.    The state's going to ask you what color clothes

15  he had on when you saw him.  Was it red?

16       A.    Yes.

17            MR. PARKER:  No further questions, Your

18       Honor.

19                    REDIRECT EXAMINATION

20  BY MR. WILLIAMS:

21       Q.    Kim, when you went to the jail that time, you

22  say you looked through a window?

23       A.    Um-hum.

24       Q.    Was it a big like glass partition?

25       A.    Yes.

002073

STATE V. GREL , 5/31/90                                        83

1        Q.    How many people were in there with the person

2   whom you think was the same fellow you saw?

3        A.    Around four or five.  Around four or five.

4        Q.    Now those two pictures Mr. Parker showed you,

5   Defendant's D for identification --

6             MR. WILLIAMS:  May I approach?

7             THE COURT:  Before you do, the clerk

8        mismarked them with the wrong colored tags

9        and she wants to correct that.

10            MR. WILLIAMS:  Defense, what, A and B?

11            THE CLERK:  Yes.

12            MR. WILLIAMS:  Your Honor, for the

13       record, since the witness did not say she

14       recognized either one, then it doesn't matter

15       that I call B what previously was D or A or

16       anything like that?

17            THE COURT:  That's right.

18            THE CLERK:  I marked them C and D.  Now

19       it's A and B.

20            THE COURT:  Just so the record is

21       clear, why don't you describe the change?

22            THE CLERK:  What was previously marked

23       Exhibit C, now it's Defense Exhibit A; and

24       previously marked Defense D is Defense B.

25            MR. WILLIAMS:  A was C, and B was D.

002074

1              THE CLERK:  Right.  Sorry.

2    BY MR. WILLIAMS:

3         Q.   Let me show you what's now Defendant's B.  You

4    just said that the hair is curly and long and kind of

5    greasy; is that right?

6         A.   Yes.

7         Q.   What's different in that hair than is different

8    on the person's you saw that night?

9         A.   Not a whole lot.  It's about the same.

10        Q.   And this hair here?

11        A.   The hair is not right.  That's like dry.

12        Q.   Kim, you testified to Mr. Parker when you

13   looked at the line-up you knew when you saw the picture; is

14   that right?

15        A.   Yes.

16        Q.   Of the features in this picture -- the record

17   should reflect I'm showing her the line-up, State's 2 in

18   evidence -- what are the points of concentration when you

19   knew that was the man you saw that night?

20        A.   His nose, how like the complexion -- how dark

21   and his eyes.

22        Q.   So would it be fair to say that you made your

23   identification based upon his face?

24        A.   Yes.

25        Q.   Take a look at me and take a look at Mr.

002075

1    Parker.  Would you agree with me we have the same color

2    hair?  Close?

3              A.    Yes, close.

4              Q.    Would you agree that unlike most men we part

5    our hair on the right side and comb it to the left; is that

6    right?

7              A.    Yes.

8              Q.    We are approximately, without you knowing, the

9    same age, same generation wouldn't you say?

10             MR. PARKER:  Speak for yourself.

11             THE WITNESS:  Yes.

12   BY MR. WILLIAMS:

13             Q.    Can you tell us apart?

14             A.    Yes.

15             MR. WILLIAMS:  I don't have anything

16        further.

17                        RECROSS EXAMINATION

18   BY MR. PARKER:

19             Q.    Kim, you didn't see us at 11:30 at night

20   without a moon or a sun, scared to death, under the

21   influence of narcotics, did you?

22             A.    No.

23             MR. PARKER:  No further questions.

24             THE COURT:  You may step down, ma'am.

25             Who is your next witness?

002076

STATE V. GREE. , 5/31/90                                          86

1               MR. WILLIAMS:  Mr. Hallock.

2    WHEREUPON:

3                    ROBERT HALLOCK,

4    a witness herein, having previously been duly sworn,

5    testified upon his oath as follows:

6               THE COURT:  What is your full name,

7         sir?

8               THE WITNESS:  Robert George Hallock.

9                    DIRECT EXAMINATION

10   BY MR. WILLIAMS:

11        Q.    Mr. Hallock, are you Kim Hallock's father?

12        A.    That's true.

13        Q.    Were you present at the sheriff's office when

14   she was presented with a six-person photo line-up?

15        A.    That's correct.

16        Q.    What, if anything, did you discuss with her

17   prior to her being shown the photo line-up?

18        A.    Okay.  On the way down to the sheriff's office,

19   I told her to be very sure of who she identified.  If she

20   knew it was him, then to identify him.  But only identify

21   him if she knew who it was.  Just words to that extent.

22        Q.    Were you taken aside and talked to by the

23   sheriff's department individually prior to her going in to

24   identify him or did you go in the room first or exactly

25   how --

002077

STATE V. GREE..., 5/31/90                                           87

1          A.    Well, I think they took me to the side and kind

2    of explained to me what the procedure was going to be and

3    how nervous she would be and said I think she would feel

4    better if I was there.

5                And I think they asked her and she said she

6    would.  So they asked me to accompany her in there.

7          Q.    And did you?

8          A.    Yes, I did.

9          Q.    Did you have any conversation with her between

10   that point in time and her looking at the photographs?

11         A.    No, sir, not really.

12         Q.    Did you see the deputy hand her the

13   photographic line-up?

14         A.    I may be wrong on the names, but I think it was

15   Scotty at the time had the pictures and explained to her

16   that he was going to turn them over in a minute and they

17   thought that the suspect that had committed the crime was on

18   the other side and for her to take her time and see if she

19   could identify him.

20               And they just told her to relax a minute and

21   then they handed her the picture line-up.

22         Q.    And were you there when she did indicate one of

23   the persons as being the perpetrator?

24         A.    Yes.

25         Q.    Did you observe her while she was making that

002078

1   decision?

2          A.    Yes.

3          Q.    Tell us what you observed?

4          A.    What I observed is she turned over the

5   pictures -- they handed her so many pictures.  I don't know

6   how many was on there at the time myself.  I believe there

7   were six.

8                She looked at all of them and said that it's

9   number two or number three -- whatever number it was.  I

10  can't really testify which number it was at the time.

11               And then the one on the right of me, which was

12  the other detective with the curly head, I think it's Tom,

13  said: "Are you sure?"  And she said: "Yes."  And he said:

14  "Good because that's the one we suspected as doing it."

15         Q.    That's basically --

16         A.    Basically it.

17         Q.    That's all you did in this whole case, is it

18  not -- I mean as far as the line-up is concerned?

19         A.    As far as the line-up, yes, sir.

20               MR. WILLIAMS:  I have nothing further,

21  Your Honor.

22                         CROSS EXAMINATION

23  BY MR. PARKER:

24         Q.    Mr. Hallock, do you recall whether or not there

25  was a tape recorder going at the time?

STATE V. GREL , 5/31/90                                                89

1          A.    Now I don't recall.

2          Q.    Are you certain of the people who were in the

3    room at the time she looked at the photographic line-up?

4          A.    Yeah, I would say I could identify them.

5    Certainly could.

6          Q.    How long were you actually in the room with her

7    before she picked one out?

8          A.    That's hard to say.  I would say a minute or

9    two.  No more.

10         Q.    Would it surprise you if your daughter said

11   three to four minutes?

12         A.    No, it don't surprise me.  In the shape she was

13   in, no.

14         Q.    So she was not in good shape?

15         A.    What do you mean by not in good shape?

16         Q.    Well, they were your words.

17         A.    Well, what I would say is she was in the trauma

18   of what happened.

19         Q.    Upset?

20         A.    Rightfully so.

21         Q.    Scared?

22         A.    I don't think it was.  Scared was not involved

23   there.

24         Q.    Everybody get real quiet when they handed her

25   the line up?

002080

1      A.    Yes, nobody said nothing.  They handed it to

2    her and asked her to identify him.

3           Q.    Everybody was looking at her?

4           A.    I can't testify for those people.  I was

5    looking at her.

6           Q.    Would you say it was a pretty pressure-packed

7    moment?

8           A.    No, I wouldn't say so.

9           Q.    Everybody was just at ease?

10          A.    Well, no.  I wouldn't say it was

11   pressure-packed though.

12          Q.    Did you believe that the person that did this

13   was in that line-up?

14          A.    Well, I figured they must have had some facts

15   to point to this or they wouldn't have had it.

16          Q.    They wouldn't have told you the suspect was in

17   there?

18          A.    They suspected the suspect was there.

19          Q.    Would it surprise you if you knew that your

20   daughter said that they actually told her the suspect was in

21   there?

22          A.    Who they suspected, yes.  Okay.

23          Q.    And would it surprise you that she believed the

24   person was in there?

25          A.    Oh, I don't know what was on her mind.  I can't

1   read a person's mind.

2       Q.   I'm saying you were both there.  There could be

3   two interpretations of what occurred; is that correct?

4       A.   You mean in my mind?

5       Q.   Yes, sir.

6       A.   No two interpretations in my mind.

7       Q.   Kim testified that she said:  "I'm pretty sure

8   that's the one."  Were those her exact words?

9       A.   That I can't say.  I can't really say one way

10  or the other on that.

11      Q.   She also testified she was asked again and she

12  said:  "I'm pretty sure that's him".

13      A.   No, no.  She said:  "Yes, that's him."

14      Q.   And then she said she was asked a third time

15  "Are you sure?" and that's when she said:  "Yeah, I'm sure."

16      A.   I don't remember a third time.  I remember a

17  second time and that was all, and that was done by the

18  officer on the right of me, which was Tom.

19      Q.   Mr. Hallock, were you upset yourself?

20      A.   Well, rightfully so.

21      Q.   I'm not questioning that a bit, sir.  I'm just

22  asking you the question if you were upset?

23      A.   Yes.

24      Q.   Were you mad?

25      A.   I think anybody in that position would be a

002082

1    little irate.

2            Q.    I understand that.  Mr. Hallock, were you mad

3    though?

