# Exhibit 35-A



IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

IN AND FOR BREVARD COUNTY, FLORIDA

CASE NO:   05-1989-CF-4942-AXXX-XX


STATE OF FLORIDA

       Plaintiffs,

vs.

CROSLEY ALEXANDER GREEN,

       Defendant.

_____/

**ORIGINAL REPRINT**

TRANSCRIPT OF PROCEEDINGS
VOLUME I
(Pages 1 - 196)


DATE TAKEN:         October 28 - 29, 2003
PLACE:             Moore Justice Center
                   2725 Fran Jamieson Way.
                   VIERA, FLORIDA 32940

BEFORE:           The Honorable Bruce Jacobus,
                   Circuit Judge


    This cause came on to be heard at the time and place aforesaid when and where the following proceedings were reported by:


JENNIFER ZANMILLER
Court Reporter
Notary Public, State of Florida at Large


Brevard Associated Court Services, Inc.
14 Suntree Place, Suite 101
Melbourne Viera, Florida  32940



STATE vs. GREEN;   10/28/03 - 10/29/03                    2

APPEARANCES


FOR THE PLAINTIFF
Mr. Christopher White, Esquire
Assistant State Attorney
2725 Judge Fran Jamieson Way, Bldg. D
Melbourne, Florida   32940


Mr. Wayne Holmes, Esquire
Assistant State Attorney
2725 Judge Fran Jaimeson Way, Bldg. D
Melbourne, Florida   32940



FOR THE DEFENDANT
Mr. Mark Gruber, Esquire
CCRC-Middle
3801 Corporex Park, Dr., Ste. 210
Tampa, FL   33619


Ms. Daphney E. Gaylord, Esquire
CCRC-Middle
3801 Corporex Park, Dr., Ste. 210
Tampa, FL   33619


Mr. David Hendry, Esquire
CCRC-Middle
3801 Corporex Park, Dr., Ste. 210
Tampa, FL   33619


Mr. Kenneth S. Nunnelley
Assistant Attorney General
444 Seabreeze Blvd., 5th Floor
Daytona Beach, FL   32118

STATE vs. GREEN;  10/28/03 - 10/29/03                    3

INDEX OF PROCEEDIINGS

PAGE NO.

Proceedings                                                  5


DEFENSE WITNESSES

    SHEILA GREEN
        Direct Examination by Ms. Gaylord              14
        Cross Examination by Mr. Holmes                29
        Redirect Examination by Ms. Gaylord            66


    LONNIE HILLARY
        Direct Examination by Mr. Hendry               78
        Cross Examination by Mr. Holmes                91
        Redirect Examination by Mr. Hendry            102


    JEROME MURRAY
        Direct Examination by Ms. Gaylord            111
        Cross Examination by Mr. White               130
        Redirect Examination by Ms. Gaylord          131


    JOHN ROBERTSON PARKER
        Direct Examination by Mr. Gruber             152

Certificate of Reporter                              196



                    VOLUME II

    JOHN ROBERTSON PARKER
        Direct Examination by Mr. Gruber Con't       201
        Cross Examination by Mr. White               338
        Redirect Examination by Mr. Gruber           369

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 5 of 100 PageID 954

INDEX OF EXHIBITS

PLAINTIFF'S EXHIBITS

| NO. | DESCRIPTION | MARKED | RECEIVED |
|-----|-------------|--------|----------|
| A | Letter from Atty Dees 7/11/90 | 29 | |
| B | Transcript Sheila Green 7/13/90 | 29 | |
| C | Tript trial testimony 8/29/90 | 29 | |
| D | Tript sentencing – Mr. Spruill | 29 | |

INDEX OF EXHIBITS CONTINUED

DEFENDANT'S EXHIBITS

| NO | DESCRIPTION | MARKED | RECEIVED |
|----|-------------|--------|----------|
| E | Affidavit of Sheila Green | 27 | |
| F | Tript Jerome Murray 10/13/90 | 109 | 130 |
| G | Videotaped statement of Jerome | 111 | 130 |
| H | Copy of statement Mr. Murray | 115 | 130 |
| I | Certified copy of conviction | 112 | 316 |
| J | Copies of 3 X 5 cards | 201 | |
| K | Request for felony PTR | | 316 |
| M | Certified copy of conviction | | 322 |
| O | Certified copy committment card | | 376 |

1    THE COURT:  What are we going to take up first?

2    MR. GRUBER:  I'm trying to remember now, there

3    are two matters outstanding.  I filed a motion for

4    reconsideration of the Court's ruling on the Count

5    I, regarding juror misconduct.

6    THE COURT:  I did an order on that.  I signed

7    it yesterday.  I'll get you a copy.  I denied that.

8    I have an order for it.

9    Would everybody state their appearance for the

10   Court, please?

11   MR. GRUBER:  Mark Gruber with CCRC-Middle.

12   MR. HENDRY:  David Hendry with CCRC-Middle, and

13   I'll be appearing with Daphney Gaylord, who is not

14   in the room at the moment.  She will be here

15   shortly.

16   MR. WHITE:  Chris White for the State

17   Attorney's Office.

18   MR. HOLMES:  Wayne Holmes with the State

19   Attorney's office.

20   MR. NUNNELLEY:  Ken Nunnelley for the Attorney

21   General's Office.

22   THE COURT:  What else have we got?

23   MR. GRUBER:  Just to clarify this, I had spoken

24   with Mr. Holmes on Friday about this, and I don't

25   know if we have got a transcript of the hearing the

1    last time, or not.

2         THE COURT:  We do.

3         MR. GRUBER:  We have moved in on the issue of

4    waiver, some items of evidence, and the Court had

5    accepted them for the purpose of considering waiver,

6    whether or not the witness had previously waived it

7    prior.  Those include videotapes, and some

8    transcribed statements by a particular witness, with

9    some recantations, and the circumstances of that.

10        The Court had, at least, a preliminary ruling

11   that there was a threshold met to ask that witness,

12   Sheila Green, about whether she wanted an attorney,

13   to appoint one.  I don't know if the Court made a

14   final determination as to waiver, or not.

15        THE COURT:  I had not.

16        MR. GRUBER:  The State was under the impression

17   that the Court had.

18        THE COURT:  I don't think I did.  I recall

19   Ms. Reid being here and going through the colloquy

20   about a right to counsel, which she chose to do.  I

21   think she had Mr. Gruber -- I mean, Mr. Lanning, you

22   know, who advised her, but I don't think I ever

23   ruled on the waiver issue.  That would require some

24   evidence.

25        MR. HOLMES:  I thought the Court had because

1   the Court took testimony from her about the prior

2   statement that she had given, and I believe it was

3   Kentucky, which was the only other sworn statement

4   in existence.   And my recollection is the Court

5   found that would not be sufficient to constitute

6   waiver.

7        THE COURT:   I'm pretty familiar with the law,

8   but I don't --

9        MR. HOLMES:   He may be correct.  He may have

10  asked to reconsider, but my recollection, we went

11  through the process.

12       THE COURT:   Let me look through here.  Did you

13  all get the transcript at all?  Did anybody look at

14  it?

15       MR. GRUBER:   At this moment in time, I'm not

16  asking the Court to rule on that issue.  I think

17  we're ready to go forward.

18       THE COURT:   I'll take a look through here, all

19  right, so what are we going to do?  You read this

20  case out of the Fifth, Mark?

21       MR. GRUBER:   The Hill case?

22       THE COURT:   Yes.

23       MR. GRUBER:   That's what we're all working on,

24  yes.

25       THE COURT:   We ready to go with Sheila Green?

STATE vs. GREEN;   10/28/03 - 10/29/03

8

1    Is Ms. Green here?

2         MS. GAYLORD:  She's outside.

3         THE COURT:  Ms. Green, would you come up here

4    and be sworn, please?

5    WHEREUPON:

6              SHEILA GREEN,

7    A witness herein, acknowledged she was duly sworn and

8    testified upon her oath as follows:

9         THE WITNESS:  I do.

10        THE COURT:  Have a seat over here.  Let me go

11   through and advise her of a few things.

12        Ms. Green, you are -- we talked last time, I

13   think, you came to testify.  I have no idea what

14   you're going to testify about, but I understand that

15   you made certain testimony during the trial, and

16   that you may have different testimony here today.  I

17   need to advise you that potentially, you could be

18   charged with a crime.  You would be incriminating

19   yourself by doing that.

20        You have an absolute right not to do that.

21   That's a Constitutional right that you have.  You

22   have an absolute right to waive that, refuse to.

23   You also have a right to counsel if you want to

24   discuss it with an attorney, to make a knowing

25   waiver, or whatever it might be.  I believe last

1    time you chose to talk to an attorney.  I have an

2    attorney available, same one as a matter of fact.

3    Mr. Lanning is here, if you choose to do that.  Do

4    you understand all the right you do have?

5          THE WITNESS:  I think so.

6          THE COURT:  You choose to testify?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  Thank you.  Go ahead.

9          MS. GAYLORD:  Your Honor, I would like to make

10   another objection, it's an ongoing objection, to the

11   presence of Mr. White during the presence of

12   Ms. Green's testimony.  He would be a party witness

13   to the testimony to rebutt the testimony.  I don't

14   think he has a privilege, or should have a privilege

15   to being privy to her testimony at this particular

16   time, and proceeding to develop his own testimony.

17         THE COURT:  The objection is Mr. White being in

18   the courtroom because he may be a witness to rebutt

19   her testimony?

20         MS. GAYLORD:  To rebutt her testimony.  His

21   presence, that's the first objection.  The second

22   objection would be based upon the fact that his

23   presence could be intimidating to the witness, and

24   would hinder the process, which is the purpose of

25   the post commission proceedings.

1        THE COURT:  Why would he be --

2        MS. GAYLORD:  His presence may be intimidating

3    to the witness.

4        THE COURT:  How would his presence

5    be intimidating?

6        MS. GAYLORD:  Some of the statements that

7    Ms. Green is going to testify to, goes against

8    Mr. White in terms of persecutory misconduct on his

9    part in that she did receive certain privileges,

10   special privileges from Mr. White.

11       THE COURT:  All right.  You want to be heard on

12   that?

13       MS. GAYLORD:  There is one more part to my

14   objection.

15       THE COURT:  Okay, go ahead.

16       MS. GAYLORD:  I also want to object to

17   Mr. White being involved in the cross-examination of

18   Ms. Green.  I'm not sure what his role is going to

19   be today, but if he's going to be cross-examining --

20       THE COURT:  Who's going to cross-examine?

21       MR. HOLMES:  I will be cross-examining

22   Ms. Green.

23       THE COURT:  Do you want to be heard on the

24   objection, on Mr. White's presence in the courtroom?

25       MR. HOLMES:  Your Honor, as you may recall,

1    this Court has had this particular issue before it.

2    The only issue that relates to concern we would have

3    is if Mr. White was called as a witness, and the

4    testimony was in controversy.  There is an ethical

5    consideration there.

6         We had previously announced to this Court that

7    we recognize that as a potential issue, and that if

8    Mr. White remains on the case, he would not be

9    called as a witness.  So, it's our intent to proceed

10   with cross-examination, and other forms of evidence,

11   but we do not intend to call Mr. White.

12        THE COURT:  I think her objection was a little

13   bit different.  I'm familiar -- we have discussed

14   the other portion, the ethical portion.

15        As I understand, two things, he's not going to

16   be a witness, evidently, so that would take away

17   number one.  The second one being that the witness

18   might be intimidated by his presence.  Do you want

19   to be heard on that?

20        MR. HOLMES:  I can't imagine a witness being

21   intimidated by his presence.  The only thing that

22   the State is interested in is the truth, as the

23   Court is, and we have already provided options to

24   Ms. Green.  She discussed the options.

25        I can't imagine under all the circumstances

1    that are before this Court that Mr. White merely

2    sitting here at counsel table is in any way, shape,

3    or form, intimidating.

4         THE COURT:  The Court will overrule the

5    objection.  Mr. Lanning?

6         MR. LANNING:  I don't know if it's not clear.

7    Did the Court intend this to be a continuing -- for

8    the public defender to continue the representation

9    of Ms. Green?

10        THE COURT:  I think Ms. Green said that she

11   prefers to testify, so as to her, I don't think it

12   would be.  She did discuss it with you last time, as

13   I recall, and I have advised her of the same rights

14   again, and she said that she prefers to proceed on.

15   In other words, she doesn't feel that she needs

16   counsel, or she's made an informed decision.  I

17   understand what she said.  As to her -- I think we

18   have got other witnesses coming?

19        MS. GAYLORD:  We have Jerome Murray.

20        THE COURT:  You may have another witness that

21   would be in the same situation.  Do you want us to

22   call you?

23        MR. LANNING:  The Public Defender's Office

24   would pose an objection to appointment to any of

25   these witnesses.  They have not been charged with

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 14 of 100 PageID 963

1    any crime, or arrested.

2        THE COURT:  The Court is basing that on Hill

3    versus State.

4        MR. LANNING:  Hill versus State appears to

5    provide for appointment of special public defenders,

6    which I believe would constitute conflict counsel,

7    or private attorneys.

8        THE COURT:  I don't know what it means.  You

9    may be right, but --

10       MR. LANNING:  The Statute provides for the

11   public defender to be appointed, the persons

12   charged, or arrested.

13       THE COURT:  I'm going to overrule the

14   objection, so.

15       MR. LANNING:  Yes, sir.

16       THE COURT:  As far as do you want us to call

17   you when we get the next witness, or do you want to

18   stay here?

