# Exhibit 35-B

1    Q.   They also covered, and you mentioned, actually, that

2   your attorney in your Federal case, he did not tell you to

3   lie?

4    A.   No, sir.

5    Q.   You lied on your own, correct?

6    A.   Yes, sir.

7    Q.   What was your feeling, was it apparent to you that

8   the State wanted you to testify against Crosley Green?

9    A.   Yes.

10    Q.   And your interactions with the State, the

11   individuals who were working this case up against Crosley

12   Green, did they appear to care whether or not something was

13   false, or true?

14        MR. HOLMES:   Objection, your Honor, calls for

15        him to form an opinion as to what's in someone

16        else's mind.

17        THE COURT:   Sustained.

18   BY MR. HENDRY:

19    Q.   They also talked about, at the trial in August of

20   1990, again, they touched on how you did testify, and it is

21   important to tell the truth.   Do you remember that?

22    A.   Yes.

23    Q.   Is your testimony here today the truth?

24    A.   Yes.

25    Q.   Where do you work?

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 3 of 95 PageID 1052

1        A.    Rinker Materials.

2        Q.    How long have you worked there?

3        A.    Five years.

4        Q.    Do you value your freedom?

5        A.    Yes, sir.

6        Q.    Do you have a wife?

7        A.    Yes, sir.

8        Q.    Are you aware that coming here today, you would have

9    had the right to speak with an attorney prior to providing

10   this testimony here today?

11       A.    Yes, sir.

12       Q.    Are you aware that that attorney might have advised

13   you it would be in your best interest to remain silent?

14       A.    Probably.

15       Q.    Are you aware that you could have exercised your

16   right to remain silent here today?

17       A.    Yes.

18       Q.    Are you aware that by your testimony here today you

19   virtually admitted to having committed perjury back in 1990?

20       A.    Yes.

21       Q.    The State asked you a question about where were you

22   August 3rd of 1989.  Do you remember that question?

23       A.    Yes.

24       Q.    You don't remember where you were?

25       A.    No, sir.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 4 of 95 PageID 1053

```
 1     Q.    Where were you back on October 2nd of this year?

 2     A.    I don't know.

 3           MR. HENDRY:  No further questions, sir.

 4           THE COURT:  All right, thank you.

 5           MR. HOLMES:  No further questions.

 6           THE COURT:  You may step down.  Why don't we

 7     take a lunch break, come back 1:15.

 8           MR. NUNNELLEY:  What I'm trying to find out is

 9     how much time we're going to take from your docket

10     tomorrow.

11           THE COURT:  You have the day.

12           MR. NUNNELLEY:  I don't think we're going to

13     use it.

14           THE COURT:  That's okay, I have the day for it.

15           MR. NUNNELLEY:  I wanted to tell you, if we're

16     going to be done at noon, or something like that,

17     you have a half a day.

18           THE COURT:  That's fine.

19           MR. HOLMES:  Question, do you want me to have

20     Mr. Parker available this afternoon so that we can

21     proceed on into that issue?

22           MR. NUNNELLEY:  I would think so.  We only have

23     one more witness.

24           MR. HOLMES:  I'll have Mr. Parker available

25     after lunch.
```

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 5 of 95 PageID 1054

1          MR. WHITE:  Maybe we can have Mr. Lanning here

2     at 1:15.  We'll have another witness of that nature.

3     A second thing is, I think that is felony of the

4     second degree.

5          THE COURT:  Did I say the third?

6          MR. HOLMES:  They changed the law about capital

7     proceedings.

8          THE COURT:  That's the difference.  I thought

9     it was a third degree.  I was looking at that case,

10    Hill, it was a third.  All right, so let's call

11    Mr. Lanning.  He has to be here at 1:15.

12          (Whereupon, a lunch recess was had.)

13          THE COURT:  Who's our next witness?

14          MS. GAYLORD:  Jerome Murray.  I believe he's in

15    custody.

16    WHEREUPON:

17                    JEROME MURRAY,

18    A witness herein, acknowledged he was duly sworn and testified

19    upon his oath as follows:

20          THE WITNESS:  I do.

21          THE COURT:  Mr. Murray, do you want to have a

22    seat over here?

23          THE WITNESS:  Uh-huh.

24          THE COURT:  Mr. Murray, let me go over some

25    preliminary things.  I don't know you, and I don't

1    know what you're going to testify to.  It's been

2    represented to the Court that you testified in

3    Mr. Green's trial to certain facts that you may or

4    may not have knowledge of.

5        Here, today, you may change your testimony.  In

6    other words, you may say, Judge, what I said back in

7    the trial of 1990 was not true, and something else

8    was true.  If that is the case, you could expose

9    yourself to a charge of perjury.  In a capital case,

10   that's a 2nd degree felony, punishable by 15 years

11   in prison.

12       You have an absolute right under the

13   Constitution not to self-incriminate yourself.  You

14   don't have to testify.  A person can waive that if

15   they choose to.  You have a right to do that also,

16   but you also have an absolute right to have an

17   attorney advise you, if you choose to, too.  I have

18   an attorney here available if you would like to

19   discuss that with an attorney before you testify.

20   Do you understand what I'm talking about?

21       THE WITNESS:  Yes.

22       THE COURT:  First, do you want to talk to the

23   lawyer?

24       THE WITNESS:  Yeah.

25       THE COURT:  Okay, why don't we take a minute

Case 6:14-cv-00330-RBD-GJK  Document 3-38  Filed 02/27/14  Page 7 of 95 PageID 1056

1    and let him talk with Mr. Lanning.

2         MR. LANNING:  Judge, two things, one, would the

3    Court provide a written order appointing?

4         THE COURT:  Yes, sir, we'll do that.  Let me do

5    that, a written order.

6         MR. LANNING:  And number two, I'm scheduled to

7    appear in front of Judge Griesbaum at 1:30.

8         THE COURT:  I'll call.

9         (Whereupon, a brief recess was had.)

10        MR. LANNING:  Judge, if called to the stand, he

11   would be exercising his Fifth Amendment privilege.

12        THE COURT:  Okay.

13        MS. GAYLORD:  We would argue that Mr. Murray,

14   making subsequent statements to the Florida

15   Department of Law Enforcement, and signing an

16   affidavit, has waived his right to remain silent in

17   these proceedings.

18        THE COURT:  That's a different issue.  Well,

19   let's get Mr. Murray out here.

20        (Whereupon, Mr. Murray entered the courtroom.)

21        THE COURT:  Mr. Murray, you have had an

22   opportunity to talk with Mr. Lanning?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  You understood what I told you

25   about your Constitutional rights?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  You wish to remain silent?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  Do you want to inquire about a

5  waiver?

6    MS. GAYLORD:  Yes, sir.

7    THE COURT:  Mr. Lanning, why don't you pull up

8  a chair over there.

9    MS. GAYLORD:  At this time, we would like to

10  mark a statement of Jerome Murray, from October 31,

11  1999, as Defendant's Exhibit, I believe it would be

12  F for identification.

13    THE COURT:  Okay.  Have you got a copy?

14    MS. GAYLORD:  Yes.

15    THE COURT:  The original should get filed.  Go

16  ahead and mark the original.  That's fine.  That's

17  correct.

18    MS. GAYLORD:  We would also like to mark a

19  videotaped statement, Jerome Murray, August 3, 1999.

20  That would be Exhibit G for identification.

21    MS. GAYLORD:  Your Honor, part of our original

22  appendix, Volume II, and that would be Exhibit I, a

23  signed affidavit by Jerome Murray, and that would be

24  dated August 3, 1999, as well.

25    THE COURT:  Okay.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 9 of 95 PageID 1058

1      MS. GAYLORD:  That would be for identification

2  H.

3      THE COURT:  Do you have that?

4      MR. WHITE:  Yes, we have that, and we have the

5  other two exhibits, and I would assume they are the

6  originals of the same things we have copies of.  The

7  only point for objection I would have is referring

8  to this signed statement as an affidavit when, in

9  fact, an affidavit would be a sworn statement.

10     THE COURT:  I didn't see where --

11     MR. WHITE:  It would look like this, Judge.

12     THE COURT:  I have got it.

13     MS. GAYLORD:  I would say it's an affidavit

14  because it was sworn and witnessed by --

15     THE COURT:  It looks like a statement.  Albeit

16  the style of affidavit is not sworn, correct?

17     MS. GAYLORD:  No, but it is witnessed by

18  another witness.  It was notarized.

19     MR. WHITE:  If it was notarized and sworn to,

20  it would be a sworn statement and affidavit,

21  otherwise, it is a statement.

22     THE COURT:  It's a statement.  Go ahead.

23     MS. GAYLORD:  That would be G.

24     THE COURT:  G.

25     (Whereupon, Defendant's Exhibit G was marked

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 10 of 95 PageID 1059

```
 1        for identification.)

 2            MS. GAYLORD:  Your Honor, if I may approach the

 3    witness?

 4            THE COURT:  Yes.

 5                    DIRECT EXAMINATION

 6    BY MS. GAYLORD:

 7        Q.   Mr. Murray, state your name for the record, please.

 8        A.   Allen Jerome Murray.

 9        Q.   Where are you currently residing?

10        A.   I don't know what you mean.

11            THE COURT:  Where do you live?

12            THE WITNESS:  2742 Nolen, Mims, Florida.

13    BY MS. GAYLORD:

14        Q.   That's your home address?

15        A.   That was.

16        Q.   Where did you stay last night?

17        A.   In the county jail.

18        Q.   How long have you been staying at the county jail?

19        A.   Since September 4th.

20        Q.   Is this your first opportunity to stay at the county

21    jail?

22        A.   Yeah.

23        Q.   Yes?

24        A.   Yes.

25        Q.   Have you ever been arrested, or convicted of any
```

Case 6:14-cv-00330-RBD-GJK Document 3-38 Filed 02/27/14 Page 11 of 95 PageID 1060

1   type of felony offenses?

2        A.    Yeah.

3        Q.    How many times have you been convicted of a felony?

4        A.    Once, in '81.

5        Q.    1/81?

6              THE COURT:  Once, in 1981.

7              MS. GAYLORD:  1981.

8   BY MS. GAYLORD:

9        Q.    Do you have any other felony convictions that you

10  are aware of?

11       A.    Not that I know about.

12             MS. GAYLORD:  Your Honor, at this time, I would

13       also like to mark this as a Defense Exhibit, that

14       would be now J.

15             THE CLERK:  I.

16             MS. GAYLORD:  I, and that is a certified copy

17       of a conviction of Mr. Murray that's dated back in

18       1988, which is the additional felony conviction of

19       Mr. Murray.

20             THE COURT:  It's two?

21             MS. GAYLORD:  There is two.

22             (Whereupon, Defendant's Exhibit I was marked

23       for identification.)

24  BY MS. GAYLORD:

25       Q.    Were you also convicted of a felony back in 1976?

1    A.    Probably.  I don't remember.

2    Q.    So you have more than one felony conviction.  Now,

3  we're up to three.

4    A.    I don't remember having them, but if it is, I don't

5  know.

6    Q.    So it's safe to say you have been through the

7  criminal court system before?

8    A.    Yes, I have been through it before.

9    Q.    In those proceedings, you have been advised of your

10  right to counsel?

11    A.    Yes.

12    Q.    In those proceedings you were represented by an

13  attorney?

14    A.    Yes.

15    Q.    In those proceedings, you made statements against

16  your interest in those type of proceedings?

17    A.    Could be, I couldn't say.

18    Q.    You were aware you did not have to make those

19  statements against your interest?

20    A.    No.

21    Q.    When you were advised that you have a right to

22  remain silent, what did think that meant?

23    A.    To be quiet.

24    Q.    That you can be quiet.  You cannot be forced to make

25  any statements you don't want to make that may subject you

1    to --

2              MR. WHITE:  May I offer --

3              MS. GAYLORD:  Let me finish the question, then

4        you can object.

5              THE COURT:  Talk to me, not to him, okay?

6              MS. GAYLORD:  Okay.

7              MR. WHITE:  That's fine, she can finish the

8        question.

9    BY MS. GAYLORD:

10       Q.    That would subject you to criminal liability, which

11   is a new penalty.

12             MR. WHITE:  Objection, your Honor, it's

13        irrelevant.  To my knowledge, he was not advised of

14        any such rights at the time.

15             THE COURT:  We're talking about these

16        statements.

17             MS. GAYLORD:  I'm trying to develop a pattern

18        that Mr. Jerome Murray is familiar with the system,

19        he's heard these rights before, and he's been

20        advised of certain rights.

21             THE COURT:  I think I just ruled, that was

22        relevant.  Sustained.

23   BY MS. GAYLORD:

24       Q.    Mr. Murray, let's jump immediately to your

25   statements you have before you.  There is three different

STATE vs. GREEN;  10/28/03 - 10/29/03                    115

1    statements before you.  Do you see all three statements?