4            A.    At what though, sir?

5            Q.    Well, somebody had just allegedly kidnapped

6    your daughter --

7            A.    That's correct.  I was mad over that.

8            Q.    Killed Mr. Flynn.  Were you angry over that?

9            A.    Yes, I was.

10           Q.    Do you know Mr. Crosley Green, Mr. Hallock?

11           A.    No, sir.

12           Q.    Have you ever seen him before?

13           A.    No, sir, not to my knowledge.  Now I may have

14   seen the man.

15           Q.    How about the newspaper?  Did you look at his

16   photograph in the newspaper?

17           A.    Yeah, afterwards I believe I did.

18           Q.    Did Kim look at it in the newspaper?

19           A.    I can't speak for what she did.

20           Q.    Were you ever present when she had the paper

21   and you all discussed the picture in the paper?

22           A.    Well, no.  Really she didn't discuss it that

23   much with me and her mother.  Really she didn't.

24           Q.    Mr. Hallock --

25           A.    Her girlfriend.

STATE V. GREL. , 5/31/90                                                     93

1          Q.    I'm sorry, I didn't mean to interrupt you.  My

2     question was:  Do you remember when the photograph came out

3     in the paper, the actual photograph of Mr. Green?

4          A.    Yeah.

5          Q.    Do you ever remember sitting around the house

6     when the paper came out watching Kim read the paper and

7     looking at the photograph?

8          A.    Kim read all the articles.  I know that.

9          Q.    Were you there when that happened?

10         A.    No, it was usually with her mother.

11         Q.    Did she ever say the picture in the paper looks

12    different than the person she picked out?

13         A.    Not to me, no, sir.

14         Q.    You paused.  Did you ever even think --

15         A.    I think before I answer.

16         Q.    Okay.  That's fine.

17               Mr. Hallock, do you have any close black

18    friends that you invite into the home in a fairly often

19    manner?

20         A.    I have black friends that do come -- not very

21    often -- to the house, yes, okay.

22               MR. PARKER:  Thank you, sir.  I have no

23         further questions.

24               MR. WILLIAMS:  No, more questions.

25               THE COURT:  You may step down, sir.

                                                         002084

```
 1              MR. WILLIAMS:  I would call Tom Fair.
 2   WHEREUPON:
 3                    THOMAS FAIR,
 4   a witness herein, having previously been duly sworn,
 5   testified upon his oath as follows:
 6              THE COURT:  Sir, what is your full
 7        name?
 8              THE WITNESS:  Thomas Michael Fair,
 9        spelling F-a-i-r.
10              THE COURT:  You may inquire.
11                    DIRECT EXAMINATION
12   BY MR. WILLIAMS:
13        Q.    Agent Fair, you are employed with the Brevard
14   County Sheriff's Department homicide division; is that
15   right?
16        A.    That's correct.
17        Q.    You were so employed on the 3rd of April, 1989;
18   is that right?
19        A.    That's correct.
20        Q.    The investigation into the death of Chip Flynn
21   and suspect, Crosley Green -- when was your initial
22   involvement in that case?
23        A.    It would have been early in the morning of that
24   date when I was notified of the incident.
25        Q.    I want to move forward from your preliminary
```

002085

1    investigation and direct your attention to when you met with

2    Kim Hallock at the sheriff's department later on in the

3    morning and there were some photographs, loose photographs,

4    shown to her.

5            Do you remember that incident?

6        A.    Yes, sir.

7        Q.    Tell us how she came to view those photographs.

8        A.    Upon completion of the initial interview of Ms.

9    Hallock by Agent Nyquist and she was attempting of course to

10   describe the assailant, we gathered up a series of

11   photographs of black males of no specific physical

12   characteristics, just everything we had on black males, and

13   they numbered approximately sixty-eight as I recall --

14   sixty-three or sixty-eight.  They were lots.

15           I began showing them to Ms. Hallock, who was

16   seated across the table from me, just peeling them off one

17   at a time.  She went through the entire series of

18   photographs that we had in our intelligence files without

19   making an identification.

20           She was able to on two or three photographs

21   pull them aside and qualifying that the individual as

22   depicted in those photographs was not her assailant but that

23   her assailant would have eyes such as this individual, a

24   chin such as this individual, or ears or hair such as this

25   individual to give us some semblance of example of the

002086

1    individual that she was trying to describe.

2              This was done immediately prior to her

3    constructing a ·sketch utilizing our sketch artist.

4         Q.    Did she provide you with a physical description

5    in addition to the facial description?

6         A.    Yes, sir, in general terms.

7         Q.    Height?  Weight?  Approximate age?

8         A.    Yes, sir.

9       · Q.    Later on the next day -- after the completion

10   of the composite sketch, that concluded the business with

11   Ms. Hallock on that morning I believe?

12        A.    My particular involvement with her, yes, sir.

13        Q.    The next time you became involved with her for

14   the photo line-up -- let me ask you first:  Were you

15   involved in a photo line-up?

16        A.    Yes, sir, I was.

17        Q.    Tell us how that came about?

18        A.    Well, essentially information had been

19   developed through use of the physical description as

20   provided to us through our homicide agents, through our road

21   deputies, through our CID personnel and other contacts.

22              Information had also been developed through the

23   sketch that was done of the possibility of the involvement

24   of an individual by the name of Crosley Green.

25              We attempted to locate in our archives a

00208'/

STATE V. GREE ; 5/31/90                                            97

1    current photograph of Crosley Green and we were not

2    successful.

3              We contacted the Department of Corrections I

4    believe at Lake Butler and I dispatched Agent Nyquist to fly

5    to Lake Butler to obtain their most recent photograph to be

6    included in a photographic line-up.

7              And of course that photograph line-up was

8    constructed containing the suspect's photograph and it was

9    shown to Ms. Hallock by myself.

10             Q.    Is this the photograph line-up which is marked

11   as State's 2 for identification?

12             A.    Yes, sir, it is.

13             Q.    You know that because?

14             A.    My initials, the date and time are inscribed on

15   the back.

16             Q.    So this photograph in number two, is that of

17   Crosley Green?

18             A.    That's correct, sir.

19             Q.    That photograph was obtained from records at

20   the Department of Corrections?

21             A.    At Lake Butler.

22             Q.    Would it be safe to say it was taken sometime

23   prior to the 3rd of April 1989?

24             A.    That's correct.

25             Q.    Do you know or did your investigation disclose

002088

STATE V. GREE   ·5/31/90                                    98

1   when Mr. Green was released from Department of Corrections?

2        A.   I cannot be date certain.  It was within six

3   weeks of the incident.

4        Q.   So that picture could be -- it's older than six

5   weeks but at the time the exact date of that picture is

6   really unknown to you?

7        A.   That's correct.  It's unknown to me.

8        Q.   Were you there when the line-up was presented

9   to Ms. Hallock?

10       A.   Yes, sir, I presented it to her.

11       Q.   Tell us how that occurred.

12       A.   Well, essentially Ms. Hallock was invited back

13  to one of our interview rooms.  It was on the 5th of April,

14  '89 during the mid-evening hours.

15            Her father was present in the room with her,

16  although he was not in a position to immediately look at the

17  photographic line-up himself and he had been instructed not

18  to speak or interfere in the process that was about to

19  occur.

20            Essentially I informed Ms. Hallock that I had a

21  photographic line-up comprised of six negro males of similar

22  physical features and that the photographic line-up may or

23  may not contain the individual who had been involved in the

24  crimes that was the reason that we were present.

25            She was to tell me whether or not she

002089

1    recognized the person in the photographic line-up.  She was

2    instructed to review all of the photographs; and if she in

3    fact could make an identification, merely to tell me the

4    number of the person depicted.

5           And if the person was not there, she was

6    instructed to tell me simply:  "He is not here."

7           At that point in time I presented her with the

8    photographic line-up.  I observed her.  She appeared to be

9    looking at all of the photographs.  And she indicated within

10   a very short period of time that number two was the

11   individual who was responsible for the crimes against

12   herself and Mr. Flynn.

13          Q.   Did you ask her a second time to be sure or

14   take another look or words to that effect?  Did you inquire

15   as to her identification?

16          A.   I asked her if she was certain and I received

17   the indication from her she was positively certain that the

18   person depicted in position number two was in fact the

19   killer of Chip Flynn.

20          Q.   Did you then have her do anything in reference

21   to that line-up?

22          A.   At that point in time I excused myself.  She

23   remained in the interview room.

24          I informed my immediate supervisor, another

25   agent.  So there was a lot of hustle and bustle going on at

()02090

STATE V. GREE   ·5/31/90                                    100

1    ·that time.

2              I instructed Agent Nyquist to follow up the

3    identification with a formal taped interview, which he did.

4         Q.   So he re-presented the line-up to her?

5         A.   That's correct.

6         Q.   Were there other officers or Nyquist in and

7    around the room at the time the identification was made?

8         A.   Well, during the actual period of time the only

9    persons in the interview room would be Ms. Hallock, Ms.

10   Hallock's father and myself.

11             Within the confines of our homicide offices,

12   yes, there were a lot of agents around.

13             MR. WILLIAMS:  I don't have anything

14        further at this time.

15                     CROSS EXAMINATION

16   BY MR. PARKER:

17        Q.   Agent Fair, you actually conducted the actual

18   display, the administration of the photographic line-up to

19   Ms. Hallock; is that correct?

20        A.   Yes, sir.

21        Q.   Are you certain that you did?

22        A.   Yes, sir.

23        Q.   Do you remember our discussions back during the

24   deposition that we had back on February the 12th, 1990?

25        A.   I remember our deposition, yes, sir.

002091

STATE V. GREi   5/31/90                                          101

1          Q.    Do you remember me asking you that question

2    about what your participation was in the photographic

3    line-up that was administered to Ms. Hallock?