19       MR. LANNING:  If somebody can call me.

20       THE COURT:  How about giving Donna -- Ernie,

21   you here as conflict, or what?

22       MR. CHANG:  Mr. Gruber asked me to show up,

23   depending on what your ruling was.

24       MR. HOLMES:  Your Honor, in consulting with

25   Mr. White, he is in agreement to step outside the

Case 6:14-cv-00330-RBD-GJK Document 3-37 Filed 02/27/14 Page 15 of 100 PageID 964

1    courtroom for this purpose.  Because of that,

2    because he won't be here as to while she's

3    testifying, we are also backing up and reserving the

4    possibility of him as a witness, if he's actually

5    going to be stepping outside of the courtroom.

6         THE COURT:  Do you want step outside the door?

7         MR. WHITE:  In abundance of caution.

8         MR. HOLMES:  Not knowing what's going to

9    transpire, Mr. White wishes to be overly cautious.

10        MR. WHITE:  It's very seldom said about me by

11   him.

12        THE COURT:  There's a record.

13        MR. WHITE:  There's a record of it.  Thank you.

14        THE COURT:  Okay.  Are we ready to proceed?

15        MS. GAYLORD:  Yes.

16                  DIRECT EXAMINATION

17   BY MS. GAYLORD:

18        Q.  State your name for the record, please.

19        A.  Sheila Green Keyes.

20        Q.  Are you the younger sister of Crosley Alexander

21   Green?

22        A.  No, I have two under me.

23        Q.  But you're younger than Crosley?

24        A.  Yes.

25        Q.  Back in 1990, do you recall providing courtroom

1   testimony against Mr. Green during his trial proceedings?

2       A.    Yes.

3       Q.    After those trial proceedings, did you later have an

4   opportunity to execute an affidavit?

5       A.    Yes.

6           THE COURT:  You need to talk up.  You have a

7       soft voice.

8           THE WITNESS:  Yes.

9           THE COURT:  Thank you.

10  BY MS. GREEN:

11      Q.    We're going to go ahead and start with the affidavit

12  because I believe that's what started the initiation of

13  certain proceedings, okay?

14      A.    Okay.

15      Q.    Do you recall signing that affidavit back in 1992?

16      A.    As I recall, I think I did.

17      Q.    Where did you actually sign the affidavit?

18      A.    In '92, I was in Lexington, Kentucky.

19      Q.    That's where it was actually executed, where you

20  actually signed it?

21      A.    Federal prison yes.

22      Q.    Did you actually have an opportunity to review that

23  affidavit, to contribute to whatever information is presented

24  in that affidavit?

25      A.    Not recently.

1    Q.   Did you have an opportunity to read the affidavit

2  before you signed it?

3    A.   Yes.

4    Q.   Did you understand this affidavit to be different

5  than your trial testimony at the time?

6    A.   Yes.

7    Q.   What was the purpose of you signing this affidavit?

8    A.   The purpose of me signing the affidavit was based on

9  the truth of what really happened during the testimony of

10  Crosley Green.

11    Q.   What is the truth in reference to your trial

12  testimony?

13         THE COURT:  You okay?

14         MS. GAYLORD:  I believe there is some tissue

15         right there, your Honor.

16         You can take all the time you need.  I know

17         that this is a very difficult moment.

18         THE WITNESS:  Back in 1990, I was charged in a

19         Federal case with a drug charge.  I was approached

20         by the State Attorney in Brevard County to provide

21         testimony against Crosley Green.

22  BY MS. GAYLORD:

23    Q.   Do you recall which agent, or State Attorney

24  approached you?

25    A.   Yes.

1    Q.    Who was that?

2    A.    Chris White and Phil Williams.

3    Q.    Was this before or after your conviction on the

4    Federal drug charges?

5    A.    It was after my conviction.

6    Q.    Had they ever approached you before your

7    conviction --

8          THE COURT:  Did you have a trial in the Federal

9       case?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  You went to trial and the jury

12      convicted you?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  And it was after that that this

15      occurred, but before you were sentenced?

16         THE WITNESS:  Yes, sir.

17   BY MS. GAYLORD:

18   Q.    Were you ever approached, prior to your conviction,

19   about any information that you may have known in reference to

20   the murder of Charles Flynn?

21   A.    Yes, through my attorney though.

22   Q.    Prior to your conviction and trial, did you provide

23   any information to the State in reference to this, at that

24   time?

25   A.    Are you saying before my trial?

STATE vs. GREEN;   10/28/03 - 10/29/03                    18

1    Q.    Before your trial.

2    A.    No.

3    Q.    After your conviction, how long after your

4    conviction, or the end of your trial, and before your

5    sentencing, was it that you were approached by Mr. White and

6    Mr. Williams?  Did you say Mr. Williams was the other person?

7    A.    Yes.  I don't recall the period of time from the

8    time I was convicted.  I don't recall.

9    Q.    Do you think it was a short time, a very long time?

10   A.    It wasn't too long because they told me I was going

11   to be sentenced.  I was looking at getting ten years in

12   prison.

13   Q.    Prior to your conviction and your trial, had you

14   been out on bond during dependency, during your Federal

15   proceedings?

16   A.    For my trial, I was out on bond.

17   Q.    So at this point in time, you were now in custody?

18   A.    Yes.

19   Q.    Sheila, after the murder of Mr. Flynn, did Mr. Green

20   ever come to you at your sister's house, and did you have a

21   conversation with Mr. Green in reference to the murder of

22   Mr. Flynn?

23   A.    I never even saw him.  I lived in a total different

24   town.  I lived in a government housing authority, me and my

25   four children.  I never made contact with him.  I hadn't seen

1    him for a couple of days.

2         Q.    Did Mr. Green ever confess to you that he committed

3    this particular murder against Mr. Flynn?

4         A.    No, he didn't.

5         Q.    Did Mr. Green ever provide you any information that

6    this murder occurred by his hand because Mr. Flynn had pulled

7    a gun on him?

8         A.    I never came in contact with Mr. Green.

9         Q.    Let's talk a little bit about your trial testimony.

10   During your trial testimony, do you recall the exact date you

11   testified in court?  I know it was a long time ago, but do you

12   recall the exact date?

13        A.    No, I don't.

14        Q.    Do you recall being transported back by the Seminole

15   County Detention Center, or to the Brevard County Jail?

16        A.    They transferred me from Osceola County.

17        Q.    While you were at the Osceola County Jail, what was

18   your status at that time, your medical status?

19        A.    I was placed on suicidal watch.

20        Q.    Were you placed on suicide watch immediately upon

21   your arrival at the Brevard County Jail?

22        A.    No.

23        Q.    How long was it before you were placed on suicide

24   watch?

25        A.    I was transferred from Seminole County to Osceola

STATE vs. GREEN;   10/28/03 - 10/29/03                    20

1   County Jail because I had a co-defendant coming to Seminole

2   County, that they transported me one night, one morning.

3           THE COURT:  Were you in Federal custody at that

4       time?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  They kept you in the Seminole

7       County Jail?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  The other case was a State case,

10      evidently, the one in Osceola County?

11          THE WITNESS:  No.  I had a Federal co-defendant

12      that came to Seminole.  They transferred me from

13      Osceola.

14  BY MS. GAYLORD:

15      Q.   After you got to the detention center, do you recall

16  how long it was before you were placed on suicide watch?

17      A.   I don't recall.

18      Q.   Could it have possibly been a day or two, or not

19  sure how long you were there?  It could have been a week, but

20  was it shortly thereafter?

21      A.   I don't recall.

22      Q.   What was your medical condition at the time that you

23  were placed on suicide watch?

24      A.   Depressed, didn't know what to do, didn't know where

25  to turn, thinking about I was facing ten years, I wasn't going

1    to see my kids anymore, who was going to raise my kids.

2         Q.   Your children were an important consideration in

3    your testimony against Mr. Green?

4         A.   I was told, How would I like to go to prison and

5    never be able to see my children again.

6         Q.   Who made that statement to you?

7         A.   I don't remember exactly which one, but I was

8    questioned by Chris White and Phil Williams.

9         Q.   When that statement was made to you, what was on

10   your mind at the time?

11        A.   I lost my parents when I was ten, and I never wanted

12   my kids to have to experience the pains I had to go through in

13   life.  All I wanted was to be able to raise my kids and be

14   there for them.

15        It was hard.  It was really hard.  I couldn't understand

16   life without my kids.  I never really been in trouble before.

17   It was like my first time.  I was frightened, didn't know the

18   system.

19        Q.   Do you believe that your children were being used in

20   an effort to get you to testify against Mr. Green?

21        A.   Yes.  They knew my children mean the world to me.  I

22   was a single parent.  I had a boyfriend, but I was a single

23   parent raising four children, and they lived with me.  So

24   basically, we had each other.

25        Q.   There are also reports of -- do you recall much of



STATE vs. GREEN;   10/28/03 - 10/29/03

22

1   your jail stay at the time that you were being housed, prior

2   to your trial testimony in this case?

3       A.   Yes.   I was given special treatment, special

4   privileges.

5       Q.   What type of special privileges and treatments were

6   you given?

7       A.   I don't recall which one told me, but I was informed

8   by either Chris White or Phil Williams, because those were the

9   two that was talking to me to get Lonnie to testify.   They

10  made it so that I was able to call the State Attorney's Office

11  collect, and they would send someone out to Brown's Avenue to

12  get Lonnie to talk to me on the telephone on several

13  occasions.

14      So we had, you know, whenever I called, we had contact.

15  So I would call collect to the Brevard County State Attorney's

16  office, and they would accept my call, and they would go get

17  him and let me talk to him.

18      Q.   During the time period you were talking to

19  Mr. Hillary, what type of things did you talk to Mr. Hillary

20  about, in reference to this case?

21      A.   They felt like I was the power over Lonnie, that I

22  could convince Lonnie to do what I wanted him to do.

23      Q.   Was Mr. Hillary in custody at the time, or was he

24  out of custody?

25      A.   No, he was not in custody.

1      Q.    Did you ever tell Mr. Hillary to help you out, and

2   to corroborate your lie, or to lie, as well, in Mr. Green's

3   case?

4      A.    I don't know what his testimony was about.

5            MS. GAYLORD:  May I have one moment, your Honor?

6            THE COURT:  Yes, ma'am.

7   BY MS. GAYLORD:

8      Q.    Just a couple more questions, Ms. Green.  When you

9   testified in court, do you recall if you were under any

10  medications at the time?

11     A.    I was on suicide watch.  I was confined in Osceola

12  County Jail to a holding cell where they stripped all my

13  linens, gave me just a bare bed.

14           THE COURT:  Were you on any medications?

15           THE WITNESS:  Not that I recall.

16  BY MS. GAYLORD:.

17     Q.    Do you recall why you were on crutches during that

18  time?

19           THE COURT:  Say that again.

20           MS. GAYLORD:  Why she was on crutches during

21      her trial testimony.

22           THE WITNESS:  I remember being on crutches.  I

23      came to court on crutches.

24           THE COURT:  Do you know why?

25           THE WITNESS:  My legs swelled up on me.  They

1          never knew why.

2    BY MS. GAYLORD:

3          Q.   I'm just going to show you a copy of your affidavit.

4              MS. GAYLORD:   Your Honor, I'm not sure -- I

5          know it's a part of our appendix, Exhibit H.   I

6          would like to show Ms. Green a copy of this

7          affidavit that's listed as Defendant's Exhibit --

8              THE COURT:   Defendant's H?

9              MS. GAYLORD:   Appendix H.  I believe it's the

10         second exhibit in Volume II.

11             THE COURT:   There we go.

12             BY MS. GAYLORD:   If I may approach the witness?

13             THE COURT:   Yes, ma'am.

14   BY MS. GAYLORD:

15         Q.   Ms. Green, I'm showing you a copy of an affidavit

16   that I have.  Do you recognize that affidavit?

17         A.   Yes.

18         Q.   Is this the affidavit that you executed?

19         A.   Yes.

20         Q.   Have you had an opportunity, recently, to review

21   this affidavit?

22         A.   No, ma'am.

23         Q.   Why don't you go ahead, take a few moments to review

24   it quickly.

25         A.   (Complied.)

STATE vs. GREEN;   10/28/03 - 10/29/03

25

1    Q.    This is the affidavit you executed in Kentucky?

2    A.    It is.

3    Q.    And this is the same affidavit which was notarized

4  on April 1, 1992, in Fayette, Kentucky?

5    A.    Yes.

6        MS. GAYLORD:  Your Honor, at this time, I would

7  like to move this affidavit into evidence for the

8  3.850 proceedings.

9        MR. HOLMES:  Objection, hearsay.  There has not

10 been a predicate laid.  She said that she remembered

11 doing an affidavit in Kentucky.  She did not write

12 it.  She read it before she gave it, and basically,

13 what they're offering is her affidavit outside this

14 courtroom for truth of that affidavit.

15       This affidavit can be used to refresh her

16 recollection.  That affidavit can be used if they

17 lay the proper predicate for past recollection.  But

18 her testimony is here today in the courtroom, not on

19 a statement given on a prior day.

20       What is she offering it for?  Impeachment.  At

21 this point in time, the State's objection is that

22 there is not a proper predicate, it's hearsay.

23       THE COURT:  Ms. Gaylord, what's the purpose of

24 this one, is it substantive, is it offered to show

25 the truth of it?