2         A.   Yes, I see them.

3         Q.   Let's look at the first statement which would be --

4    let's start off with the signed statement that you made on

5    August 3rd.

6              THE COURT:  What exhibit?

7              MS. GAYLORD:  Defense Exhibit I for

8         identification.

9              THE CLERK:  No, the signed statement is H,

10        which hasn't been marked.

11             MS. GAYLORD:  H.

12             THE COURT:  Is this the one we're going to use

13        as the exhibit?

14             MS. GAYLORD:  We can.

15             THE COURT:  Let's get one marked.  Let's get

16        the clerk to mark it.  Mr. Murray has Exhibit H.

17             MS. GAYLORD:  Very good.

18             (Whereupon, Defendant's Exhibit H was marked

19        for identification.)

20   BY MS. GAYLORD:

21        Q.   If you can just review that, Mr. Murray, right

22   quick.

23        A.   I don't remember this here.

24        Q.   That one?

25        A.   I don't remember.

STATE vs. GREEN;   10/28/03 - 10/29/03                    116

1        Q.    You don't remember that?  Look at the second page of

2    that document.

3        A.    I don't remember seeing nothing like that.

4        Q.    Is that your signature at the bottom of that

5    document?

6        A.    Yes.  I don't remember that.

7        Q.    Okay.  Going to the August 3, 1999 videotaped

8    statement --

9              THE COURT:  Which one is that?

10             MS. GAYLORD:  That would be -- madam clerk, is

11        that --

12             THE CLERK:  G.

13   BY MS. GAYLORD:

14        Q.    Dated August 3, 1999.

15             THE COURT:  Is this G, right here?  He's got

16        Exhibit G.

17   BY MS. GAYLORD:

18        Q.    On that particular date, do you recall giving a

19   statement to a Paul Ciolino, an investigator out of New York,

20   in reference to the Crosley Green case?

21        A.    Yeah.

22        Q.    Were you threatened, or coerced in any way, to give

23   that sworn statement?

24             MR. WHITE:  I have an objection to any

25        questioning regarding this statement, which also was

1    an unsworn statement.  Because it was an unsworn

2    statement, I fail to see how it could, in any way,

3    act as any sort of a waiver of any rights that he

4    has.

5        MR. LANNING:  It's also without the benefit of

6    counsel.

7        THE COURT:  We have to establish that.  That's

8    what I thought we were going to establish.  Because

9    it's unsworn --

10       MR. WHITE:  I don't know how it can act as a

11   waiver for somebody to give a prior unsworn

12   statement.

13       THE COURT:  You want to be heard on that?  How

14   can he waive something?  You have to swear to it.

15       MS. GAYLORD:  We're not establishing what was

16   in the statement, just the fact he did make

17   statements, and subsequently made statements in a

18   sworn statement to the Florida Department of Law

19   Enforcement.

20       THE COURT:  Doesn't it have to be a sworn

21   statement to be a waiver?

22       MS. GAYLORD:  Yes, sir, and we're getting to

23   the FDLE statement.

24       THE COURT:  That would be the sworn statement?

25       MS. GAYLORD:  That's the sworn statement.

Case 6:14-cv-00330-RBD-GJK  Document 3-38  Filed 02/27/14  Page 17 of 95 PageID 1066

1          THE COURT:  I'll sustain the objection.

2          MS. GAYLORD:  That's a statement that was also

3     made by Mr. Murray.

4          THE COURT:  I'll sustain the objection because

5     the unsworn statement doesn't mean anything.  It's

6     the sworn statement.  I'll sustain the objection,

7     Mr. White's objection.

8          MS. GAYLORD:  Okay.

9  BY MS. GAYLORD:

10     Q.   When had you spoke with Mr. Ciolino, you don't have

11  to look at your statement anymore, but when you spoke with

12  Mr. Ciolino, were you pressured, or coerced in any way to

13  speak with Mr. Ciolino?

14          MR. WHITE:  Objection, relevance.

15          THE COURT:  Sustained.

16  BY MS. GAYLORD:

17     Q.   Were you advised by Mr. Ciolino that you did not

18  have to speak with him?

19          MR. WHITE:  Objection, relevance.

20          THE COURT:  Sustained.  We need to move on to

21     the sworn statement.

22          MS. GAYLORD:  Moving on to the sworn statement

23     dated October the 31st, 1999.  It's an audiotaped

24     sworn statement of Jerome Murray.

25  BY MS. GAYLORD:

1      Q.   Do you recall giving a sworn statement to the

2  Florida Department of Law Enforcement in reference to the

3  Crosley Green case?

4      A.   I don't remember.

5      Q.   Why don't you look at Defendant's Exhibit --

6           MS. GAYLORD:  Madam clerk, that would be now --

7           MR. WHITE:  It's actually, just to correct this

8      for the record, it actually shows on the transcript

9      the date of October 31, 1999, if you're looking for

10     that.  In fact, it was supposed to have -- we have a

11     typo.  It should be --

12          THE COURT:  That's F. I have got F.

13          MR. WHITE:  It should reflect it was October

14     13th.

15          THE COURT:  October 31, 1999?

16          MR. WHITE:  What I wanted to correct, and

17     hopefully defense counsel has background to

18     understand and agree, so we make it clear for the

19     record, the audiotape I have is dated 10/13, and the

20     reports of investigating officers indicate it was

21     10/13, so I think we have a typo there.  I'm not

22     sure if it's going to be an issue or not.  I'm

23     trying to rectify it.

24          THE COURT:  You think the typo may be on the

25     front?  It says Wednesday afternoon.

STATE vs. GREEN;  10/28/03 - 10/29/03                          120

1          MR. HOLMES:  I looked at a calendar when I

2     noticed this, your Honor.  The 31st was not a

3     Wednesday that year.

4          THE COURT:  What's that?

5          MR. HOLMES:  The 13th was a Wednesday.  The

6     31st was not a Wednesday.

7          THE COURT:  This would be Exhibit F.

8          MS. GAYLORD:  He has a copy in front of him,

9     your Honor.

10          THE COURT:  So he's looking at the one that's

11     marked?

12          MS. GAYLORD:  Yes.

13          THE WITNESS:  Your Honor, I remember this one.

14          THE COURT:  You remember that?

15          THE WITNESS:  Yeah.

16     BY MS. GAYLORD:

17     Q.   On page 4, Mr. Murray, look at page 4.  Were you

18     sworn in, where you raised your right hand, and you promised

19     to tell the truth in that statement?

20     A.   Yes, I did.

21     Q.   Did you understand that this was a statement to law

22     enforcement officers?

23     A.   No, I didn't.

24     Q.   Did Mr. Ladner advise you that he was from the

25     Florida Department of Law Enforcement?

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 20 of 95 PageID 1069

1      A.    He didn't explain nothing, but he says he was a cop.

2            THE COURT:   He said he was a cop?

3            THE WITNESS:   That's what he said.

4            THE COURT:   He was a cop?

5            THE WITNESS:   He was a cop.

6   MS. GAYLORD:

7      Q.    Did you voluntarily agree to accompany law

8   enforcement, or Mr. Ladner, or Mr. King, to a location to

9   record your statement?

10      A.    I didn't agree to voluntarily record it.

11      Q.    Were you under arrest at the time that you made your

12   statement?

13      A.    No, he didn't arrest me, he just told me to come

14   down to PD.

15      Q.    Were you placed in handcuffs at the time you made

16   your statement?

17      A.    No.

18      Q.    Did they pressure you, threaten you, or threaten to

19   kill anyone, to get you to make your statement?

20      A.    No, they didn't.

21      Q.    Did they advise you that they were conducting an

22   independent investigation into Mr. Green's case?

23      A.    Not at that time, but later they did, after they

24   recorded it.

25      Q.    Okay.  Were you under the influence of any drugs or

1   alcohol at the time that you made your statements to FDLE?

2        A.   I was drinking.

3        Q.   Excuse me?

4        A.   I was drinking.

5        Q.   Refer to page 7.

6        A.   (Complied.)

7        Q.   Actually, it would be the bottom of page 6, and the

8   top of page 7.

9             (Whereupon, the transcript of Jerome Murray on

10            10/13/99 was read into the record by Ms. Gaylord, as

11            follows:)

12            "Question:  Have you had anything to drink

13   today?

14            "Answer:  Nothing.

15            "Question:  Nothing at all?

16            "Answer:  Nothing.

17            "Question:  So when we picked you up, you had

18   just gotten off of work?

19            "Answer:  Just got off.

20            "Question:  No drugs?

21             "Answer:  No.

22   BY MS. GAYLORD:

23        Q.   At the time that you made the statements, were you

24   under the influence of alcohol or drugs?

25        A.   I was drinking.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 22 of 95 PageID 1071

1      Q.    Are you always under the influence of alcohol and

2  drugs any time you make statements?

3      A.    When I come from work, I stopped at the first store

4  I see, and I get me a bottle.

5      Q.    What did you buy?

6      A.    Beer.

7      Q.    How many did you by?

8      A.    A quart.

9      Q.    A quart?

10     A.    Yeah.

11     Q.    How many quarts do you normally drink before you're

12  drunk?

13     A.    The first one I kick out.

14     Q.    When you made the statement to Florida Department of

15  Law Enforcement, you had one quart of beer, or one quart of

16  malt liquor?

17     A.    I ain't told them nothing.  I didn't say I was

18  drinking, though.

19     Q.    Did you feel that you were drunk?

20     A.    Tired or drunk, one of the two.

21     Q.    When was the last time you had used drugs?

22     A.    I used drugs the weekend.

23     Q.    Excuse me?

24     A.    I used drugs the weekend.

25     Q.    The weekends?

STATE vs. GREEN;   10/28/03 - 10/29/03                    124

1      A.   Yeah, the weekends.

2      Q.   The weekend before you made this statement?

3      A.   Yeah.

4      Q.   What type of drugs did you use?

5      A.   Marijuana, crack.

6      Q.   How much crack did you use?

7      A.   Sixty dollars worth, three twenties.

8      Q.   Did you feel you were capable of making this
9  statement, although you had used crack the weekend before?

10     A.   No, not really, but I thought I could say something
11 different, avoid all of that.

12     Q.   Did you feel well enough to go to work that day?

13     A.   I felt good going to work.

14     Q.   Did you go to work on the Tuesday before you made
15 your statement?

16     A.   Yeah.

17     Q.   Did you go to work the Monday before you made your
18 statement?

19     A.   Yeah.

20     Q.   On that Monday or Tuesday before you made your
21 statement, you hadn't used crack?

22     A.   I drank a lot of beer.

23     Q.   That was it?

24     A.   That was it.

25     Q.   You felt good enough to go to work?

STATE vs. GREEN;   10/28/03 - 10/29/03                    125

1        A.    Yeah.

2        Q.    Did you pass out at work before you made your

3   statement, or go to the hospital in any way because you were

4   intoxicated, that you could not do anything voluntary on that

5   date.

6        A.    I didn't do any volunteer --

7        Q.    What type of work were you involved in?

8        A.    Lawn service.

9        Q.    That's hard work, isn't it?

10       A.    That's hard work.

11       Q.    You use machinery?

12       A.    Yeah.

13       Q.    You have to be alert, and attentive?

14       A.    Yeah.

15       Q.    You were alert and attentive?  You didn't have any

16   accidents while you were at work?

17       A.    When I drink, I be real sharp.

18       Q.    Okay.  When Mr. Ladner or Mr. King took your

19   statement, did they threaten or force you into making any

20   statements?

21       A.    Just certain things that had me, kind of, shooked

22   up.  They said if I didn't, I wouldn't make a statement, there

23   could be something, like, I would go to jail.  Something like

24   that.

25       Q.    So if you didn't make a statement, you could go to

STATE vs. GREEN;   10/28/03 - 10/29/03

126

1   jail?

2      A.   Yeah.   I made a statement.   The way they was

3   talking, I thought it was a control thing.

4      Q.   Those were the same type of things you felt at the

5   trial level when you were approached to testify?

6      A.   Yeah.

7        MR. WHITE:   Objection, your Honor, to the

8       relevance of that.

9        THE COURT:   Sustained.

10  BY MS. GAYLORD:

11     Q.   Were you also advised that you could leave at any

12  time, and you didn't have to make any statements?

13     A.   They didn't say I could just leave like that.

14     Q.   Refer to page 32, line 6.

15      "Question:   Has a statement been made of your

16     own free will?

17      "Answer:   Right.

18      "Question:   Do you recall me telling you, at

19     any time, you can leave, and we're going to take you

20     back to wherever you want to go:

21      "Answer:   Right, right.

22  BY MS. GAYLORD:

23     Q.   Do you recall making those statements?

24     A.   I remember saying that.

25     Q.   So that you could leave at any time?

1    A.    Yeah.

2    Q.    Actually, you reaffirm, again, that this statement

3 is being made of your own free will, back on page 36. Do you

4 recall reaffirming that this is a statement being made of your

5 own free will?