4          A.    Not specifically.

5                MR. PARKER:  If I may approach?

6                MR. WILLIAMS:  No objection.

7    BY MR. PARKER:

8          Q.    Starting with line seventeen, page eight?

9          A.    All right, sir.  Should I read it?

10         Q.    Just refresh your memory if you would.

11         A.    Yes, sir.

12         Q.    Does that refresh your memory?

13         A.    Yes, sir.

14         Q.    Agent Fair, did you tell me at that time that

15   you were involved very lightly in the identification of the

16   suspect from the photographic line-up?

17         A.    Yes, sir.

18         Q.    And that the item was then preserved by Agent

19   Nyquist?

20         A.    Yes, sir.

21         Q.    Actually your recollection now is that you

22   actually performed that photographic line-up?

23         A.    Yes, sir.  That's correct.  I did not take the

24   statement from Ms. Hallock.

25         Q.    Did you put the line-up together?

                                                        002092

1        A.    No, sir, I did not.

2        Q.    Did you supervise the officer that put the

3   line-up together?

4        A.    I saw the line-up once it was constructed prior

5   to delivery to the witness.

6        Q.    Did you make any suggestions to your lead

7   investigator, Agent Nyquist, about maybe how the line-up

8   could be put together better?

9        A.    I had some concern about the skin tone of the

10  suspect's photograph.

11       Q.    In number two?

12       A.    That's correct.

13       Q.    Did you voice that concern to Agent Nyquist?

14       A.    Yes, sir.  In fact this was not the first

15  structured line-up.  We included darker skinned black males

16  in it and this is the best that we could come up with from

17  what our archives had to produce.

18       Q.    So how long have you been an agent in the

19  sheriff's office?

20       A.    I'm in my sixteenth year.

21       Q.    You've been doing this a long time?

22       A.    Yes, sir.

23       Q.    You've put together a lot of line-ups?

24       A.    Yes, sir.

25       Q.    You understand the law on line-ups?

002093

Case 6:14-cv-00330-RBD-GJK   Document 3-20   Filed 02/27/14   Page 24 of 82 PageID 738

1    A.    Yes, sir.

2    Q.    And your advice to Agent Nyquist was that -- or

3  at least you alerted Agent Nyquist that the skin tone in

4  number two, the suspect that was placed on the top row in

5  the middle, was a bit darker than the rest of them?

6    A.    In, the first line-up.

7    Q.    You had concerns about that?

8    A.    In the first line.

9    Q.    Did you express any concerns about this one?

10   A.    No, sir.

11   Q.    You are of the opinion this was just fine?

12   A.    Yes, sir.

13   Q.    Did you preserve the first line-up?

14   A.    No, sir, we did not.

15   Q.    How come?

16   A.    Simply because we had constructed a

17  photographic line-up.  It was presented to me for some type

18  of review.  I suggested the corrections that I have just

19  described to you.  One or two pictures were taken out and

20  darker toned or darker skinned black males were inserted and

21  we used that.

22        I saw no need to preserve it.

23   Q.    Did you show Ms. Hallock any other line-ups?

24   A.    I showed her a gross amount of approximately

25  sixty-three to sixty-eight general photographs of negro

STATE V. GREE    5/31/90                                          104

1    males.

2         Q.    I'm talking about actual line-ups put together

3    in a similar fashion in a folder?

4         A.    No, sir.

5         Q.    You reduced the number of photographs for

6    viewing?

7         A.    No, sir.

8         Q.    Do you know if she reviewed any other

9    photographic line-ups other than this one?

10        A.    No, sir, I do not.

11        Q.    Agent Fair, who all was in the room when you

12   showed the line-up to Ms. Hallock?

13        A.    There was Ms. Hallock, her father and myself.

14        Q.    Are you sure about that?

15        A.    That is my best recollection at this moment.

16        Q.    Could you be mistaken?

17        A.    I don't think so.

18        Q.    Was Agent Nyquist in the area?  You said there

19   was a lot of hustle and bustle going on.  Was Agent Nyquist

20   in the area with you?

21        A.    Yes, sir, he was.

22        Q.    Was he in the room with you?

23        A.    I don't believe so.  I think he was outside,

24   perhaps in the inspector's office or my office.

25        Q.    Was he the lead investigator on --

STATE V. GREE    5/31/90                                      105

1          A.    He was the case agent.

2          Q.    Does that mean he is the lead investigator?  He

3    is the one running the show under your --

4          A.    That means he is responsible for the

5    maintenance of the case file, the organization of the

6    investigative effort per se.

7          Q.    Who actually was in charge of the

8    investigation, Agent Fair?  Would that be you?

9          A.    Yes, sir.

10         Q.    Buck stop with you?

11         A.    Pretty much.

12         Q.    Would it surprise you to know that Agent

13   Nyquist testified under oath at deposition back on the 5th

14   day of March that you were the only one in the room with Ms.

15   Hallock and that you were the one that handled the

16   administration of this particular photographic line-up alone

17   with her?

18         A.    It's my recollection, sir, that her father was

19   present.

20         Q.    Ms. Hallock was interviewed from

21   approximately -- tell me, do you recall what time she

22   arrived at the sheriff's office?

23         A.    No, sir I don't.  I was notified early in the

24   morning.  I responded.  When I got to the homicide squad

25   offices, Ms. Hallock was present I believe with Agent

002090

STATE V. GREE    5/31/90                                         106

1    Nyquist, Inspector Wilmer and other elements of the

2    department were coming and going.

3           Q.    What time did you arrive, sir?

4           A.    Just gross speculation, I would say somewhere

5    between 4:30 and 5:30 in the morning.

6           Q.    Did you make any reports?  I think I asked you

7    that question and you said you did not?

8           A.    I did not.

9           Q.    So you don't have anything to refresh your

10   memory?

11          A.    No, sir, I don't.

12          Q.    Do you know how long of your own personal

13   knowledge Ms. Hallock was at the Brevard County Sheriff's

14   Department after she came from the orange grove before she

15   left?

16          A.    Well, it's my recollection she departed

17   sometime between 10:00 and 10:30.  So a good number of

18   hours.

19          Q.    She was there when you arrived at four and she

20   left sometime around ten that morning?

21          A.    10:00 or 10:30, yes, sir.

22          Q.    Were you questioning her the entire time?

23          A.    No, sir.  I met Ms. Hallock very briefly.  I

24   was present without questioning her myself as Agent Nyquist

25   interviewed her.

002097

1              I would leave, assign agents, take information,

2    inform the inspector, come back in.  Just in and out, if you

3    will.

4         Q.    Do you know how many taped statements Ms.

5    Hallock gave that morning?

6         A.    No, sir, I don't.  I would suspect one.

7         Q.    Were you present when she gave that taped

8    statement?

9         A.    I might have come in and gone out.  I was not

10   there for the entire interview, no, sir.

11        Q.    Who was conducting it with her?

12        A.    That would have been Agent Nyquist.

13        Q.    Did you see Crosley Green when he was arrested

14   I believe in June?

15        A.    Yes, sir.

16        Q.    And did he look any different than he looks in

17   that photograph?

18        A.    I think his hair was a little bit longer and I

19   think he had a recent moustache.

20        Q.    You say recent?

21        A.    That would be my impression.

22        Q.    What do you base that on?

23        A.    Well, the moustache.

24        Q.    I mean your conclusion that it was a recent

25   moustache?

002093

STATE V. GREEN; 5/31/90                                             108

1     A.    It is my recollection he had just general

2  growth, like from two or three days, over his face.  I'm

3  assuming it was recent.

4          MR. PARKER:  Thank you, sir.  I have no

5      further questions.

6          MR. WILLIAMS:  Nothing.

7          THE COURT:  You may step down, sir.

8          Who is your next witness?

9          MR. WILLIAMS:  Scott Nyquist.

10 WHEREUPON:

11                  SCOTT NYQUIST,

12 a witness herein, having previously been duly sworn,

13 testified upon his oath as follows:

14         THE COURT:  What is your full name?

15         THE WITNESS:  Scott Nyquist.

16         THE COURT:  For the benefit of the

17     court reporter, please spell your last name?

18         THE WITNESS:  N -- as in Nancy --

19 y-q-u-i-s-t.

20         THE COURT:  You may inquire.

21                  DIRECT EXAMINATION

22 BY MR. WILLIAMS:

23     Q.    Agent Nyquist, you are employed with the

24 sheriff's department of Brevard County?

25     A.    Yes, sir.

002099

1        Q.    And on the 3rd of April 1989 you were a

2    homicide agent; is that right?

3        A.    Yes, sir.

4        Q.    You were the case agent in the State of Florida

5    versus Crosley Green?

6        A.    Yes, sir.

7        Q.    Let me move you forward in time or go back in

8    time to the incidents when you were first notified, and

9    direct your attention forward to when you first met Kim

10   Hallock.  What time and where was that?

11       A.    I first met Kim Hallock at the scene, which was

12   on April the 4th, 1989 at approximately three a.m.

13       Q.    The scene was where?

14       A.    At the Hammock Road in Mims.

15       Q.    From there where did you go and where did Ms.

16   Hallock end up?

17       A.    From there we ended up conducting an interview

18   of Ms. Hallock at our homicide office at the sheriff's

19   office in Titusville.

20       Q.    Was that interview done on tape?

21       A.    Yes, sir.

22       Q.    Are you aware that Agent Fair at some point in

23   time allowed Ms. Hallock to view some sixty-odd photographs

24   of black males?

25       A.    Yes, sir.

1        Q.    Was that done before or after your taped

2   interview?

3        A.    I believe it was done before the taped

4   interview.   There was a subsequent interview done of her

5   first before the taped interview.

6            MR. PARKER:   I'm sorry.   Did you say a

7        subsequent interview done before?

8            THE WITNESS:   Right.

9            MR. WILLIAMS:   I will clear it up for

10       you.

11  BY MR. WILLIAMS:

12       Q.    Did you interview her twice?

13       A.    Yes.

14       Q.    Once on tape?

15       A.    Right.

16       Q.    But there was only -- tell us about the first

17  interview.