1      MS. GAYLORD:  It's offered to show that after

2   the trial proceeding, she executed an affidavit back

3   in 1992 which was later the subject of other motions

4   filed, I believe, by Mr. Parker.  These were the

5   statements at the time, and she did attempt to

6   correct her statements during that time, and she is

7   now here before the Court acknowledging those are

8   her statements, and that she's testifying

9   consistently.

10      THE COURT:  One of two things.  Either that

11   would be hearsay, it's an out-of-court statement

12   offered to prove the contents therein, or it's

13   repetitious.

14      MS. GAYLORD:  I believe she's testified

15   sufficiently that she recognized that the affidavit

16   -- she executed the affidavit.

17      THE COURT:  Which exception of hearsay would

18   that be, 803 -- I can't think of it.  I'll sustain

19   the objection.  We'll mark it as an exhibit.  If

20   it's offered to prove what's in it, then it would be

21   hearsay.  If it's offered for some other purpose, it

22   might not be.

23      Right now I believe it's one of two things.

24   It's hearsay, it's repetitious.  She's here to

25   testify.  It can be used to impeach her, or used to

1    refresh her recollection, those kinds of things.

2    But her testimony here, this is the substantive

3    testimony.  I'll sustain the objection.

4        We'll mark it as Defense Exhibit A for

5    identification.

6        MR. NUNNELLEY:  I was checking with madam clerk

7    on the exhibits which had been entered.  It appears

8    that we have already had four exhibits marked A, B,

9    C and D for identification.

10        It looks like as far as what's actually been

11    entered has been a 1, 2 and 3.  We would ask -- I

12    don't know if it was an oversight, but it appears

13    that what we previously marked for identification A

14    was the 48 Hours broadcast.  We would ask --

15        THE COURT:  The video?

16        MR. NUNNELLEY:  A is a 48 Hours video.  We

17    would ask that to be entered as number 4, and then

18    if we can mark this affidavit as Defendant's Exhibit

19    E.

20        (Whereupon, Defendant's Exhibit E was marked

21    for identification.)

22        THE COURT:  We'll take up the admissibility at

23    another time.  Go ahead and mark that.  I'll sustain

24    the State's objection.

25  BY MS. GAYLORD:

STATE vs. GREEN;  10/28/03 - 10/29/03                    28

1      Q.   At the time, Ms. Green, that you executed that

2  affidavit, had you had any contact with Crosley Green?

3           THE COURT:  With who?

4           MS. GAYLORD:  Crosley Green.

5           THE COURT:  Oh, Mr. Green.  Okay.

6           THE WITNESS:  I never contacted him, never

7      talked to him, wrote him, or anything.

8  BY MS. GAYLORD:

9      Q.   Did anyone pressure you, or threaten you, or

10  intimidate you to execute that affidavit?

11     A.   No.

12     Q.   Have you been threatened, coerced, or intimidated in

13  any way to come forth to testify, and bring forth the

14  testimony today?

15     A.   No.

16          MS. GAYLORD:  Your Honor, at this time, we have

17     no other questions.

18          THE COURT:  Mr. Holmes, cross-examination?

19          MR. HOLMES:  Thank you, your Honor.  Your

20     Honor, as overly prepared as I am, I have previously

21     marked several exhibits as State's, for

22     identification.  I would like to present these to

23     the clerk at this time.  I have a list where I have

24     numbered them A, B, C, and D. Although the State may

25     not offer them into evidence, I will be referring to

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 30 of 100 PageID 979

STATE vs. GREEN;   10/28/03 - 10/29/03                                    29

1      them in this fashion.

2              MR. GRUBER:  Can I get a copy?

3              THE COURT:  Have you got a copy of the

4      exhibits?

5              MR. GRUBER:  Yes, we just received a copy.

6              THE COURT:  Okay.  Mr. Holmes, go ahead.

7              (Whereupon, State's Exhibits A, B, C, and D,

8      were marked for identification.)

9                           CROSS EXAMINATION

10     BY MR. HOLMES:

11         Q.  Ms. Green, am I correct, Crosley Green is your

12     brother, is that true?

13         A.  Yes.

14         Q.  Who is O'Connor Green?

15         A.  My brother.

16         Q.  That's another brother.  Is he an older brother, or

17     younger brother?

18         A.  He's older than me.

19         Q.  O'Connor Green was charged along with you in the

20     Federal case that you were in Federal court on.  Is that

21     correct?

22         A.  Yes.

23         Q.  He also was convicted at trial just as you were

24     convicted at trial.  Is that correct?

25         A.  Yes.

STATE vs. GREEN;   10/28/03 - 10/29/03                    30

1      Q.   The time period of that Federal indictment -- you

2   had not been indicted by the Federal authorities back on April

3   3rd of 1989 when Crosley was accused of having committed this

4   homicide.   Is that correct, you were not in Federal custody

5   April 3rd of '89?

6      A.   No.

7      Q.   As a matter of fact, you weren't indicted until, I

8   believe, it's April 18th of 1990, in Federal court.   Is that

9   what would be an approximate time that you would recollect?

10      A.   I'm not sure.

11      Q.   But clearly, you were not in custody when this

12   incident occurred where your brother Crosley was accused of

13   the homicide.   Is that correct?

14      A.   Correct.

15      Q.   And you're saying that you were living in another

16   city.   What other city was that that you were living in with

17   your children?

18      A.   Titusville.

19      Q.   The incident that Crosley is alleged to have

20   committed, and I think that you testified about in the prior

21   trial, that's alleged to have occurred in Mims.   Is that

22   correct?

23      A.   According to what the newspaper says.

24      Q.   That's only a few miles away from Titusville,

25   correct?

STATE vs. GREEN;  10/28/03 - 10/29/03

31

1    A.    Yes.

2    Q.    As a matter of fact, your sister lived very close to

3    Holder Park where this incident began, isn't that true?

4    A.    Yes.

5    Q.    That was Celestine Peterkin, your sister that lived

6    there?

7    A.    Yes.

8    Q.    It was not uncommon for you to go to Celestine's

9    home, was it?

10    A.    I didn't have a car, so someone had to give me a

11    ride.

12    Q.    You had been to Celestine's home many times over the

13    years?

14    A.    I used to live there.

15    Q.    Also, there was an individual by the name of Terry

16    Spruill that was indicted with you in Federal court.  Is that

17    correct?

18    A.    Yes.

19    Q.    He was convicted in that trial along with --

20        MS. GAYLORD:  I object.  This is beyond the

21    scope of our direct examination.  We were basically

22    dealing with her testimony, and her charges.  At

23    that particular time, we did not bring in Terry

24    Spruill, Mr. O'Connor, or any of these other

25    individuals in our direct examination.

STATE vs. GREEN;   10/28/03 - 10/29/03

32

1          THE COURT:   Your objection is beyond the scope?

2          MS. GAYLORD:   Beyond the scope.

3          THE COURT:   Overruled.

4   BY MR. HOLMES:

5     Q.   Terry Spruill was a co-defendant with you in Federal

6   court, correct?

7     A.   Yes.

8     Q.   Along with Lonnie Hillary.   Is that correct?

9     A.   Yes

10    Q.   You and Lonnie Hillary had a child together prior to

11  your indictment in Federal court, isn't that true?

12    A.   Yes.

13    Q.   While you were in custody, wasn't Celestine Peterkin

14  taking care of your children, including Lonnie's child that he

15  had with you?

16    A.   Yes.

17    Q.   Now, I believe you testified a few minutes ago that

18  you had no contact with the Federal authorities, being the

19  Federal prosecutor, or the state prosecutors, prior to your

20  trial about the possibility of testifying.   Is that correct?

21    A.   I don't recall saying that.

22       THE COURT:   I think she said through her attorneys.

23  BY MR. HOLMES:

24    Q.   So your contact -- any information you got was

25  solely through your attorneys, correct?

1        A.    Not all, but the first part, yes.

2        Q.    But prior to your trial, you had no meeting with,

3   for example, I believe Rick Jancha was the Assistant US

4   Attorney that handled the case.  He did not meet with you

5   prior to the trial, did he?

6        A.    I don't recall.

7        Q.    No state prosecutors met with you prior to your

8   trial, did they?

9        A.    I don't recall, no.

10       Q.    Isn't it true, ma'am, that after your trial, you

11  initiated contact with the Federal and state authorities about

12  wanting to testify in the Crosley Green case?  It was your

13  desire to come forward and testify.

14       A.    No.

15       Q.    Do you recall an attorney by the name of Jeffrey

16  Dees?

17       A.    Yes.

18       Q.    Isn't it true that Mr. Dees was your public defender

19  representing you in a Federal case?

20       A.    Yes.

21       Q.    And so he was acting on your behalf as your agent

22  through that process in the Federal court system, wasn't he?

23       A.    As my attorney?

24       Q.    Your attorney.

25       A.    Yes.

1    Q.   The public defender, he was acting in your best

2   interest, he was representing you during that proceeding,

3   correct?

4    A.   Yes.

5    Q.   Isn't it true that you approached him about

6   contacting the US Attorney, and offering your cooperation in

7   the Crosley Green case?

8    A.   I don't recall.  Mr. Dees came on several occasions.

9   You know, it was so much going on, you know, it was back and

10   forth.

11    Q.   Let me show you something that may help refresh your

12   recollection.  If I can show you State's Exhibit A --

13        MS. GAYLORD:  Your Honor, in reference to the

14        letter from Attorney Dees, I believe Mr. Holmes is

15        attempting to refresh her recollection with a

16        document she did not create.  This document was

17        actually created by Mr. Dees.  It was actually

18        written to Mr. Jancha, and it's -- although it's

19        cc'd with Sheila Green, there is no direct evidence

20        she had a copy of this particular document.

21        MR. HOLMES:  I'm just about to show that to her

22        to see if she's ever seen it.

23        THE COURT:  Is there an objection at this time?

24        MS. GAYLORD:  I was objecting to him showing

25        her the document because she did not create it.

1          THE COURT:  The purpose is so she can see it,

2     to see if she can identify it, or refresh her

3     recollection?

4          MR. HOLMES:  To refresh her recollection, to

5     see if she had received this letter.

6          THE COURT:  Overruled.

7          MR. HOLMES:  Thank you.

8  BY MR. HOLMES:

9     Q.   Let me show you what's previously been marked as

10 State's Exhibit A, and take a couple of minutes to read that,

11 and look at it and tell me if you have ever seen that letter,

12 or a copy of that letter.  It indicates, I believe, at the

13 end, that you were copied by your attorney.

14    A.   I don't recall this letter.

15    Q.   So looking carefully at State's Exhibit A, you do

16 not have a recollection of having received a copy of that from

17 your attorney?

18    A.   I don't recall.

19    Q.   But Mr. Dees was your attorney, correct?

20    A.   Yes.

21    Q.   Thank you.  Now, prior to trial, were you aware

22 that --

23          THE COURT:  Which trial?

24 BY MR. HOLMES:

25    Q.   Prior to the Federal trial back in 1990, were you

1    aware that Lonnie Hillary had talked to the US Attorney's

2    Office, and the State Attorney's Office about information he

3    might have concerning Crosley Green being involved in the

4    death of Chip Flynn?

5        A.   I don't recall.  I never discussed nothing like that

6    with him, so I don't recall.

7        Q.   So it would be your testimony here today that you

8    did not have any direct contact with Lonnie Hillary about

9    whether or not he should testify in State court?

10       A.   My testimony is --

11            MS. GAYLORD:  Has been asked and answered.  I

12       believe he also asked -- I asked her that question,

13       as well.

14            THE COURT:  Overruled.  He just asked too.

15            MS. GAYLORD:  I think she just stated that she

16       did not discuss those types of things with

17       Mr. Hillary, and now he's attempting to go ask the

18       same question of her again.

19            THE COURT:  Overruled.

20   BY MR. HOLMES:

21       Q.   The question was, is it your testimony here today

22   that you did not have a conversation with Mr. Hillary about

23   his testimony in State Court, prior to the Federal trial

24   beginning?

25       A.   I don't recall.

1       THE COURT:  So you don't remember one way or

2   the other?

3       THE WITNESS:  Your Honor, there was so much

4   going on.

5       THE COURT:  I mean, what you're saying is,

6   Judge, I can't remember one way or the other.  Would

7   that be right?

8       THE WITNESS:  I don't recall, your Honor.

9       THE COURT:  Okay.

10  BY MR. HOLMES:

11      Q.   Now, do you recall, after your trial, that you gave

12  a sworn statement in the presence of Phil Williams, Chris

13  White, and Rick Jancha on July 13, 1990, about your knowledge

14  of Crosley Green's involvement in the Chip Flynn homicide?

15      A.   I don't recall.

16      Q.   So you don't recall them coming and talking to you,

17  and having you give a sworn statement in front of a court

18  reporter, at which time you told them about your knowledge of

19  Crosley Green's involvement in the Chip Flynn homicide?

20      A.   I don't recall.

21      Q.   At this time, I would show you State's Exhibit B for

22  identification purposes.  And if you could, take a few

23  minutes.  Have you seen this before?

24      A.   No, sir.

25      Q.   The face of it indicates this is testimony that was

STATE vs. GREEN;   10/28/03 - 10/29/03                                    38

1   obtained July 13, 1990 in the presence of Chris White, Phil

2   Williams, and Rick Jancha, in front of a court reporter.  At

3   that time, it was taken at the Seminole County Jail.  Do you

4   remember being in the Seminole County Jail?

5       A.   Yes, I remember being there.

6       Q.   Could you take a few minutes, and take a look at

7   that, and see if that refreshes your recollection that such a

8   statement was taken from you?