6    A.    No, I don't think I remember that.

7    Q.    Page 36, line 8.

8         "Question:  Again, this statement is of your

9         own free will?

10         "Answer:  Right.

11         "Question:  Nobody has threatened or promised

12         you anything?

13         "Answer:  No, they didn't.

14 BY MS. GAYLORD:

15    Q.    Isn't it true that you reaffirm you were making a

16 voluntary, free statement?

17    A.    I probably did.  I didn't understand, I just --

18    Q.    Do you understand the word threatened, or promised

19 anything to make a statement?

20    A.    I know what a promise is.  You promise me something.

21 I know that.

22    Q.    Do you understand what a threat is to get you to

23 make a statement?

24    A.    Yeah.

25    Q.    In this statement, you indicated that no one had

Case 6:14-cv-00330-RBD-GJK  Document 3-38  Filed 02/27/14  Page 27 of 95 PageID 1876

1  threatened you, or promised you anything, and that you were

2  doing this of your own free will.  Did you reaffirm that fact?

3      A.   I probably say it.  I don't remember, really, to

4  tell you the truth.

5      Q.   Mr. Murray, when you gave this sworn statement, did

6  you understand the statement to be a statement that was

7  different than your trial testimony?

8      A.   No, I didn't.  I didn't realize none of that.

9      Q.   Did you testify in the same manner in which you had

10 testified to the Court?

11         MR. LANNING:  Objection, objection.  His Fifth

12     Amendment privilege, he said he wants to exercise

13     that.

14         THE COURT:  Sustained.

15 BY MS. GAYLORD:

16     Q.   Mr. Murray, I have asked you a question about your

17 use of crack cocaine.  Back at the time of your -- back in

18 1988, '89, '90, were you frequently using crack cocaine during

19 those periods?

20     A.   Yes, I did.

21     Q.   How often did you use crack cocaine during those

22 periods?

23     A.   Every day.

24     Q.   Every day?

25     A.   Every day.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 28 of 95 PageID 1077

1    Q.    Did you also drink every day?

2    A.    Every day.

3         MS. GAYLORD:  Your Honor, at this time, we

4    would like to -- we have no further questions of

5    Mr. Murray on that issue.  We would like to move

6    those exhibits that we have marked for

7    identification into evidence for the purpose of the

8    Court to decide whether or not Mr. Murray, based

9    upon his statement to FDLE, executed a waiver or

10   account of his right to remain silent.

11        Given his statement, I would like to make legal

12   argument after the State has an opportunity to

13   inquire.

14        THE COURT:  You're offering in those Exhibits

15   G, H, I?

16        MS. GAYLORD:  G, H, I.

17        THE COURT:  Any objection?

18        MR. WHITE:  No objection.

19        THE COURT:  G, H, and I will be the next

20   numbered defense exhibits.

21        THE CLERK:  F, G, and H.

22        THE COURT:  F, G, and H, that's what it is.

23   Exhibit F will be the sworn statement dated, should

24   be October 13th, G would be the videotaped statement

25   of Mr. Murray, and H would be the written statement

STATE vs. GREEN;   10/28/03 - 10/29/03                    130

1       of Mr. Murray.  No objection?

2               MR. WHITE:  None.

3               MS. GAYLORD:  As well as a certified copy of

4       conviction for Mr. Murray.

5               THE CLERK:  That would be 4, 5, and 6.

6               (Whereupon, Defendant's Exhibits F, G, and H

7       were received in evidence as Defendant's Exhibits 4,

8       5, and 6.)

9               THE COURT:  Cross-examination?

10              MR. WHITE:  Briefly.

11              THE COURT:  Yes, sir.

12                       CROSS EXAMINATION

13      BY MR. WHITE:

14         Q.   Good afternoon, Mr. Murray.  I just want to focus on

15      the statement she was last asking you about, the one you gave

16      to the FDLE gentlemen.  You didn't have counsel there with you

17      when they were questioning you that day, did you?

18         A.   No, sir.

19         Q.   So there was no one there, like Mr. Lanning, to

20      advise you of what your rights might be, and what you might be

21      doing by giving that sworn statement?

22         A.   Nobody was there.

23         Q.   It was just them and you?

24         A.   And me.

25         Q.   Did they advise you -- I have seen the statement.

STATE vs. GREEN;   10/28/03 - 10/29/03                    131

1    They didn't advise you of Miranda, or anything, to let you

2    know you might be committing a crime if you gave that

3    statement, did they?

4         A.   They didn't do nothing.

5              MR. WHITE:  Nothing further, your Honor.

6              THE COURT:  Mr. Lanning, any questions?

7              MR. LANNING:  No, sir.

8              THE COURT:  Any redirect?

9                   REDIRECT EXAMINATION.

10   BY MS. GAYLORD:

11        Q.   Mr. Murray, did you ask for counsel to be appointed

12   when you were giving your statement to FDLE?

13        A.   I didn't have time.

14             THE COURT:  You didn't ask them?

15             THE WITNESS:  No.

16             MS. GAYLORD:  That was a no?

17             THE WITNESS:  That was a no.

18             MS. GAYLORD:  I have no other questions, your

19   Honor.

20             THE COURT:  Based upon the testimony of

21   Mr. Murray, I looked at his statement, the sworn

22   statement which would be Defendant's Exhibit 4 in

23   evidence at this time, and the Court finds there was

24   no waiver.

25             Mr. Murray has exercised his Fifth Amendment

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 31 of 95 PageID 1080

1    right, and he's not going to testify.

2         MS. GAYLORD:  Leading to the second argument.

3    Based upon that ruling by the Court, we would ask

4    the Court to declare Mr. Jerome Murray an

5    unavailable witness at this particular time, so we

6    can introduce evidence of his prior sworn statements

7    by FDLE that he's exercising that right.

8         THE COURT:  You want to be heard on that?

9         MR. WHITE:  Your Honor, to my knowledge, there

10   is still hearsay.  I understand he's become an

11   unavailable witness, but at this point in time, I

12   don't know that they have satisfied that, and

13   frankly, I think what we ought to do, in abundance

14   of caution, before you rule on that, we don't have

15   to rule today, to give us a chance to respond to

16   that in writing, perhaps.

17        THE COURT:  Okay, it would require Mr. Murray

18   to do that.

19        MS. GAYLORD:  I would like the Court to go

20   ahead, if the State has something to present on the

21   issue, there is hearsay exceptions.  We can go

22   through the Rules of Evidence, and look at all of

23   the exceptions.

24        THE COURT:  What hearsay exception?

25        MS. GAYLORD:  We've got 804, we've got

1    declarations against interest, statements against

2    interest.  We can go through that.  That would be

3    90.804(c), and that would just say hearsay

4    exceptions are not excluded.

5         "(c) is the statement against interest - A

6    statement which, at the time of making, was so far

7    contrary to the declarant's pecuniary or proprietary

8    interest or tended to subject the declarant to

9    liability or to render invalid a claim by the

10   declarant against another, so that a person in the

11   declarant's position would not have made the

12   statement unless he or she believed it to be true.

13   A statement tending to expose the declarant to

14   criminal liability and offered to exculpate the

15   accused is inadmissible, unless corroborating

16   circumstances show the trustworthiness of the

17   statement."

18        I believe Mr. Murray is here.  He already

19   identified the statement, we have transcripts of the

20   statement.  The investigation renders certain

21   conclusions, and that was all initiated by the

22   State.  I think that can just be the basis for the

23   exception.

24        We can go into further the case law that's

25   presented in the Hill case, and things of that

STATE vs. GREEN;   10/28/03 - 10/29/03                    134

1    nature, but the problem is Mr. Murray is a very hard

2    person to get up with.  The only reason we got up

3    with him this time is because --

4         THE COURT:  As I understand it, what you're

5    offering in from the statement is for a substantive

6    purpose, correct?

7         MS. GAYLORD:  Uh-huh.

8         THE COURT:  And you're saying because, Judge --

9    they're objection first, off the top, was hearsay.

10   But you're saying, Judge, maybe, but there's an

11   exception, and it's 804.

12        MS. GAYLORD:  We can present the argument on

13   that.

14        THE COURT:  I'm saying either way I rule, we

15   don't need Mr. Murray for that.

16        MS. GAYLORD:  No.  If the Court rules in our

17   favor, the next point, after we have the argument on

18   that, we would like this law enforcement to assure

19   that Murray, if the Court tells him to come to

20   Court, that he comes to court.  Otherwise, Mr.

21   Murray --

22        THE COURT:  First of all, he didn't waive his

23   right of self-incrimination to testify about what

24   you want to ask him.  He's exercised his Fifth

25   Amendment right.  As I understand it, he's not going

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 34 of 95 PageID 1083

1    to testify about his statement recantation.  That's

2    pretty much it for him.

3        What you're saying is, Judge, he made his

4    statement prior, in which he did recant.  He said it

5    under oath.  We want to use it in place of his

6    testimony, in a substantive way, correct, because

7    there is an exception under our Rules of Evidence

8    that lets it become admissible, for the truth

9    contained in.  Isn't that what you're saying?

10       MS. GAYLORD:  Yes.

11       THE COURT:  Why do we need Mr. Murray, again?

12       MS. GAYLORD:  We wouldn't need Mr. Murray.

13       THE COURT:  It's a legal issue.  Mr. White is

14   saying, rather than rule on that particular point,

15   let us give a chance to send you a memo.

16       MS. GAYLORD:  That's fine.

17       THE COURT:  That okay?

18       MS. GAYLORD:  That's fine.  We also have other

19   issues that deal with Mr. Murray.  We have an order

20   to show cause why he should not be held in contempt

21   of court for his prior failure to appear.  We need

22   to deal with that.

23       We also have some other questions, that I do

24   not think would subject Mr. Murray to his Fifth

25   Amendment privilege waiver, that we would like

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 35 of 95 PageID 1084

1    Mr. Murray to answer while he's here.

2        THE COURT:  What would that be?

3        MS. GAYLORD:  A couple questions that involve

4    his feelings of being threatened, or pressured, in

5    the initial trial proceedings to provide testimony.

6    I do not believe he has a privilege as to those

7    types of questions.

8        MR. WHITE:  The State's position would be that

9    they're so interrelated, and interlocked into his

10   alleged statement of recantation, that they are, in

11   fact, Fifth Amendment barred.

12       MR. LANNING:  I would agree.

13       THE COURT:  Let me see if I have it straight.

14   You want to forget about show cause.  I understand

15   that issue.  But you want to ask him questions about

16   his testimony he gave initially, about if anyone

17   threatened him, or made promises to him, or

18   something along those lines?

19       MS. GAYLORD:  Yes, sir.

20       MR. WHITE:  Maybe I can help you understand.  I

21   know you weren't there.  Let's put it this way.

22   You're trying to simulate.  Mr. Murray gave several

23   different statements, at one point, and he was

24   inconsistent in this.  But at one point, he made

25   allegations that he was threatened.  At other

1    points, he said no.

2        He's been inconsistent back and forth.  They

3    want, now, to raise the issue, and ask him about

4    whether, in fact, I, or anybody else in law

5    enforcement, I suppose, threatened him to make him

6    testify at the trial.  I suggest that is tied into

7    the issue of whether or not he's recanting.  It

8    becomes barred by the Fifth Amendment.

9        THE COURT:  He didn't tell the truth?

10       MR. WHITE:  Right, exactly.

11       THE COURT:  I see what you're saying.  Is that

12   part of the 3.850?  You all read that?  I can't

13   remember.

14       MR. GRUBER:  I'm trying to remember, too.  I'm

15   shifting gears here.  Where I think Mr. White is

16   going is essentially a material argument.

17       THE COURT:  What's that?

18       MR. GRUBER:  I think he's going into a second

19   prong, or third prong type materiality argument.

20   The question is, what would he have said, or what

21   was the --

22       THE COURT:  If I understand his argument, he's

23   saying, Judge, the implication that I guess the

24   Court should make, if you ask Mr. Murray those

25   questions about was he incriminated, let's assume he

1    said yes, and they said these certain things to him,

2    that what he said was not true.  That would be, I

3    guess --

4         MR. GRUBER:  That's why I'm thinking in terms

5    of he's making a materiality argument on the issue.

6    In other words, was there prejudice, was there

7    harmful error, was there something like that?  You

8    know, I don't know, that's why I said that.  I'm not

9    sure whether I'm right or wrong.

10        First of all, I will be very surprised if there

11   is not some boiler plate motion somewhere or other.

12        MR. NUNNELLEY:  Judge, page 67, 68.

13        THE COURT:  That's kind of implied there.

14   Mr. Lanning?

15        MR. LANNING:  Judge, the question about

16   pressure or threats could lead Mr. Murray to answer

17   questions in an inconsistent manner with his trial

18   testimony.  The crime of perjury by inconsistent

19   statements is a 15 year felony.  Mr. Murray wants to

20   exercise his Fifth Amendment --

21        THE COURT:  I'm going to sustain the objection.

22   I think that's right.  I'll sustain the objection.

23        MS. GAYLORD:  Quick response, if I may.  Issues

24   that we're talking about have to do with possible

25   misconduct issues.  That's what the questions would

1    be geared to, not questions that would subject

2    Mr. Murray, himself, to open himself up for criminal

3    liability, but whether or not he felt pressured, or

4    coerced by the State.