18       A.    The first interview I just sat down and went

19  through all the details with her from start to finish.   Then

20  a short period of time after that I went back and went on

21  tape and did a taped interview of her.

22       Q.    And you say before that the pictures were shown

23  to her as best you recall or after?

24       A.    I believe the pictures were shown to her after

25  we did the first interview.

002101

1        Q.    But before the taping?

2        A.    Yes, sir.

3        Q.    Were you present when she was shown the

4    sixty-three or sixty-eight odd photographs?

5        A.    Yes, sir.

6        Q.    During the whole time?

7        A.    Yes, sir.

8        Q.    Tell us how she viewed those photographs?

9        A.    Well, basically I had obtained the box of

10   photographs from Sergeant Stan from the CID unit.

11            I sat down with her and took a handful at that

12   time of these pictures and handed them one at a time

13   individually to her.

14       Q.    And did she go through all of them?

15       A.    Yes, sir.

16       Q.    Describe, if you will, how she -- what she did

17   with each photograph, each individual photograph?

18       A.    I would hand her the photograph, she would look

19   at it and say:  "No, that's not him."

20       Q.    Was there anything remarkable about one or more

21   of the photographs she viewed?

22       A.    I believe there was two or three photographs

23   that she had pulled aside that she said that this wasn't the

24   individual but that maybe a certain characteristic,

25   something about the face or whatever was close to the person

002102

STATE V. GREEN; 5/31/90                                            112

1    that we were looking for.

2          Q.    You go through the whole photograph process and

3    is that when she made the sketch with Sergeant West?

4          A.    Yes, sir.

5          Q.    Were you present when the sketch was made?

6          A.    No, sir.

7          Q.    You are familiar with the end result of the

8    sketch?

9          A.    Yes, sir.

10         Q.    After that, what involvement with photographs

11   or sketches did she have that day with you, if any?

12         A.    Nothing else on that particular day.

13         Q.    When was the next time that she was presented

14   with any photographs?

15         A.    It was on April the 5th, 1989 at approximately

16   9:32 p.m.

17         Q.    Who was present then?

18         A.    Myself, Sergeant Fair, Agent Holloway.

19         Q.    I show you State's Exhibit 2 in evidence and

20   ask you if you recognize that?

21         A.    Yes, sir.  This is the photo line-up that we

22   showed Ms. Hallock.

23         Q.    Is that the only photo line-up you showed her?

24         A.    Yes, sir.

25         Q.    At any time after viewing that line-up, did she

002103

STATE V. GREEN; 5/31/90                                                          113

1    indicate one of those individuals to be the assailant?

2         A.    Yes, she did.

3         Q.    Could you tell the Court how that occurred and

4    what you were able to observe?

5         A.    Well, Sergeant Fair initially had taken the

6    photo line-up in with Ms. Hallock and her father.  And after

7    a short period of time, Sergeant Fair came out and told me

8    she had identified number two as being the person that

9    committed the crimes and asked myself and Agent Holloway to

10   go back in and do a quick statement with her on tape

11   documenting that fact.

12        Q.    Was that done?

13        A.    Yes, it was.

14              MR. WILLIAMS:  I have nothing further

15        at this time.

16                        CROSS EXAMINATION

17   BY MR. PARKER:

18        Q.    Why didn't you tape record the actual

19   identification, Agent Nyquist?

20        A.    Well, I wasn't in on the first identification.

21   I couldn't really say.

22        Q.    Do you know why Agent Fair didn't tape record

23   the initial identification?

24              MR. WILLIAMS:  I will object to that.

25              MR. PARKER:  If he knows, Judge.

002104

STATE V. GREEN; 5/31/90                                                    114

1   BY MR. PARKER:

2        Q.    I mean did you have conversations with Agent

3   Fair about why?

4            THE COURT:   I will allow this question

5        which is whether he had conversations.

6            THE WITNESS:  No, I didn't.

7   BY MR. PARKER:

8        Q.    Was Agent Fair alone in the room with Ms.

9   Hallock when she allegedly picked out this particular person

10  in the line-up?

11       A.    I believe it was Ms. Hallock and her father.

12       Q.    Are you sure about that?

13       A.    No.  No, I'm not.

14       Q.    The reason I'm asking is do you remember the

15  deposition that you gave when you and I were there and you

16  were sworn in back in March of this year?

17       A.    Yes.

18       Q.    Do you remember me asking you:  "So you weren't

19  in the room at the time she was suppose to have picked out

20  Mr. Green as the perpetrator?"  You said: "No, sir."  And

21  my question was: "Just Mr. Fair?"  Your answer:  "Yes,

22  sir."

23            "Question:  "No other person was in that room?

24  Answer:  Not that I can recall, no, sir."

25            Do you remember that?

002105

1   A.   Yes, sir.

2   Q.   So you do recall saying that and answering my

3   questions in that manner?

4   A.   Yes, sir.

5   Q.   Now does that refresh your memory as to --

6   well, strike that.

7   How long were they in the room?

8   A.   Approximately five minutes I would say.

9   Q.   And you weren't in there so you don't know what

10  was going on; is that right?

11  A.   Yes, sir.

12  Q.   Did Agent Fair have discussions with you about

13  a prior photographic line-up that you put together with Mr.

14  Green in it?

15  A.   A prior line-up?

16  Q.   Was there a prior line-up that you put together

17  and ultimately had to take apart?

18  A.   I believe in the process of putting this one

19  together he made us change maybe one or two pictures out of

20  there before this one was completed.

21  Q.   He testified earlier that was because Mr.

22  Crosley Green's photograph was a darker hue, if you will, or

23  shade; is that correct?

24  A.   Yes, sir.

25  Q.   Do you remember that conversation?

002106

STATE V. GREEN; 5/31/90                                      116

1        A.     Yes, sir.

2        Q.     Other than Mr. Green, were these the darkest

3   male negros that you could find?

4        A.     Yes, sir.  From the photographs that I had to

5   pick from, yes, sir.

6        Q.     And what photographs were you picking from,

7   Agent Nyquist?

8        A.     Criminalistics at the time usually has a pile

9   of photographs that they leave downstairs that they leave

10  for agents when they need to do line-ups.  They are extra

11  photographs that have been done over the past --

12       Q.     Agent Nyquist, these weren't the photographs

13  you had been going through previously?

14       A.     As far as I know they weren't, no, sir.

15       Q.     Do you know for sure?

16       A.     The pictures I had gone through were all

17  Polaroid pictures.  Those are not Polaroid pictures there.

18       Q.     Do you know if she looked at any other

19  photographs there while she was at criminalistics?

20       A.     No, she never came down to criminalistics.

21       Q.     The box of photographs that you said she was

22  looking through, do you have those photographs with you?

23       A.     No, sir, I don't.

24       Q.     Do you know where they are at?

25       A.     Yes, sir.  Subsequently they have been filed in

STATE V. GREEN; 5/31/90                                    117

1    CID files in Titusville.

2          Q.    So you wouldn't know what photographs were in

3    that box or not?  If you had to find them you wouldn't

4    know --

5          A.    No, sir.

6          Q.    So you wouldn't know whether -- you put the

7    line-up together?

8          A.    Yes, sir.

9          Q.    Do you know whether any of these individuals --

10   whether or not these are the same photographs that were in

11   that box of photographs that she looked at prior to the

12   line-up?

13         A.    I can't say whether any of those individuals

14   were in the Polaroids or not.

15         Q.    Did you check and see?

16         A.    No, sir.

17         Q.    You initially focused on a suspect -- two

18   suspects, is that correct, both of whom were not Crosley

19   Green?

20         A.    There were several, yes, sir.

21         Q.    You specifically told me of two; is that not

22   correct?

23         A.    Yes, sir.

24         Q.    Mr. Mitchell and a Mr. Eddie Dennison.

25               MR. WILLIAMS:  I'm going to object to

STATE V. GREEN; 5/31/90                                          118

1       relevance.

2              MR. PARKER:  I think it's relevant

3       because one of the photographs I showed Ms.

4       Hallock was Mr. Mitchell.

5              THE COURT:  I will allow it.

6    BY MR. PARKER:

7         Q.    You originally focused on Mr. Mitchell as one

8    of the suspects in this case; is that correct?

9         A.    Yes, sir.

10        Q.    I will show you a photograph.  It's been marked

11   as Defendant's Exhibit B for identification purposes.  Do

12   you recognize that photograph?

13        A.    Yes, sir.

14        Q.    Is that Wilford Mitchell?

15        A.    Yes, sir, it is.

16        Q.    Is that the fellow you initially focused on as

17   a possible suspect in this case?

18        A.    Yes, it is.

19        Q.    Did you ever put any of his photographs in a

20   photographic line-up so Ms. Hallock could look at it?

21        A.    No, sir.

22        Q.    Initially at that time when it's all fresh in

23   her mind?

24        A.    Right.

25        Q.    That didn't occur?

002109

STATE V. GREEN; 5/31/90                                    119

1         A.    No, sir.

2         Q.    You interviewed Ms. Hallock several times; is

3   that correct?

4         A.    Yes, sir.

5         Q.    And did you talk to her about possible basic

6   features that she recognized about this perpetrator?

7         A.    Yes, sir.

8         Q.    Did you specifically ask her about facial hair

9   or did this guy have facial hair?

10        A.    Yes, sir.

11        Q.    Do you recall how she answered that question?

12        A.    I believe she answered that she wasn't sure.

13        Q.    That she was not sure whether he had facial

14  hair or not?

15        A.    Right.

16        Q.    Not that she is positive he didn't have facial

17  hair, just that she wasn't sure?

18        A.    Right.

19        Q.    So as far as you know the perpetrator could

20  have had facial hair?

21        A.    I guess it's possible.

22        Q.    Is there any reason why you didn't put anybody

23  in the photo line-up with facial hair?

24        A.    Yes, sir, because based on her findings or her

25  composite drawing, the composite drawing not having any

STATE V. GREEN; 5/31/90                                    120

1   facial hair depicted on it, that's what we used for our

2   basis of identification.