9       A.   (Complied.)

10      Q.   Have you had a chance to look over State's Exhibit

11  B?

12      A.   Yes.

13      Q.   Does that refresh your current recollection that you

14  gave a sworn statement on July 13, 1990, while in the Seminole

15  County Jail, to Chris White, Phil Williams, and Rick Jancha?

16      A.   I honestly don't recall, but I read this affidavit,

17  whatever this is, this statement.

18      Q.   You don't recall having given a sworn statement.

19  After you wanted to testify, and they came to see you in the

20  Seminole County Jail, and they took this statement in front of

21  an official court reporter, you don't recall that occurrence

22  even happening?

23      A.   I don't recall, sir.  I'm sorry, I just don't

24  recall.

25           THE COURT:  Let me ask you, when you read that,

1    did that refresh your memory at all, when you read

2    that?

3                THE WITNESS:  No, sir.

4    BY MR. HOLMES:.

5        Q.   So you have no recollection, at all, of the contents

6    of that interview?

7        A.   I was so depressed, I don't recall what took place

8    day to day, sir.  I'm so sorry, I just can't remember it.

9        Q.   Now, do you recall testifying at trial on August the

10   29th of 1990, here in Brevard County, at the trial of Crosley

11   Green, for the homicide of Chip Flynn?

12       A.   I don't remember the date.

13       Q.   But you do remember coming to court?

14       A.   I remember coming to court because I was on

15   crutches.

16                THE COURT:  What was the date?

17                MR. HOLMES:  August the 29th, 1990.

18                THE COURT:  Okay.

19   BY MR. HOLMES:

20       Q.   So you do remember coming to court?

21       A.   I remember being transported by Seminole County --

22   Osceola County deputies.  I was put in a separate room.  I was

23   on crutches.

24       Q.   Do you remember coming into a courtroom like this

25   one, and being placed under oath?

1      A.    I don't remember.  They had me in a room.  I can't

2   tell you where I was.  I know I was in an office when Lonnie

3   came in the room with me.

4      Q.    I'm asking you, after that, do you remember -- look

5   around you, open your eyes and look around you right now.  Do

6   you remember coming into a room that had chairs with jurors

7   sitting in it, and Crosley Green sitting at counsel table with

8   Mr. Parker?  Do you remember coming in --

9      A.    To testify.

10     Q.    Coming in to testify?

11     A.    I remember coming in to testify.

12     Q.    Okay, all right.  Isn't it true that you testified

13   in court that you did see Crosley Green the day after the

14   shooting occurred at your sisters?

15     A.    I don't know if it was in those exact words, but I

16   remember testifying to something to that effect.

17     Q.    Let me show you what's previously been marked as

18   State's Exhibit C, and I'll go through with it line by line,

19   and ask you to take a look.

20          If you'll turn to page 855, and looking down at

21      line 8:

22          (Whereupon, the transcript of trial testimony

23      of Sheila Green, 8/29/90, was read into the record

24      by Mr. Holmes as follows:)

25          "Question:  Where did you see him after you

STATE vs. GREEN;   10/28/03 - 10/29/03                    41

1        heard about the shooting?

2             "Answer:  Over at my sister's house, at 3658

3        Bar Cliff Way, in Mims, Florida."

4             (Whereupon, this concludes the reading of the

5        transcript of Ms. Sheila Green.)

6   BY MR. HOLMES:

7        Q.   Do you recall being asked that question, and giving

8   that answer?

9        A.   As far as remembering, no, but I see it on the

10  paper.

11       Q.   So you're saying today, in court, you have no

12  recollection that that was your testimony back on August the

13  29th, 1990, under oath, in a courtroom here in Brevard County,

14  Florida?

15       A.   No, sir, I'm saying that it was so many questions

16  asked me -- asked from me on that day, that I don't remember

17  everything that was asked of me.

18            THE COURT:  The question was, when you read

19       that, does that refresh your recollection?  Was that

20       question asked, and that was your answer?  That was

21       what the question was.

22            THE WITNESS:  No, sir.

23            THE COURT:  If you read that, do you remember

24       that that was the question that was asked of you,

25       and that was your answer?

1         THE WITNESS:  I don't know, your Honor.

2         THE COURT:  Okay.

3         THE WITNESS:  I don't know if this is how I

4     said it, or what.  I really don't know how it was

5     said, but if you say the court reporter recorded it

6     like this --

7  BY MR. HOLMES:

8     Q.   Isn't it true as stated there, that you testified in

9  court that you saw Crosley Green at your sister's house, his

10  sister's house, in Mims, the day after the homicide?

11     A.   Yes, that's what I said on here.

12     Q.   That is what you recall testifying to at trial, that

13  you did see him at your sister's the day after the incident?

14         MS. GAYLORD:  Your Honor, asked and answered.

15     I believe she just answered that question.

16         MR. GRUBER:  I would like to make a --

17         THE COURT:  One lawyer, one witness.  Tell

18     Ms. Gaylord what you want to object to.

19  BY MR. HOLMES:

20     Q.   Now, turning to page 857, and we're going to begin

21  at line 14, which is right here.  Beginning on page 857, do

22  you recall the question:

23         (Whereupon, the transcript of trial testimony

24     of Sheila Green, 8/29/90, was read into the record

25     by Mr. Holmes as follows:)

STATE vs. GREEN;  10/28/03 - 10/29/03                                    43

1         "Question:  Now, when you went and saw Crosley

2     and motioned him over to talk to him, what did you

3     say to him?

4         "Answer:  I asked him about did he kill that

5     dude."

6  BY MR. HOLMES:

7     Q.   Do you recall your testimony about being asked the

8  question, first, did you see him, and then having seen him,

9  him coming over and you asking him, Did he kill that dude?  Do

10  you recall that question, and that answer which you gave?

11    A.   Yes, that I'm looking at it, and reading it over.

12    Q.   So you do recall now that you gave that testimony in

13  court that you did talk to him the day after the homicide, at

14  your sister's, and you asked him if he killed that dude?

15    A.   I don't remember what I said in court, but as I read

16  over the transcript, it said I said that during the trial.

17    Q.   Well, do you have a current recollection?

18    A.   No, I don't have a current recollection, you know,

19  what took place, the questions that was asked.

20    Q.   Do you have a recollection of having previously

21  testified that Crosley Green admitted to you that he killed

22  Chip Flynn?

23    A.   Yeah, I remember testifying.

24    Q.   Do you remember testifying to that fact that he told

25  you --

1    Q.    So you have no recollection of what you testified to

2   at trial, and the transcript itself does not refresh your

3   current recollection?

4    A.    No, sir, I was in another state of mind.

5    Q.    Looking down a little bit further on page 861 at

6   line 12:

7         "Question:  Sheila, of all the things that I

8         asked you about, and asked you the questions, the

9         times that we've met, what's the most important

10        thing, and the one thing I kept reminding you that

11        you had to do?

12        "Answer:  To tell the truth.

13        "Question:  What you told us today, Sheila, is

14        that the truth?

15        "Answer:  Yes, sir.

16        (Whereupon, this concludes the reading of the

17        transcript of Ms. Sheila Green.)

18   BY MR. HOLMES:

19    Q.    Do you recall being asked those questions in the

20   trial, and do you recall that being your answer, that you knew

21   it was important to tell the truth, and in that proceeding,

22   you did tell the jury the truth?

23    A.    I don't recall.

24    Q.    So you're saying today you have no recollection of

25   your testimony before that jury, and this document does not

1  refresh your current recollection as to your testimony before

2  that jury?

3       A.   I'm saying today that I was depressed.  I was going

4  through mental problems, and I just don't recall what I said

5  the day of trial.

6       Q.   Do you understand the term, telling the truth?

7       A.   Yes, sir.

8       Q.   Did you understand the importance of telling the

9  truth when you took the oath at the trial back in 1990?

10      A.   Yes, sir.

11      Q.   Isn't it true that the only thing the State

12  Attorney's Office asked you to do was to tell the truth?

13      A.   I don't recall that they said that to me.  I don't

14  recall, sir.

15      Q.   Do you recall appearing at the sentencing in Federal

16  court on August the 30th, 1990, for the sentencing of Terry

17  Spruill.

18           MS. GAYLORD:  Objection, your Honor, this is

19      beyond the scope.

20           THE COURT:  Ask the question again.

21           MR. HOLMES:  Asking whether or not she appeared

22      and testified at the sentencing for Terry Spruill,

23      which was her co-defendant in the Federal case.

24           THE COURT:  Overruled.  Go ahead.

25           THE WITNESS:  I don't remember.  I went, but I

1    don't know the date.

2  BY MR. HOLMES:

3      Q.   Okay, but you do remember going to the sentencing

4  for Terry Spruill?  You know who Terry Spruill is, correct?

5      A.   I think I went to the sentencing by myself, too.   I

6  think I had to go to sentencing.

7      Q.   Do you also remember going to sentencing for Terry

8  Spruill, and testifying during that proceeding?

9      A.   I think I was supposed to be sentenced on that day

10  along with him, so I think that was the reason I was there.

11     Q.   Let me show you what's previously been marked as

12  State's Exhibit D for identification purposes.  It indicates

13  that that's a transcript, August 30th, 1990, in the Middle

14  District of Florida, sentenced before the Honorable Patricia

15  Fawcett, US District Court Judge, and the heading of the case

16  is USA versus Terry William Spruill.

17         MS. GAYLORD:  Your Honor, we would object.

18         THE COURT:  Legal basis?

19         MS. GAYLORD:  Beyond the scope of direct, and

20     it's irrelevant to what's going on in these

21     proceedings.  Terry Spruill has nothing to do with

22     these proceedings.

23         THE COURT:  Where's the relevance?

24         MR. HOLMES:  Your Honor, in that proceeding, I

25     intend to point out that she testified that she was:

1            (Whereupon, the transcript of trial testimony

2       of Terry Spruill, 8/30/90, was read into the record

3       by Mr. Holmes as follows:)

4            "Question:  Who is going to speak on your

5       behalf?

6            "Answer:  The government.

7            "Question:  If you testify correctly, what they

8       want to hear, correct?

9            "Answer:  Yes, tell the truth.

10           MR. HOLMES:  She, in the Federal proceeding,

11      also is reiterating the fact that she is being

12      called to testify, to tell the truth, and that her

13      testifying there was part of her cooperation with

14      the government after her conviction, which includes

15      testifying, Crosley Green testifying --

16           THE COURT:  So the relevancy is that she knew

17      that she was supposed to tell the truth in that

18      proceeding?  Is that what you're trying to show?

19           MR. HOLMES:  Let me back up.  Beginning on page

20      32, line 22:

21           "Question:  Have you been promised any points

22      or participation in your case to testify against

23      O'Connor Green?

24           "Answer:  No.

25           "Question:  Is it your testimony today that

1    you're not getting any benefit at all from this

2    particular testimony here today?

3         "Answer:  All I'm getting is somebody to speak

4    on my behalf.

5         "Question:  If the testimony is correct, to

6    what they want to hear, correct?

7         "Answer:  Yes, to tell the truth.

8         THE COURT:  The purpose is to show --

9         MR. HOLMES:  To ask her if she recalls

10   testifying at that proceeding, and that she was

11   being called to tell the truth, and that that was

12   the only benefit that was being given to her.

13        THE COURT:  For that testimony --

14        MR. HOLMES:  For her whole sentencing case.

15        THE COURT:  I see.

16        MR. HOLMES:  Her coming to State court is based

17   on --

18        THE COURT:  Overruled.  Go ahead.

19   BY MR. HOLMES:

20   Q.    Turning to page 32, and beginning down at line 22:

21        "Question:  Have you been promised any points

22   for participation in your case out there, and

23   testifying against O'Connor Green?

24        "Answer:  No.

25        "Question:  Is it your testimony today that you

STATE vs. GREEN;  10/28/03 - 10/29/03

52

1    are not getting any benefit at all from this

2    particular testimony here today?

3         "Answer:  All I'm getting is somebody to speak

4    on my behalf, that's all, but not saying I will get

5    this time or that time.

6    BY MR. HOLMES:

7         Q.   Do you recall giving that testimony?

8         MS. GAYLORD:  Same objection I previously noted

9    as of Terry Spruill.

10        THE COURT:  Overruled.

11        THE WITNESS:  I don't recall.

12   BY MR. HOLMES:

13        Q.   Reading that, does that refresh your current,

14   present recollection, at all?

15        A.   No, not exactly.

16        Q.   Can you remember who was asked -- who was going to

17   be asked to speak on your behalf, and your answer, the

18   government, line 9.  Do you have any recollection of that?

19   Does that, in any way, refresh your present recollection?

20        A.   No, sir.

21        Q.   The next line:

22        "Question:  If you testify correctly to what

23   they want to hear, correct?

24        "Answer:  Yes, tell the truth.

25   BY MR. HOLMES:

1      Q.    Do you recall testifying in Federal court that your

2   purpose in being there, and the benefit that you were to get

3   in the sentencing of your Federal case was to tell the truth?

4   Do you have any recollection of that?

5      A.    What?

6      Q.    Do you have any recollection of that?

7      A.    Which one now, number what?

8            THE COURT:  What's the line?

9            MR. HOLMES:  Twelve.  "Yes, tell the truth."

10           THE COURT:  What line?

11           MR. HOLMES:  Line 12.

12           THE WITNESS:  I don't recall that that was said

13      to me.