5         How could answering that particular question

6    subject Mr. Murray to the State filing an indictment

7    against Mr. Murray, to charge him with perjury based

8    upon that statement alone?

9         THE COURT:  I don't know what he's going to say

10   about any of it.  I see what's in the motion.  I

11   think what you're saying is, Mr. Murray, did

12   Mr. White, or Mr. Williams, or the investigators

13   threaten you in some way to get you to testify in

14   this case.  Let's say he said yes, they did.  I

15   guess the implication from that would be --

16        MR. WHITE:  There is more than an implication.

17   Let me stop and ask you to analyze this.  At trial,

18   he said there were no threats or promises.

19        THE COURT:  That could be another --

20        MR. WHITE:  You don't have to imply anything.

21        THE COURT:  You may have asked him, under oath,

22   and that may be inconsistent here.  I'll sustain the

23   objection.

24        MS. GAYLORD:  The other question I would like

25   to ask Mr. Murray about involves his trial

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 39 of 95 PageID 1088

1     testimony.  I'm trying to find the point.

2          This would go to all the Brady issues.  It

3     would be of the trial record on page 1237, where

4     Mr. Murray was asked whether or not when you were

5     arrested on the warrant, do you remember what it

6     was, how long it was after I talked to you.  He's

7     been examined, I believe, by Mr. White, at the time.

8          About two weeks after that, I guess, was that

9     warrant, because of a misdemeanor charge that you

10    had?

11         Mr. Murray answers, Yes, sir.  In fact, that

12    information is not correct.  Then, Judge, on your

13    behalf, to allow you out on a warrant.  Yes, sir.

14    In fact, Mr. Murray had been arrested on violation

15    of probation, not a misdemeanor charge.  We would

16    like to ask Mr. Murray a question on that part.

17         MR. LANNING:  Judge, I wasn't clear on the

18    question, or what they want to ask.

19         THE COURT:  Evidently, there was some trial

20    testimony where Mr. White, inquiring that Mr. Murray

21    had been arrested sometime after that, and Mr. White

22    talked to him, and he asked him what he had been

23    arrested for, but he actually said he was arrested

24    on a misdemeanor, correct?

25         MS. GAYLORD:  That's correct.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 40 of 95 PageID 1009

1      THE COURT:  Mr. Murray said yes.  And what
2  you're saying now, he got arrested on a violation of
3  probation.
4      MR. LANNING:  They want Mr. Murray to admit
5  perjury to himself during his testimony.
6      THE COURT:  What would be the purpose of your
7  questioning?
8      MS. GAYLORD:  Brady issues, and the State
9  obligation to prevent false testimony back to
10  Mr. Murray.
11      MR. WHITE:  If, in fact, that's true, the
12  record is the record.  In other words, we have case
13  files, I would assume.
14      THE COURT:  That would be -- that wouldn't
15  require his testimony.  The record is the record.
16  Anything else we're going to ask Mr. Murray?
17      MS. GAYLORD:  Let me just double check real
18  quick.  Your Honor, I would also like to --
19      THE COURT:  How about a question for
20  Mr. Murray?
21      MS. GAYLORD:  No, sir.
22      THE COURT:  Can we let Mr. Murray go?
23      MS. GAYLORD:  That's fine if the Court --
24      MR. LANNING:  Order to show cause?
25      THE COURT:  You want to go into that?

STATE vs. GREEN;   10/28/03 - 10/29/03                     142

1          MS. GAYLORD:  Oh, yes.

2          THE COURT:  I forgot about that.  Mr. Murray,

3    have a seat.

4          MS. GAYLORD:  Mr. Murray, do you recall getting

5    a subpoena back in April of 2003?  I'm not sure of

6    the date, but we did file a service of subpoena on

7    Mr. Murray, where myself, and Ms. Valdez, served you

8    with a subpoena to appear?

9          THE WITNESS:  I remember that.

10         MS. GAYLORD:  It was actually handed to you.

11   Is that correct?

12         THE WITNESS:  To the house in Mims.

13         MS. GAYLORD:  You were served at your house?

14         THE WITNESS:  Yeah.

15         MS. GAYLORD:  Did you fail to appear to court

16   as noted on the subpoena?

17         THE WITNESS:  Well, I worked, and I got off

18   late.

19         MS. GAYLORD:  Did you call anybody, and tell

20   them you're not going to be here?

21         THE WITNESS:  I didn't see the phone number.

22         MS. GAYLORD:  Isn't it true that I handed you

23   my business card with my 1-800 number on it?

24         THE WITNESS:  I don't think you did.

25         MS. GAYLORD:  Did you call the Court to advise

1    the Court that you were at work, and couldn't come?

2         THE WITNESS:  No, I didn't.

3         MS. GAYLORD:  Did you call my office, or

4    attempt to call Mr. White's office, or contact any

5    court official about your inability to come?

6         THE WITNESS:  I didn't have the phone number.

7         MS. GAYLORD:  Did you show the subpoena to your

8    job?

9         THE WITNESS:  No.

10        MS. GAYLORD:  So you just didn't come?

11        THE WITNESS:  I wasn't there.

12        MS. GAYLORD:  Did you understand that you could

13   be subjected to any type of penalty for failure to

14   appear?

15        THE WITNESS:  That's what I have been told.

16        MS. GAYLORD:  You still chose not to come?

17        THE WITNESS:  I just, like I said, I was

18   working.  It was too late when I got off.

19        MS. GAYLORD:  Did you understand that was a

20   legal court process, and you had to appear?

21        THE WITNESS:  I can't read that good, and I

22   didn't understand the paper that you did give me.

23        MS. GAYLORD:  Did you understand that your name

24   was Jerome Allen Murray?

25        THE WITNESS:  I do know that.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 43 of 95 PageID 1092

1          MS. GAYLORD:  Did you understand it was a

2    subpoena because when it was handed to you, it was a

3    subpoena?

4          THE WITNESS:  I didn't know it was a subpoena.

5          MS. GAYLORD:  But you understood it was a court

6    date?

7          THE WITNESS:  It was a court date.

8          MS. GAYLORD:  You received subpoenas before,

9    isn't that true?

10          THE WITNESS:  The one you brought, yes.

11          MS. GAYLORD:  Didn't the State, back at the

12    trial court, subpoena you to appear, so you have

13    seen a subpoena before?

14          THE WITNESS:  Yeah.

15          MS. GAYLORD:  So you understood that was a

16    legal process, and that you had to appear?

17          THE WITNESS:  Like I said, I can't read that

18    good, and I don't see no phone number on it.  If

19    there was a phone number on it, I didn't know that

20    was a phone number.

21          MS. GAYLORD:  Other than the fact that you got

22    off work late, and it was a two day proceeding, did

23    you come the next day, after the first date, when

24    you got off from work?

25          THE WITNESS:  When you brought that there, I

1   looked at it.  I set it aside, took a bath, laid

2   down, got up the next morning, went to work.

3       MS. GAYLORD:  Since that time period, have you

4   ever made any contact with the Court to let them

5   know anything about your failure to appear for court

6   that day?

7       THE WITNESS:  Like I said, I didn't know that

8   was a subpoena.  Although you had brought it there,

9   I didn't know I had to be there a certain time, on

10  the date.

11      MS. GAYLORD:  Your Honor, I don't have a copy

12  of the filing of the certificate of service of the

13  subpoena, but we did file that.  I would ask the

14  Court to take judicial notice of that particular

15  document, and hold Mr. Jerome Murray in contempt of

16  court for failing to appear.

17      THE COURT:  Does Mr. Lanning get to ask some

18  questions now?

19      MS. GAYLORD:  Sure, go ahead.  I'm sorry,

20  Mr. Lanning.

21      MR. LANNING:  Mr. Murray, why didn't you show

22  up?

23      THE WITNESS:  I didn't know it was really a

24  subpoena.  She just said to be at court that day.  I

25  went to work that morning.  I was way out.  I

1    couldn't just come right back, or anything like

2    that.

3         MR. LANNING:  Did she tell you that it was a

4    lawful subpoena?

5         THE WITNESS:  She just said be to court.

6         MR. LANNING:  Have you ever been served a

7    subpoena by, like, the Sheriff's Department?

8         THE WITNESS:  Somebody that come in a coat?

9         MR. LANNING:  Yes.  When somebody -- when they,

10   back in '90, at the time of the trial, how were you

11   served with subpoenas, was it by a uniformed deputy?

12        THE WITNESS:  Plain clothes.

13        MR. LANNING:  Like me?

14        THE WITNESS:  Yeah.

15        MR. LANNING:  Did you know that she was

16   Mr. Green's attorney?

17        THE WITNESS:  She said something.  She said she

18   worked on the case.  That's what she said, she's

19   working on the case.  Three of them came to the

20   house.  Three of them.  All of them try to tell me

21   to do this, do that, do that.  I got confused.  I

22   left it alone.  All of them telling me what to do, I

23   have to do this a certain time, that time, you know,

24   they just kept -- they had me all confused.  I just

25   tried to back off.

1      MR. LANNING:  Your Honor, I don't have any

2  further questions.

3      MS. GAYLORD:  Just one more question.  I forgot

4  to ask you, Mr. Murray, isn't it true that we

5  offered to give you a ride to court?  You told us

6  you would get there, and that was okay?

7      THE WITNESS:  When you all came, I was working.

8      MS. GAYLORD:  But we offered to bring you to

9  court, isn't that true?

10      THE WITNESS:  Oh, yeah.

11      MS. GAYLORD:  You understood it was a court

12  date?

13      THE WITNESS:  You offered, but I wasn't there

14  when you did came.

15      MS. GAYLORD:  We came back and talked to you,

16  and we served you with a subpoena, and offered to

17  bring you to court.

18      THE WITNESS:  That was in the afternoon.

19      MS. GAYLORD:  Okay.  But we offered to bring

20  you to court?

21      THE WITNESS:  You did say --

22      MS. GAYLORD:  So you understood it was a court

23  date, and you had to appear?

24      THE WITNESS:  But it was too late.

25      MS. GAYLORD:  That was before the 3.850

1    Proceedings, it wasn't too late.

2         THE WITNESS:  I remember one time you all came

3    to the house, that's what I remember.  One time, you

4    gave me a card.  I remember you bringing papers to

5    me.  That's the only time I remember you coming to

6    the house.

7         MS. GAYLORD:  You do recall me coming to your

8    house, and that's the same day you were served the

9    subpoena.

10        THE WITNESS:  The papers.  The card, you didn't

11   give me no card.  If you had given me a card, I

12   would have called.

13        THE COURT:  Mr. Murray, did you read the paper?

14        THE WITNESS:  I looked at it.  What she said,

15   it's a court day for me.

16        THE COURT:  Did she tell you the next day?

17        THE WITNESS:  She didn't say anything about the

18   next day.

19        THE COURT:  What day was it?

20        THE WITNESS:  I don't remember now.

21        THE COURT:  Did they tell you the time?

22        THE WITNESS:  It was on the paper.  I can't too

23   much read, so I just seen the date on here, so I set

24   it aside.

25        THE COURT:  That day came, you got up, went to

Case 6:14-cv-00330-RBD-GJK  Document 3-38  Filed 02/27/14  Page 48 of 95 PageID 1097

1    work, and didn't go to court?

2         THE WITNESS:  No, I didn't.

3         THE COURT:  When you got off work, you said it

4    was too late to come to court?

5         THE WITNESS:  It was too late.

6         THE COURT:  You didn't call anybody, say, Look,

7    I'm not coming, I'm working?  Do you know what a

8    subpoena is?

9         THE WITNESS:  No, I don't.

10         THE COURT:  Anything else?

11    MS. GAYLORD:  Your Honor, based upon the

12    severity of this case, and the fact that it is a

13    very serious proceeding, we ask that the Court hold

14    Mr. Jerome Murray in contempt of court.

15         The witnesses must understand when they are

16    issued a subpoena to appear, they must appear.  If

17    they do not appear, there are punishments and

18    penalties for failure to appear.  That is clearly at

19    the bottom of the subpoena.  If he didn't understand

20    that before, he needs to understand that now.

21    MR. LANNING:  Judge, in that Mr. Murray has

22    exercised his Fifth Amendment privilege, I don't

23    know what the prejudice to the proceedings have been

24    by his nonappearance.

25         THE COURT:  Does there have to be prejudice?

1     Is that an element?

2          MR. LANNING:  I would think it would go to any

3     aggravation.

4          THE COURT:  He was subpoenaed to court.  He

5     should have exercised, I assume he would have,

6     because he did today, but that's not an element.