3        Q.    Did she ever tell you that when Agent West or

4   Sergeant West drew this composite that she told him that it

5   was wrong?

6        A.    I believe she said that the hair may have been

7   a little bit too high for that.

8        Q.    Would that be wrong?  It's not the way she told

9   him to draw it.

10            MR. WILLIAMS:  Objection, Your Honor.

11        He has no personal knowledge of that.

12            THE COURT:  Sustained.

13   BY MR. PARKER:

14        Q.    I may have asked you this, Agent Nyquist.  I

15   apologize if I have.  Do you know how long Ms. Hallock -- do

16   you know what time she arrived initially at the sheriff's

17   department on the 4th of April?

18        A.    Following the murder?

19        Q.    Yes.

20        A.    I believe the first interview that I did with

21   her was at approximately 4:54 a.m. that morning.  I arrived

22   at the scene at approximately 3:10 a.m.

23        Q.    My question is:  Do you know what time she

24   arrived at the sheriff's office?

25        A.    It would have been shortly before I did the

KING REPORTING SERVICE   MELBOURNE FLORIDA

1    first interview at 4:54 a.m.

2         Q.    How many interviews did you conduct with Ms.

3    Hallock?

4         A.    Two.

5         Q.    How many did you tape?

6         A.    One.

7         Q.    Do you know whether she was being interviewed

8    by any other agent other than you that morning?

9         A.    No, sir.

10        Q.    Did Ms. Hallock tell you she had been smoking

11   marijuana just prior to this incident?

12        A.    No, sir.

13        Q.    Did you ask her?

14        A.    Yes, sir.

15        Q.    What did she say?

16        A.    She said no.  I asked her if she had been

17   involved in any type of narcotic use or marijuana or

18   anything and she said no.

19             MR. PARKER:  No further questions.

20                     REDIRECT EXAMINATION

21   BY MR. WILLIAMS:

22        Q.    When did the investigation shift from Mr.

23   Mitchell, is it, to Crosley Green and why did it shift?

24             MR. PARKER:  I'm going to object at

25        this point, Your Honor, only because I

002112

1              anticipate there is going to be some form of

2         hearsay and it's hearsay.

3              MR. WILLIAMS:  The issue has been

4         posed, Your Honor, to this witness that this

5         was your first suspect and all of a sudden he

6         is not in a line-up.

7              I think the Court should know why.

8              THE COURT:  I think it's okay for

9         purposes of the suppression hearing.

10    BY MR. WILLIAMS:

11         Q.   Do you remember the question?

12         A.   Yes.  On April the 5th, 1989 at approximately,

13    I'd say, one p.m. that afternoon or shortly after that, we

14    had an individual call into us by the name of Dale -- Dale

15    or Dave -- Carlisle, who indicated that the previous night

16    that he had an opportunity -- prior to that he had read the

17    article in the paper about the murder and had an opportunity

18    to see the defendant at Holder Park wearing the same type of

19    clothing as revealed by Ms. Hallock.

20              That particular time we had initiated, after we

21    learned this information, trying to locate some background

22    information on Crosley Green.  We ended up finding out about

23    his prison stay and started trying to obtain a current

24    photograph of him for purposes of doing a photographic

25    line-up.

002113

1          I will back up.  Subsequent to that, on April

2    the 4th, 1989, prior to that information, we also got a call

3    from Officer Ficky (phonetic) from the Titusville Police

4    Department and he had indicated that he had received a call

5    through an anonymous person, a CI or something to the effect

6    that --

7               MR. PARKER:  I would just object again

8          just for the record.  I would also object on

9          the grounds this is a narrative and that I

10         would prefer the state ask questions and I

11         can hear the answer and give me an

12         opportunity to object.

13              THE COURT:  Well, first of all, the

14         issue is whether it's hearsay.  It's not

15         really offered for any purpose other than to

16         show why the investigation shifted, not the

17         truth of the matter of what this person has

18         said.  So I don't really think it's hearsay.

19              Because it's an issue that was brought

20         up by defense counsel, I think any objection

21         as to relevance has been waived.

22              MR. PARKER:  May I just respectfully

23         request that the colloquy occur through

24         question and answer to give me an opportunity

25         to formulate an objection if need be?

002114

STATE V. GREEN; 5/31/90                                          124

1              THE COURT:  To that extent your

2         objection is sustained, Mr. Parker.

3  BY MR. WILLIAMS:

4         Q.    Dale Carlisle saw the picture in the paper and

5  called you up and said to take a look at Crosley Green on

6  the 5th at one p.m. or thereabouts; is that right?

7         A.    Right.

8         Q.    That was an unsolicited from the sheriff's

9  department call in from a citizen?

10        A.    Right.

11        Q.    Before that you said you got a call from

12  Officer Ficky of the Titusville Police Department?

13        A.    Yes, sir.

14        Q.    What did he tell you?

15        A.    He told us that he had received a call from I

16  believe it was a CI who indicated that the person that had

17  done the murder that night by the name of either Crosby or

18  Crosley was staying at Colleen Brothers' apartment.

19        Q.    So logically you drop Mitchell and focus on

20  Crosley as a result of that or at least you focus on

21  Crosley?

22        A.    Right.  We had already interviewed Mitchell

23  that afternoon.

24        Q.    The result of that interview was what?

25        A.    Basically after we talked to him and myself and

STATE V. GREEN; 5/31/90                                    125

1    Agent Holloway saw his physical, he didn't match the

2    physical that was given to us by the victim.

3                    MR. WILLIAMS:  I have nothing further.

4                    MR. PARKER:  No further questions.

5                    THE COURT:  You may step down, sir.

6                    MR. WILLIAMS:  That's all the witnesses

7            I have, Your Honor.  We are not going to put

8            on anymore testimony.

9                    THE COURT:  Sir?

10                   MR. WILLIAMS:  If that concludes the

11           testimony may Agent Nyquist remain?

12                   THE COURT:  Sure, but I don't know if

13           that concludes the testimony.

14                   MR. PARKER:  I have nothing further,

15           Judge, except argument.

16                   THE COURT:  You agree that he goes

17           first?

18                   MR. PARKER:  I agree he has the burden.

19                   THE COURT:  So he goes first?

20                   MR. PARKER:  Yes.

21                   MR. WILLIAMS:  Your Honor, what we are

22           faced with here today is basically two

23           issues.  The first one is was that

24           photographic line-up impermissibly

25           suggestive.

KING REPORTING SERVICE

1       That issue if it's resolved in favor of

2    the state lays to rest issue number two.

3       I think the Court can notice that the

4    photographic line-up, when you take a look at

5    it for yourself, shows six black males.

6       Mr. Parker in his motion has indicated

7    that the background -- I believe he said the

8    background in the photographs was different

9    than the defendant.

10      The Court will have to be the finder of

11   fact.  One through four appears to be the

12   same.  Five and six appear to be different in

13   that one through four appears to be either a

14   light blue or a grayish-white background and

15   five and six looks like he is standing

16   against somewhat of a little bit of a faded,

17   dirty wall.

18      But in any event it's still a light

19   color as opposed to a black photograph.  The

20   state will concede that of the six black

21   males, number two in the picture of the

22   defendant who Kim Hallock selected as being

23   the assailant is the darker of the six black

24   males.

25      However, number four is almost as dark

STATE V. GREEN; 5/31/90                                           127

1       from our view point.  There again, the Court

2       is the finder of fact.  Number six is there

3       again almost as dark.  Number five, the

4       photograph is dark.  Number three is a

5       lighter skinned yet obvious negro male.  And

6       number one and three are lighter than two or

7       four, lighter than five and six.

8            So it's a matter of degree.

9            Also in evidence for the Court to

10      consider is the composite sketch drawn by the

11      police artist at the direction of the

12      witness.

13           Your Honor, Agent Nyquist and Agent

14      Fair both testified that this photographic

15      line-up was assembled with the darker black

16      males available to the sheriff's department.

17      And while the defendant's rights should not

18      be prejudiced such as in the case that they

19      just had white males and one picture of a

20      black male and they assembled a line-up, that

21      would be ludicrous.

22           But there was good faith evidenced here

23      by the police department.  Agent Nyquist's

24      preparation of the line-up and Sergeant

25      Fair's review of it and they made it as fair

002118

1    as their resources would allow.

2          Ms. Hallock testified she looked at

3    each photograph, but by the facial features

4    she identified number two as being her

5    assailant.

6          Probably more importantly than that is

7    that you go back to this chain of events that

8    occurred that night and she is part there --

9    admittedly she smoked a little bit of

10   marijuana, about a half a joint of marijuana.

11         She said she was under the influence of

12   that to some degree.  I believe that's what

13   her testimony was.

14         But she described in great detail the

15   events transpiring, the fellow walking up to

16   the truck -- and at that point in time she

17   would have no particular reason to note

18   anything other than he was a black male and

19   she and her boyfriend were no longer alone --

20   that he spoke to her and her boyfriend then

21   went out of the truck and then walked off.

22         She noticed detail of distance of the

23   sheriff's car and described it.  It was a

24   marked car with a spotlight on top.  And then

25   shortly thereafter the black male returned

STATE V. GREEN; 5/31/90                                            129

1     after her boyfriend had stepped out of the

2     truck to go to the bathroom.

3          At that point in time she testified

4     that she saw him -- saw the black male walk

5     around to the side of him.

6          So she had a full -- from the door

7     literally in the space where the door of the

8     pick-up truck was opened, that close, she had

9     an opportunity to view the defendant at that

10    point in time.

11         She had an opportunity to view him when

12    he knelt or squatted behind her boyfriend and

13    took the time to take a shoe lace that he had

14    instructed her to remove from a tennis shoe

15    and tie her boyfriend up.  The time it takes

16    to do that.

17         She had time to view him in the

18    situation occurring before her very eyes.