14           (Whereupon, this concludes the reading of the

15      transcript of the Terry Spruill sentencing.)

16   BY MR. HOLMES:

17      Q.    Reading that document does not refresh your present

18   recollection?

19      A.    No, not exactly.

20      Q.    You say not exactly.  Does it refresh your present

21   recollection at all?  Does it give you a memory that that was

22   what your testimony was in the sentencing of Terry Spruill?

23      A.    I don't remember what was said.  All I remember is

24   my kids, you know, playing a major role in everything.

25      Q.    So your answer is no, you have no recollection?

1    A.    No, sir.

2    Q.    Do you recall being sentenced in Federal court on

3  October 22, 1990?

4    A.    I don't remember the date I was sentenced.  I don't

5  recall.

6    Q.    But you do have a recollection that you were

7  sentenced?

8    A.    No, I was sentenced.

9    Q.    That was your opportunity to present to the Federal

10 judge your cooperation in State court in hopes to receive some

11 sort of benefit for your having testified truthfully.  Isn't

12 that correct?

13   A.    Excuse me, could you rephrase that?

14   Q.    You were there for sentencing, correct?

15   A.    Yes, sir.

16   Q.    You had contacted your attorney, and asked them

17 about cooperating in the Crosley Green case?

18   A.    No, sir.

19   Q.    So you're saying now that you didn't contact your

20 attorney?

21   A.    I was seeked out.

22   Q.    So after your sentencing, you didn't contact your

23 attorney, and ask your attorney to contact Mr. Jancha about

24 cooperating in Crosley Green?

25        MS. GAYLORD:  That's been asked and answered.

1      I believe the witness testified she did not

2      recognize the letter.

3              THE COURT:  Sustained.

4              MR. HOLMES:  Okay.

5  BY MR. HOLMES:

6      Q.   So, do you recall your sentencing proceeding in

7  Federal court?

8      A.   I recall being sentenced in Federal court.

9      Q.   Do you recall Phil Williams, an Assistant State

10 Attorney, being called as a witness on your behalf in Federal

11 court to tell what your cooperation had been in testifying in

12 the Crosley Green case?

13     A.   Uh-huh.  I don't exactly recall if they -- I know I

14 was sentenced. When I was sentenced, I don't remember.  They

15 were supposed to have spoken on my behalf, but --

16             THE COURT:  Do you remember if they did?  Do

17         you remember if Mr. Williams came over and

18         testified?

19             THE WITNESS:  Somebody did.  I don't know if it

20         was him, or Chris White.

21             THE COURT:  Okay.

22 BY MR. HOLMES:

23     Q.   Let me show you what's been previously marked as

24 State's Exhibit E for identification purposes.  That's headed

25 as United States America versus Sheila Chandra Green, before

STATE vs. GREEN;   10/28/03 - 10/29/03

56

1    the Honorable Patricia Fawcett, October 22, 1990, at the

2    Federal courthouse in Orlando.

3        Turning to page 12, where it indicates, or -- excuse me,

4    line 12, page 10, where it indicates calling a witness on your

5    behalf at sentencing by the name of Phil Williams.  Do you

6    have·a recollection of that?

7        A.   As a recollection, no, but I see it on the paper.

8        Q.   So you have no recollection of that, and that does

9    not refresh your current recollection about Phil Williams

10   testifying at your sentencing proceeding?

11       A.   I told you, it was like Phil or Chris White, so from

12   what I see on the affidavit, it says Phil Williams.

13       Q.   Turning over to page 12, down at line 22, do you

14   recall Mr. Williams testifying in your presence in open

15   Federal court:

16       (Whereupon, the transcript of sentencing for

17       Sheila Green, 10/22/90, was read into the record by

18       Mr. Holmes as follows:)

19       "Question:  Did the assistance of Sheila Green

20       have any substantial affect in the outcome of your

21       case?

22       This is to Mr. Williams, referring to the

23       Crosley Green case.

24       "Answer:  It did, your Honor.  Without

25   Ms. Green's participation in our case, it's my

1    opinion, and I think it would be shared by

2    Mr. White, that we would not have been able to

3    secure the conviction against her brothers.  She

4    played a pivotal role in that, and allowed us to use

5    -- led us to another witness that we knew of before

6    that, but were able to obtain that witness's

7    testimony, also.

8         It also involved a significant admission of

9    guilt made by the defendant at her sister's home, in

10   her presence, and she testified truthfully.  She was

11   very straightforward in her testimony there in

12   Brevard County, and without her, we would have been

13   in a position where a very violent criminal would

14   have probably escaped justice.

15   BY MR. HOLMES:

16        Q.   Do you remember Mr. Williams testifying at your

17   sentencing, on your behalf, and explaining to the court how

18   you testified truthfully, and the significance of your

19   testimony in the State proceeding?

20        A.   Not that I recall.

21        Q.   So you have no present recollection, whatsoever, and

22   this document does not refresh your recollection?

23        A.   I don't have a recollection of what was said.

24        Q.   Now, going just below that, question 13:

25             "Question:  During the course of Crosley

STATE vs. GREEN;   10/28/03 - 10/29/03

58

1    Green's trial --

2    A.    Excuse me, what page?

3          THE COURT:  Line?

4          MR. HOLMES:  Line 13.

5          THE WITNESS:  Page 13?

6          MR. HOLMES:  Page 13, Line 13.

7          "Question:  During the course of Crosley

8    Green's trial, were there other family members

9    related to Sheila Green present in the courtroom?

10         "Answer:  Yes, there were.  Several of Crosley

11   Green's, and four of Sheila Green's sisters were

12   there in support of Crosley Green.

13         Noticeably absent, I believe, today from the

14   courtroom, are members of the family here to support

15   her.

16   BY MR. HOLMES:

17   Q.    Do you recall that testimony by Mr. Williams, in

18   your sentencing?

19   A.    Sorry, no, sir.

20   Q.    Isn't it true that your family was not there in

21   support of you at that sentencing?

22   A.    I don't recall if they was there, or not.  I was --

23   I don't remember.

24   Q.    Isn't it true that because of your testimony against

25   your brother in trial, you have been on the outs with your

1    family since that time?

2         A.   No, sir, my sister raised my kids, and I used to

3    contact my kids all the time by calling her house.

4         Q.   Okay.  So you have no concerns about her raising

5    your kids, having contact with your kids.  So all this

6    pressure about who's going to raise your kids, and all that,

7    didn't exist.  Is that what you're saying?

8         A.   I raised my own kids ever since I had them.  My kids

9    always been with me.  No one else has ever had to raise them

10   but me.

11        Q.   You're saying you had that relationship forever with

12   your sister?  She was very capable of taking care of your

13   children, correct?

14        A.   My sister raised me when my parents died, to keep us

15   from going to a foster home.

16        Q.   The fact you were going to prison, you had no

17   concerns about your children because they were going to be

18   well taken care of by your sister?

19        A.    My kids know me as a mother, not my sister.  She's

20   not their mother.  I'm their mother.  I took care of them.

21   That was my greatest concern, was my children.  They used to

22   being with me, not her.

23        Q.   Turning to page 14.  Beginning at line two:

24             "Question:  And have you felt her cooperation

25        with your offices, is there some concern concerning

1    the welfare of her four children having testified

2    against the family members, and her children being

3    watched by family members?

4         "Answer:  There is.  Our office has instigated,

5    with the cooperation and help of Rehabilitative

6    Services investigation into the welfare of the

7    children.  There is quite a concern on our office's

8    behalf, and we have had the state authorities there

9    on two occasions.  Because of her testimony in the

10   Crosley Green case, there is very much concern, some

11   remarks made, and so forth, by the other sisters, to

12   the welfare of her children, and she was aware of

13   that at the time she testified.

14   BY MR. HOLMES:

15        Q.   Do you recall that testimony by Mr. Williams at your

16   sentencing on your behalf?

17        A.   No, I don't.

18        Q.   Do you have any present recollection, having looked

19   at that transcript, that that was his testimony?

20        A.   No, sir, this is my first time.

21        Q.   So, to summarize what you're saying here today is,

22   you're saying you did not talk to Crosley Green after the

23   homicide, and he did not make the admissions to you that he

24   was involved in the death of Chip Flynn?

25        A.   I don't know the last time I had talked to him.

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 59 of 100 PageID 1008

1        Q.   But you're saying, your testimony here today is,

2   that didn't occur.  Whatever you testified about before,

3   seeing him at your sisters, and all of that, that just didn't

4   occur.

5        A.   No, sir, it never occurred.

6        Q.   You're saying that you felt some pressures, concerns

7   about the fact that you were going to be going to Federal

8   prison, and concerns about your children, and that's why you

9   came forward and cooperated with the State, correct?

10       A.   They told me, how would I like going to prison for

11  ten years, and never seeing my kids again.  Can you imagine

12  somebody telling you you would never see your kids again?

13       Q.   Didn't you tell yourself that?  When you were

14  convicted in Federal court, you actually faced a longer prison

15  sentence than that, didn't you?

16       A.   It was 97 to 121 months.

17       Q.   You knew that when you got sentenced, didn't you?

18       A.   I didn't understand the system.

19       Q.   Isn't that true, that's why you turned to your

20  attorney to ask about cooperating with the State, it was your

21  decision?

22            MS. GAYLORD:  Objection, your Honor.  That

23       question has been asked and answered.

24            THE COURT:  Sustained.

25  BY MR. HOLMES:

STATE vs. GREEN;   10/28/03 - 10/29/03                    62

1      Q.    So after you decided to cooperate, you came to court

2   and testified, correct, back in 1990?

3      A.    Yes, sir.

4      Q.    And you're saying today that you have no

5   recollection of what you testified to, and nothing that's been

6   presented to you here today refreshes that recollection of

7   your testimony in that proceeding?

8      A.    I was a young mother of four children.

9            THE COURT:  That's not his question.  Listen to

10       his question.  Say it again.

11  BY MR. HOLMES:

12     Q.    You're saying, here today, that you have no

13  recollection today of your testimony in court back in 1990,

14  correct?

15     A.    I said I remember testifying, but what I exactly

16  said, I don't remember.

17     Q.    And having looked at these transcripts of your

18  testimony, none of that has helped refresh your current

19  recollection as to any of the statements you made at the

20  trial, correct?

21     A.    I don't recall.

22     Q.    At the sworn statement you gave shortly after your

23  conviction, you have no recollection of that?

24     A.    I don't recall.

25     Q.    No recollection of what was said at your sentencing

1   in Federal court, correct?

2       A.   No, sir.

3       Q.   And no recollection of what you said at the

4   sentencing of Terry Spruill, in Federal court?

5       A.   I don't know yesterday from today.  I don't know.  I

6   don't recall.

7       Q.   So you have no recollection of yesterday, from

8   today?

9       A.   Back then, I was going up -- I was on depression.

10      Q.   And you want this Court to believe your testimony

11  here today, in this courtroom, don't you?

12      A.   Yes.

13      Q.   And you want Crosley Green to hear this testimony,

14  here today, in this court.  You want him to have the benefit

15  of this testimony here today, don't you?

16      A.   I'm just here to tell the Court how the State

17  Attorney coerced me, threatened me to take my children away

18  just to get a conviction of an innocent person.  That I had no

19  knowledge --

20      Q.   Did you read your testimony?

21      A.   Which one, the one you gave me?

22      Q.   Today, where you said, I'm telling the truth?

23      A.   I read it as you was telling me, go line to line.

24      Q.   But you have no recollection of that.  So you're

25  wanting the Court to believe what you're saying here today?

```
 1            THE COURT:  Do we have an objection?

 2            MS. GAYLORD:  Asked and answered, unless he's

 3       going to follow that up with another cumulative

 4       question.

 5            THE COURT:  Sustained.

 6  BY MR. HOLMES:

 7       Q.   But you want Crosley to hear this testimony today,

 8  correct?

 9            MS. GAYLORD:  Asked and answered, your Honor.

10            MR. HOLMES:  I think she got sidetracked.

11            THE COURT:  I think she did.  Overruled.

12  BY MR. HOLMES:

13       Q.   You wanted Crosley to hear this testimony today,

14  correct?

15       A.   I wanted the Court to hear.

16       Q.   You wanted your family members, your sisters who are

17  sitting in the courtroom to hear that today, didn't you?

18       A.   I wanted everyone to hear how I was threatened by

19  the State to give a testimony.

20       Q.   I understand that you have an excuse today, but

21  isn't it true you want them --

22            MS. GAYLORD:  Object.  I believe the witness is

23       attempting to answer the question.  Mr. Holmes is

24       cutting her off.  She was not finished giving an

25       answer to Mr. Holmes in reference to the Court,
```

STATE vs. GREEN;   10/28/03 - 10/29/03                    65

1        Mr. Green, and her family.

2            MR. HOLMES:  The State would object, and ask

3        the Court to direct the witness to answer the

4        question.  She is being nonresponsive.

5            THE COURT:  I would agree.  Just listen to

6        Mr. Holmes' question, and answer as concisely as you

7        can what he asked.

8    BY MR. HOLMES:

9        Q.   Isn't it true you wanted your family members, who

10   are present here in the courtroom -- and Celestine Peterkin is

11   here, is that my understanding?

12       A.   Yes, sir, she's here.

13       Q.   You wanted Celestine, and you wanted other family

14   members to hear this in court today, didn't you?

15       A.   No, I just want the Court to know the truth, sir.

16       Q.   This is the same Celestine Peterkin not present at

17   your sentencing in Federal court?