7          MR. LANNING:  Right, but there is -- again,

8     there has been no -- okay, while he failed to

9     appear, it's had no substantial affect on the

10    proceedings, and I think the Court should take that

11    into account.

12         THE COURT:  Well, the Court, Mr. Murray, the

13    Court is going to find you are in contempt.

14    Subpoenas are important documents, court orders for

15    you to be in court.  The Court finds you were served

16    with a subpoena, the subpoena had the date and time,

17    you were to be in court.  You indicated to the Court

18    you went to work.  You have to work.  The Court

19    understands that, sometimes people have to make

20    court orders.

21         The Court is going to find you in willful

22    contempt, and sentence you in ten days in Brevard

23    County Jail.

24         MS. GAYLORD:  Your Honor, we would ask that be

25    consecutive to any time he's in for today at this

1    particular time.

2           THE COURT:  Ten days starting today.

3           MR. GRUBER:  I'm ready to go with Mr. Parker.

4           THE COURT:  Is Mr. Parker here?

5           MR. NUNNELLEY:  He's sitting out in the hall.

6           THE COURT:  Let's get Mr. Parker.

7           (Whereupon, a brief recess was had.)

8           THE COURT:  Ready to proceed?

9           MR. WHITE:  I just want to make sure we take

10   care of everything we need to take care of.  In

11   light of their moving for contempt against our last

12   witness, Mr. Murray, do they want to do that with

13   regard to Lonnie Hillary?  I want to make sure we

14   don't have any issues, or problems.

15          MS. GAYLORD:  Your Honor, we actually spoke to

16   Mr. Hillary during the dependency of the last

17   proceeding.  He indicated he had a problem, and we

18   said we can continue as to Mr. Hillary.

19          THE COURT:  There was no issue of cause?

20          MS. GAYLORD:  No, that was just Mr. Murray.

21          MR. WHITE:  Good deal.

22          THE COURT:  You ready for Mr. Parker?

23          MR. GRUBER:  I am, yes, sir.

24   WHEREUPON:

25                  JOHN ROBERTSON PARKER,

Case 6:14-cv-00330-RBD-GJK  Document 3-38  Filed 02/27/14  Page 51 of 95 PageID 1100

1   A witness herein, acknowledged he was duly sworn and testified

2   upon his oath as follows:

3            THE WITNESS:  I do.

4                        DIRECT EXAMINATION

5   BY MR. GRUBER:

6        Q.   Good afternoon.

7        A.   How are you?

8        Q.   Just splendid.  What's your name and occupation,

9   please?

10       A.   My name is John Robertson Parker, and I'm an

11   Assistant State Attorney.

12       Q.   Is that microphone on?  You're a State Attorney in

13   this jurisdiction?

14       A.   That's correct.

15       Q.   I'm going to go back over your background a little

16   bit, okay?

17       A.   Yes, sir.

18       Q.   First of all, I understand you're a native

19   Floridian?

20       A.   Yes, sir.

21       Q.   Born and raised in Gainesville?

22       A.   That's correct.

23       Q.   You went to lawschool where?

24       A.   At Cumberland, in Birmingham, Alabama.

25       Q.   Is that Cumberland University, or Cumberland

1   College?

2       A.   No, it's Sanford University, Cumberland Law School.

3       Q.   Do you have any formal education, other than what

4   you just said?  In other words, any other degrees, or

5   attendance, or any other professional academic schools, or

6   anything of that --

7       A.   Other than continuing legal education, I do not.

8       Q.   Have you ever authored a work that has been

9   published, such as The Law Review, ALR, anything of that

10  nature?

11      A.   No, sir.

12      Q.   Have you ever lectured anywhere?

13      A.   You know, I speak to high school students from time

14  to time, but that's pretty much it.

15      Q.   As in CLE courses?

16      A.   No, sir.

17      Q.   You were first employed out of law school as an --

18  actually, as an intern, I believe?

19      A.   That's correct.

20      Q.   That was -- what's the circuit again?

21      A.   Eighteenth.

22      Q.   That was here in the State Attorney's Office?

23      A.   Yes, sir.

24      Q.   When was that, do you know the year?

25      A.   I began as an intern on June the 15th of 1983.

Case 6:14-cv-00330-RBD-GJK Document 3-38 Filed 02/27/14 Page 53 of 95 PageID 1102

1      Q.    You were admitted to the bar when?

2      A.    October 31, 1983.

3      Q.    At that point, you became an Assistant State

4  Attorney?

5      A.    Well, soon thereafter, I was sworn in.

6      Q.    What was your career path with the State Attorney's

7  Office?

8      A.    Let's see, I began in the misdemeanor division as a

9  trial lawyer.  Approximately eight and a half months after I

10 began with the office, I was sworn in, I moved to felony

11 division as a trial lawyer.  In fact, I was in Mr. Holmes'

12 division at that time.

13     Soon thereafter, I moved to the intake division, which

14 was a new division instituted by Mr. Wolfinger, who is the

15 State Attorney now, and I was there for 14 months.  I was then

16 promoted to division chief in the division that Judge Harris

17 was seated, and I stayed there until May 22nd of 1987, at

18 which time I resigned official that day.  I resigned earlier,

19 went into private practice.

20     Q.    When you did intake, were you the one who signed

21 informations?

22     A.    Yes, sir.

23     Q.    You were then, yourself, off the case, and it was

24 then transferred to a trial attorney?

25     A.    Generally.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 54 of 95 PageID 1103

1      Q.   You left, and went into private practice, and you

2  returned to the State Attorney's Office, I think it was July

3  1st of 1994?

4      A.   That's correct.

5      Q.   And you have been there ever since?

6      A.   Yes, sir.

7      Q.   Generally, the reasons for both going into private

8  practice, and eventually going back to the State Attorney's

9  Office -- why don't you state it in your own words?

10     A.   I'm sorry?

11     Q.   What are your reasons for both of those events?

12     A.   To go into private practice, and come back to the

13 State Attorney's Office?

14     Q.   Yes, sir.

15     A.   Well, it's complicated.  We had just -- we had a new

16 State Attorney at the time.  We had a crushing amount of cases

17 that were in our office as a result of our intake division.

18     Under those circumstances, I was handling, I don't know,

19 I think we had that particular year, we had, or the year

20 before we had 42 homicides in this particular county because

21 of the loss of the shuttle.  At least, I think that had

22 something to do with it.  We had twice as many murders as we

23 normally do, or homicides.

24     I was carrying a large number of homicides and cases that

25 were substantial, and I thought to myself, you know what,

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 55 of 95 PageID 1104

1   maybe I can make a little bit better money if I went out and

2   did this.  So I went into private practice, and came back

3   because I really enjoyed the job that I had as prosecutor.  I

4   truly have an opportunity to do what I think is right, and so

5   here I sit.

6        Q.    When did you say you became a division chief?

7        A.    The first time?

8        Q.    Okay.  What I'm trying to get at, when you're in the

9   Intake Division, that is the first time you're really doing

10  felony work, right?

11       A.    No, I was a felony trial lawyer, approximately,

12  eight months.  I was promoted to the felony division about

13  eight and a half months after I arrived at the State

14  Attorney's Office.  I was promoted from misdemeanor to felony

15  division.

16       I then was there for, I want to say somewhere between up

17  to six months, and it was during that period of time that

18  Mr. Wolfinger approached me, along with Mr. Michael Hunt, and

19  we would actually be the intake division.  We were the first

20  intake division under the new State Attorney.  So I did have

21  felony experience prior to intake trial experience, if that's

22  what you're asking.

23       Q.    That's what I'm getting at.  As an intake attorney,

24  from what I have seen, you signed an information.  Did you

25  work on any grand jury indictments, or capital cases at that

STATE vs. GREEN;   10/28/03 – 10/29/03                      157

1   time?

2        A.   Absolutely.

3        Q.   How many?

4        A.   I couldn't tell you.  Many.  Probably, less than 50.

5        Q.   You left from there, became a division chief, that

6   would have been trial work?

7        A.   That's correct, supervising other trial lawyers,

8   along with investigative and support staff.

9        Q.   How long were you there?

10       A.   Less than six months, I want to say, but I don't

11   have a clear recollection of that.

12       Q.   Less than six months, perhaps, and then in private

13   practice?

14       A.   That's correct.

15       Q.   The time you're in private practice is the only time

16   in your career you have done criminal defense work.  Is that a

17   fair statement?

18       A.   Yes.

19       Q.   As I understand it, that was almost all of your

20   practice at that time?

21       A.   Pretty much.

22       Q.   Did you advertise at all?

23       A.   In the yellow pages?

24       Q.   Sure.

25       A.   Yeah.

1       Q.    You would take on some civil cases, I presume?

2       A.    Sure.

3       Q.    Could you describe what's the most complicated civil

4   case you ever did?

5       A.    Complicated?

6       Q.    Demanding, whatever word like that.  There is some

7   very routine minor civil things to do.

8       A.    The most complicated I had involved a multiple

9   jurisdictional paternity action.  There was a civil rights

10  violation that involved two separate state venues that was

11  filed in Federal court.  I filed in Federal court.

12       That was somewhat complicated because of the

13  jurisdictional issues.  But when you say complicated, I'm

14  thinking scientific, medical, things of that nature.  I don't

15  recall anything that sticks out in my mind at this point in

16  time.

17       Q.    As a prosecutor, prior to your entry into private

18  practice, how many felony jury trials did you do?

19       A.    As a prosecutor?

20       Q.    Yes, sir.

21       A.    Mr. Gruber, I don't know.

22       Q.    Roughly?

23       A.    Thirty.

24       Q.    Were you sole counsel on any of those cases?

25       A.    All.

1     Q.    All of them?

2     A.    Yes, sir.

3     Q.    Are those cases --

4     A.    I -- let me stop you.  Was I sole counsel on the

5   cases that I was asked by some of the more senior trial

6   lawyers to assist in, certain homicide prosecution, I wanted

7   to do that, so I sat second chair in, I want to say, four or

8   five cases before I actually left the State Attorney's Office.

9     Q.    That was going to be my next question, about your

10  capital case experience.  Did you just describe what your

11  capital case experience was?

12    A.    That was my capital case experience up to May 22,

13  1987.

14    Q.    Did you just say May 22nd of 1987?

15    A.    Whenever this was.  The date, I believe it was May

16  22nd.  That was the date I left of the State Attorney's

17  Office.  That was my last day.

18        Up to that point in time, I started June the 15th, 1983.

19  I left May 22, 1987.  I sat on, approximately, five -- three

20  to five 1st Degree murder cases, where I sat second chair, one

21  of which was a death penalty case.  Up until May 22nd of 1987,

22  that's the entirety of my capital experience.

23    Q.    I don't think I quite understood that.  At the

24  deposition, you were one of -- this was a case that actually

25  went through to a death sentence.  Is that right?

STATE vs. GREEN;   10/28/03 - 10/29/03                    160

1      A.    That's correct.

2      Q.    Did you handle the penalty phase in that case?

3      A.    Well, I don't think it was, like, divided up that

4    way.  We handled witnesses, various.  We all -- I don't recall

5    it being divided that way.  I recall Mr. White saying, I want

6    you to handle this witness, or that witness.  I remember

7    making -- I believe I made one of the closing remarks.

8          I handled several of the witnesses.  There had been some

9    argument, some cross-examination.  As I recall, it was a

10   relatively even division of actual performance, if you will.

11     Q.    You mentioned Mr. White.  Is he the one you worked

12   with on all of them?

13     A.    No.

14     Q.    Did you work with him on some of them?  How many?

15     A.    That's correct.  Let's see, Mr. Bellow, I worked

16   with Chris on Mr. Bellow, I worked with Chris on Wilbur Aaron

17   Lam, I worked with Mr. Anderson on -- you know, two with

18   Mr. White come to mind right now, stick out in my mind.  One

19   with a Mr. Robert Anderson, who is now in private practice.

20   Mr -- I'm sorry, Mr. Gruber, I don't have a recollection of

21   any others at this point in time.

22     Q.    Again, for these sorts of things, I'm asking for the

23   best you can recall right now.  I don't think you should be

24   held to an exact answer.

25          You have indicated that one actually went through to a

1   death penalty?

2       A.   That's correct.

3       Q.   That death penalty was reversed on appeal?

4       A.   Yes, sir.

5       Q.   The others, how many of them was the death penalty

6   sought?

7       A.   We did not seek it in Mr. Bellow's, and we did not

8   seek the death penalty in Mr. Sample's case.  And again, any

9   others, I can't recall.

10      Q.   So that would be the only one that actually went

11  through a penalty phase?

12      A.   That's the only one I'm certain of that went through

13  a penalty phase.

14      Q.   In all of those cases, you were designated second

15  chair.  Is that right?

16      A.   Yes.

17      Q.   In any of those cases, were you confronted by more

18  than one defense counsel?

19      A.   I believe Mr. Andy Graham represented Mr. Samples.

20  I believe he had assistant counsel, but I do not believe that

21  they participated in putting forth a defense, or any

22  cross-examination.