19    She is seated in the driver's side of a truck

20    and he is conducting this assault with a

21    handgun, tying him up merely right there in

22    the open space of the door of the truck.  He

23    hands her a wallet.

24         And I think it's critical that the

25    Court is concerned about the sufficiency of

1.   the lighting not to make a detailed

2   description to where they can describe

3   everything like gray hair; exact length;

4   whether it's mid-ear, lower ear;  sideburns

5   or whether there is hair on the back of the

6   neck but recognition as opposed to

7   description.

8      Recognition is the issue here.  Whether

9   she can recognize this individual again if

10   she were to see him again.

11      There was sufficient light for her to

12   go through a quantity of US currency and make

13   a determination, in fact an accurate

14   accounting of the money that was in her

15   boyfriend's wallet reading the numbers off

16   the paper money.

17      So obviously there was light sufficient

18   to do that.

19      There was light sufficient at two to

20   three feet for an extended period of time,

21   four to five minutes with this person, to be

22   able to see him there.

23      Additionally, then they get in the

24   truck.  She is seated between Chip Flynn and

25   the defendant in the truck and was instructed

STATE V. GREEN; 5/31/90                                      131

1       .only after they had driven some distance to

2       put her head down.

3           She also testified that on one occasion

4       she looked up through the window and saw the

5       Niven's Fruit Company sign.

6           She is with the defendant for that

7       period of time until they end up in an orange

8       grove wherein he grabs her by the arm.  And

9       although she may not have testified directly

10      to this, the Court can infer from the

11      circumstances that he gets out -- she did

12      testify he gets out of the driver's door,

13      grabs her by the arm and pulls her toward him

14      and then starts leading her around the back

15      of the truck when she breaks free from him

16      and runs around him, runs all way around the

17      back of the truck, driving some distance away

18      from the initial assault and he catches her

19      again.

20          At the time Chip kicks open the

21      passenger's door and fires a shot and she

22      jumps in the truck and breaks free.

23          Then after all that time she has an

24      opportunity to look back and see the

25      defendant standing over Chip Flynn firing a

1        handgun as she drives away.

2            Keeping in mind the description is not

3        the issue.  Recognition is the issue.  Can

4        she recognize this person again?  Did she

5        recognize the right person in this line-up?

6            She went through sixty to eighty black

7        male photographs.  We don't know what age

8        they were.  We don't know their facial

9        features or whether they had facial hair, but

10       she sifted through sixty to eighty and made a

11       very careful analysis of that and selected

12       two to three, according to the officer's

13       testimony, that had features that reminded

14       her of the defendant, but not that this is

15       the person.

16           She has never equivocated on this being

17       the person.  She never selected any other

18       person.

19           It isn't as if this line-up was the

20       first six black names shoved under her nose

21       after this homicide.

22           She performed an artist sketch with the

23       police artist.  She liked the nose, the

24       checks, the eyes.  She didn't like the hair.

25       Trying to verbally describe, there again, for

1    someone to draw it, she evidently had some

2    difficulty because to this day she is not

3    satisfied with the hair as it is depicted on

4    that line-up.

5         Then she is present with the

6    photographic line-up.  There has been a lot

7    of testimony and cross examination about

8    whether or not she was told there is a

9    suspect in that line-up.

10        Your Honor, I think it begs the

11   question that these police officers involved

12   in a hot and heavy homicide investigation are

13   not going to put a set of photographs of just

14   anybody in front of the surviving witness of

15   a homicide.  Of course there is going to be a

16   suspect in there.

17        So the fact they said:  "Look at this.

18   There may be a suspect in there" -- if that's

19   what was said -- that's of little consequence

20   because why else would she be looking at

21   photographs.

22        And there is a case that speaks to that

23   issue as to the mentioning of it being a

24   suspect.  I think it begs the question.

25        The bottom line, Judge, is is the Court

1      going to be satisfied that this line-up was

2      fair and reasonable considering the

3      circumstances and whether or not this witness

4      has positively from a recollection of those

5      events that night made an independent

6      identification of this defendant in this

7      line-up.

8          And the state submits that the line-up

9      is fair, that there never will be a line-up

10     of any type, whether live or by photograph,

11     that someone cannot take issue with.

12         That she studied each photograph.

13     There is nothing suggestive about it except

14     that the defendant's picture is in there and

15     she went and identified him.

16         And I think I would like the Court to

17     look at the sketch, the facial construction

18     of the sketch:  The face, the nose, the check

19     bones and so forth.

20         That sketch matches that photograph as

21     well -- better than it does any others that

22     are in the line-up, yet they are similar

23     enough to be fair.

24         That is our contention:  The witness

25     should be allowed to testify that she did

1    select number two from the line-up and that

2    addresses issue number one.

3         THE COURT:  You want to address number

4    two or you want to wait and do that on

5    rebuttal?  You don't want to address it?

6         MR. WILLIAMS:  I wouldn't care to

7    address it now.  I think issue one needs to

8    be satisfied.  We're kind of putting the cart

9    before the horse so to speak.

10         THE COURT:  When you say that there is

11    two issues, it would be if this is an

12    impermissible --

13         MR. WILLIAMS:  Issue two is conditioned

14    upon the finding that the line-up itself is

15    unfair.

16         THE COURT:  Mr. Parker?

17         MR. PARKER:  Judge, I placed some cases

18    before you.  They are on the bench.  One of

19    them is Florida Law Weekly at 1462 --

20         THE COURT:  Hold on one second, Mr.

21    Parker.  There is a paper clip on them.

22         The first one being Cox?

23         MR. PARKER:  No, Your Honor.  The first

24    case should be -- well, the first case may be

25    Cox, but you should be concentrating on

002126

1        Nathaniel Butler versus State of Florida, a

2        Third District Court case, June of '89.

3            THE COURT:  Okay.

4            MR. PARKER:  Your Honor, in that

5        particular case in the right hand column

6        virtually down at the bottom they quote the

7        analysis of error in alleged photo

8        identification as a two-step procedure and

9        they put it together.

10           They basically cite what the Supreme

11       Court came up with in Manson versus

12       Brathwaite, a 1977 case which defines the

13       standard which is a totality of the

14       circumstances case, a fairness sort of test.

15           Basically what they say is did the

16       police employ an unnecessarily suggestive

17       procedure in obtaining an out-of-Court

18       identification.  Number one, first prong.

19           And number two, if so, considering all

20       the circumstances, did the suggestive

21       procedure give rise to a substantial

22       likelihood of irreparable mis-identification.

23           What we are talking about, Judge, is a

24       constitutional violation of the due process

25       protection accorded Mr. Green under the

002127

1    Constitution of the United States.

2         As a matter of law, if the Court finds

3    it was unnecessarily suggestive, then the

4    Court has to move on to the second prong that

5    if that is so, given the totality of the

6    circumstances is there the substantial

7    likelihood of an in-court mis-identification.

8         Judge, if there ever has been a classic

9    case where that can be true, it's in this

10   case.

11        This is the line-up they showed that

12   girl.  Number two is in the top row in the

13   middle.  Number two is obviously the darkest

14   male in that line-up.

15        Her father testified she was told or

16   words to the effect that the suspect was in

17   the line-up.  She testified that she felt the

18   suspect was in the line-up and she needed to

19   make an identification.  She was under that

20   pressure, Judge.

21        If they had taken these photographs and

22   stuck them in that box and handed them to her

23   one at a time, we might not be here today.

24   But what they did is they centralized it into

25   one for her viewing pleasure and put the

1      pressure on her and told her:  "The guy is in

2      there."  Not only that, but we made the

3      picture darker for you.

4           When they did that, Judge, that was

5      unnecessarily suggestive.  And, Judge, I

6      don't care whether or not she comes in here

7      and testifies now she is sure.

8           She testified earlier it took her three

9      or four minutes.  When she first pointed him

10     out she said:  "I'm pretty sure that's him."

11     Pretty sure ain't I'm sure.

12          And then she was asked again:  "Are you

13     sure?"  "I'm pretty positive."  And then she

14     remembers the third time because she knew,

15     Judge, she knew -- it's human nature -- if

16     she didn't say "I'm sure" we weren't going to

17     get this guy.

18          And that's what she said.  She said:

19     "I'm sure."  So now we have our guy, Crosley

20     Alexander Green.

21          This Court has to look to the

22     surrounding circumstances for indicia of

23     reliability now to determine whether or not

24     an in-court identification is so tainted by

25     that unnecessarily suggestive line-up as to

1    .be reliable in Court.

2         There are no indicia of reliability,

3    Judge.  She can't describe his nose.  She

4    can't describe his eyes.

5         She said he looked mean.  She also said

6    Mr. Wilford Mitchell looked mean.  She said

7    Mr. Jefferson looked mean.

8         She can't recall whether the man had a

9    shirt on.  She can't recall if there were

10   buttons, patches, zippers, snaps, or pockets

11   on this coat.  She remembers the coat.

12        She can't remember if he had boots or

13   tennis shoes on.  She first tells the police

14   he has close, cropped hair, but later she

15   says he has grease in his hair, gel,

16   afro-sheen, if you will, some sort of styling

17   product.

18        Curls.  Curls I might add that she says

19   looks almost just like Mr. Mitchell's.

20        She says she didn't look at this man

21   the entire time she was in the truck with Mr.

22   Flynn.  She didn't look at this man the

23   entire time she was at the orange grove.

24        She said they were at Holder Park

25   approximately three to five minutes and she

002130

1    looked at him one time while they were there

2    at night at 11:30 with no moon or she can't

3    recall any natural light.  She doesn't know

4    whether there is an interior light on or not.

5         These are the indicia of reliability I

6    think this Court has to look to.

7         She gets the first look at him a

8    profile view while he was hunkered over Mr.

9    Flynn.  Profile view.

10        She can't describe his ears because the

11   hair was covering them.

12        And then she says she gets a good look

13   at him that one moment when she is standing

14   there.  The woman who is under the influence

15   of marijuana, the woman who is terrified, the

16   woman who has no training in identification,

17   who was not focusing on any particular

18   feature of this man, a woman who all she knew

19   is she wanted out of there and she didn't

20   care how she got out of there.