18       A.   I didn't say she wasn't there, I said I didn't think

19   so.  I don't recall.

20            MR. HOLMES:  May I have just one moment, your

21       Honor?

22            THE COURT:  Yes.

23   BY MR. HOLMES:

24       Q.   How long did you serve in Federal prison?  How much

25   time did you serve?

1      A.    Ninety-seven months.

2      Q.    Then were you on any type of parole, or controlled

3  release, after prison?

4      A.    Yes, sir.

5      Q.    Are you still on that control at this time, or has

6  that ended?

7      A.    No, sir, I'm not on it.

8      Q.    How long ago did that end?

9      A.    I don't recall, but I was on it for five years after

10  I was released.

11          MR. HOLMES:   Thank you.   No further questions.

12          THE COURT:   Redirect?

13          MS. GAYLORD:   Yes, sir.

14                    REDIRECT EXAMINATION

15  BY MS. GAYLORD:

16      Q.    Ms. Green, you were asked a question in reference to

17  the testimony of Mr. Phil Williams at your sentencing, and I

18  believe Mr. Holmes indicated that Mr. Williams testified that

19  your testimony at the trial was a very -- without your

20  participation, the State would not have been able to obtain a

21  conviction against Mr. Green, and that a potential, very

22  violent criminal would have escaped justice.   And that was

23  Mr. Holmes reading from the Federal sentencing.   Did you

24  understand your testimony to be very important in the State

25  obtaining a conviction against Mr. Green?

1      A.    Could you repeat that, please?

2      Q.    Did you understand your testimony to be a very

3  important aspect in the State obtaining a conviction against

4  Mr. Green?  Was your testimony a key point in the State's

5  case?

6      A.    I assume, I guess.

7      Q.    Is this the same state agency that threatened to

8  take your children away from you if you did not cooperate?

9          MR. HOLMES:  Objection, your Honor, that's a

10      mischaracterization of her testimony.  She merely

11      said that she was informed that she would be in

12      prison, or could be in prison, and that she would

13      not have access to them.

14          THE COURT:  Overruled.

15          MR. HOLMES:  She has not testified she was

16      threatened.

17          THE COURT:  That's what she said.  Overruled.

18  BY MS. GAYLORD:

19      Q.    Did the Office of the State Attorney use your

20  children to get you to testify in the proceedings against

21  Mr. Green?

22          MR. HOLMES:  Objection, your Honor, leading

23      question.

24          THE COURT:  Sustained.  Rephrase your question.

25  BY MS. GAYLORD:

1        Q.    Were your children an important consideration in

2    your testimony against Mr. Green?

3              MR. HOLMES:   Objection, your Honor, leading

4        question again.

5              THE COURT:   Why don't you rephrase it?

6    BY MS. GAYLORD:

7        Q.    How important were your children in getting you to

8    testify in the State of Florida versus Crosley Green case?

9        A.    They said I would go to prison, not see my kids for

10   the long time.

11       Q.    Who told you that?

12       A.    I don't recall which one, but it was Phil Williams

13   and Chris White did a lot of talking to me.

14       Q.    Would you have done anything to spare your children

15   what you experienced growing up, being without a mother?

16       A.    I had them at a young age.  I was raising them.  I

17   think I was doing a pretty good job, and I just couldn't see

18   myself going off leaving them.  I didn't think they could

19   survive without me.

20       Q.    Would you have done anything to spare your children

21   surviving without you?

22       A.    They meant the world to me.

23             THE COURT:   Listen to her question.  That's not

24       what she's asking.

25   BY MS. GAYLORD:

1       Q.    Would you have done anything to spare your children

2   the type of life you grew up with, without your mother?

3           MR. HOLMES:  Objection, your Honor, leading the

4   witness.  She's basically trying to put words --

5           THE COURT:  Sustained.  Rephrase it.

6           MS. GAYLORD:  I believe the witness testified

7   that her children were the most important thing, and

8   that she would have spared them --

9           THE COURT:  That wouldn't be redirect then,

10  because she already said it.  She wouldn't be saying

11  it again, correct?

12          MS. GAYLORD:  That's the lead up question to

13  the next question.

14          THE COURT:  It's leading the way you said it,

15  so.  She's already said that.  I remember what she

16  said.

17  BY MS. GAYLORD:

18      Q.    Ms. Green, back at the time you testified at trial,

19  would you have lied in order to help your sentencing, help in

20  your sentencing?

21          MR. HOLMES:  Objection, your Honor, leading

22  question.  It's just a rephrasing, and trying to put

23  words in her mouth.

24          THE COURT:  Overruled.

25          THE WITNESS:  What did you say now?

STATE vs. GREEN;   10/28/03 - 10/29/03                                    70

1    BY MS. GAYLORD:

2         Q.    Would you have lied during Mr. Green's trial

3    proceedings in order to help yourself out in your Federal

4    sentencing?

5         A.    Yes.

6         Q.    Although you understood your oath to tell the truth,

7    is it your testimony today that you did not provide truthful

8    information at that time?

9         A.    No.

10        Q.    Although your children, I believe you testified,

11   were being taken care of by your sister, Celestine -- let me

12   rephrase that.  Although your children were being taken care

13   of by Celestine, I believe Mr. Holmes asked you a question

14   about that, in your mind, who did you want raising your

15   children?

16        A.    Me.  I didn't want them to have to grow up without

17   me, without a mother, because I grew up without one.

18        Q.    Now, you indicated a lot of -- back in 1990, '92,

19   all the way up to your Federal sentencing, thereafter has been

20   kind of a blur to you.  You don't really remember everything,

21   but what the trial transcript indicates you made certain

22   statements, or that certain things were said.  Would you rely

23   on the trial transcript records to indicate your exact words

24   at that time?

25        A.    I don't really recall what was said at trial, but

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 69 of 100 PageID 1018

1    the transcript said that I said it.

2         Q.    You're not disputing that's what the transcripts

3    say?

4         A.    The transcript reads it.  I don't recall.

5         Q.    When you testified at Mr. Green's trial proceedings,

6    did you actually look at Crosley when you were testifying, or

7    were you facing Mr. White's table at the time of your

8    testimony?

9         A.    I don't recall what direction I was looking at.

10        Q.    In terms of your Federal sentencing, were you

11   looking for your family to testify, to help you out with your

12   sentencing, or were you looking for the office of the State

13   Attorney to come and help you out with your sentencing?

14        A.    I don't quite understand it.

15        Q.    In terms of your Federal sentencing, what was going

16   to be the most important information coming forth in your

17   Federal sentencing, information from your family members, or

18   information from the State Attorney's Office about your

19   cooperation in Mr. Green's case?  What was more important in

20   terms of getting you a better Federal sentence?

21        A.    I suppose the State.

22             MS. GAYLORD:  No further questions, your Honor.

23             THE COURT:  Is that it?  I just have a couple.

24        Ms. Green, let me just show you that exhibit,

25        Defendant's Exhibit E of the affidavit.  Who

STATE vs. GREEN;   10/28/03 - 10/29/03

72

1    prepared that?  Who typed that up, do you know?

2         THE WITNESS:  I don't recall if I did it, or I

3    had somebody type it for me, your Honor.

4         THE COURT:  But you had either prepared it

5    yourself, or had somebody prepare it for you?

6         THE WITNESS:  Probably typed it.

7         THE COURT:  You think you typed it?

8         THE WITNESS:  I don't remember.

9         THE COURT:  How did that come up, did you just

10   -- what made you decide to prepare that affidavit?

11        THE WITNESS:  I guess I thought about how the

12   State used me, and had me to lie, and I wanted to

13   just tell the truth.

14        THE COURT:  Okay.  Now, this also covers the

15   sentencing of Terry Spruill, too.  In other words,

16   the prosecutors over there threatened you also,

17   correct, that's the first part?

18        THE WITNESS:  I was threatened.

19        THE COURT:  They did the same thing, isn't that

20   correct?  That's what your affidavit seems to say.

21        THE WITNESS:  More or less, that's what it

22   says.

23        THE COURT:  That would be, well, if you look at

24   B, that has to do with your other cases, correct,

25   your Federal case?

1    THE WITNESS:  I don't recall.  I just know they

2    badgered me so bad about my children.

3    THE COURT:  The Federal people did the same

4    thing, according to your affidavit.  In other words,

5    if I read it right, you're saying the prosecutors in

6    the Federal case did the -- Promised they would

7    lower my sentence if I knew that O'Connor Green --

8    see that D there?

9    THE WITNESS:  I was told by the officer of the

10   court, prosecutors, that the court would lower my

11   sentence.

12   THE COURT:  That would be the Federal case,

13   correct?

14   THE WITNESS:  Yes.  That's what it's referring

15   to.

16   THE COURT:  Then down E is where you're talking

17   about testifying in the State court case against

18   Mr. Green?

19   THE WITNESS:  Yes, sir.

20   THE COURT:  Okay, and in there you said also

21   that -- you said officers of the court.  You didn't

22   say Mr. White and Mr. Williams, you just said

23   officers of the court, correct?

24   THE WITNESS:  Yes, sir.

25   THE COURT:  That's who that is, correct?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  But then you also say that you were

3     threatened by the Florida -- State of Florida DEA,

4     and the Brevard County Sheriff's Officers.  Did they

5     threaten you in some way?

6          THE WITNESS:  They all played a role in it, but

7     it was mainly the State Attorneys, Chris White and

8     Phil Williams.

9          THE COURT:  That's who it was?

10         THE WITNESS:  It was mainly them.

11         THE COURT:  At the time I think -- is it Mr.

12    Dees?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Did he represent you in the

15    sentencing, also?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  He represented all the way through,

18    correct?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Okay, that's all.  Anybody have any

21    questions?

22         MS. GAYLORD:  No, sir.

23         THE COURT:  All right, you may step down.

24    Thank you.

25         MR. HOLMES:  No other questions.

STATE vs. GREEN;   10/28/03 - 10/29/03

75

1      THE COURT:  Why don't we take a break, about

2   ten minutes, come back about 11:00.

3      (Whereupon, a brief recess was had.)

4      THE COURT:  We ready to proceed?

5      MS. GAYLORD:  Yes, sir.

6      THE COURT:  Let me make a note here.

7   Mr. Green, I noticed during your sister's testimony,

8   you were flashing signals to your brother, I think.

9   I think your sister was flashing up notes.  I ask

10  you all not to do that.  You're welcome to be in the

11  courtroom, it's open to the public, but that makes

12  it somewhat disruptive.  If you continue to do that,

13  I'm going to have to ask you to leave.  Keep that in

14  mind.

15      Who's our next witness?

16      MR. HENDRY:  Your Honor, we call Lonnie

17  Hillary.

18      THE COURT:  Is Lonnie a recanter, potentially?

19  We ought to get Mr. Lanning back up here.  Let's get

20  him over here.

21      MR. HOLMES:  Your Honor, what you may want to

22  do, since we don't have a whole lot of time before

23  lunch, is to find out not only on him, but I think

24  Mr. Murray is in the holding cell, and it's a

25  similar situation.  So while the public defender is

1     here, that way we can find out.

2          THE COURT:  I prefer to do it --

3          MR. HENDRY:  For the record, we object, again,

4     for the appointment of counsel to Mr. Hillary.

5          THE COURT:  You would object to the appointment

6     of counsel?

7          MR. HENDRY:  Yes, sir.

8          THE COURT:  What would the basis of your

9     objection be?

10         MR. HENDRY:  Same objection that we had.  It's

11    a long standing objection, standing objection,

12    regarding the process of Hill.

13         THE COURT:  We didn't have Hill last time, did

14    we?

15         MR. WHITE:  We did.

16         THE COURT:  I knew we had one, I didn't think

17    it was Hill.  I thought it was another one.  It was

18    Hill?

19         MR. HOLMES:  Yes, sir, it came out April 4th.

20    I think our hearing was in April.

21         MR. GRUBER:  They're the ones that saw Hill,

22    and brought it to our attention.

23         THE COURT:  Okay.  Is he coming up?  I

24    apologize for not -- well, we can start.  You want

25    to call Mr. Hillary?

1          MR. HENDRY:  Yes, your Honor.

2          THE COURT:  We can go through the preliminaries

3     and see where this is going to go.

4   WHEREUPON:

5                    LONNIE HILLARY,

6   A witness herein, acknowledged he was duly sworn and testified

7   upon his oath as follows:

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Mr. Hillary, I need to go through a

10     couple of things with you.  I really don't know you,

11     and I don't know what your testimony is going to be,

12     but it's been represented to the Court that you may

13     testify different than you did in trial.  In other

14     words, evidently, you were a witness in Mr. Green's

15     original trial.  You gave some testimony there.

16     You're here today, and you may be recanting that

17     testimony, and telling the Court what you said there

18     was not true.

19          I'm going to advise you that you could expose

20     yourself to a felony, that would be perjury by doing

21     that.  That's a third degree felony, subject to up

22     to five years in prison.  You could potentially be

23     incriminating yourself.  The Constitution gives you

24     an absolute right against self-incrimination.  You

25     don't have to testify.  You have a right to waive

STATE vs. GREEN;   10/28/03 - 10/29/03

78

1    that, and certainly, you have a Constitutional right

2    to waive a right against self-incrimination.

3         You also have a right to consult an attorney if

4    you choose to.  The Court will provide you an

5    attorney to discuss it with him, and he's going to

6    tell you what the ramifications might be in the

7    event you testify.  It's up to you, would you like

8    to talk to a lawyer about it?