23      Q.   Is that the death penalty case?

24      A.   That was not the death penalty case.  An attorney

25  from over in Seminole County represented Mr. Lamm in that

1    case, and he did not have assistant counsel, as I recall.

2       Q.   How about the one that went through to the death

3    penalty?

4       A.   That's the one I'm talking about.  I don't recollect

5    second chair counsel.  Vince Howard.  I'm sorry, that's the

6    name of the attorney.  I believe he handled it himself.

7       Q.   We'll go to private practice.  You had got a

8    contract for handling conflict juvenile cases.  You went on

9    the roster for capital cases, and felony cases?

10      A.   Yes, sir.

11      Q.   At the time, was there a conflict case attorney who

12   systematically took over the conflicts, or was it on a

13   rotating basis?

14      A.   I believe at the time I did it, the county was

15   actually subcontracting that out to a finite number of

16   attorneys.  And based on the geographics of our county, if we

17   had them in the south, central, and north.  And the juvenile

18   contract, I was interestingly enough located in the northern

19   part of the county, and I practiced in the southern part of

20   the county on the juvenile contract.

21      Q.   Were you appointed on any capital cases prior to

22   Crosley Green's case?

23      A.   I believe so.  There was a juvenile alleged to have

24   done a drive by.  His name was Cory Cooper.  Death penalty was

25   not sought in that case.  Mr. Cooper was convicted.  The judge

1   directed verdict to 2nd Degree murder.

2        There was Mr. Green's case, and I believe there was a

3   couple sexual battery cases that met that capital definition.

4   But those were resolved by way of a plea.

5        Q.   Your office was a solo practice, is that right?

6        A.   For a period of time, until about the last year, and

7   then I associated an Assistant State Attorney, next assistant,

8   Mr. Tim Bradley, for about a year.

9        Q.   Between the time you started, and the time you tried

10  Mr. Green's case, it was a solo practice?

11       A.   That's correct.

12       Q.   You were assisted by two individuals, Denise

13  Williams, and Brenda Quinn, and they were on a split time

14  system, each worked part time?

15       A.   That's correct.

16       Q.   One of them sat with you during this trial.  Is that

17  true?

18       A.   That's correct.  Ms. Quinn, I believe, actually sat

19  with me on this case.

20       Q.   What was their -- particularly Ms. Quinn, what was

21  her background?

22       A.   She had a Bachelor's degree in paralegal studies

23  from UCF, if I'm correct, and she had been a secretary in

24  paralegal for the State Attorney's Office during the course of

25  the time that I was there, initially.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 63 of 95 PageID 1112

1      Q.   That's where you met her?

2      A.   Yes, sir.

3      Q.   At the time you handled Mr. Green's case, I think

4  you indicated your office was pretty busy.  Is that true?

5      A.   Sure.

6      Q.   That was to the point where you had to turn clients

7  away?

8      A.   Sure.

9      Q.   Did handling this case hurt your practice?

10      A.   I don't want to say this case alone hurt my

11  practice, but I think it probably convinced me that I wasn't

12  going to do any more of them.  It was just too much.

13      Q.   During the entire time you handled this case, did

14  you ever receive any type of threats, anonymous, or anything?

15      A.   Threats, did I receive threats?

16      Q.   Uh-huh.

17      A.   Not that I recall.

18      Q.   Did you feel -- I'm not sure how to ask this, but

19  any negative impressions from handling an unpopular client in

20  this community?

21      A.   Actually, I was kind of proud to do that.

22      Q.   You also got a Robert Cook appointed as an

23  investigator in this case?

24      A.   Yes, sir.

25      Q.   Why him, in particular?

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 64 of 95 PageID 1113

1      A.   I had known Bob for some period of time.  He was a

2    community control officer, and probation officer in this

3    particular circuit.  He opened his own investigative firm.  I

4    began leasing space to him.

5         He was working for various insurance companies, and I was

6    -- from what I could see, he was doing a real good job, plus

7    he was from around this area.  So, went to school, knew

8    Crosley, knew O'Connor, and I thought that he would be very

9    helpful in if I needed to talk to people.

10      Q.   Was he given any specific assignments, with regard

11   to background mitigation?

12      A.   Background mitigation?

13      Q.   Do you understand what I mean?  I'll explain, if you

14   like.

15      A.   Be a little more specific.

16      Q.   Basically, investigating, a capital defendant's

17   entire history, all of his family members, friends,

18   institutional records of any type that can be found, any type

19   of social assessment, anything of that nature?

20      A.   No, sir, he was not.

21      Q.   He served subpoenas for you for depositions for

22   trial, isn't that true?

23      A.   That was part of his task, yes.

24      Q.   Specifically, with regards to the depositions, there

25   were quite a few of them, weren't there?

1      A.    Yes, sir.

2      Q.    Did he have any prior experience, prior experience,

3  with regard to capital cases, do you know?

4      A.    Was he specifically hired as an investigator in a

5  similar situation?

6      Q.    Actually, do you know if he had ever worked on a

7  capital case before?

8      A.    I do not.

9      Q.    Is it a true statement that among those in your

10  office, including Mr. Cook, that if anyone had any experience

11  with regard to the penalty phase of the capital case, it would

12  have been you?

13      A.    That's correct.

14      Q.    Did he sit through the trial?

15      A.    He was there from time to time, but he was not -- he

16  didn't sit through the trial, the entirety of the trial.

17      Q.    It's a true statement you had not defended a penalty

18  phase in a capital case prior to this case?

19      A.    That's correct.

20      Q.    Did you ever -- this is going to be a quotation,

21  okay, "Attend and successfully complete a training, or

22  educational program on criminal advocacy, which focused on the

23  trial of cases in which the death penalty is sought,"  prior

24  to Crosley's case?

25      A.    If I understand you correctly, did I participate in

1    a course where we actually engaged in various trial aspects of

2    that particular kind of case, or defense?

3         Q.    That's what I think, but I'll go ahead and tell you.

4    I think that's a quotation from the Federal Rule regarding

5    bringing counsel upon capital cases.

6         A.    I can tell you not that I'm aware of --

7         Q.    Have you ever heard of the life over death seminar?

8    I believe it's put on by the Florida Public Defender's

9    Association.

10        A.    Yes.

11        Q.    Did you ever attend one of those seminars prior to

12   Crosley Green's case?

13        A.    I don't recall that specific seminar.  There was a

14   seminar that I attended in West Palm, and it was just prior to

15   the trial involving Mr. Green, but I can't tell you it was

16   that exact one.

17        Q.    You indicated that -- how long did that particular

18   program last?

19        A.    A couple of days.

20        Q.    Was that one of those that starts on a Friday night,

21   and goes through most of the weekend?

22        A.    I think it was a Thursday, ended Friday afternoon.

23        Q.    You don't recall the name of that particular

24   program?

25        A.    I do not.

Case 6:14-cv-00330-RBD-GJK Document 3-38 Filed 02/27/14 Page 67 of 95 PageID 1116

1      Q.   In regard to this hearing today, I was told that you

2    had done a bit of preparation.  You walked in with a package

3    of materials.

4      A.   Things you had given me, various things.

5      Q.   Roughly, what do you have?  I'm not asking for a lot

6    of detail.

7      A.   I have this portion of the document entitled Review

8    of Transcript of Trial, Jury Selection, and then I have that

9    transcript.  Then I have the two transcripts of what appear to

10   be my deposition, one dated September 25, 2001, one dated

11   October 30, 2001.

12     Q.   Did you read, at least, portions of the 3.850 motion

13   that has been filed in this case?

14     A.   I have.

15     Q.   The ones that mention your name?

16     A.   Oh, yeah.

17     Q.   And have you read the record on appeal, on direct

18   appeal on this case, at any time?

19     A.   No.

20     Q.   Let's talk about your file in this case, a little

21   bit.  You apparently destroyed a portion of it.

22     A.   I don't know what happened to it, Mr. Gruber.

23     Q.   Whatever it was, it was an accident, right?

24     A.   I didn't intentionally take his file and burn it, I

25   can assure you.

Case 6:14-cv-00330-RBD-GJK  Document 3-38  Filed 02/27/14  Page 68 of 95 PageID 1117

1     Q.    When the trial was over, and the death penalty had

2  been imposed, you indicated you thought -- then you would

3  probably be in a situation like the one that you're in today?

4     A.    No question about it.

5     Q.    Why were any files destroyed?  I know the answer, I

6  have not done this myself, but go ahead.

7     A.    There was a Statutory provision that required

8  attorneys who wound down their business, during the course of

9  their business, to hang onto their files for a period of time.

10  I think it was three years.  I had to rent a storage space to

11  place those files, and it just as the three years, or whatever

12  the term was, I would periodically destroy them.

13       On one particular case, there was a number of files that

14  were -- I took in a truck and had them destroyed.  And I'm

15  presuming that it got locked up in there somehow.

16     Q.    I mean, basically, it's just a financial and

17  otherwise burden on you to keep a whole lot of old files.  Is

18  that right?

19     A.    Yeah.

20     Q.    The order of your appointment in this case is

21  November 20th of 1989, if my reading of the record is correct.

22     A.    Okay.

23     Q.    When you were appointed, did you get a file of some

24  sort from the Public Defender's Office?

25     A.    As I recall, it was minimal.  I did receive some

1    documents from the Public Defender's Office.

2         Q.   You knew, or at least you have since learned that

3    Gray Campbell represented Mr. Green while he was being

4    represented by the Public Defender's Office?

5         A.   That name, I believe Mr. Brian Onek. There was also

6    a Mr. Brian Onek, I believe, but yes, that's correct.

7         Q.   Physically, how did you get whatever file you did

8    get?

9         A.   I don't recall.

10        Q.   Was there any kind of documentation, or paper trail

11   that you're aware of that would help answer that question?

12        A.   Not that I'm aware of.

13        Q.   We talked about this during a deposition. I got the

14   impression that often --

15        A.   I'm sorry to interrupt. Maybe Mr. Hammell actually

16   came by the office, but I'm not sure.

17        Q.   The impression I got is that your practice was

18   rather informal at the time, as far as getting files from the

19   Public Defender's Office, on appointment?

20        A.   Sure.

21        Q.   You might go over, they might hand it to you, it

22   might occur in a courtroom?

23        A.   That's correct.

24        Q.   It couldn't be a written receipt, or anything of

25   that sort?

Case 6:14-cv-00330-RBD-GJK Document 3-38 Filed 02/27/14 Page 70 of 95 PageID 1119

1      A.   You know, I don't recall.  I don't know.

2      Q.   In any event --

3      A.   In terms of the written receipt aspect?

4      Q.   In any event, as far as you know, there is nothing

5  like that in this particular case?

6      A.   I just don't recall.

7      Q.   The original round of discovery information, well, I

8  know what I mean by that.  Do you know what I mean by that?

9      A.   Discovery, in terms of my participation in

10  discovery?

11      Q.   I'll suggest to you that very quickly upon an

12  arraignment, and a demand for discovery, that the State will

13  furnish a package, and in a relative minor case that might be

14  a few pages, and in a capital case it's going to be a lot.

15  That would be what I'm calling the original round of discovery

16  information.  Sometimes, I have seen it called just discovery.

17  Does that explanation help you at all?

18      A.   Yes.  I can't recall how in depth the criminal

19  report was I actually received, along with the discovery, the

20  actual answer to my demand.  It is my recollection that it was

21  somewhat slim.

22      I'm not sure that the case reports at all have been

23  completed by the time that I filed my demand, which is, that's

24  common.  I don't recall some volumus file coming over to me,

25  or me picking that up.

STATE vs. GREEN;   10/28/03 - 10/29/03                          172

1        Q.    Physically, how did you obtain it?

2        A.    Well, I don't know.  I know, probably, what the

3    procedure was at that time, that was I would go there, I would

4    receive it in the mail, first of all, granting the

5    authorization to then engage in the process, and then I would

6    either myself, or have Mr. Cook go over and make copies.  I

7    would imagine I made copies of everything, so I could look

8    into the file.

9        Q.    In your own office?

10       A.    No.  I don't believe they would allow me to take the

11   file from their office.  I would go to the State Attorney's

12   Office, and make copies in their office.

13       Q.    Did they charge you for copies?

14       A.    If they did, it was because I was appointed, and

15   Mr. Green was indigent.  The county picked up that cost.

16       Q.    I understand there are motions to compel in the

17   court file.  As far as actual receipt, or discovery, is there

18   a paper trail in that regard?  Is there any documentation that

19   you're aware of?

20       A.    There should be any number of supplemental discovery

21   documents that are found in the file as they are generated by

22   the State.  If I understand your question correctly, yes,

23   there would be a trail that you could follow based on that.

24       Q.    Well --

25       A.    Then, of course, I made a table of contents for my

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 72 of 95 PageID 1121

1    trial file that was very detailed, and tabbed, and you could

2    certainly follow it by that table of contents.