21        And everyone of us in this room would

22   have felt the same way.  The girl was

23   terrified.

24        And you couple that with the darker

25   photo in the line-up, the "I'm pretty sure",

STATE V. GREEN; 5/31/90                                     141

1    being told that the man is in there or the

2    suspect is in there or that she believed he

3    was in there, her feelings that she knew she

4    needed to pick somebody and I think most

5    telling, Judge, is she felt really good when

6    they said:  "You're right.  That's him."

7            Now we solidified it.  Now we certainly

8    have robbed this man of any fair

9    identification process in Court.  It's over.

10   He cannot get a fair trial at this point in

11   time just because of those few words:

12   "You're right, young lady.  That's him."

13   Can't get it.

14           And then to find out -- which I feel is

15   tantamount to encouraging this woman to go to

16   the jail -- she calls the state attorney's

17   office.  She testifies she speaks to Mr.

18   White.  Mr. White says:  "I can't tell you

19   what to do."  Let's just single him out.  Go

20   down and take a look at him again.

21           To me that was nothing more than a

22   request when she contacted the state

23   authorities and wondered what she should do.

24   It was blatant, Judge.  Unacceptable.

25           The Supreme Court in

1      . Manson V. Brathwaite concludes that

2      reliability is the linchpin in determining

3      the admissibility of identification

4      testimony.

5           These include the opportunity of the

6      witness to view the criminal at the time of

7      the crime, the witness's degree of attention,

8      the accuracy of the witness's prior

9      description of the criminal, the level of

10     certainty demonstrated at the confrontation,

11     and the time between the crime and the

12     confrontation.

13          Against these factors is to be weighed

14     the corrupting effect of the suggestive

15     identification itself.

16          Your Honor, I would point the Court to

17     page one fifty-four of that particular

18     Supreme Court decision.  It's the top

19     left-hand paragraph.

20          Your Honor, providing the state what I

21     would consider is an excellent case I have

22     provided the Court Billy Williams and Bobby

23     Young versus State of Florida.  It's a Third

24     District Court of Appeal case, 1989.

25          I labeled this case good independent

002133

STATE V. GREEN; 5/31/90                                                     143

1       indicia of reliability.  This is the second

2       prong.  This is what the Court looked at in

3       overcoming a tainted, suggestive photographic

4       line-up for purposes of in-court

5       identification.

6            Basically they quote page nine hundred

7       and five, left-hand column.  If I may read,

8       Judge?

9            THE COURT:  Well, did you give me this

10      case?

11           MR. PARKER:  Yes, sir.

12           THE COURT:  It's what?

13           MR. PARKER:  Williams and Young versus

14      State.

15           THE COURT:  Williams and Young versus

16      State.

17           MR. PARKER:  I'm sorry, Judge.  Well,

18      if I may present this to the Court.  Phil,

19      you got the case.

20           MR. WILLIAMS:  Is it Billy Williams

21      and Bobby Lee Young versus the State?

22           MR. PARKER:  Yes.  14 F.L.W. 904.

23           MR. WILLIAMS:  Yes.

24           MR. PARKER:  Your Honor, here is what

25      the Court looked to in that particular case

STATE V. GREEN; 5/31/90                                                144

1        involving robbery in a jewelry store.

2           They found that there was an

3        unnecessarily suggestive line-up.  Well, I

4        say a line-up.  It was a show-up.

5          And they looked to those facts and

6        figures -- excuse that wording.  And if I

7        may, Judge, the trial court based its denial

8        on Perez's testimony that Young was in a

9        well-lit jewelry store for eight to ten

10       minutes.  That he clearly observed Defendant

11       Young when he was in the store.  That he

12       became suspicious and paid close attention to

13       Young.  That he chased Defendant Young after

14       the robbery occurred and pointed Young out to

15       the police before Young was taken into

16       custody.

17          The Court said that's the indicia of

18       reliability we are looking for to overcome

19       this tainted identification.

20          Judge, while I thought I provided you

21       with all the cases I have, I'm relying on an

22       Edwards case.

23          THE COURT:  I think I have that.

24          MR. PARKER:  This is a Supreme Court of

25       Florida, Judge, January 19th, 1989.

002135

1              Quoting from that case, "It is the

2       state's burden to show by clear and

3       convincing evidence that the courtroom

4       identification had an independent source or

5       that its introduction into evidence was in

6       any event harmless error."

7              An independent source, Judge, untainted

8       by the unnecessarily suggestive tactics of

9       the police department.

10             And I think also in the Supreme Court

11      case, Judge, it's very important that the

12      Court understand that Justice Stevens stated

13      in evaluating the admissibility of the --

14             THE COURT:  This is Brathwaite?

15             MR. PARKER:  That's correct, sir.  Page

16      one forty-one.

17             MR. PARKER:  Justice Stevens concurring

18      in the judgment states that in evaluating the

19      admissibility of a particular identification

20      testimony, courts must be sure to put other

21      evidence of guilt entirely to one other side.

22             THE COURT:  Well, I don't have any to

23      put to the other side.  This is all I have.

24             MR. PARKER:  You had some indication

25      about prior sightings and things of that

KING REPORTING SERVICE

1    nature, why the investigation turned from Mr.

2    Mitchell and moved to Mr. --

3         THE COURT:  I won't consider that, Mr.

4    Parker.  That was just as I said.  That

5    wasn't offered for the truth of that matter.

6    It was just why the investigation shifted.

7         MR. PARKER:  There is one other thing,

8    Judge.  The Supreme Court notes in talking

9    about Mr. Glover's identification in the

10   narcotics sale in the Manson V. Brathwaite --

11   basically it was an undercover buy of heroin.

12        Mr. Glover went to a particular

13   apartment and while he stood there in the

14   hallway where there was natural light, the

15   door opened once and he had conversation with

16   the alleged defendant.  The door closed.  The

17   door then opened up again.  Standing there

18   within two feet, he had more conversation

19   with the alleged defendant.

20        And what occurred at that point in time

21   was then Mr. Glover, who was the undercover

22   officer, told a fellow police officer --

23   described the person that he was talking to

24   in great detail:  Build, features, the whole

25   nine yards.

002137

1          And that officer then went -- thinking

2     he knew who it was -- and got a photograph.

3     He took the photograph back to Mr. Glover's

4     office and put it on the table and Mr. Glover

5     came in and said:  "Whoa.  That's the guy."

6          And they sought to exclude that

7     photographic identification, which they

8     basically find is tainted.  They say that's

9     unnecessarily suggestive.

10          But they say his description and the

11     other surrounding indicia of reliability

12     overcomes that taint.  They talk about the

13     proximity of distance, two feet between the

14     two people.  They talk about natural light in

15     the hallway.

16          And curiously, Judge -- I don't want

17     this to sound wrong, but they talk about it

18     was the fact of one negro identifying another

19     negro.  And I think that was pretty

20     interesting to hear from the United States

21     Supreme Court even in 1977.

22          They found that there was a direct

23     observation of this particular defendant and

24     that the officer was trained in knowing how

25     to closely scrutinize people because he knew

STATE V. GREEN; 5/31/90                                                    148

1      he was going to be called to testify at a

2      later date:  Race, build, height, color,

3      style of hair, high cheek bones, clothing;

4      all of that was addressed to the tee.

5              And very interesting is that when asked

6      at some later point in time about his

7      identification, he said:  "There is no

8      question in my mind that that's the guy that

9      did it."

10             That's the first words out of his

11     mouth, not I'm pretty sure or maybe; not,

12     yeah, that looks like him.  No question in my

13     mind whatsoever.  He asserted it several

14     times.

15             And finally, Judge, they talk about the

16     coercive pressure that's applied to the

17     person that's making the identification.

18             Your Honor, when you take a young woman

19     who has relatively little life experience and

20     she incurs this horrible affair and then she

21     is told the suspect is in there and she sits

22     in a room and there is the police and her dad

23     and she knows a real close boyfriend of hers

24     is dead and she doesn't want this person to

25     get away, there is an awful lot after

KING REPORTING SERVICE

1    coercive pressure on that young woman to make

2    an identification to be sure.

3         And I think those facts, Judge, based

4    on the particular line-up that was shown to

5    her and the way it was shown to her make not

6    only the line-up inadmissible but anything

7    that flows there, particularly in light of

8    her going to the jail.

9         THE COURT:  Yes, I don't understand

10   that.

11        MR. PARKER:  And I would ask the Court

12   exclude that evidence in this cause.

13        MR. WILLIAMS:  Judge, may I have some

14   rebuttal on the case?

15        THE COURT:  Yes.

16        MR. WILLIAMS:  I think the case cited

17   by Mr. Parker, Brathwaite, they didn't

18   exclude the in-court identification or the

19   out-of-court identification and that was one

20   single photograph shown to this fellow

21   shortly after the crime, not a line-up.

22        This guy in Brathwaite, this officer,

23   he didn't go through sixty-three to

24   sixty-eight photographs, pick out two or

25   three with similar features but emphatically

002140

1    say:  "I'm sorry, this man is not here but

2    these cheek bones, this nose, this chin is

3    similar."  This man didn't sit down and make

4    a composite drawing and say:  "Other than the

5    hair, these features are -- this looks like

6    the man."

7        But just like Brathwaite, the Court --

8    Mr. Parker says they relied on that he

9    described his race.  Well, so did Kim

10    Hallock.  They described his age in

11    Brathwaite.  So did Kim Hallock.  They

12    described his height in Brathwaite.  So did

13    Kim Hallock.

14        His build in Brathwaite.  So did Kim

15    Hallock.  His hair style in Brathwaite.  So

16    did Kim Hallock.

17        Kim Hallock went on to describe his

18    clothing in detail.

19        After viewing, if you count them up, at

20    the least sixty-nine and at the most

21    seventy-four photographs as opposed to one

22    photograph, she selects the defendant.