9         THE WITNESS:  No.

10        THE COURT:  You don't want -- do you understand

11   what I'm telling you?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  Very good.  I have Mr. Lanning

14   coming over.  We'll send him back when he gets here.

15   Go ahead.

16        MR. HENDRY:  Thank you.

17                   DIRECT EXAMINATION

18   BY MR. HENDRY:

19   Q.   Mr. Hillary, could you tell us where you live?

20   A.   1505 Kings Court.

21   Q.   What town is that in?

22   A.   Titusville, Florida.

23   Q.   How long have you lived there?

24   A.   Two years.

25   Q.   I want to take you back to a trial that happened

STATE vs. GREEN;   10/28/03 - 10/29/03                         79

1  back in 1990, the trial of Crosley Green.  Do you remember

2  that trial?

3      A.    Yes, sir.

4      Q.    Were you a witness in that trial?

5      A.    Yes, sir.

6      Q.    Did you testify against Crosley Green in that trial?

7      A.    Yes, sir.

8      Q.    Did you provide testimony at that trial which

9  reflected that Crosley Green had made some incriminating

10 statements to you regarding the murder of Mr. Flynn?

11     A.    Yes, sir.

12     Q.    Was that testimony false?

13     A.    Yes, sir.

14     Q.    I want to ask you some questions regarding

15 surrounding the circumstances behind why you testified

16 falsely.  Can you tell us why it was that you testified

17 falsely against Crosley Green?

18     A.    I wanted to help my child's mother at the time.

19     Q.    Your child's mother is Sheila Green, correct?

20     A.    Yes, sir.

21     Q.    How many children did you have at the time in 1990?

22 How many children did you have with Sheila Green?

23     A.    One.

24     Q.    Did Sheila encourage you to provide false testimony

25 against Crosley Green?

STATE vs. GREEN;   10/28/03 - 10/29/03

80

1    A.   No.

2    Q.   Tell us the circumstance of how you were encouraged

3  to testify falsely back in 1990.

4    A.   When it came up, it first started when we got a case

5  on us for drugs, or trafficking, and it came up then that I

6  could help her avoid jail time if I testified against Crosley.

7  And when that came up, she didn't want me to do it at that

8  time, so I backed away.

9    And then when we went to court, and everything went

10  through there, they came, approached me again concerning it,

11  and at that time I did.

12    Q.   That was prior to Sheila being sentenced for her

13  conviction?

14    A.   Yes, sir.

15    Q.   Were you informed that if you provided false

16  testimony against Crosley Green, that her sentence would be

17  reduced in some way?

18    A.   If I provided --

19    Q.   If you gave testimony against Crosley Green, were

20  you told that that could help out Sheila Green?

21    A.   Yes.

22    Q.   Would that be in terms of a reduced sentence?

23    A.   Yes.

24    Q.   If you could, specify the individuals who had

25  provided this information to you.

1    A.    At that time, I can't remember his name, but one of

2  them was my public -- the attorney that was representing me in

3  my trafficking case.  I spoke to Mr. Chris White.

4    Q.    At your own trial you were found not guilty, right?

5    A.    Yes, sir.

6    Q.    Did you -- going back to -- the murder was back

7  April 3, 1989.  Back on April 4th of 1989, did you ever see

8  Crosley in a location, and have a conversation with him

9  regarding the murder of Mr. Flynn?

10    A.    No, sir.

11    Q.    Did you ever see Crosley Green on April 4, 1989, and

12  notice that Crosley Green seemed shaky and scared?

13    A.    No, sir.

14    Q.    Did you ever see Crosley Green on April 4, 1989, and

15  notice he was scruffed up, dirty, seemed high?

16    A.    No, sir.

17    Q.    Did Crosley Green ever inform you, "I fucked up,

18  man?"

19    A.    No, sir.

20    Q.    Did Crosley Green ever tell you that some people

21  came through to buy something, i.e. drugs, and they tried to

22  get him?

23    A.    No, sir.

24    Q.    Did Crosley Green ever tell you, approximately seven

25  days after April 4, 1989, that he got rid of some clothes, and

STATE vs. GREEN;  10/28/03 - 10/29/03                82

1   that everything was going to be all right at that time?

2       A.   No, sir.

3       Q.   Did Crosley Green ever discuss the details of this

4   murder?

5       A.   No, sir.

6       Q.   Did Crosley Green ever tell you that he got into a

7   truck with a man and woman, and that when the woman tried to

8   run, he fucked up?

9       A.   No, sir.

10          MR. HENDRY:  Can I have a moment, your Honor?

11          THE COURT:  Pardon?

12          MR. HENDRY:  Can I have a moment, your Honor?

13          THE COURT:  Yes, sir.

14   BY MR. HENDRY:

15       Q.   Mr. Hillary, I want to refer -- if you can think

16   back to the year 1999, and do you remember giving a statement

17   to a couple of investigators, one being a Mr. Ciolino?

18       A.   Yes.

19       Q.   The information that you provided in court, here

20   today, did you provide that same information to those

21   investigators back in 1999?

22       A.   Yes.

23       Q.   Did you realize that that statement was videotaped?

24       A.   Yes.

25       Q.   A few months later -- that was August of 1999.  A

STATE vs. GREEN; 10/28/03 - 10/29/03

83

1   few months later, did you remember giving another statement,

2   that would be in October of 1999, to representatives from the

3   Florida Department of Law Enforcement?

4       A.    I remember them coming by.

5       Q.    The names of the investigators from the Florida

6   Department of Law Enforcement, one was Don Ladner.  Do you

7   remember that gentleman?

8       A.    I don't remember the name.

9       Q.    But you do remember giving another statement to

10  these investigators from Florida Department of Law Enforcement

11  after you spoke with private investigators?

12      A.    Like I said, I remember them coming by.  I don't

13  remember if I spoke to them, or not.  I really don't remember

14  speaking to them.  I'm not saying I did, or didn't, I just

15  don't remember.

16      Q.    If I were to show you a transcript of the

17  conversation that you had between yourself and these

18  investigators from Florida Department of Law Enforcement, do

19  you think that might refresh your recollection?

20      A.    It may.  I'm saying I still don't remember.

21      MR. HENDRY:  Your Honor, can I approach the

22  witness?

23      THE COURT:  Yes.

24      MR. HENDRY:  I'll be showing the witness, it's

25  a videotaped sworn statement of Lonnie Hillary dated

STATE vs. GREEN;   10/28/03 - 10/29/03                                84

1      October 20, 1999.

2            THE COURT:   It's a transcript?

3            MR. HENDRY:   It's a transcript.

4            THE COURT:   It's not the videotape.

5    BY MR. HENDRY:

6       Q.   Mr. Hillary, if you can take a look at that

7    transcript, look at the cover page, maybe look at some of the

8    preliminary questions there, and I ask if you remember giving

9    that statement.

10      A.   Yes.

11      Q.   Mr. Hillary, do you remember giving that statement

12   to the Florida Department of Law Enforcement?

13      A.   Yes.

14      Q.   Do you remember in that statement saying that

15   everything you testified to in 1990 was on the fly?

16           MR. HOLMES:   Objection, your Honor, hearsay.   I

17      don't know if he's trying to impeach his own

18      witness.

19           THE COURT:   You can impeach your own witness.

20      That's not impeaching.

21           MR. HOLMES:   It's hearsay.   He's asking about

22      statements he made outside of the courtroom.

23           THE COURT:   Sustained.

24           MR. HENDRY:   Your Honor, I simply asked if he

25      remembered stating to what he testified.

1        THE COURT:  What would be the purpose of that,
2    to show that he made the statement, that he made
3    something on the fly?  Would that be offered for
4    that purpose?  The way you phrased it, that's the
5    way it would be, wouldn't it?
6        In other words, you're asking him to affirm a
7    statement he made out of court, correct, so that's
8    hearsay.  Sustained.
9    BY MR. HENDRY:
10   Q.   Mr. Hillary, was everything that you stated in 1990,
11   with regards to having knowledge about Crosley Green
12   committing this murder, was that said on the fly?
13       MR. HOLMES:  Objection, your Honor, that's
14   hearsay.
15       THE COURT:  He's asking about currently, so
16   that's overruled.  That's a question for today, is
17   what he's asking.
18       THE WITNESS:  What is your question?
19   BY MR. HENDRY:
20   Q.   With regards to the testimony that you provided back
21   in 1990 against Crosley Green, was that testimony on the fly?
22   A.   Yes.
23   Q.   What does on the fly mean?
24   A.   As I was being asked questions, I was coming up with
25   answers.

1          THE COURT:  So you were just making them up as

2     you went?

3          THE WITNESS:  Yes.

4  BY MR. HENDRY:

5     Q.   Do you remember though, that you did actually -- did

6  you have interaction with representatives in the State

7  Attorney's Office?  Do you remember a Phil Williams?  Do you

8  remember him?

9     A.   Yes.

10    Q.   Do you remember Chris White?

11    A.   Yes, sir.

12    Q.   Did you discuss with them, in detail, what your

13 testimony was going to be at the trial?

14    A.   Not in detail.

15    Q.   Do you remember that you did give a deposition to

16 them back in 1990?

17    A.   Yes, sir.

18    Q.   But you don't remember discussing, in detail, what

19 your testimony might be?

20    A.   We went over what I knew back then.

21    Q.   Do you remember that your public defenders were

22 there, Jules Renlan (phonetic), and James Skuthan?

23    A.   Yes, sir.

24    Q.   So you do remember discussing what your testimony

25 was going to be against Crosley Green?

STATE vs. GREEN;   10/28/03 - 10/29/03                    87

1          A.    Yes, sir.

2          Q.    Another thing I want to ask you about, it's kind of

3     a related subject is, do you remember a point in time, maybe a

4     couple points in time, where you were given the opportunity to

5     speak with Sheila Green by Chris White, where Chris White

6     enabled you to speak to Sheila?

7          A.    Yes, sir.

8          Q.    If you could, discuss with us the circumstances of

9     how you were able to speak with Sheila.

10         A.    She wanted to talk with me, then I think it was a

11    Mr. Knight would come and pick me up, and bring me to his

12    office, and we would speak over the telephone.

13         Q.    Did you say Mr. Knight?

14         A.    Yes, sir.  I don't remember what his title was, but

15    I think he was an investigator, or something like that.  I

16    think he worked for Mr. White, but he would come by and pick

17    me up, bring me to the office, and let me speak with Sheila.

18         Q.    Chris White seemed to be arranging this discussion,

19    or this ability to speak with Sheila on the telephone?

20         A.    He would be in the other office.

21         Q.    Back at the trial in 1990, do you remember having

22    the opportunity to be with Sheila, just prior to her giving

23    testimony, or just prior to you giving your testimony?

24         A.    Yes, sir.

25         Q.    Could you discuss the circumstances of that meeting?

1      A.    We wanted to see each other.  We asked if we could

2  see each other before the trial.  I think this was before we

3  actually -- the trial actually started.  They had agreed to

4  let us have some time by ourselves, with each other.  And when

5  I got there, they took me into the room where she was, and

6  left us alone.

7      Q.    Do you think that this was the day of trial?

8      A.    It was.

9      Q.    And that this was the day that you were going to

10 testify against Crosley Green?

11     A.    Yes, sir.

12     Q.    And this was the day that Sheila Green was going to

13 be testifying against her brother?

14     A.    Yes, sir.

15     Q.    And you guys were able to have some time alone

16 together, and speak to each other?

17     A.    Yes, sir.

18     Q.    Did anyone ever inform you, prior to that meeting,

19 that you weren't to discuss the contents of your testimony

20 with Sheila?

21     A.    I don't remember.  They told us we could have time

22 together.  That was all I was concerned about.

23     Q.    Sheila was in custody of law enforcement at that

24 time?

25     A.    Yes, sir.

1          MR. HENDRY:  Your Honor, may I have one more

2      quick moment?

3          THE COURT:  Yes, sir.

4  BY MR. HENDRY:

5      Q.   Mr. Hillary, just going back to the situation where

6  you had gone to Chris White's office, you had spoken to Sheila

7  on the telephone.  Remember we talked about that?

8      A.   No.

9      Q.   Remember it was you that initiated contact, whereby

10  you called Chris White, and said, I want to speak to Sheila,

11  or was it the other way around?  Were you contacted by the

12  State Attorney's Office, and said Sheila wanted to speak with

13  you?

14      A.   Once I got out of jail, it was -- I mean, our

15  contact never broke.  Chris promised that we would still be in

16  touch with each other, and that we would be all right, and the

17  kids would be all right.  Sheila was the one that would call,

18  that would get in touch with Chris, and he would get in touch

19  with me.

20      Q.   You mentioned Chris White, and how he was ensuring

21  you that you would be all right, Sheila would be all right,

22  you would be with your kids.  Was that a large component which

23  caused you to testify falsely against Crosley Green?

24      A.   Like I said, it started when the drug case was up.

25  My attorney at that time, told me a bunch of stuff, that Chris

STATE vs. GREEN;  10/28/03 - 10/29/03                    90

1   had contacted him, and that he would help me out of the case.

2   I told him I didn't want help.  I wanted Sheila out.

3       At that time, they told me that they would arrange it

4   that all the charges would be dropped against her, and I had

5   no deal with me.  Whatever would come, would come.

6       I spoke with her about it, and let her know.  She didn't

7   want that at the time.  She told us we would go to court.

8   When we went to court, that's what happened.  And then after

9   that, they came back to her again, and told her that --

10          MR. HOLMES:  Objection, your Honor, he's trying

11      to testify to hearsay.