3         Q.   What I'm interested in, there is a state package, or

4    otherwise, witness statements, police officers, things of that

5    sort.

6         A.   Yes, sir.

7         Q.   Then there's a memo, and there is a single page

8    document, typically, and it says, State Attorney hereby gives

9    defense attorney such and such.  You might sign it, return it,

10   and then there would be a document that would indicate that

11   such a transfer had taken police.  Are there documents like

12   that?

13        A.   I don't recall that.

14        Q.   You know by now, there's a bond hearing in this case

15   where a photographic lineup was discussed.  You were not the

16   attorney at that time, but are you aware of that?

17        A.   No.  I mean, I don't recall that.

18        Q.   You have been told that, I'm just saying that.

19        A.   I'm sure I probably was aware of that.

20        Q.   Then sometime thereafter, you conducted, or

21   participated in a rather lengthy suppression hearing.  Is that

22   true?

23        A.   Yes, sir.

24        Q.   Also, the lineup was discussed quite a bit at that

25   suppression hearing?

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 73 of 95 PageID 1122

1      A.   Yes, sir.

2      Q.   In fact, the whole lineup proceeding was part of the

3   subject of that suppression hearing.  Did you specifically

4   waive Mr. Green's presence?

5      A.   I did.

6      Q.   That was for strategic reasons?

7      A.   Correct.

8      Q.   You knew Ms. Hallick would be testifying, and you

9   didn't want in court identification of her at trial?

10      A.   That's correct.

11      Q.   During the trial itself, the lineup was physically

12   introduced?

13      A.   As I recall, certainly.

14      Q.   A lineup was introduced.  Does there come a time

15   when Crosley Green said there was a problem with the lineup?

16      A.   (No response.)

17      Q.   Or, I think you know what I'm talking about.

18      A.   As I recall, he felt like there was another picture,

19   and that I didn't have the right picture, or something, now

20   that you mention that.  But more than that, I can't recall.  I

21   recollect that at one portion of the trial Mr. Green became,

22   not necessarily upset with me, personally, but upset with the

23   way my presentation was going.

24      It may indeed have had something to do with the

25   photograph.  That's what it was, it was a different lineup.

1    He felt like there was another lineup, that this wasn't the

2    lineup that was actually utilized.

3         Mr. Green and I discussed the issue, and my -- he did not

4    agree with the way I was has handling it, and at that point

5    this time, we brought it to Judge Antoon's attention, where I

6    described what was happening, and Mr. Green may wish to

7    address the Court.

8         Mr. Green addressed the Court, somehow smoothed it over,

9    and we then proceeded again.  But yes, I recall him saying

10   there was -- I'm pretty sure there was something about a

11   missing lineup.

12        Q.   I am thinking these are two separates episodes.  I

13   vaguely recall the second one.  I'm thinking of Mr. Green

14   addressing the Court, or something like that.

15             MR. WHITE:  You know, your Honor, perhaps

16        Mr. Gruber could ask a question instead of

17        reminiscing about what he remembers.

18   BY MR. GRUBER:

19        Q.   Let's go to the lineup part.  There was a time when

20   Mr. Green said the lineup that was introduced, was not the

21   lineup previously seen?

22        A.   I believe that's correct.

23        Q.   What did you do as a result?

24        A.   I said, that's the lineup.

25        Q.   Was there a point in the court proceedings where

1    Mr. Hammell appeared in court?

2        A.   He may have come in or out.  There may have been a

3    time when he came in the courtroom.

4        Q.   Was that particular -- that was because of what

5    Mr. Green said about the lineup, isn't that true?

6        A.   I don't know that.  I don't have a recollection of

7    that being his specific purpose to come in the courtroom.  It

8    may indeed have been.  I don't know.

9        Q.   Do you recall an affidavit that was ever completed

10   by Mr. Hammell?

11       A.   I don't.  I'm sorry, Mr. Gruber.

12           MR. GRUBER:  I'm going to try to refresh the

13       witness' memory, if I can.

14           I'm going to show you a document that is

15       presently in the court file under Appendix O, the

16       affidavit of Gregory Hammell.  And I'm going to

17       offer this to the witness because I think it will

18       refresh his recollection about these events.  If I

19       may approach?

20           THE COURT:  Okay.

21   BY MR. GRUBER:

22       Q.   Please, take a look.

23       A.   (Complied.)

24       Q.   Does that document refresh your memory at all?

25       A.   It does not refresh my recollection regarding a

1   specific telephone call to Mr. Hammell.  It does refresh my

2   recollection as to what lengths I went to determine there was,

3   indeed, a second lineup.  I do recall speaking to Mr. Hammell,

4   showing him the lineup, Mr. Hammell saying that's it, that's

5   the one I had.  That's it.

6       At no time did Mr. Green ever tell me that in the lineup

7   that was used at the trial, at no time it didn't happen that

8   he knew some of the people, or one other person in that

9   particular lineup.  That just didn't happen.

10      As far as any further lineup, I poked around, tried to

11  find if there was one because that was what he was telling me.

12  There was none to be found.

13      Q.   For reference, this is at trial record 785, I

14  believe.  In the preparation of the photograph lineups in this

15  case, Agent Nyquist prepared one.  Do you recall?

16      A.   Yes, sir.

17      Q.   And then Agent Fair?

18      A.   Tom Fair.

19      Q.   Whoever it is, had him change it?

20      A.   Tear it apart, start over.

21      Q.   So apparently there were, at least at one time

22  during the course of the investigation, two separate lineups?

23      A.   If you want, that's one way of looking at it, I

24  guess.

25      Q.   Did something happen during the trial to the effect

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 77 of 95 PageID 1126

STATE vs. GREEN;   10/28/03 - 10/29/03                               178

1    that the trial was stopped, and Mr. Hammell came into the

2    courtroom with regard to this lineup issue?

3         A.    I'm sorry, Mr. Gruber, I just don't recall that.

4         Q.    Do you recall anything about additional court files,

5    in this particular case, being brought into the courtroom, and

6    going through them yourself, or with Mr. Green for that

7    matter?

8         A.    I know that Mr. Green and I went through every

9    document that I obtained, but do I remember sitting in the

10   courtroom with a box in front of Mr. Green, and he and I going

11   through this box of documents?  No, I do not.  And no, I don't

12   remember asking the Court to stop the proceedings so I can

13   speak with Mr. Hammell, or Mr. Hammell could speak with the

14   Court.

15        As I recall, I spoke with Mr. Hammell on a break, and

16   showed him the lineup.  The lineup, which I might add, was in

17   my opinion, incredibly suggestive because the photograph of

18   Mr. Green, as I recall, had a blue hue to it, and all the

19   others had a brown hue.  He was squarely at number two.  From

20   the defense prospective, I thought I had a shot at suppressing

21   that lineup because of the way it was put together.

22        Q.    Hang on one second.  I take it, then, you do not

23   recall searching the court file to see if there was a

24   photostatic copy of the lineup, and finding there was, in

25   fact, not?



1    A.   I don't recall that.

2    Q.   As the investigation went, before -- the lineup

3    itself occurred, I believe, on April 5th?

4    A.   If you say so.

5    Q.   Well, the night of the crime would be April 3rd over

6    to April 4th, so the investigation would have begun the

7    morning of April 4th?

8    A.   Okay.

9    Q.   You agree to these things, right?

10   A.   To be honest with you, I don't have that time table

11   in front of me.  If you say that's when it happened, then

12   that's when it happened.  I have no reason to disbelieve you.

13   Q.   Okay.  Do you recall litigating the issue of a shoe

14   box full of photographs?

15   A.   I do.

16   Q.   What do you recall, just generally, about that part

17   of it?

18   A.   They had taken Ms. Hallick to the Sheriff's

19   Department.  They had handed her a shoe box full of loose and

20   individual photographs of potential suspects, like a mug book

21   that had been cut up, and the pictures were in there loose.

22   She had an opportunity to go through that particular box of

23   photographs.

24       It was during that time that she withdrew three

25   photographs that were somehow similar to the person that

1   actually conducted, that she had pointed out, if I'm not

2   mistaken, some of those that looked kind of like him.

3       From there, a composite was put together.  Those

4   photographs were then placed back in the box.  Whatever

5   happened to that box, and those photographs, is anybody's

6   guess.  We've litigated that.  And as I recall, relatively

7   strongly, we don't know if some of those photographs she had

8   already looked at didn't find their way into this lineup.

9   Judge Antoon didn't seem to find that a problem.

10      Q.   During the testimony, well, you just said it

11  yourself, Ms. Hallick indicated, and the police indicated,

12  Fair and Nyquist, in particular, that she pulled some

13  photographs and said that these have features, or something

14  like that that, that resemble the perpetrator?

15      A.   As I recall, yes.

16          MR. WHITE:  Let me just object to hearsay at

17  this point.

18          MR. GRUBER:  This is straight out of the trial

19  record.

20          MR. WHITE:  That may be.  I don't know why you

21  have to ask Mr. Parker about it.

22          MR. GRUBER:  I'm just trying to refresh his

23  recollection about the event so I can get to the

24  question.

25          MR. WHITE:  Is there a point to all of this?

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 80 of 95 PageID 1129

```
 1              THE COURT:  I'll overrule it.  It's for
 2       recollection.
 3  BY MR. GRUBER:
 4       Q.   Before going further, I'd like to show you a
 5  photograph, and ask you if you recognize it.
 6       A.   Uh-huh.
 7       Q.   What is it?
 8       A.   That's a photograph of the lineup that I received in
 9  discovery.
10       Q.   Let me have this back a minute.
11            MR. GRUBER:  Your Honor, with regard to the
12       photograph that I just regarded to, it's a
13       photograph of the photographic lineup that was
14       actually used in this case.  I recognize that the
15       issue has been litigated.
16            Also, this Court was not the presiding judge at
17       the time.  I'd like the Court to look at the
18       picture, just to show what it is.
19            MR. WHITE:  First, can I see the photo he wants
20       you to look at?
21            THE COURT:  Sure.
22            MR. WHITE:  If I may inquire, is this photo
23       lineup in evidence in this case?  Mr. Gruber, I
24       think that's directed to you.
25            MR. GRUBER:  I'm trying to think.  I can't give
```

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 81 of 95 PageID 1130

1    you an accurate answer off the top of my head.  I

2    think so, but --

3         MR. WHITE:  And thirdly, while he's looking --

4         THE COURT:  In evidence of the trial, the

5    record of the trial?

6         MR. WHITE:  I guess my question is, isn't this

7    an exhibit that was introduced at the trial of this

8    case?  I don't know why he's having you look at this

9    instead of looking at the original, number one.

10        Number two, I'm going to object to the

11   relevancy of this line of inquiry.  I don't recall

12   in their previous preliminary, maybe I'm wrong, but

13   I don't recall there being an ineffective assistance

14   of counsel argument with regard to this.  In fact,

15   we heard Mr. Parker --

16        THE COURT:  I think we do have this.

17        MR. WHITE:  We need to focus --

18        THE COURT:  It's 8.

19        MR. NUNNELLEY:  What is it?

20        THE COURT:  Page 36, paragraph 8.

21        MR. NUNNELLEY:  Sorry, Judge.

22        THE COURT:  Isn't that what we're talking

23   about?

24        MR. WHITE:  I guess, though you can't -- I

25   don't know if they're being allowed relief on this.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 82 of 95 PageID 1131

1    What is that allegation exactly, is that there was

2    ineffective assistance of counsel?

3         MR. GRUBER:  Yes.

4         MR. WHITE:  Is it newly discovered evidence of

5    Brady material?

6         THE COURT:  It goes to the ineffective counsel.

7    It goes -- and that's what it's about.  It goes back

8    to civics.

9         MR. WHITE:  Then I object to the Court

10   reviewing this because I don't know how it relates

11   to that issue, for you to look at this particular

12   photo of the evidence that was admitted in this

13   case.  I fail to see how it's material.

14        THE COURT:  What would be the purpose of me

15   seeing that?

16        MR. GRUBER:  The overall purpose is because

17   Mr. Parker said what he said because this Court did

18   not preside over the case, I would like to emphasize

19   --

20        THE COURT:  He said because in his mind, he

21   hopes it was because the color tint of the photos.

22   That was a direct appeal issue, correct?

23        MR. WHITE:  Yes.

24        MR. GRUBER:  The suggestiveness of the lineup

25   procedure, per say, was a direct appeal issue,

1    that's true.

2         What I would like to indicate to the Court

3    through this photograph, is that what Mr. Parker

4    just said voluntarily, that the lineup was

5    suggestive is, in fact true, and that there's a

6    question as to the extent to which --

7         THE COURT:  Does that mean I didn't believe

8    Mr. Parker when he said it, or what?

9         MR. GRUBER:  I would like the Court to see it,

10   that's all.  It jumps right out at you.

11        MR. WHITE:  That's all fine and good.  What

12   he's asking the Court to do is what the Court issued

13   in its order, said it wouldn't do.