23        I think if they allow Brathwaite to

24    make an in-court identification, this very

25    case just screams to allow Kim Hallock to

1       make the identification.

2           The time that the undercover officer

3       had in Brathwaite was substantially less than

4       the total time that the crime occurred that

5       Ms. Hallock was in his presence.

6           Identically the same amount of time she

7       had the face-to-face contact with the visual

8       observations with him, which I submit to the

9       Court are even more accurate because she had

10      an opportunity to observe the back of him;

11      the side of him; the side of his face; the

12      sides of his face while standing; the side of

13      his face while squatting; and direct facial

14      confrontation with him when he threw two

15      objects to her to catch:  the shoe, take the

16      lace out; and the wallet, count the money;

17      and handed him back the money.  They were at

18      arm's length.

19          I would cite to the Court another case

20      that I don't have copies for everybody but I

21      will show it to Mr. Parker.  It's

22      Hollingsworth versus State at 522 So.2d 348.

23          THE COURT:  562?

24          MR. WILLIAMS:  522 So.2d. 348.  In that

25      case the Supreme Court of Florida in

002142

STATE V. GREEN; 5/31/90                                          152

1         evaluating a witness by the name of Mrs.

2         Salerno said Mrs. Salerno was shown a photo

3         display in which she identified three

4         possible suspects, one of which was the

5         appellant.

6              The appellant's photograph was number

7         five.  Mrs. Salerno then viewed a live

8         line-up in which again the appellant was

9         positioned at number five and was the only

10        one of the persons viewed who had appeared in

11        the previous photo display.

12             For the live line-up the suspects were

13        given eyeglasses and allowed to position

14        themselves as they like and allowed to

15        exchange clothing.

16             She selected the guy finally out of the

17        live line-up and the Supreme Court of Florida

18        applying Manson versus Brathwaite said no

19        problem.

20             MR. PARKER:  Your Honor, just so the

21        Court knows, further more Ms. Salerno

22        testified that she had ample opportunity to

23        observe the appellant during the crime.

24             MR. WILLIAMS:  So what?  So had Kim

25        Hallock.  She said:  "I was accosted.  I saw

1     him walk up to the truck.  He talked to us.

2     He left.  He came back.  He robbed us.  He

3     kidnapped us.  He kneeled down.  He stood up

4     he. .Looked at me.  Exchanged shoes, money

5     and walked.  Then kidnapped me and drove to

6     an orange grove and jerked me out of a

7     truck."

8         I don't really know how long Ms.

9     Salerno was with him, but I think that case

10    speaks pretty heavily to some police

11    procedures that, if you are comparing them,

12    that one is pretty bizarre compared to what

13    we have here.

14        I mean these officers did everything

15    they could in the circumstances to make this

16    line-up fair.  And you consider the time she

17    spent -- you know, she is not a police

18    officer and, yes, she was scared; but if the

19    criteria to be a witness who is allowed to

20    identify a suspect in court is you have to,

21    one, be a police officer and, number two, be

22    fearless, then we would never sustain a

23    conviction in this state for any crimes that

24    weren't committed against fearless police

25    officers.

1        And we submit that case would ask the

2   Court to read Brathwaite because it lists, as

3   does another Supreme Court case -- I'm sure

4   Mr. Parker has this one and we are all I

5   think familiar with it -- United States

6   versus Billy Wade.  It's a Sixth Amendment

7   case, right to counsel at the time of the

8   line-up.

9        I believe that Wade addresses those

10  criteria that the Court should look at and --

11       THE COURT:  What's the date in that

12  case?

13       MR. WILLIAMS:  Excuse me.  It's an

14  older case.  It's US Supreme Court 1967 and

15  they went for -- I think we can agree that

16  those criteria -- time of observance,

17  opportunity to observe and so forth -- remain

18  the criteria.

19       MR. PARKER:  It's cited in the Edwards

20  case.  There is two unnecessarily suggestive

21  situations.  One is where a show-up or

22  line-up is conducted without benefit of

23  counsel and then the unnecessarily suggestive

24  techniques.  Wade stands for that.

25       THE COURT:  I know you guy's thwart

STATE V. GREEN; 5/31/90                                      155

1         your cases from the state attorney's office

2         but may I have your copy of Wade?

3               MR. WILLIAMS:  Yes.

4               MR. PARKER:  The cite is in there.

5               THE COURT:  I will give you the cite.

6               MR. WILLIAMS:  If Mr. Parker doesn't

7         mind, Mr. Hunt has carefully highlighted it.

8               THE COURT:  His are highlighted too.

9         That rule has really fallen by the wayside.

10        That used to be such a bad thing to do, but

11        now everyone seems to highlight whatever they

12        want in a case.

13              MR. WILLIAMS:  The other cite, Your

14        Honor, was 522 So.2d --

15              THE COURT:  Yes, I got that.

16              MR. WILLIAMS:  There is one other case

17        that I will need to give to the Court.  I

18        forgot that I had it.  I will cite it for the

19        Court and show Mr. Parker.

20              It's John Carrasco versus State, 470

21        So.2d 858.

22              In all candor to the Court and to Mr.

23        Parker, this case addresses a photographic

24        line-up.  They ruled that it was not

25        impermissibly suggestive.  In paragraph one

00217

1    under headnotes one after going through

2    Manson versus Brathwaite, "Applying the first

3    prong of the above test, we find that no

4    impermissibly suggestive procedure was used

5    in obtaining the out-of-court identification.

6         "At the time of the line-up

7    Rollings" -- who is the identifying person --

8    "was advised by Officer Dennis that his car

9    had been recovered and Dennis had some

10   suspects."

11        The Court did go on to note, however,

12   that he was not told that either/or both of

13   the suspects' photos were in the line-up.

14        They didn't ground their decision I

15   don't believe on that point.  If they had,

16   they would have thrown it out.

17        They do mention that in passing.  It's

18   not grounded upon that point.  I think the

19   Court should be aware that that type of

20   situation has been addressed, if not just in

21   passing, as a grounded issue.

22        THE COURT:  Thank you, gentlemen.  I

23   appreciate your help.  Sorry I kept you

24   waiting this afternoon.

25        MR. PARKER:  We had planned to address

00214

1      the motion to dismiss, Your Honor.  In that

2      it's my impression the Court's going to

3      reserve on this until a later date, should we

4      postpone the motion?

5              THE COURT:  Do you think I can do that

6      based upon the pleadings?  Do you think I

7      need argument on that if we get to it?

8              MR. PARKER:  Your Honor, I think in

9      light of additional facts I have pled in the

10     motion to dismiss, I would like the Court to

11     know as is in the pleadings that the state

12     has taken the sworn deposition of a witness I

13     have provided by the name of James Carnes

14     (phonetic) who swore under oath that at the

15     time of the shooting Mr. Crosley Green was

16     with him at a Colleen Brothers' house.  And I

17     think that's something the Court needs to

18     consider.

19             It's been filed with the Court.  I

20     would merely point that out to the Court and

21     I think ask that it be added if the Court

22     considers the motion to dismiss.

23             MR. WILLIAMS:  There is something I

24     need to address on that issue.  Collateral to

25     the internal pleadings of the motion to

002

STATE V. GREEN; 5/31/90                                    158

1    dismiss, we would object to it on technical

2    grounds even though we traversed it out of an

3    abundance of caution.

4          It's improperly drafted and it is not

5    sworn to by the defendant.

6          There is a case, State versus

7    Rodriguez.  I did this research at four in

8    the morning.  I did not copy the case, but

9    the jurat above the name sworn to best of my

10   knowledge is insufficient.

11         I submit the absence of anything is

12   equally insufficient, so it needs to come

13   back and be sworn to.

14         In the body of that C-4 motion, Mr.

15   Parker lays it out very well.  We have a

16   witness that says he is the murderer.  He has

17   a witness who says he wasn't there.

18         That's an issue of fact.  It can't be

19   resolved by C-4 motion.

20         THE COURT:  Do you agree with that, Mr.

21   Parker?

22         MR. PARKER:  I agree that, Judge, if

23   there is no identification in this case this

24   case is circumstantial.

25         THE COURT:  But assume that I say that

002149

1    this was a good ID.

2         MR. PARKER:  Then the Court will be --

3    I can assure the Court that I would expect

4    the Court would deny my motion to dismiss.

5         MR. WILLIAMS:  The only other matter I

6    would ask the Court to direct is that in that

7    motion there is alluded to the existence of

8    depositions, sworn testimony, that Mr.

9    Crosley Green was in fact with Mr. Carnes and

10   Colleen Brothers' when the crime was

11   committed.

12        There is a case that address that.

13   Kagan, 529 So.2d 356, says the defendant is

14   not totally allowed to rely on the

15   depositions of others.  If he was somewhere,

16   then he should say under oath he was with him

17   and they have also given deposition to say

18   that effect.  Not just to allude that "Oh,

19   yeah, I have some witnesses that say I was

20   with them."

21        It's insufficient.  He needs to get

22   right with himself.  If he is going to take a

23   stand, let's take a stand and get it under

24   oath and do it right.

25        MR. PARKER:  Sure would like to see

STATE V. GREEN; 5/31/90

160

1     that case, Judge.

2         MR. WILLIAMS:  529 So.2d 356.  You

3  ought to read it.  It's really nice.

4         THE COURT:  You guy's have a good day.

5         (Whereupon, these proceedings were

6  concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE V. GREE.   5/31/90                                      161

# CERTIFICATE OF REPORTER

I, Elizabeth Wilson, Deputy Official Court Reporter, in and for the County of Brevard, State of Florida, was authorized to report in stenotypy the foregoing proceedings at the time and place hereinabove stated; and that the foregoing pages constitute a true and correct transcription to the best of my ability of said proceedings.

Dated this 5th day of July 1990, in Melbourne, County of Brevard, Florida.

Elizabeth Wilson
Deputy Official Court Reporter

002152