12          THE COURT:  Sustained.  Don't say what they

13      said.

14  BY MR. HENDRY:

15      Q.   Mr. Hillary, you know that you, in 1990, you took an

16  oath, you swore to tell the truth?

17      A.   Yes.

18      Q.   And do you know --

19          THE COURT:  Which time in 1990 did he give a

20      deposition?

21          MR. HENDRY:  Back during the trial testimony in

22      1990.

23  BY MR. HENDRY:

24      Q.   You took the oath, and you swore to tell the truth?

25      A.   Yes, sir.

1        Q.    Do you know what the consequences are for not

2   telling the truth at trial?

3        A.    Yes.

4        Q.    What are the consequences?

5        A.    Jail time, or I could be convicted for whatever

6   comes of that.

7        Q.    Basically, as you sit here today, you are admitting,

8   you're basically confessing to perjury, is that right?

9        A.    Yes, but at that time, I didn't care.  It was about

10   my kids, and that was all it was about.

11        Q.    Is it fair to say that your testimony here today, in

12   front of Judge Jacobus, this testimony is not in your best

13   interest?

14        A.    No.

15             MR. HENDRY:  Could I have one moment, your Honor?

16             THE COURT:  Yes.

17             MR. HENDRY:  No further questions, your Honor.

18             THE COURT:  Cross-examination?

19             MR. HOLMES:  Thank you, your Honor.

20                         CROSS EXAMINATION

21   BY MR. HOLMES:

22        Q.    Mr. Hillary, you indicated that you and Sheila have

23   a child together, or children.  Is it just one child, or more

24   than one child?

25        A.    We have more than one, but we only have one now.

1      Q.   Now, back at the time that you were facing the

2    charges in Federal court, how many children did you have at

3    that time?

4      A.   She had a total of four.

5      Q.   How many of those children were yours?

6      A.   One.

7      Q.   That child, that is yours, is she still living

8    today?

9      A.   I have got one boy who's still living, and one girl

10   that's not.

11     Q.   Now, going back to that time, the child that you had

12   with Sheila that was living at that time, are they still

13   living today?

14     A.   Yes, sir.

15     Q.   Where do they live now?  Where does your child, that

16   lived with her back then --

17     A.   With his mother now.

18     Q.   So is it a son, or daughter?

19     A.   A son.

20     Q.   So your son currently lives with Sheila?

21     A.   Yes, sir.

22     Q.   How old is your son at this time?

23     A.   He is 15.

24     Q.   Does she have -- was there ever -- were you all ever

25   married, or any type of custody determination made?

STATE vs. GREEN;   10/28/03 - 10/29/03                          93

1      A.    No, sir.

2      Q.    So you just recognize that is your son, and he lives

3   with Sheila, who is his mother at this time?

4      A.    He's always been my son.

5      Q.    He lives with his mother, Sheila, at this time?

6      A.    Yes, sir.

7      Q.    Now, was there a period of time where he -- well,

8   okay.  You were found not guilty in Federal court, correct?

9      A.    Yes, sir.

10     Q.    You were released from custody, correct?

11     A.    Yes, sir.

12     Q.    And did your son come to live with you during that

13  time period when you were out of custody, but Sheila was still

14  in custody?

15     A.    I went to live with Celestine, and we are all

16  together.

17     Q.    Now, were you all together at the time of the trial

18  of Crosley Green back in 1990, where you appeared and

19  testified in Melbourne?  Were you still living together there

20  at that time?

21     A.    No, sir.

22     Q.    What brought about you not living there?

23     A.    Me testifying.

24     Q.    After that time, did you have custody?

25           THE COURT:  You were living there because of what?

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 92 of 100 PageID 1041

1          THE WITNESS:  When I realized I was going to

2     testify, I moved back in with my mother.

3          THE COURT:  Okay.

4  BY MR. HOLMES:

5     Q.   Your son continued to live where?

6     A.   With Celestine.

7     Q.   Now, after the trial, where did your son live after

8  that time?

9     A.   With Celestine.

10    Q.   Did you take custody of your son at any point in

11 time after the trial?

12    A.   No, sir, I wasn't able to take care of him.

13    Q.   So your son continued to live with Celestine

14 Peterkin.  Did there come a time where your son was reunited

15 with Sheila?

16    A.   Yes, sir.

17    Q.   When was that?

18    A.   That was when she bottomed out.

19    Q.   Approximately, how long ago was that that she got

20 out of prison, and your son went back to living with her?

21    A.   A couple of years.  I can't remember how many.  It's

22 been a couple years now.

23    Q.   Now, turning your attention back to April 3, 1989,

24 which is the date that the alleged homicide occurred where

25 Crosley Green killed Chip Flynn, you were living in the Mims

1    community, weren't you?

2          A.    No, sir.

3          Q.    Where were you living?

4          A.    In Titusville.

5          Q.    Did you go into the Mims community at that time?

6          A.    Yes, sir.

7          Q.    So that was the community that was very familiar to

8    you?

9          A.    Yes, sir.

10         Q.    So you knew people, you heard things going on in the

11   community, things of that nature?

12         A.    Yes, sir.

13         Q.    And then it was after that that you were arrested on

14   the Federal charges, wasn't it?

15         A.    Yes, sir.

16         Q.    And you faced trial in 1990?

17         A.    I think so.

18         Q.    There came a time when you gave a statement about

19   what you knew about Crosley Green's involvement in that

20   murder, isn't there?

21         A.    Yes, sir.

22         Q.    Do you recall that occurring June the 30th, 1990,

23   1:30 PM, at the United States Attorney's Office over in

24   Orlando?  Do you recall that statement that you gave, and

25   present were your attorneys, Mr. Remlin, and Mr. Skuthan, I

1    think it is, S-K-U-T-H-A-N, as well as Rick Jancha, with the

2    United States Attorney's Office, Scott Nyquist, and Doug

3    Waller from the Brevard County Sheriff's Office.

4         Do you remember giving that statement -- as well as Phil

5    Williams from the State Attorney's office.

6         A.   I think that was the first time they approached me

7    about helping them out.

8         Q.   Now, showing that -- I want to ask you about this

9    first.   Page 12 --

10             MR. HENDRY:  I would object.  This is improper.

11        He's answered that he gave a statement to these

12        individuals.  I don't know why we're rehashing what

13        was said back in the statement.

14             THE COURT:  What's your legal objection?

15             MR. HENDRY:  Improper impeachment, or improper

16        attempt to refresh one's recollection.  We ask that

17        he not ask questions about a statement given in

18        1990.

19             THE COURT:  Overruled.  Go ahead.

20    BY MR. HOLMES:

21        Q.   Turning to page 12, let me ask you if you recall.

22        Mr. Williams asking this question, and you giving this

23    answer:

24             (Whereupon, a statement given by Mr. Hillary on

25        June 30, 1990, was read into the record by Mr.

STATE vs. GREEN;  10/28/03 - 10/29/03                    97

1      Holmes as follows:)

2            "QUESTION:  Do you understand that both

3      Mr. Jancha and I have one thing, and one thing only

4      from you, and that's everything you know that's the

5      truth.  Okay?

6            "ANSWER:  All right.

7            "QUESTION:  Mr. Williams, everything you know

8      that's the truth, nothing else.

9  BY MR. HOLMES:

10     Q.   Do you remember Mr. Williams asking you that during

11 that sworn statement, asking you to tell -- all they wanted

12 was for you to tell the truth.  Do you recall that?

13     A.   I remember us talking about the case.  Every word

14 that was said, I don't remember.

15     Q.   Let me show you what's been previously marked as

16 State's Exhibit H, which is a transcript, and ask you to take

17 a look at line 12.

18           THE COURT:  What page?

19           MR. HOLMES:  That's on page 12, line 12, and

20     ask you, does that refresh your present recollection

21     as to that question being asked, and that being your

22     answer?

23           THE WITNESS:  All I can tell you, I guess if

24     it's in here, I guess it must have been.  Like I

25     said before, I can't remember every word.

STATE vs. GREEN;   10/28/03 - 10/29/03                          98

1   BY MR. HOLMES:

2       Q.   You have no current recollection about being asked

3   to tell the truth, and only the truth?

4       A.   I would imagine they asked me that, yes.

5       Q.   So you understood the importance, when they came to

6   you and asked you to testify, that they were wanting you to

7   tell the truth, correct?

8       A.   Yes.

9       Q.   So that's all they asked of you, tell the truth?

10      A.   Yes, but this doesn't show where my lawyer came to

11  me before this and -- this doesn't explain where my lawyer

12  came to me before this and had advised me that I needed to do

13  this in order to help Sheila get out of jail.

14      This doesn't show where my lawyer told me that he had

15  already talked to them, and that things were going to be taken

16  care of if I cooperated with them.

17      Q.   But you're not testifying here today that your

18  attorney told you to lie, are you?

19      A.   My attorney didn't care.  His thing was that he

20  wanted me to do this in order to take care of the other case.

21      Q.   You're saying that your attorney advised you to lie?

22      A.   My attorney lied to me.  You want me to explain how

23  my attorney came to me, and told me they had videotape and

24  audiotape of me doing the drug investigation?

25      We got to court, and that was what he told me, that the

Case 6:14-cv-00330-RBD-GJK   Document 3-37   Filed 02/27/14   Page 97 of 100 PageID 1046

1   only reason I need to do this is because my kids and

2   everything is going to be taken once we were found convicted.

3   We were, in his words, we were going to be found convicted

4   because they had the video and audiotape on me, and everybody

5   else.

6        When we got to court, they didn't have video or audio on

7   me, so I can sit here and say yes, he lied to me about

8   different things.

9        Q.   But that still doesn't get to the question I asked

10  you.

11       A.   What your question to me was --

12       Q.   Did your attorney ask you to lie?

13       A.   I told you, he didn't care.  That's the way I feel.

14       Q.   So you took the impression, from your attorney, that

15  he didn't care, and you made the decision to give a statement,

16  correct?

17       A.   At that time, I would have done anything.

18       Q.   In terms of Mr. Jancha and Mr. Williams, when they

19  met with you, and took your sworn statement, isn't it true the

20  only thing they asked of you was to tell the truth?

21       A.   Yes.

22       Q.   Isn't it true that you then told them that you had a

23  conversation with Crosley Green, and that he did make

24  statements that he had messed up, used the F word, and that he

25  had shot someone?

1      A.    Yes.

2      Q.    Do you recall here, today, going on and testifying

3 to them that day that that is what you were saying is the

4 truth?

5      A.    Yes.

6      Q.    Do you recall testifying in court, in the actual

7 trial of Crosley Green, on August the 29th, 1990?

8      A.    Yes.

9      Q.    You came into a courtroom, similar to this, where

10 you were placed under oath, and sat in a witness chair,

11 correct?

12     A.    Yes.

13     Q.    And there was a jury present?

14     A.    Yes.

15     Q.    Defendant was present?

16     A.    Yes.

17     Q.    Do you recall being asked to raise your hand, and

18 testify to the truth, the whole truth, and nothing but the

19 truth?

20     A.    Yes.

21     Q.    Did you take that oath?

22     A.    Yes.

23     Q.    Do you recall in the trial testimony on page 879,

24 line 20, Mr. Williams asking you the question, even after you

25 had testified about what you saw:

1          "Question:  Now, what was -- what did I tell

2     you was the most important thing that you do in this

3     case when you testify?

4          "Answer:  To tell the truth.

5  BY MR. HOLMES:

6     Q.   Do you recall that question being asked of you at

7  trial, and your answer being that telling the truth was the

8  most important thing, and that's what the State asked you to

9  do?

10    A.   Yes, sir.

11    Q.   Isn't it true that at trial, you testified again

12 under oath, just as you had in that sworn statement over at

13 the Federal building in Orlando, and you told about seeing

14 Crosley Green and speaking to him, and he again saying that he

15 F'd up, that he shot the kid, correct?

16    A.   Yes, sir.

17    Q.   You also described how he was nervous, correct?

18    A.   Yes, sir.

19    Q.   Shaky, and that you saw him near the barbecue stand,

20 correct?

21    A.   Yes.

22    Q.   I think you were there by yourself.  Isn't that what

23 you testified to, there were other people around, but

24 basically you saw him, talked to him, and it was you and he

25 that were just talking, correct?

STATE vs. GREEN;   10/28/03 - 10/29/03                          102

```
 1        A.    That's what I testified to at that time.
 2              MR. HOLMES:  May I have just a moment?
 3              THE COURT:  Yes.
 4   BY MR. HOLMES:
 5        Q.    Now that it's been established that you're saying
 6   you did not see him, where were you at that time when the
 7   homicide occurred?
 8        A.    I have no idea.
 9        Q.    So you don't have any idea, at the present time,
10   what you were doing, who you were with?
11        A.    No, sir.
12              MR. HOLMES:  No further questions.
13              THE COURT:  Thank you.  Any redirect?
14              MR. HENDRY:  Yes, your Honor.
15                        REDIRECT EXAMINATION
16   BY MR. HENDRY:
17        Q.    Mr. Hillary, Mr. Holmes was speaking about a
18   deposition that was taken back in June of '90, where it was
19   emphasized, the questions and your answers, the importance of
20   telling the truth.  Remember that?
21        A.    Yes, sir.
22        Q.    Back in that deposition of June of 1990, when you
23   stated in that deposition in 1990 that Crosley was somehow
24   involved in this murder, was that the truth?
25        A.    No, sir.
```