14        The Court's ruling has been that the defense

15   first realizes that the photograph of Crosley Green

16   in the photographic lineup was too suggestive, and

17   stood out from the other photos in the lineup.  The

18   defense did not raise a post-conviction motion

19   claiming what should have been raised, or were

20   raised on direct appeal.  As this claim was raised

21   on direct appeal, the defense is barred from

22   pursuing this argument on a post-conviction

23   proceeding.

24        That's why I'm objecting.  This is irrelevant,

25   and immaterial.  He is not alleging -- obviously,

1    Mr. Parker did everything humanly possible to

2    litigate that issue.  It was taken up on direct

3    appeal.  What he's trying to do, at this point, and

4    I realize the Court is probably above being affected

5    by it, but I don't want to waste our time with him

6    trying to appeal to you, and get you to second guess

7    what the Florida Supreme Court said.  I don't know

8    why we have to go through that.  It's irrelevant.

9         THE COURT:  They second guess me, Mr. White.

10        MR. WHITE:  I understand, but it only works one

11   way.  As best I understand it, it only works one

12   way.

13        MR. GRUBER:  I'm saying that the issue be,

14   Judge Antoon, may have been a close one.  In any

15   event, there's an objective question as to whether

16   there was ineffective assistance during the

17   suppression hearing.

18        Beyond that, there was certainly an issue of

19   the trial as to challenging the lineup, the entire

20   lineup procedure, and the identification by the

21   victim.

22        THE COURT:  Mr. Parker didn't do that?

23        MR. GRUBER:  He didn't.

24        MR. WHITE:  Wait a minute.  I have to defend

25   Mr. Parker.  He challenged that in every way

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 85 of 95 PageID 1134

1    conceivable to man.

2        MR. GRUBER:  There is something I'm not sure

3    about.  I'm going to get to it real quick.  It's

4    whether Mr. Parker did everything that he was able

5    to do, or whether he did not do everything that he

6    was able to do.

7        THE COURT:  It seems like that's the issue.

8        MR. GRUBER:  Whether he was prevented from

9    doing what he would have liked to do by the State.

10   I don't know the answer.  I intend to ask.

11   BY MR. GRUBER:

12       Q.   Next, with regards to the exhibit number, it appears

13   to be -- there's a whole list of exhibits in the index, and

14   photo lineup is identified as being page 2932 of the record on

15   appeal, under Exhibits, Number 2.

16       THE COURT:  Let me do this.  I'll sustain.  I

17   don't need to see the picture.  I heard Mr. Parker

18   testify.  I know the issue.

19       The real issue is what he said.  Did he do

20   everything he could to determine if there was

21   another lineup to litigate that issue.

22       MR. GRUBER:  That's what I set up as far as the

23   other lineup.  I was moving on to the shoe box

24   photographs.

25       THE COURT:  Okay.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 86 of 95 PageID 1135

BY MR. GRUBER:

Q.    There was a box of photographs, and I'm calling it a shoe box.  Do you know about how many Ms. Hallick looked at?

A.    I don't know.

Q.    Do you recall who showed her these photographs?

A.    It was my recollection --

Q.    Would it have been either Nyquist, or Fair?

A.    That's not the name that sticks out in my mind.  He's still with the sheriff's office up in Titusville.  In fact, I believe, Mr. Flynn was a distant cousin, or nephew of him.  I don't recall his name right now.

Q.    You said you did raise an issue as to whether those photographs that were in the shoe box ever wound up in the photographic lineup that was eventually shown to Ms. Hallick?

A.    That's correct.

Q.    The State challenged you on that point.  Is that true?

A.    In way of challenge, I don't understand.

Q.    Did the State witnesses deny that any of those photographs wound up in a photographic lineup?

A.    I believe they did deny that.  While admitting that the box was missing, and all the photographs were missing, it was my recollection that we were left with -- I'm not sure, sort of.  Maybe that just is my inner feeling about it, but they couldn't satisfactorily, in my opinion, explain what

1   happened to them.  I don't recall them being adamant about the

2   fact that none of those photographs found their way into the

3   lineup.

4         Q.   Did they testify -- I keep saying they, both

5   Nyquist, and Fair?

6         A.   Both of them testified.

7         Q.   Specifically, Fair?

8         A.   Yes.

9         Q.   Did he testify that they made a search, and were not

10  able to find a current photograph of Crosley Green within the

11  Brevard Sheriff's Office?

12        A.   There was some compelling reason why they had to go

13  up to Florida State Prison and receive a photograph that was

14  taken either when he arrived at FSP, or when he departed FSP,

15  the last time he was in prison.  Whether that was because they

16  didn't have a photograph of Mr. Green, or whether or not the

17  one they had was a problem, I don't recall.

18        Q.   For reference, I'll go ahead and tell you this, it's

19  Fair testifying, Volume 11, page 2087.  "We attempted to

20  locate in our archives a current photograph of Crosley Green.

21  We were not successful."

22        A.   I don't disagree with that, no.

23        Q.   And then when the photographic lineup was taken to

24  Ms. Hallick, the testimony was she made an identification.

25        A.   If you want to call it that.

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 88 of 95 PageID 1137

1       Q.    That occurred on April 5th?

2       A.    I don't disagree with that.

3       Q.    Why did you make that qualification, if you want to

4   call it that?

5       A.    Because she was in a room filled with law

6   enforcement officers.  I think her father was there.  She was

7   alone.  They asked her several times, can she pick out the

8   person.  The first time, she pointed to Crosley, and said, I

9   think that's him.

10         They said, Well, that's not good enough, or words to

11   that effect.  You have to be sure.

12            Well, I'm pretty sure that's him.  On the third, or

13   subsequent time, she then said, Yes, that's him, I'm positive.

14   I believe that's in the testimony.

15       Q.    Now, as far as -- they said that they did not have a

16   current photograph.  For one reason or another, they did not

17   have a photograph early on in the investigation.  They had to

18   go to the prison, or Department of Corrections.

19       A.    That's my understanding.

20       Q.    Crosley Green was convicted in 1986 on a drug

21   possession charge.  Do you recall that?

22       A.    I do.

23       Q.    Were there -- that would have been in Brevard

24   County.  Would there routinely have been a photograph taken at

25   that time?

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 89 of 95 PageID 1138

1     A.   Yes.

2     Q.   Did you ever take a look at that photograph?

3     A.   I did not.

4     Q.   Did you ever ask for that photograph?

5     A.   I don't think I did.

6     Q.   At any time during your career, have you had an

7   occasion to call the Brevard County Sheriff's Office and ask

8   them for a booking photograph of someone?

9     A.   I do it all the time.

10     Q.   Sure.  Do you get it fairly easily?

11     A.   Relatively quickly.

12     Q.   Does it help if you identify who the individual was,

13   and the date that the booking photograph would have been

14   taken?

15     A.   Sure.

16     Q.   Would it surprise you to know that we obtained a

17   photographic, or a copy of the photographic -- of the

18   photograph of the 1996 arrest, just by a phone call, just the

19   way you described?

20          MR. WHITE:  Objection to relevancy, whether or

21     not it would surprise him, or not.

22          THE COURT:  Sustained.

23   BY MR. GRUBER:

24     Q.   Based on your knowledge of local practice, why would

25   it be that the Brevard County Sheriff's Office, in 1989, would

1  not have a photograph within the office of someone that they

2  booked in two years prior?

3          MR. WHITE:  Objection, your Honor.  I'm sorry,

4      I think his question needs to be directed to the

5      testimony that was given.  That wasn't they didn't

6      have a photo, they didn't have a recent photo.  This

7      question is irrelevant.

8          He's asking about why they didn't do something

9      they didn't do.  What they did was they testified,

10     we didn't have a recent photo, so we went to FSP to

11     get a recent photo.  No one ever said we didn't have

12     a photo of Crosley Green to use.  That's the web

13     he's weaving by asking him why would they not have

14     had a 1986 photo.  It's irrelevant, and immaterial,

15     the whole question.

16         THE COURT:  I'll sustain the objection.

17         MR. GRUBER:  I'll agree with that.  That was

18     the quote.  There's a reference to a current

19     photograph which would simply imply that there was a

20     not so current photograph.

21  BY MR. GRUBER:

22     Q.   To your recollection, was it ever brought out they

23  did, in fact, have a photograph of Crosley Green in possession

24  on April 4th?

25     A.   I don't recall ever seeing one.  I don't recall

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 91 of 95 PageID 1140

1    asking them about -- I'm sorry, repeat your question again,

2    please.

3         Q.    Do you recall -- I forget what it was.  Do you

4    recall any member of law enforcement ever saying that, in

5    fact, Brevard County Sheriff's Office did have a photograph of

6    Crosley Green, and that would be on April 4th of 1989, which

7    is the day following the event?

8         A.    I don't recall them saying, specifically, we pulled

9    this particular photograph.  We felt like a more current

10   photograph was necessary, so we went to FSP. All I knew was we

11   needed a current photograph.  We went to FSP.  I suppose I

12   presumed they had a photograph, a previous photograph.

13        Q.    To your knowledge, there was never any such

14   testimony that they did, in fact, have a photograph?

15        A.    Not that I can recall.

16        Q.    Do you recall if anyone ever asked them that

17   question?

18        A.    I don't believe I did, Mr. Gruber.

19        Q.    Now, do you see where testimony to that effect on

20   the morning of April 3rd, Ms. Hallick looked at 60-plus

21   photographs of black males who were not Crosley Green,

22   identified a few that looked like him, but was clear that none

23   of them were him.  Okay, step one.

24             Step two, that the investigating agency, not having

25   a photograph of Crosley Green in its possession, would have to

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 92 of 95 PageID 1141

1    go to another agency, that being the Department of

2    Corrections, and getting one?  That's step two.

3              Step three, that Ms. Hallick, the following day on

4    April 5th, is shown a photographic lineup with Mr. Green's

5    picture in it for the first time.  Do you see how that would

6    tend to bolster the accuracy of her identification, and the

7    general correctness of the police line of procedure?

8         A.   You know, Mr. Gruber, I don't understand what you're

9    asking me.  Let me just tell you this, though, unless you just

10   want me to remain silent until your next question.

11        That photograph of Crosley Green in that lineup, in my

12   opinion, was the best thing that ever happened to the defense

13   because Ms. Hallick described a man that had ringlets, big

14   hair.  And there she was picking this man out, in its obvious

15   position and color in the lineup.  To be in a position like

16   that, and have that argument, I thought was -- I was pleased

17   to have that photograph, if that makes any sense to you, from

18   my perspective.

19        Q.   That's fine, but I want to try and go back to my

20   question, which is actually not inconsistent with what you

21   just said.  It's a difficult question.  I doubt you

22   understood.  What I'm getting at --

23        A.   I'm kind of hard with difficult things.

24        Q.   I'm also being a little bit coy here.  I might as

25   well show you this stuff.  What I'm getting at is, the point

STATE vs. GREEN;  10/28/03 - 10/29/03                    194

1   where Ms. Hallick is saying, here are photographs, about 60 of

2   them.  None of them are the perpetrator.  None of them are

3   him.  Some of them, however, have similar features.  They

4   weren't him, either.

5        A.    Correct.

6        Q.    Understand what I've said so far?

7        A.    So far, so far.

8        Q.    Then they have to get a photograph someplace else.

9   They put that photograph in a lineup.  She says, Ah ha, that's

10  him.  That tends to bolster that case for them.

11       A.    You're asking my opinion?

12       Q.    Did the specific fact that she looked at those

13  photos on the morning of April 3rd, and said what she said

14  about them, does that tend to help their case?

15       A.    Does that tend to help their case in terms of the

16  prosecution of Mr. Green?  I don't see, at that point in time,

17  her looking at a thousand photographs, and not picking anyone

18  out.  That, in and of itself, doesn't assist the prosecution.

19  I don't see how, other than she's seeing this wealth of black

20  males.

21       Then there's a photograph placed in front of her, in

22  photo lineup form, as Mr. Green's photograph was placed in

23  front of her, and she does not positively pick Mr. Green until

24  she's, in my opinion, until she decides, I better do this, or

25  somebody is not going to get arrested.  I don't see anything

STATE vs. GREEN;   10/28/03 - 10/29/03                    195

1   that happened during that process as assisting or bolstering

2   the prosecution.

3           (Whereupon, these proceedings are continued in

4      Volume II, October 29, 2003.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 6:14-cv-00330-RBD-GJK   Document 3-38   Filed 02/27/14   Page 95 of 95 PageID 1144

1                    THE CERTIFICATE OF REPORTER

2

3

4          I, Jennifer J. Zanmiller, Court Reporter, do

5     hereby certify that I was authorized to and did

6     report the foregoing proceedings, and that pages 1

7     through 195 are a true and correct record of my

8     stenographic notes.

9

10

11          Dated this 4th day of December, 2002.

12

13

14

15

16          _____

17               JENNIFER J. ZANMILLER

18                  COURT REPORTER

19

20

21

22

23

24

25