# Exhibit 36-A

IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
IN AND FOR BREVARD COUNTY, FLORIDA

CASE NO:   05-1989-CF-4942-AXXX-XX

STATE OF FLORIDA

             Plaintiffs,                    **ORIGINAL**
                                            **REPRINT**
vs.

CROSLEY ALEXANDER GREEN,

             Defendant.

_____/

TRANSCRIPT OF PROCEEDINGS
VOLUME II
(Pages 197 - 377)

DATE TAKEN:        October 28 - 29, 2003
PLACE:             Moore Justice Center
                   2725 Fran Jamieson Way.
                   VIERA, FLORIDA 32940

BEFORE:            The Honorable Bruce Jacobus,
                   Circuit Judge


     This cause came on to be heard at the time and place
aforesaid when and where the following proceedings were
reported by:


JENNIFER ZANMILLER
Court Reporter
Notary Public, State of Florida at Large


Brevard Associated Court Services, Inc.
14 Suntree Place, Suite 101
Melbourne Viera, Florida  32940

STATE vs. GREEN; 10/28/03 - 10/29/03                    198

APPEARANCES


FOR THE PLAINTIFF
Mr. Christopher White, Esquire
Assistant State Attorney
2725 Judge Fran Jamieson Way, Bldg. D
Melbourne, Florida  32940


Mr. Wayne Holmes, Esquire
Assistant State Attorney
2725 Judge Fran Jaimeson Way, Bldg. D
Melbourne, Florida  32940



FOR THE DEFENDANT
Mr. Mark Gruber, Esquire
CCRC-Middle
3801 Corporex Park, Dr., Ste. 210
Tampa, FL  33619


Ms. Daphney E. Gaylord, Esquire
CCRC-Middle
3801 Corporex Park, Dr., Ste. 210
Tampa, FL  33619


Mr. David Hendry, Esquire
CCRC-Middle
3801 Corporex Park, Dr., Ste. 210
Tampa, FL  33619


Mr. Kenneth S. Nunnelley
Assistant Attorney General
444 Seabreeze Blvd., 5th Floor
Daytona Beach, FL  32118


ALSO PRESENT


Mr. Mark Lanning, Esquire

STATE vs. GREEN;   10/28/03 - 10/29/03

199

## INDEX OF PROCEEDINGS

PAGE NO.

Proceedings                                                    5

DEFENSE WITNESSES

SHEILA GREEN
    Direct Examination by Ms. Gaylord              14
    Cross Examination by Mr. Holmes                29
    Redirect Examination by Ms. Gaylord           66

LONNIE HILLARY
    Direct Examination by Mr. Hendry               78
    Cross Examination by Mr. Holmes                91
    Redirect Examination by Mr. Hendry           102

JEROME MURRAY
    Direct Examination by Ms. Gaylord            111
    Cross Examination by Mr. White               130
    Redirect Examination by Ms. Gaylord          131

JOHN ROBERTSON PARKER
    Direct Examination by Mr. Gruber             152

Certificate of Reporter                                     196


VOLUME II

JOHN ROBERTSON PARKER
    Direct Examination by Mr. Gruber Con't       201
    Cross Examination by Mr. White               338
    Redirect Examination by Mr. Gruber           369

STATE vs. GREEN;   10/28/03 - 10/29/03                           200

## INDEX OF EXHIBITS

### PLAINTIFF'S EXHIBITS

| NO. | DESCRIPTION | MARKED | RECEIVED |
|---|---|---|---|
| A | Letter from Atty Dees 7/11/90 | 29 | |
| B | Transcript Sheila Green 7/13/90 | 29 | |
| C | Tript trial testimony 8/29/90 | 29 | |
| D | Tript sentencing - Mr. Spruill | 29 | |

## INDEX OF EXHIBITS CONTINUED

### DEFENDANT'S EXHIBITS

| NO | DESCRIPTION | MARKED | RECEIVED |
|---|---|---|---|
| E | Affidavit of Sheila Green | 27 | |
| F | Tript Jerome Murray 10/13/90 | 109 | 130 |
| G | Videotaped statement of Jerome | 111 | 130 |
| H | Copy of statement Mr. Murray | 115 | 130 |
| I | Certified copy of conviction | 112 | 316 |
| J | Copies of 3 X 5 cards | 197 | |
| K | Request for felony PTR | | 316 |
| M | Certified copy of conviction | | 322 |
| O | Certified copy committment card | | 376 |

STATE vs. GREEN;   10/28/03 - 10/29/03                    201

1          (Whereupon, direct examination of Mr. Parker by

2     Mr. Gruber is continued from Volume I, October 29,

3     2003.)

4          MR. GRUBER:  Okay.  I have a handful of

5     documents I would like to have marked as a composite

6     exhibit.

7          MR. WHITE:  Can I?

8          THE COURT:  Are they stapled together?

9          MR. GRUBER:  They're in two separate sets, both

10    are stapled.

11         THE COURT:  Are there two exhibits?

12         MR. GRUBER:  I would rather make them a

13    composite exhibit.  I'll do whatever anybody wants.

14    I just want to have these marked.

15         (Whereupon, Defendant's Exhibit J was marked

16    for identification.)

17              DIRECT EXAMINATION CONTINUED

18    BY MR. GRUBER:

19    Q.   While they're doing that, my notes for the

20    references I made here are to the suppression hearing, Volume

21    11, page 2087, 2102, Trial Volume IV, 781, and an argument by

22    Mr. Williams, Volume XI of 2123, and this regards the

23    assertion that Ms. Hallick looked at the shoe box photographs,

24    did pull some of them, but made sure they were not photographs

25    of the perpetrator.

STATE vs. GREEN;   10/28/03 - 10/29/03

202

1        I'll go ahead and explain to the Court.  I, as of

2  yesterday morning when we came over here, had a folder where I

3  had made this exhibit, and made three copies, and it's still

4  sitting on my desk over in Tampa.  I cannot find it right now.

5        Let me go ahead and show you what's been marked as

6  Defendant's Exhibit J.  Take a look through it and tell me when

7  you're done glancing at it.  I don't want you to look at

8  anything in particular.  Take a look at it and see what it

9  looks like to you.

10       A.    (Complied.)

11       Q.    Let me ask you some questions about it to identify

12  what it is.  First, there appears to be -- all of these are

13  photo copies.  There appears to be a series of three by five

14  cards.

15       A.    That's what it appears to be.

16       Q.    The upper right-hand corner of those three by five

17  cards has a number on it that's handwritten in?

18       A.    I'm presuming that's -- I don't know, it's

19  handwritten.  I presume it is.

20       Q.    There are also some sort of police reports that

21  appear to refer to some of the names on those three by five

22  cards, correct?

23       A.    Yeah, I believe these used to be the local kind of

24  docket entries, or arrest entries that we would have back

25  then, as opposed to NCIC.  These were records.  This appears to

STATE vs. GREEN;   10/28/03 - 10/29/03                    203

1    be those type of records, pull out the card.   Type in the new

2    arrests, that sort of stuff.

3         Q.   Are those sometimes called jail cards?

4         A.   You know, I don't know the answer to that.

5         Q.   And then there are some completely indecipherable

6    photo copies of booking photographs, right?   Some?

7         A.   There is copies of what appear to be booking

8    photographs, as too indecipherable that you know, they're not

9    the best quality.

10        Q.   Sure.   And then in addition, there are some reports

11   that look as if they refer to police activity that was

12   conducted, I believe, on April 4th?

13        A.   What I see are documents which appear to be

14   entitled, which are entitled case memorandum, and with certain

15   names and addresses, and other identifying data of the

16   individual, what I assume was the individual named in this

17   particular memorandum.

18        Q.   One in particular, I believe, refers to a Wilfred

19   Mitchell?

20        A.   Okay.

21        Q.   Do you see that one in there?

22        A.   Yes, I do.

23        Q.   It looks, from reading it, if it reports what it

24   says it is, if it's accurate, they went and cleared him as a

25   suspect on that date?

STATE vs. GREEN;   10/28/03 - 10/29/03

204

1      A.   Well, I don't know about clearing him as a suspect.
2  There is information that they spoke with him about any
3  involvement in the case, and that he evidently gave an alibi
4  of being with his mom.

5      Q.   Does it say something about a full beard, or do I
6  have something else?

7      A.   Let's see, it said Wilfred Mitchell, right.

8      Q.   Well, okay, that serves my purpose.  Anyway, with
9  regard to the three by five cards, each one of them has a
10 notation, correct?  I'll give you suggestions, as named as
11 possible suspect, name offered by Bailiff Stamp?

12     A.   That's correct.

13     Q.   In that same spot, on each one of them, a number of
14 them have a statement, Photo pulled by victim, correct?

15     A.   Yes.

16     Q.   Does it not appear to you that that notation,
17 whether it refers to Bailiff Stamp, or whether it says photo
18 pulled by victim, is an explanation of why that individual is
19 a suspect?

20     A.   You know, I can see where it would be, but I wasn't
21 -- I don't know what was in the mind of the person making
22 these notes, Mr. Gruber.

23     Q.   Sure.  And number seven, the card, and anything that
24 does correspond to it is Green, Crosley Papa, correct?

25     A.   Yes.

STATE vs. GREEN;   10/28/03 - 10/29/03                    205

1    Q.    And Papa is Crosley Green's nickname?

2    A.    That's correct.

3    Q.    Now, one point is that these are numbered up to

4    number 11, and I think we're missing one through three, if I'm

5    not mistaken.

6    A.    There is 1 and 2, and then you have 3, 4, 5, 6, 7,

7    8, and you're missing 9 and 10.  Yeah, that's correct.

8    Q.    So if the documents that I just handed you are

9    accurate, excuse me, are what they purport to say, and if the

10   information contained on them accurately reflects the state of

11   the investigation at the time that they were made, is it not

12   true they would indicate that photographs of individuals who

13   were pooled by the victim were, in fact, suspects at that

14   time?

15   A.    Again, you're asking me to speculate as to what they

16   were thinking, whether or not that's what this means?

17   Q.    I'm asking whether you agree that would be an arson.

18   A.    Possibly.

19   Q.    Now, have you ever seen those documents before?

20   A.    I'm sorry?

21   Q.    Have you ever seen those documents before,

22   particularly the three by five cards?

23   A.    No.

24   Q.    You did request all discovery available on the case,

25   I'm sure, at one time, or another?

1      A.    I did.

2      Q.    So, it is your testimony that those three by five

3  cards, in particular, were never turned over to you in the

4  discovery process.   Is that true?

5      A.    My recollection is, I did not receive these, but I

6  will tell you this, there was, and I believe it may be

7  Mr. Mitchell because of his hair style, and because of the

8  composite, I did have a photograph, and I believe it's of

9  Mr. Mitchell, and I believe there was an attempt on my part to

10 introduce that particular photograph to show that Mr. Mitchell

11 indeed fit the exact description of the person that Ms.

12 Hallick was describing, versus the defendant.

13     At least I have some recollection of that.   So I guess

14 the point is, for some reason I believe I had this photograph,

15 and if that's the case, maybe I did, indeed, have these cards.

16 I don't know.

17     Q.    Well, you also had a photograph of Eddie Denson, I

18 think?

19     A.    You know, Mr. Gruber --

20     Q.    I think it was Mitchell and Denson you did have at

21 the time?

22     A.    That may be the case.   I don't recall Mr. Denson's

23 name, specifically.

24     Q.    Remember what I have said a number of times here,

25 you have both Fair and Nyquist saying the victim looked at

STATE vs. GREEN;   10/28/03 - 10/29/03

207

1   those photographs and said they were not actual suspects.

2   They would help in the composite process, help give you some

3   idea of what the guy looked like, but they were not suspects.

4        I'm trying to assert the point through these documents

5   that yeah, those individuals were pulled by Ms. Hallick were

6   suspects for a period of time.   In other words, both Fair and

7   Nyquist did not tell the truth, either at trial, or at the

8   suppression hearing.   That's the assertion I'm making.

9        A.   Okay.

10       Q.   Now, I'm asking, were those documents provided to

11  you, particularly the three by five cards, or were they

12  provided to you, and did you not use them during either of

13  those occasions?

14       A.   Mr. Gruber, it is my opinion that if I had these

15  particular documents, I would have utilized them during the

16  course of the suppression hearing regarding identity.   That's

17  all I can tell you.   I don't know.

18       Q.   I'm going to -- I may have an authenticity problem

19  at this point.   I'm still going to move them into evidence,

20  and request an admission from the State that they are what

21  they purport to be.

22            THE COURT:   Have you seen them, Mr. White?

23            MR. WHITE:   I did see them.   What I didn't see

24       is if there is any way for me to figure out exactly

25       who made them, when they were made.

STATE vs. GREEN;   10/28/03 - 10/29/03

208

1    MR. GRUBER:  I'll advise the Court a little bit

2  more about what I can, as far as these were

3  documents that are in the possession of CCRC-Middle,

4  that we found over the weekend.

5    THE COURT:  You mean the originals?

6    MR. GRUBER:  That package, in particular.

7    THE COURT:  Like it is there?

8    MR. GRUBER:  Yes, sir.  I believe we have some

9  reason to believe that they were documents for which

10  an exemption was claimed.  At this point in time, I

11  can't prove that.  I might be able to in the future.

12    THE COURT:  Any other request to produce?

13    MR. WHITE:  An exemption by who?

14    MR. GRUBER:  By the State in a post-convention

15  process.

16    MR. WHITE:  Go ahead and make that allegation.

17  You're always just free with them.  Go ahead and

18  make it.

19    MR. GRUBER:  An exemption was claimed.

20    MR. WHITE:  The judge can go and re-examine the

21  records that we exempted, and I can tell the Court

22  here, this is my posture, I don't know if I ever had

23  any of the case reports, case memorandums. I don't

24  know if I had any of those at any time.

25    I may have received them, and discovery, from

STATE vs. GREEN;   10/28/03 - 10/29/03

209

1    Mr. Parker.  Frankly, if I did have them, I don't

2    know who made them up.  I don't know if they're

3    accurate.

4        THE COURT:  You can't say?  You can't offer --

5        MR. WHITE:  I can't stipulate to authenticity.

6    The crucial thing, probably, is these index cards.

7    I don't see anything in here that even identifies

8    these as relating to this case.  I certainly see

9    nothing relating who wrote them.  There's no way.  I

10   have never seen them before.  There is no way I can

11   agree to their authenticity.

12       THE COURT:  You're offering them, Mr. Gruber?

13       MR. GRUBER:  I'm offering them.

14       THE COURT:  The Court will sustain the

15   objection.

16   BY MR. GRUBER:

17   Q.    You indicated that you would have used these if you

18   did have them?

19   A.    Certainly.

20   Q.    What would you have used them for?

21   A.    I would have used them to attack the suggestiveness

22   of the identification process.  It was my approach that those

23   photographs, or the photographs that she looked at, may

24   indeed, have found some, if not all of Mr. Green's, that found

25   their way back into the lineup that was utilized.  This

1    particular exhibit that you showed me, I would have explored

2    the possibility of those particular people as suspects, and I

3    believe would have attempted to bring that out, in light of

4    what I perceived to be the poor quality of the identification

5    in the first place.

6        Q.    Also bearing in mind what I told you about the

7    testimony of Agents Fair and Nyquist, would you have used

8    these documents to impeach them?

9        A.    Absolutely.  They told me they didn't -- absolutely.

10        MR. WHITE:  I'm sorry, I couldn't hear you.

11    They told you what?

12        THE WITNESS:  Would I have used those documents

13    in the suppression hearing, or at trial, I would

14    imagine, to impeach them when they said -- talked

15    about various suspects, or lack thereof.  Are we on

16    the same page?  Maybe I'm not.  I don't know.

17        MR. GRUBER:  That's the answer I was looking

18    for.  Shall I leave this with the Court clerk now?

19        THE COURT:  Yes, sir.

20        MR. GRUBER:  I will advise the Court that's the

21    most egregious example of what I'm planning to do

22    here, as far as possibly requiring me to amend the

23    3.850.  So I don't know if the Court wants to think

24    about that.

25        I don't think I would need to, having presented

1    what I presented so far, but I am making an

2    allegation, and was invited to by Mr. White, and I

3    could file a written amendment that would

4    incorporate these documents, and facts, and the

5    argument I just presented orally.

6         THE COURT:  These particular documents, because

7    you just found them, aren't contained.  They're not

8    part of what you set forth in your 3.850?

9         MR. GRUBER:  No, the documents, per say, are

10   not, but there are thousands of documents relating

11   to this.

12        MR. WHITE:  I think what he's saying is he

13   never made a Brady complaint, that the State failed

14   to provide him these documents.

15        THE COURT:  Is that what you're saying?

16        MR. WHITE:  I think that's what he's saying.

17   I'm not sure.

18        MR. GRUBER:  At this point, I'm in an

19   alternative, it's either IAC or Brady, and I don't

20   know the answer.

21        THE COURT:  It's either what now?

22        MR. GRUBER:  It's either ineffective

23   assistance, or Brady, that the State failed to

24   disclose.  From the testimony here today, which I

25   honestly didn't know what I would get, it would

STATE vs. GREEN;   10/28/03 - 10/29/03

212

1    appear to be a Brady claim.

2         MR. WHITE:  It would all depend on whether or

3    not he can actually authenticate these records in

4    some fashion.  I would object to the Court allowing

5    him to formerly amend his motion in the middle of

6    this hearing, before he authenticates these records.

7         THE COURT:  I agree.  I'm not going to.  I'll

8    deny that without prejudice.

9         MR. GRUBER:  I'm going to move on to another

10   topic, namely the juror issue.  I have 4:30.  I

11   don't know what the Court's scheduling is.

12        THE COURT:  We'll go to 5:00.

13        THE WITNESS:  May I respectfully request a

14   brief recess?

15        THE COURT:  Let's take about ten minutes.  Let

16   me ask you this, would this be a good time to stop

17   for the day?

18        MR. GRUBER:  It might be.

19        THE COURT:  You have all day tomorrow.

20        MR. GRUBER:  I had thought I would move along a

21   little quicker.  I'm going to be going on in the

22   morning quite a bit.

23        THE COURT:  We have all day.  Would this be a

24   good time to stop for the day?  Why don't we do

25   that.

1     THE COURT:  We'll be in recess until in the

2  morning, 9:00.

3     (Whereupon, Court was recessed until 9:00 AM on

4  October 29, 2003.)

5     THE COURT:  Mr. Parker, do you want to take the

6  stand?

7     THE WITNESS:  Yes, sir.

8              DIRECT EXAMINATION CONTINUED.

9  BY MR. GRUBER:

10    Q.    Good morning.

11    A.    Good morning.

12    Q.    Get settled in, check your microphone again, if you

13  would.  A few things I thought about overnight.  Let me ask

14  you about them.  In connection --

15    THE COURT:  Before we start, I went through --

16    my staff attorney went through on those pictures,

17    there is nowhere that we can find in the stuff that

18    I reviewed, that that was included, so you must have

19    gotten that on a public record's request, or

20    something.

21    MR. WHITE:  Your Honor, can I just take this

22  moment to thank you very much for checking that for

23  me, and clearing my name?

24    THE COURT:  It wasn't in any of that.  It

25  wasn't exempted, it wasn't -- I kind of -- I don't

STATE vs. GREEN;   10/28/03 - 10/29/03

214

1    remember everything, obviously, but you know,

2    looking through all the documents, we checked again,

3    and I didn't see any.  I'm not certain where you

4    came from, to tell you the truth.

5        MR. GRUBER:  As far as that, as far as I know,

6    an exemption in a case like this, which is pre

7    repository, explained by the particular agency, by

8    the State Attorney's Office --

9        THE COURT:  There were some exemptions.  There

10   was an exemption asserted by FDLE, I believe, and by

11   the State.  I did go through those, but I just went

12   back, we went and looked through the stuff.  I

13   didn't do a full search again, but it didn't stick

14   in my mind, or did it stick in Ashley's mind.

15       MR. GRUBER:  I will say, this is a case, of

16   course, where Mr. Green was originally represented

17   by CCRC, and I believe Mr. Chardolin (phonetic)

18   CCRC, had a particular interest in the case.

19       When the agency's system changed under the

20   three regions, Mr. Chardolin went with the north

21   office, and wanted to keep this case.  There is the

22   State that filed a motion to have the north

23   dismissed, CCRC-Middle replaced.  How significant

24   that is, there are these many boxes, thousands and

25   thousands of documents that have gone from place to

STATE vs. GREEN;   10/28/03 - 10/29/03

215

1   place, and I can't tell you right now where those

2   things came from.

3        THE COURT:  I went through all the stuff.  It

4   didn't appear to come that way.  Thank you.

5        MR. WHITE:  One other matter with that exhibit

6   J, I got a copy of that from the clerk, and looked

7   through it last night.  One thing that's obvious, it

8   contains a duplication.  If you look at the first

9   three pages, and you look at the four, five and six,

10  four, five, and six, they're copies of one, two, and

11  three.  That lends itself to confusion.  I would ask

12  that we redact that exhibit, take out -- I think Mr.

13  Gruber is well aware of that.

14       THE COURT:  We'll get the exhibit and fix it.

15       MR. WHITE:  That would be fine.  In later

16  review, it might avoid confusion.

17       THE COURT:  Ready to proceed?

18       MR. GRUBER:  Yes, sir.

19  BY MR. GRUBER:

20       Q.   In connection with a witness who was testifying on

21  behalf of the State of Florida in a criminal case -- well,

22  have you had an occasion to participate in a case where such a

23  witness has been offered a deal, or has testified pursuant to

24  a deal?

25       A.   Sure.

STATE vs. GREEN;   10/28/03 - 10/29/03

216

     1      Q.   Many times?

     2      A.   Many.

     3      Q.   I think your career in criminal justice, on one side

     4   or the other, spans close to 20 years?

     5      A.   On the 31st of this month.

     6      Q.   Would you say hundreds of times, perhaps?

     7      A.   I can't say that.  I would say, probably, somewhere

     8   in-between one and one hundred.

     9      Q.   Can you recall a single case where the condition of

    10   the deal was anything other than provide truthful testimony?

    11      A.   Oh, yeah.

    12      Q.   Really?

    13      A.   Sure.

    14      Q.   Tell me about one of them.

    15      A.   I can't tell you specifics.  We would negotiate

    16   sentence, we would negotiate --

    17      Q.   Sorry, I didn't ask that question right.  In such a

    18   case where one of the conditions of the deal would be that the

    19   witness would, in fact, testify at trial --

    20      A.   Okay.

    21      Q.   -- in such cases, do you recall anywhere the

    22   condition was anything other than provide truthful testimony?

    23      A.   You know, Mr. Gruber, I don't understand what you're

    24   saying.

    25          THE COURT:  He's saying, I understand his

STATE vs. GREEN;   10/28/03 - 10/29/03

217

1    question, but if the substance of the agreement is

2    to testify in court, the agreement is to come to

3    court and testify truthfully.  That's what he's

4    saying.

5        MR. WHITE:  Let me offer this objection.  I'm

6    asking he be specific.  Is he asking Mr. Parker to

7    vouch for defense attorneys, as well as prosecutors,

8    or is this directed at prosecutors?  There may be a

9    difference.  I don't know.  But I don't know how he

10   could know all that.

11       THE COURT:  It was a general question by

12   Mr. Gruber, where the underlying bargain is for

13   testimony in court.  Is there -- do you know of any

14   time where it was other than for truthful testimony?

15       THE WITNESS:  Whatever it was, it was offered

16   to the defendant in return for his testimony.  The

17   State would grant certain considerations, but in

18   return for those considerations, the primary, if not

19   the only return or condition that we requested was

20   that he testify, or she testify truthfully.

21   BY MR. GRUBER:

22       Q.   Do you know of any situation where the prosecutor,

23   or anybody working with the prosecutor in a given case, would

24   enter into a deal with a potential witness, along the lines of

25   you may testify truthfully, you may testify falsely, but you

STATE vs. GREEN;   10/28/03 - 10/29/03

218

1   better say the following?

2       A.   Oh, no.

3       Q.   Of course not.  Now, does every defense attorney

4   know that?  Is that an objective standard of criminal

5   practice?

6       A.   I think every defense lawyer hopes that prosecutors

7   adhere to that standard.  I'm sure there are some in the

8   defense bar that would believe that prosecutors may indeed

9   request such an answer.

10      Q.   Is there any reason, that you're aware, of why a

11  defense attorney would withhold that knowledge from his

12  client?

13      A.   Well, if the defense lawyer is representing his

14  client zealously, and complying with his duty to his client,

15  no.  I could imagine any number of reasons why some

16  unscrupulous defense lawyer may not indeed advise his client

17  of that.  I don't know of any, nor have I seen any in the 20

18  years I have been an attorney.

19      Q.   Who determines what's truthful, and not, in those

20  circumstances?

21      A.   Well, I would -- I can only speak for myself, in

22  that that testimony that we receive better dovetail with the

23  facts, or I, as a prosecutor, would have some real problems

24  with it.

25      So, I would guess the lead trial lawyer, with any kind of

STATE vs. GREEN;   10/28/03 - 10/29/03

219

1  discussions he might have with other attorneys to assist him

2  with that decision, or her with that decision.

3      Q.   I believe that there is a mechanism in the Federal

4  courts where if there is such a deal, and the witness does

5  testify, and the testimony for one reason or another does not

6  satisfy the prosecutor, that the matter can then be tested

7  before a judge as to whether or not the witness testified

8  truthfully, or not.  I believe there is such a procedure.

9  First of all, are you familiar with anything of that sort?

10     A.   I'm not.

11     Q.   Do you know if there is any corresponding procedure

12  in the State of Florida courts?

13     A.   The only thing that I'm aware of is the ethical

14  standards we, as prosecutors, are held to.  Other than that,

15  no, the weight given to any testimony is for the jury.  So I

16  know of no other independent proceeding like that.

17     You're talking about the Federal court system, where a

18  judge makes some sort of determination, and whether or not

19  that judge believes it's criminal.

20     Q.   Is the motion to mitigate appealable, in the State

21  of Florida?

22     A.   Say that again.

23     Q.   Is a motion to mitigate, the denial of a motion to

24  mitigate, appealable in the State of Florida?

25     A.   A denial of a motion to mitigate, in terms of a

STATE vs. GREEN;   10/28/03 - 10/29/03

220

1    capital case?

2        Q.   No, in terms of any noncapital case.

3        A.   I think if it's a statutory mitigator, and there

4    appears to be an abusive discretion, I think, certainly, that

5    appeal can be taken.

6        Q.   Are you familiar with a motion to mitigate under

7    Rule 3800?

8            THE COURT:  Mitigation of sentence?

9            MR. GRUBER:  A mitigation of sentence, yes.

10           THE WITNESS:  I'm familiar, to some degree.

11       Unless it's in front of me, I can't quote it to you.

12   BY MR. GRUBER:

13       Q.   Unless it's changed, within 60 days of sentence, a

14   defendant can file a motion to mitigate sentence.

15       A.   I understand that.

16       Q.   I'm asking you, do you know whether a denial of such

17   a motion is appealable?

18       A.   A denial of that motion to mitigate sentence,

19   specifically, for failing to mitigate?

20       Q.   Well --

21           THE COURT:  In other words, the Court denies it

22       without a hearing, or whatever, the Court just

23       denies it?

24           MR. GRUBER:  Right.

25           THE COURT:  Can you appeal that order.  Is that

STATE vs. GREEN;   10/28/03 - 10/29/03

221

1    your question?

2         MR. GRUBER:   That's my question.   It's a matter

3    of law.

4         MR. WHITE:   That would be good because I was

5    just going to offer an objection as to relevance.

6         THE COURT:   Sustained.

7  BY MR. GRUBER:

8    Q.   Is Mr. White, and of course, Mr. Williams, were they

9  known for thorough preparation?

10   A.   I can only tell you what my opinion is, and that is

11 that Mr. White is probably one of the finer prosecutors that I

12 have ever known, and Mr. Williams, as I recall, was not quite

13 as experienced as Mr. White.   I'm sure under his tutelage,

14 Mr. Williams was quite prepared.

15   Q.   Would that preparation, especially in a major case,

16 normally include face-to-face meetings with potential

17 witnesses?

18   A.   Absolutely.

19   Q.   You know now such meetings took place with regard to

20 Sheila Green, and Lonnie Hillary, and Jerome Murray?

21   A.   I wasn't present for those meetings, but I

22 understand that's true.

23   Q.   Did you know back then those meetings did occur?

24   A.   I don't believe I did.

25   Q.   You did not take depositions?

STATE vs. GREEN;   10/28/03 - 10/29/03

222

1     A.    Wait a minute, let me strike that.  In terms of an

2  SAI at transfer, from various testimony that was taken from

3  Sheila, and from Mr. Hilliard, and I believe I had a statement

4  taken from Jerome Murray, those were disclosed to me.

5     I believe Mr. Murray's statement was disclosed somewhat

6  later on, closer to trial.  I think I had, maybe, two

7  different transcribed statements from Sheila, one prior to her

8  conviction for cocaine trafficking, and one subsequent

9  thereto.  And I believe the same for Mr. Hilliard.

10    Q.    Hillary.

11    A.    Hillary.  I apologize, Mr. Hillary.

12    Q.    And an SAI is what?

13    A.    You know, generally, I don't get notes or

14  transcripts of SAIs.  That's generally a support product, and

15  unless they're sworn and recorded, I don't get those as a

16  defense lawyer.

17         THE COURT:  I believe the question is, what is

18     an SAI?

19         THE WITNESS:  I apologize.  SAI is an

20     opportunity, generally, the prosecutor --

21  BY MR. GRUBER:

22    Q.    Let me stop you there.  What do the initials stand

23  for?

24    A.    State Attorney investigation.

25    Q.    Thank you.  That's all I wanted to get at.  But you

STATE vs. GREEN;   10/28/03 - 10/29/03

223

1    did not depose any of the three witnesses, correct?

2        A.   No.

3        Q.   Were you aware of meetings that the prosecutors and

4    these witnesses had at the time?

5        A.   I was not aware, subsequent to those meetings, if

6    that's your question.

7        Q.   Prior to trial, prior to their testimony at trial?

8        A.   No, but I, you know, I understood that they would be

9    meeting with them?

10       Q.   Have you done similar trial preparation as a

11   prosecutor?

12       A.   Sure.

13       Q.   Do you have -- have you done such preparation in a

14   situation where the witness is half a deal?

15       A.   Sure.

16       Q.   Do you have any particular routine, with regard to

17   what you discuss, in such meetings?

18       A.   Generally, if I'm going to do that, if I'm going to

19   make an offer, at some point in time, and it may indeed be the

20   first time I meet with this witness, I will have a court

21   reporter.

22       I think at any time, as prosecutor, you offer some sort

23   of deal, it better be of record.   I generally try and do that.

24       Q.   If the witness has an attorney, would that attorney

25   normally be present?

STATE vs. GREEN;   10/28/03 - 10/29/03

224

1    A.   Oh, yeah.

2    Q.   Would the witness and the attorney have an

3    opportunity to consult in private?

4    A.   Oh, yeah.

5    Q.   Would the terms of the deal routinely be explained

6    to the witness?

7    A.   Very detailed, yes.

8    Q.   Would the facts of the case, the factual theory of

9    the case also be discussed with either the attorney, or the

10   witness?

11   A.   I could speak for myself, no, I don't do that.

12   Q.   Would the substance of the --

13   A.   Let me -- getting back to that point where you were

14   speaking of making a determination as to credibility of that

15   witness, the fact of the case may indeed be discussed, if I do

16   not believe the person that I'm talking with at that point in

17   time.  That might be to let him know, or her know that, wait a

18   minute, that's not what the facts say, you're lying to me, you

19   know, no deal.

20   Q.   Okay.  Would something like that be typical any

21   prosecutor's practice?

22   A.   In terms of the explaining of facts of the case to

23   that particular person, or --

24   Q.   Sure.

25   A.   I think under certain circumstances, yeah.

STATE vs. GREEN;   10/28/03 - 10/29/03

225

1    Q.   Do you believe that would be typical of Mr. White's

2    practice, or Mr. Williams' practice?

3    A.   I don't know the answer to that.  It never happened

4    in the cases I worked with Mr. White on.  It never happened,

5    that I can recall, in those cases.  I was never encouraged.

6    Basically, Mr. White, and Mr. Holmes, and those folks

7    over there, were kind of the most experienced people in the

8    office.  You looked for guidance from them when you first came

9    to the office.  I was, certainly, never taught to do something

10   like that.

11   Q.   Just another point.  In the course of defending a

12   case, on day one, say after the first day of appointment,

13   perhaps after first appearance, or something of that sort, you

14   have, at best, a booking report, perhaps an arrest affidavit,

15   some information along those lines, and what the client tells

16   you, and that's about it, correct?

17   A.   Maybe the Public Defender's Office does.  Generally,

18   for my appointment purposes, I might get a little bit more

19   than that.

20   Q.   As the case proceeds, you get considerably more

21   information?

22   A.   Sure.

23   Q.   The amount of information available to both the

24   defense attorney and the client would depend on the status of

25   the individual case, is that true?

STATE vs. GREEN;   10/28/03 - 10/29/03                    226

1       A.   The quantity and quality of the information that a

2  defense lawyer may receive at some early point in time is

3  dependant on the nature of the case?

4       Q.   I'm making sort of a general observation.  It's a

5  general question.  I'm asking if you agree to that.  As you go

6  along, preparing the case, you get more information.

7       A.   I agree with that.

8       Q.   You indicated that Mr. Murray was provided -- the

9  name of Mr. Murray as a witness was provided to you fairly

10 late in the proceedings?

11      A.   Correct.

12      Q.   Is that also true of the other witnesses?

13           MR. WHITE:  Could we ask which other witnesses?

14           MR. GRUBER:  Sheila Green, and Jerome Murray.

15           THE COURT:  Mr. Green, and Mr. Hillary?

16           MR. GRUBER:  Yes.

17           THE COURT:  You said Mr. Murray.

18           MR. GRUBER:  Did I?  I'm sorry.  I meant Sheila

19      Green and Lonnie Hillary.

20           THE WITNESS:  I knew that they were potential

21      witnesses because I had been disclosed transcripts

22      of testimony taken by them prior to them giving --

23      prior to them being convicted, or her being

24      convicted of trafficking and cocaine.

25 BY MR. GRUBER:

STATE vs. GREEN;   10/28/03 - 10/29/03

227

1     Q.   Did you meet with any of the three, prior to the

2  trial?

3     A.   No.

4     Q.   Let me switch.  You said something about a rise of

5  homicides following the Challenger disaster, and that may have

6  seemed a little bit strange.  Let me ask you this, during the

7  period from the mid '80s, roughly up to about 1990, and 1991,

8  and so forth, was the criminal justice system in Florida state

9  wide, and something of a financial -- well, actually, sort of

10  a general crisis?

11     A.   Mr. Gruber, I don't know.  I wasn't plugged into the

12  politics of finances in the State of Florida for those five

13  years.  I was too busy worrying about my job.

14     Q.   Do you remember what the early release situation was

15  at that time?

16     A.   I do.

17     Q.   And that was?

18     A.   Well, the early release, it was different.  There

19  was a -- under those guidelines at the time, the parole

20  commission would meet every, I believe every Tuesday, and they

21  would determine, based on the nature of the offense the person

22  was in prison for, how much good and gain time they could

23  receive if they were so eligible.

24     They could sit down on a Tuesday, and give somebody 250

25  days credit, which would, in effect, release them from prison.

STATE vs. GREEN;   10/28/03 - 10/29/03                    228

1    About the time you get out of the Reception Medical Center,

2    you're out on a five year sentence.  It was controversial, to

3    say the least.

4         Q.   There were many people being released on a very

5    early release.  That would be a fair statement.  That was due

6    to the overcrowding, and underfunding of the State prison

7    system?

8         A.   Well you know, you could hypothesize.  I think the

9    guidelines were more parity and sentencing, that was one of

10   the published reasons for it.

11        But certainly, I believe there was a Federal lawsuit

12   ongoing at the time, compelling no more than 97.5 percent of

13   the bed space be utilized, at any one time, by the inmates.  I

14   may be wrong on those numbers, but the Federal courts were

15   watching our prison system very closely, if I recall

16   correctly.

17        Q.   You left of the State Attorney's Office simply

18   because you were underpaid and overworked?

19        A.   Burned out.

20        Q.   And your case load, around that period, virtually

21   doubled?

22        A.   Well, the homicides and significant cases, you know,

23   I had -- Mr. Williams had just moved into my division from

24   misdemeanor division, I had another lawyer.

25        I don't think any of the attorneys that were in my

STATE vs. GREEN;  10/28/03 - 10/29/03

229

1    division at that time had a full year experience in felony

2    convictions.  As a result, anything that was more significant

3    than a 2nd Degree felony, I then assumed the role of

4    prosecuting in those cases.

5        As I told you before, the Challenger explosion, whether

6    or not it's directly related to the number of homicides that

7    following year, we had a jump to 42 homicides in Brevard

8    County.  I was assuming, I was taking all of those cases.  I

9    just wasn't going to assign them to inexperienced prosecutors.

10   As a result, you just get tired.

11       Q.   You go into private practice.  Now, as I understood

12   it, at least a large part of your practice was court

13   appointments?

14       A.   Yes.

15       Q.   Particularly, you sought out the capital

16   appointments, and Mr. Green was, I believe, the first one of

17   those?

18       A.   I don't know if he was the first one.  In fact, I

19   would disagree with that.  I think he may have come sometime

20   later, that case.

21       Q.   All those court appointments are paid by the county

22   rather than the state, isn't that true -- your attorney's fee,

23   I'm sorry.

24       A.   I believe that was correct at the time.

25       Q.   That would include --

STATE vs. GREEN;  10/28/03 - 10/29/03                    230

1      A.    I dealt with the county finance, so I just don't

2   recall who actually signed the check.

3      Q.    Well, my understanding, correct me if I'm wrong,

4   court appointments, everything you get, all the money you get

5   in connection with the case, comes from the county, not the

6   state, as a private attorney.

7      A.    That may indeed be the case now, Mr. Gruber, I just

8   don't know what it was then.  I just can't recall.

9      Q.    Let me ask you to consider the following:

10  Appointment of co-counsel, appointment of an expert with

11  regard to dog tracking evidence, appointment of a crime scene

12  analyst, appointment of a ballistics expert, appointment of a

13  mitigation expert, or an equivalent social worker.

14      With regard to those different types of individual

15  potential witnesses, do you think if you had requested any

16  such appointment, that the request would have been granted at

17  the time?

18      A.    Oh, yeah.

19      Q.    Excuse me?

20      A.    Yes.

21      Q.    Did you make such a motion?

22      A.    I did not.

23      Q.    Yesterday, I talked about those three by five

24  photographs, and I believe you agreed --

25      A.    Three by five cards.

STATE vs. GREEN;   10/28/03 - 10/29/03

231

1    Q.    Yes, I'm sorry.

2    A.    That's all right.

3    Q.    I think you agreed that if you had had that

4    information, and the information is what I suggested that it

5    was, that you would have used them for impeachment of Officers

6    Fair and Nyquist?

7    A.    I would have.

8    Q.    Generally speaking, is it easy or difficult to

9    impeach a police officer in a criminal case?

10   A.    It depends.

11   Q.    They are professional witnesses, are they not?

12   A.    They're professional law enforcement officers.

13   Whether or not they are professional witnesses, that's kind of

14   the drumbeat of the defense bar.  I don't buy into that.  I

15   think what they do is they come in here like everybody else.

16       They're generally skilled in the area in which they're

17   trained, and I think probably in those areas, they're

18   knowledgeable enough to sound, and indeed, testify, you know,

19   competently.

20   Q.    Well, law enforcement officers who hold the rank of

21   Fair and Nyquist are typically pretty well experienced, isn't

22   that true?

23   A.    It's my understanding Detective Nyquist wasn't very

24   experienced at the time he was there.

25   Q.    What can you say about that?

STATE vs. GREEN;   10/28/03 - 10/29/03

232

1    A.    It was my understanding that he had recently moved

2  into detective.  He had been a road patrol deputy for some

3  period of time.  That's how I knew him.  I think he had moved

4  in, and this may have been one of his first major criminal

5  investigations as a lead agent.

6    Q.    What about Fair?

7    A.    Fair?  Tom has been around for a while.

8    Q.    An experienced police officer, or one who has, at

9  least, some experience, would testify in court over his career

10 fairly often, isn't that true?

11   A.    Over 20 years, I guess, yeah, you would have

12 occasion to testify relatively often.

13   Q.    And what's more, as a matter of routine procedure,

14 any police officer would know, or a police agency would know,

15 that that might well happen in a given case, isn't that true?

16   A.    I hope so.

17   Q.    It's routine for police officers to prepare

18 contemporaneous reports about their involvement in their case,

19 isn't that true?

20   A.    Yes, sir.

21   Q.    It is routine for those officers to bring those

22 reports any time they attend a deposition or a trial.  Is that

23 true?

24   A.    It's supposed to be.

25   Q.    Routinely, they are permitted to, and do refer to

1   those contemporaneous reports when they testify?

2       A.    They do.

3       Q.    It is rather rare, is it not, for a police officer

4   to contradict the written report that he's prepared

5   contemporaneously?

6       A.    I would say if there's a statement within that

7   report on a material issue, that it would be very rare for

8   that officer to then contradict himself as it's stated in the

9   police report.  If he does, his recollection would be

10  refreshed.

11      Q.    If you had information that would constitute

12  impeaching evidence in this particular case with regard to

13  Fair and Nyquist, although such information might be related

14  directly to the identification process, would it also have

15  value, impeaching value, with regard to their participation in

16  the case as a whole?

17      A.    You know, that's difficult to measure, and I think

18  it's important for you to know that, as I looked at those

19  cards, and as I thought to myself whether or not this had the

20  kind of value that would attack their credibility, I'm not

21  sure, under the circumstances, that if I had those cards and

22  attacked their credibility with them that, in my own mind, I'm

23  not sure there would have been a whole lot of weight given to

24  that, in light of the surrounding circumstances that I had to

25  attack the identification, already.

STATE vs. GREEN;   10/28/03 - 10/29/03

234

1    Q.   Okay.  So suppose identification were not an issue

2   in the case at all.  However, these officers would have

3   testified to their involvement in the investigation, any other

4   information they might have.  Would you have used this

5   information to impeach them then?

6    A.   I suppose it would depend on what testimony they

7   gave on direct examination.  I would certainly be ready to use

8   it in the event I felt it was necessary.  Sometimes when you

9   attack a law enforcement officer in the presence of a jury,

10  you can really screw up, so it's a call that you have to make

11  at the time.  I just can't answer that.

12   Q.   Let me go on to the juror issue.  Have you read the

13  portion of the 3.850, or have you been advised about the

14  question about basically why you left Harold Giles on the

15  jury?

16   A.   Sure.

17   Q.   Just for context, I'd like to refer to the

18  allegations in the 3.850, and I'll run through them, and ask

19  you to confirm them.  For jury selection, did you move that

20  juror, Harold Guiles, G-U-I-L-E-S, due to his exposure to

21  pretrial publicity?

22   A.   I did.

23   Q.   And that motion was denied, correct?

24   A.   Yes.

25   Q.   Later on in the Voir Dire, there was a colloquy

1   between the Court, and I believe all the members of the Venire

2   panel at that point, who were actually seated on the panel,

3   not those who may have been in the gallery, and during that

4   colloquy, Mr. Guiles indicated that his niece had been

5   murdered, right?

6        A.   That's correct.

7        Q.   That occurred about three years ago?

8        A.   Yes.

9        Q.   Then three years ago, and that occurred in Naples?

10       A.   I'm not sure that the murder occurred three years

11   ago, I think Mr. Guiles served on a jury approximately three

12   years before.  According to the notes, I do see that three

13   years before in Naples.  That sounds right.

14       Q.   Then I have two more questions from the Court, along

15   the lines of would you be able to set aside that, and Mr.

16   Guiles said, It doesn't seem like it's the same kind of thing,

17   okay?

18       That was the end of that particular colloquy.  There was

19   one more question and answer, and that was the end of that

20   colloquy.

21       A.   Okay.

22       Q.   Then Mr. Guiles, with regard to that issue, was

23   asked no further questions by anybody?

24       A.   Correct.

25       Q.   You also did not seek to have Mr. Guiles excused for

STATE vs. GREEN;   10/28/03 - 10/29/03                          236

1   cause, nor did you exercise a peremptory challenge with regard

2   to Mr. Guiles?

3          A.    After my initial motion for excusing him?

4          Q.    Right, which occurred prior to this colloquy.

5          A.    I can't recall, specifically, but I don't have any

6   reason to doubt what you're saying.

7          Q.    Then you exercise six of your ten available

8   peremptories in this case?

9          A.    That may, indeed, be correct.

10          Q.    As you recall, you did not exercise all of your

11   peremptories?

12          A.    I did not.

13          Q.    You did not ask for additional peremptories?

14          A.    I did not.

15          Q.    Also, you did not move for a change in venue at any

16   time in this case, is that true?  I mean by that a formal

17   written motion.

18          A.    You know, I don't recall.  It seems like the case

19   was actually scheduled in Titusville because it was -- we had

20   made discussions.  There were discussions, and the ultimate

21   case was tried in Melbourne, if I recall correctly.

22          In terms of a change in venue to another jurisdiction,

23   you know, Mr. Gruber, I don't recall that.  I don't recall

24   whether I did, or didn't.  For some reason, I want to say I

25   did file a motion, but I can't recall it.

STATE vs. GREEN;   10/28/03 - 10/29/03

237

1    Q.   I might very easily be mistaken, too.  Do you know
2  how a venire panel, well back then, was selected?  The entire
3  jury pool, how are they selected?  They come from a voters
4  registration list, right?

5    A.   That's the way it was back then, absolutely.

6    Q.   We hope selected at random from that list, correct?

7    A.   Supposed to be.

8    Q.   Is there anything municipality specific about the
9  selection process?  In other words, if the case is going to be
10 tried in Titusville, is the entire pool for that courthouse
11 pool from the Titusville area, or does it extend to the entire
12 county?

13   A.   I was thinking about that last night.  I think it's
14 pulled from the entire county now.  I'm not sure what it was
15 back then.  It may have been some sort of a regional selection
16 for convenience of the jurors.  I just don't recall.

17   Q.   Do you recall if there was any kind -- well.

18   A.   I remember thinking that, in my mind, as we were
19 going through the selection process, that we had no black
20 jurors, or prospective jurors.  I remember thinking, thank
21 goodness we're not trying this in Titusville with the jury
22 that we had.  That was my --

23   Q.   Thank goodness we're not -- I didn't understand your
24 answer.

25   A.   I was kind of pleased that we weren't going to try

1   this case in Titusville because it's a small community, and

2   Mr. Flynn was from Titusville, and he knew lots of people in

3   Titusville, as did the surviving witness, Ms. Hallick.

4        Mr. Green was well known in Titusville.  I was pleased

5   that we were going to do this in Melbourne.  Anything more, I

6   don't know.  I remember that feeling, though.

7        Q.   So you're thinking that might be because there might

8   be some city specific procedure that was in place with regard

9   to the whole selection?

10       A.   That's what I'm thinking may indeed be the case.  I

11  can't say for sure.

12       Q.   Why didn't you question Mr. Guiles a bit further on

13  that issue?

14       A.   I don't know.

15       Q.   Why did you not move to use a peremptory challenge?

16       A.   I don't know the answer to that, other than -- I

17  have given that some thought.  We had eight women on the jury.

18  As an attorney, particularly a criminal lawyer, defense

19  lawyer, I was very pleased to have eight women, as opposed to

20  eight men and four women.

21       I think my concern was that by exercising peremptories,

22  that we may, indeed, get people that we wish we didn't have.

23  Keep in mind, though, that as we went through this process,

24  Mr. Green and I discussed every one of them.  He had every bit

25  of input.  I realize he's not an attorney, but we discussed

STATE vs. GREEN;   10/28/03 - 10/29/03

239

1   these matters, and maybe Mr. Green has some recollection of

2   why we didn't strike Mr. Guiles.

3       Q.   Do you recall Mr. Green ever telling you you must

4   take this one, you must not do this, you must not do that?

5       A.   No.

6       Q.   So you exercised your judgment in this matter, is

7   that true?

8       A.   I would say, what do you think?

9       Q.   Is it true at this time, that you do not know why

10  you did, or didn't do what you did with regard -- or did not

11  do with regard to Mr. Guiles?

12      A.   I can't tell you that.  I don't recall.

13      Q.   With regard to whether or not you did, you have no

14  recollection at all as to why you did not at least ask some

15  additional questions?

16      A.   No, sir, I don't.

17      Q.   Is it a possibility that for one reason or another

18  you simply missed what Mr. Guiles said during the course of

19  this colloquy?

20      A.   It's possible that the citizens of the Constellation

21  Beta committed this homicide.

22      Q.   All right.  During the course of the trial, you're

23  at counsel table with Ms. Quinn, right?

24      A.   Yes.

25      Q.   And with your client, Crosley Green, correct?

1     A.   That's correct.

2     Q.   Did any discussions ever take place while the three

3  of you were there at counsel table?

4     A.   All the time.

5     Q.   Did they take place while the court proceedings were

6  proceeding?

7     A.   Absolutely.

8     Q.   Did you participate in those discussions there at

9  counsel table?

10     A.   Yes, I did.

11     Q.   Was that done through whispering, generally?

12     A.   Generally.

13     Q.   Occasionally, would documents be pointed out to you?

14     A.   Yes, sir.

15     Q.   Could that situation -- well, first of all, does

16  that situation arise routinely?

17     A.   Mr. Gruber, it is possible.  That's what you're

18  getting at.

19     Q.   I'm asking, is it legitimately possible?

20     A.   Is it probable, I don't believe so.  I don't believe

21  that I would have missed that.  I'll tell you why.  There's

22  more to it.

23     As I recall, Ms. Quinn was actually taking notes

24  feverishly about our witness, about the potential jurors, and

25  we were comparing all those notes, and talking, and you know,

1    anything is possible.

2         Q.   Do you recall any note of any sort --

3         A.   No, I do not.

4         Q.   -- that would have to do with Mr. Guiles, and his

5    niece being murdered three years prior to this trial?

6         A.   I don't recall a note, but I can tell you, I recall

7    Mr. Guiles in that event, and I would presume there were

8    notes.  We discussed it heavily as to whether or not

9    Mr. Guiles should remain, or not.

10        Q.   Wait a minute.  You do recall that?  You do

11   recall --

12        A.   I recall Mr. Guiles, and whether or not -- I mean,

13   the guy's niece was killed.  But there was some reason, after

14   discussion with everyone, why we kept Mr. Guiles on there.  I

15   just don't know what that reason was.

16        You know something, Mr. Gruber, I'm sitting here thinking

17   about it, identification was, frankly, the issue.  In my mind,

18   the primary, the major issue.  It seemed to me that I was

19   satisfied that Mr. Guiles -- we were satisfied that Mr. Guiles

20   would be able to follow the law regarding the weighing of the

21   evidence, separate himself from the fact that his niece had

22   been killed.

23        But again, I don't recall precisely what it was that I --

24   what my basis for that decision was.

25        Q.   I took your deposition of over two days, one of them

1  being on October 30th of the year 2001.  You were present for

2  that, correct?

3       A.   I was.

4       Q.   You have it with you?

5       A.   I do.

6       Q.   Would you refer to page 31?

7       A.   I always wondered what this would feel like.  All

8  right, I'm there.

9       Q.   First of all, there is a question for me that goes

10  on sentence, after sentence, after sentence.

11      A.   It starts at line 5, and goes to line 15.

12      Q.   Yes, sir.  Then in response to that question --

13  generally, that compound question refers to Mr. Guiles, and

14  failure to use a peremptory challenge, correct?

15      A.   I see that.

16      Q.   And then you respond, line 16, I can tell you, if I

17  didn't make a motion to excuse him for cause because of a

18  family member, I should have.  If I didn't, I can't tell you

19  why.

20      A.   Did I not make a motion to excuse him for cause?

21      Q.   You did give that answer during the deposition,

22  correct?

23      A.   Yeah.

24      Q.   Was that a true answer?

25      A.   Yeah, in the context of what our discussion was.

1       MR. WHITE:  Are we -- Mr. Gruber?

2       MR. GRUBER:  Yes, sir?

3       MR. WHITE:  I thought we already established

4    that he did make a motion to recuse him for cause.

5    Now you're impeaching him with the fact that he

6    recalled that incorrectly in his deposition?

7       THE COURT:  Do you have an objection?

8       MR. WHITE:  Yes.

9       THE COURT:  What is it?

10      MR. WHITE:  If this is impeachment of some

11   sort, it's inappropriate.

12      THE COURT:  Quite frankly, Mr. Gruber and

13   Mr. Parker read the question and the answer.  I have

14   no idea what either one of them, other than it was

15   long, compound, and Mr. Parker says within the

16   context of the question the answer was okay.  So

17   that's what I know about it.

18      Whether it's improper, or not, I have no way of

19   knowing.  I think we are supposed to read the

20   question and the answer, and ask him if he said

21   that.  I guess the finder of fact, which would be me

22   in this case, would determine if it was impeachment,

23   or not.  I overrule the objection because I don't

24   know one way or the other.

25      MR. WHITE:  Thank you, Judge.

1          THE COURT:  Well, I guess it wasn't impeaching

2     him, but I don't know what it was.

3          THE WITNESS:  I think I understand what you're

4     saying.  I did move that he be excused.  But it

5     appears that the record indicates -- I don't have it

6     in front of me to look at.

7          You're asking me why I would move that he be

8     excused for pretrial publicity, and not for the

9     death of the family member.  I do not know why I

10    wouldn't have said for the death of the family

11    member.  And if I didn't say that, I should have.

12         Q.   That's what you meant by that answer, in other

13    words?

14         A.   Yeah.

15         Q.   Do you have some concern, if you exercised any

16    peremptory challenges, or made any additional motions to

17    excuse for cause, about who you would get from the jury panel,

18    if you did so?

19         A.   Sure, you look ahead.

20         Q.   You still had four peremptories remaining, correct?

21         A.   Yes.

22         Q.   Can you articulate anything now with regard to who

23    might then sit on a panel if you exercised any of those

24    peremptories, that might explain why you had that concern?

25         A.   Only that I had eight women.  I was darn pleased to

1    have eight women.

2         Q.    Do you know how large the prospective panel was, I

3    assume that you had in the courtroom at that time?

4         A.    For some reason, I want to say 35, or 50.  Fifty,

5    maybe.

6         Q.    So if some members of the sitting panel had been

7    excused, then the Court would normally, I don't know, pull

8    numbers at random out of a hat, or through some merit system,

9    or something of that sort?

10        A.    There was a box at the time.

11        Q.    So out of, perhaps, 30 people still sitting in the

12   courtroom, additional members would have been brought in to

13   sit on the panel.  Did you have concerns about all the 30 out

14   there?

15        A.    I can tell you that I would have looked at everyone,

16   that I believe I would have had a personal history that those

17   people filled out, and that as I looked at them, and as I

18   looked at these folks, I thought to myself, we have got these

19   eight women, let's hang onto these.  Any further peremptories,

20   might result in the State exercising their peremptories, and

21   we're going to end up with more men.

22        I didn't think -- I wanted women on this jury because I

23   did not think that the jury would believe Ms. Hallick if they

24   were women.  I was pretty well consumed with that.  I felt

25   like Ms. Hallick's testimony was absolutely unbelievable.  The

1    more women I had on there, particularly older women, I felt

2    like they would absolutely not believe her.  That was my whole

3    process of thought at the time.

4         Q.    Incidentally, is that process of thought affected by

5    the fact that the recommendation, in this case, was eight to

6    four?

7         A.    I thought about that, and thought about that.

8              MR. WHITE:  Objection, your Honor, calls for

9         speculation.

10             THE COURT:  Sustained.

11   BY MR. GRUBER:

12        Q.    Did you have concerns about the prospective jury

13   panel that ever reached the point of prompting you to move for

14   a change of venue?

15        A.    Other than what's reflected in the record regarding

16   potential jurors having reached decisions by their actions

17   outside the courtroom, I can't recall anything.

18        Q.    Have you ever seen, in the course of your practice,

19   a situation, right, where defense counsel moves for a change

20   in venue, pretrial, the issue is heard, and the Court

21   indicates that we will attempt to pick a jury, and if that

22   cannot be done, then the Court will entertain a motion for

23   change of venue at that point?

24        A.    Yes, sir.

25        Q.    That's not unusual, is it?

STATE vs. GREEN;  10/28/03 - 10/29/03                    247

1     A.    Common.

2     Q.    That did not occur in this case, correct?

3     A.    I don't recall that occurring.

4     Q.    Let me go back to the co-counsel issue a little bit.

5     A.    Yes, sir.

6     Q.    You never did ask for one.  Why is that?

7     A.    I thought I was a pretty damn good lawyer.

8     Q.    That's what you said in your deposition, too.

9  That's essentially your answer to that question about

10 appointment of co-counsel?

11    A.    That's my answer.

12    Q.    Do you see the value of having a co-counsel in a

13 bifurcated proceeding, where one attorney presents the defense

14 to the guilt phase portion of the trial, and another attorney

15 presents the defense to the penalty phase portion?

16    A.    I see that there could be an advantage and benefit,

17 yes.

18    Q.    I mean, it's true, in this particular case, that you

19 argue to the jury that Crosley Green should be acquitted

20 during the guilt phase, correct?

21    A.    Certainly.

22    Q.    The jury unanimously rejected your position?

23    A.    That's correct.

24    Q.    About three weeks thereafter, you argued to the jury

25 that they should not recommend the death sentence, correct?

1      A.    I did.

2      Q.    They recommended your decision eight to four?

3      A.    They did.

4      Q.    Is it your understanding that there was a push, so

5  to speak, for the appointment of co-counsel in capital cases

6  that occurred after the trial in this case?

7      A.    I believe it became -- yes, but when it occurred, I

8  don't know.  You know, Mr. Gruber, I'm not sure that -- now

9  that I'm thinking about it, I'm not sure the county was

10 appointing co-counsel.

11     Q.    I asked you earlier.

12     A.    You did, and I'm sorry, but I'm not sure they were

13 doing that.  I might have got an investigator, but I don't

14 recall that was happening.  Certainly, it wasn't happening at

15 the time that I can recall.

16     I don't recall conflict lawyers, at the time, asking and

17 receiving a second lawyer.  I have no recollection, but I

18 don't think it was occurring, now that I'm thinking about it.

19 But you know, in retrospect, Mr. Gruber, I should have asked

20 for counsel.

21     Q.    Just generally, go back to that, it was my

22 experience that the county, on court appointment, indigent

23 criminal cases --

24          MR. WHITE:  Can I object to his statement?

25          MR. GRUBER:  I'm leading up to a question.

STATE vs. GREEN;   10/28/03 - 10/29/03

249

BY MR. GRUBER:

1

2      Q.   They're tight-fisted.  Was that your experience?

3      A.   Sure.

4      Q.   Were they tight-fisted in this case?

5      A.   Very.  In fact, I had to negotiate, from what I

6   submitted in my bill, which I believe was $32,000, $35,000,

7   and basically, in my opinion, my arm was twisted, and I

8   settled for $28,000.  I mean, that's how that went.

9      Q.   That was for your fee, of course?

10      A.   That's correct.

11      Q.   And you would be going to the same people for any

12   type of cost, as far as experts?

13      A.   That's correct.

14      Q.   And with regard to the appointment of co-counsel, do

15   you recall that being an actual announced policy, or something

16   of an unwritten rule?

17      A.   I don't recall that.  I don't recall either one of

18   them, whether it was an unwritten rule, or whether it was an

19   announced policy.  It seemed to be my sense that it wasn't

20   being done.  That's my recollection at this time.

21      Let me tell you, I utilized Mr. Bardwell, several

22   different areas.  He didn't sit at the table with me, but

23   Mr. Bardwell and I talked about the case, on and off.  Now

24   that may not fit into your description of co-counsel, but in

25   my mind, I had assistance from other lawyers who had that type

STATE vs. GREEN;   10/28/03 - 10/29/03                    250

1   of experience.

2       Q.   I'll go to that.  Sam Bardwell is mentioned on your

3   affidavit for attorney's fees.

4       A.   That's correct.  I believe so.  I may have answered

5   that too quickly.  I don't recall, and no, I don't have that

6   before me.

7       Q.   Okay, I do have a copy.  It's pretty thick.

8       A.   Uh-huh.

9       Q.   I'll go ahead and show you this.

10      A.   Okay.

11      Q.   The question I have is whether Mr. Bardwell's name

12  appears anywhere other than after the conviction, in other

13  words, in connection with the guilt phase, at all?

14      A.   Well, I don't know.  You might save me some time if

15  you direct my attention.

16      Q.   Post-conviction, and penalty phase starts on page

17  21.

18      A.   Okay.

19      Q.   Then you have a reference on that page to Mr.

20  Bardwell.

21      A.   Okay.  There's a telephone conference, I see, on

22  9/10.  There is research from the Portafile, which was a death

23  penalty case Mr. Bardwell worked on, so I obtained some of

24  that research, I'm sure.  The form and substance of death

25  sentencing orders, I see where we talked about that additional

Case 6:14-cv-00330-RBD-GJK   Document 3-39   Filed 02/27/14   Page 56 of 100 PageID 1200

1   mitigation.  This lists witnesses.  I don't see anything else.

2   I'm surprised I didn't list him during the dog track portion.

3        Q.    That's what I was asking, wanted to ask about.

4              MR. WHITE:  Wow, I'm glad you told us.

5              THE WITNESS:  I didn't put that in, Mr. Gruber.

6              THE COURT:  Mr. White, if you have an

7        objection, make it, okay?

8   BY MR. GRUBER:

9        Q.    You did say during the deposition, with regard to

10  the questions about dog track evidence, that you believe you

11  had consulted with Mr. Bardwell about that issue, isn't that

12  true?

13       A.    Yes.

14       Q.    As I look here, it does not appear that you did so,

15  at least if you did, it's not recorded in your attorney's

16  fees?

17       A.    I didn't bill that out.

18       Q.    One further question.  With regard to the

19  co-counsel, are you familiar with the AVA Guidelines for

20  appointment of performance of counsel in death penalty cases?

21       A.    I am.

22       Q.    It came out in mid-session, in 1989.  Were you aware

23  of that?

24       A.    No.

25       Q.    Apparently, it was predicated on the National Legal

STATE vs. GREEN;  10/28/03 - 10/29/03

252

1   Aid and Defender Association standards for the appointment and

2   performance of counsel in death penalty cases, which is dated

3   November 18th of 1988, in other words, the proceeding year.

4        A.   Okay.

5        Q.   Are you familiar with either one of those?

6        A.   I am, but as to the dates, and specifics of those

7   particular -- of the language, I'm not.

8        Q.   Are you aware that those guidelines, going back to

9   1989 and '88, do recommend a capital defendant be represented

10  by two qualified attorneys?

11       A.   I believe there was a recommendation in place at

12  that time.  I think I recall that.

13       Q.   Were you aware of it at the time?

14       A.   I may have been, I just can't recall.

15       Q.   Your defense, in the case overall, during the guilt

16  phase, as I understand, was directed to the who done it

17  aspect, as opposed to the what happened aspect.  Would that be

18  fair to say?

19       A.   Well, no.  There were, in terms of whether it began

20  at Holder Park and ended up in an orange grove off of US1,

21  whether or not Mr. Flynn had been shot, and died as a result

22  of those wounds.

23       I think that was, yeah, who did that, was part of it.

24  But how it happened, certainly, I think was litigated, at

25  least I thought I did, how it happened.  The implication in my

1  mind was clear, that we were presenting a different theory of

2  episode than what the State had alleged.

3       Q.   The State said that you were arguing that

4  Ms. Hallick had shot Mr. Flynn.

5            MR. WHITE:  Objection, your Honor.  I don't

6       know what the relevance is of what the State said.

7       He's incorporated some hearsay statement.  I don't

8       know who the State is in his question.

9            THE COURT:  Why don't you rephrase the

10      question.

11 BY MR. GRUBER:

12      Q.   Was that your defense?

13      A.   The implication was that Ms. Hallick had, in fact,

14 caused the death of Chip Flynn.

15      Q.   What was that based on?

16      A.   There were several things.  Number one, the manner

17 in which the victim had been tied.  He certainly appeared to

18 have been tied for comfort purposes, as opposed to for

19 security purposes.  He was tied in a manner which, I couldn't

20 envision another man, who was afraid for himself, potentially

21 as Mr. Flynn was another male, I can't imagine another man

22 tying him that way.

23      Second of all, there was a broken glove box in the truck.

24 In that particular glove box were many items, that when they

25 would hit the floor, would make noise.  Evidently, according

STATE vs. GREEN;  10/28/03 - 10/29/03                    254

1   to Ms. Hallick, she had reached into the glove box, and there

2   were tapes, and other items, that would have made considerable

3   noise when they fell from the glove box.  She testified, as I

4   recall, that while the perpetrator had Mr. Flynn out on the

5   ground is when she reached to the glove box to retrieve a

6   loaded .22 caliber pistol.

7       I found it unbelievable she could do that, and all of

8   these things could fall out on the floor, and the defendant,

9   who was standing there at the door, if she testified

10  correctly, didn't hear that, look in there to determine what

11  the heck was going on.

12      I found it unbelievable that Ms. Hallick would drive to

13  the killing field, if you will, when she had a loaded .22

14  caliber pistol under her, and not shoot the guy, when her

15  testimony was that Mr. Flynn was, by eyes, and other

16  movements, indicating, shoot this guy.  I find it unbelievable

17  that she would say, I'm too afraid.

18      Her whole description of this person absolutely was not

19  Crosley Green.  She had lied about smoking marijuana, and she

20  finally admitted that at the suppression hearing.  She had

21  been, in my opinion, spurned, because Chip had engaged in a

22  sexual relationship with another woman subsequent to a

23  relationship with her.  That was coming back to her, for

24  whatever reason.

25      I found it incredibly unbelievable that she would drive

1   that truck out of there, and not go to the hospital, which was

2   approximately a mile up the road, and lit up like the shuttle

3   launch pad, instead of going to some man's house, in some

4   obscure neighborhood at this time in the morning, that she

5   didn't know, for help.

6        There were clothes that were placed out on the ground.

7   They were matted down as if someone was going to go out in the

8   woods, and make love.  These were two young people.  You know,

9   the way that he was actually shot appeared to me to be more of

10  a ricochet, than anything else.  It didn't appear to be, you

11  know, some sort of fire fight where two people were shooting

12  at each other like that.

13       Her story was unbelievable because she said he dove out

14  of that truck, and would have, and by the way she described

15  it, he would have slid across the ground on his chest.  No

16  injury to his chest, no burns, no nothing.  It was a portion

17  of a round that actually lodged in him, that caused his death.

18       I found it unbelievable that when the law enforcement

19  finally arrived, that when they asked him who did it, he would

20  say, I just want to go home, I just want to go home.

21       Everything about what she said, the fact that she jumped

22  in the truck and sat there for some period of time, and this

23  person didn't approach and grab her, and there was a wound on

24  the deceased's leg.  I believe the tags of the wound

25  indicated, at first, that he might have been run over.  Her

STATE vs. GREEN;   10/28/03 - 10/29/03                          256

1    position was, she ran over the guy.  That didn't happen,

2    according to the medical examiner.

3        What happened was, that that wound was caused by a

4    dragging motion, and it was consistent with her dragging him

5    to get him to the truck, and not being able to.  The whole

6    thing was consistent with this thing being an accident, and

7    she not knowing what to do, and making up this story.  And I

8    implied that, without explicitly saying it to the jury.

9        I'm finished.  I'm sorry.

10       Q.   Don't be sorry.  Do you recall Deputy Wade Walker?

11       A.   I do.

12       Q.   You took his deposition, correct?

13       A.   I believe so.

14       Q.   He did not testify during the trial?

15       A.   I don't recall.

16       Q.   You don't recall calling this witness yourself?

17       A.   No.

18       Q.   Did you -- do you recall either his deposition, or

19   the statement that he had provided, back then, to the police,

20   that he provided?

21       A.   No, sir, I don't.

22       Q.   Well, if I showed you a copy of the deposition, and

23   also that statement, would it help refresh your recollection?

24       A.   Probably.

25       Q.   It's in Appendix P, of the 3.850.  You don't have

STATE vs. GREEN;   10/28/03 - 10/29/03                    257

1    that with you, or do you?

2         A.   I do not.

3         Q.   I'm not, at this point, asking you to read the whole

4    thing, but the topics I want to cover are, first, did you take

5    a deposition?  During the deposition, did he rely on the

6    report, that's page one there.  Did he also indicate that he

7    had some written notes in the form of, I think you call it a

8    notebook, or notepad, or something of that sort.  Did you do

9    anything to obtain those notes?

10        And then, I want to refer you to what Walker apparently

11   told FDLE investigators in 1999, which is also reflected on a

12   report that's included there.  Those are the topics I would

13   like to ask you about.

14        A.   I can probably clear up most of your questions by

15   saying, I don't have a specific recollection of speaking to

16   him in deposition.  The deposition transcript would speak for

17   itself in terms of whether or not he said he had other things

18   that might be pertinent to my inquire.

19        As I recall, there might have been some other notes that

20   he had.  I asked him to send them to me.  I don't recall

21   whether he did, or did not.  I'm unfamiliar with any testimony

22   that he gave to FDLE regarding his participation in this

23   investigation.

24        Q.   I don't have that it's testimony, but is present

25   there is a report, either by King or Ladner at FDLE, regarding

STATE vs. GREEN;   10/28/03 - 10/29/03                    258

1   their conversation with Deputy Walker.  I did show you that

2   note in the deposition in 2001, correct?

3        A.   I'm sorry, I was reading this, and didn't hear what

4   you just said.

5        Q.   Okay.  It was not -- I don't know that Deputy Walker

6   gave any testimony to, or even himself, a written statement to

7   FDLE in 1999.  What I do have is this report by King and

8   Ladner about their conversation with Deputy Walker.  I just

9   want to clear up that that's what it is.

10       A.   Do you want me to read it?

11       Q.   Just to glance at it.  If that helps refresh your

12   memory about this issue, at all.

13       A.   Okay.  I do recall Deputy Walker as being the one

14   that responded to the trailer park where Ms. Hallick was.  I

15   can tell you, right now, that if -- well, if you have

16   questions.

17       Q.   I do.

18       A.   I recall the statement, and I'm looking at what

19   Deputy Wade alleges Ms. Hallick said, and I can tell you, at

20   no time, did Ms. Hallick ever testify to me that was, in fact,

21   what occurred, in terms of this black male approaching, and

22   Chip making him leave.

23       What actually was testified to was that Ms. Hallick and

24   Chip were smoking dope in the car, and that this black male

25   came by, the window was down, and this black male gratuitously

1  said, you know, there are Brevard County sheriff's deputies

2  that patrol this area, you have got to be careful.

3      That was the end of it until Mr. Flynn had to relieve

4  himself.  At that time, he stepped out of the truck, and he

5  was accosted by this person.

6      If Ms. Hallick told the deputy that, that is news to me.

7      Q.   Also, the issue of who tied the victim's hands --

8      A.   Right.

9      Q.   -- is implicated in these documents.  Do you want to

10  go ahead and explain what I just said?

11      A.   Well, there was an issue regarding who actually tied

12  Mr. Flynn.  It was my recollection, and my whole theory was

13  that she, indeed, tied his hands.  As I recall her testimony,

14  she said that the defendant tied his hands, was in the process

15  of tying his hands, and as a result of that process, the gun

16  inadvertently fired into the ground.

17      By the way, a projectile was never found, nor was there

18  any indication that there was any such happening.  But I

19  believe it was her statement that he tied the hands of

20  Mr. Flynn.

21      Q.   This was your theory that she was the one that tied

22  him, correct?

23      A.   Absolutely.

24      Q.   Which would indicate that these documents,

25  apparently stemming from what Deputy Walker has to say, would

Case 6:14-cv-00330-RBD-GJK   Document 3-39   Filed 02/27/14   Page 65 of 100 PageID 1209

1    support your theory?

2         A.   Absolutely.

3         Q.   If you had known this information at the time of

4    trial, would you have used it?

5         A.   Oh, yeah, because that went to the heart of my

6    defense.  The heart of it that this was not a man who did

7    this.  She couldn't describe who this person was.  She said it

8    was a blur.  She said there was no way.

9         And interestingly enough, her fingerprints were on the

10   truck in the areas --

11            MR. WHITE:  Can I offer an objection to this

12        nonresponsive answer?

13            THE COURT:  Mr. Parker, just answer the

14        question.

15            THE WITNESS:  Yes, sir.

16            THE COURT:  Thank you.

17   BY MR. GRUBER:

18        Q.   I don't know if you mentioned it, but marijuana was

19   found in the jeans at the orange grove?

20        A.   I believe so.

21        Q.   The person that she drove to was named David Strupe,

22   I believe?

23        A.   I think that's correct.

24        Q.   Did you have any information that Strupe, or

25   Ms. Hallick for that matter, made an effort to check out the

1   truck for the presence of marijuana before, at least, close to

2   the time that the police were called?

3          MR. WHITE:  Objection to relevance.

4          THE WITNESS:  I don't.

5          MR. WHITE:  Objection to relevance.

6          THE COURT:  Overruled.  Go ahead, he can

7      answer.

8          THE WITNESS:  They would have had an

9      opportunity.  Did they, or did I inquire into that?

10     I don't think I did.

11  BY MR. GRUBER:

12     Q.   Did you make any inquiry as to whether either Strupe

13  or Mr. Flynn had any prior record with regard to drug

14  possession?

15     A.   You know, Mr. Gruber, I don't recall.  I want to say

16  I don't think so.

17     Q.   In particular, presuming that the documents that you

18  just looked at regarding Deputy Walker do provide evidence

19  that there was some offer to sell drugs involved in this

20  incident --

21         MR. WHITE:  Objection, your Honor, unless he

22     clarifies what document he's referring to.

23         THE COURT:  Why don't you be more specific?

24         MR. WHITE:  First referring to the 1999

25     statement that Mr. Walker gave FDLE, that would be

1       the issue.

2  BY MR. GRUBER:

3       Q.    That one, plus the one in 1999 -- well, the one in

4  1999, FDLE, plus the original report that Walker prepared,

5  side by side.  Together, they seem to indicate that there was

6  an offer to sell drugs involved in this case.

7            THE COURT:  Mr. Parker, did you have Deputy

8       Walker's report from the time of the incident?  Is

9       that the '90 report, or the '89 report?

10           THE WITNESS:  I want to say I did, but I can't

11      recall.

12           MR. WHITE:  Your Honor, I just ask that

13      Mr. Parker not accept his representation as to the

14      report reflecting anywhere that there was any drug

15      use.  I had to read it quickly.  I'm having to check

16      up on these representations quickly.

17           THE COURT:  I'd make an objection, Mr. White.

18           MR. WHITE:  I object to misrepresentation of

19      the facts.  This report does not indicate anywhere

20      that there was any drugs considered, involved in

21      this event.

22           THE COURT:  I thought the '99 report said

23      something about it.

24           MR. WHITE:  The '99 does.  Mr. Gruber is

25      representing now that the '89 report by Deputy

1    Walker indicates that, as well.

2        THE COURT:  I didn't get his question to be

3    that.  I think he said, take them both together, so.

4        MR. WHITE:  His questions are a little

5    difficult at times.  The implication is --

6        THE COURT:  Why don't you let Mr. Parker look

7    at it and tell us.

8        THE WITNESS:  I didn't see anything.  And what

9    I would consider the deputy's narrative that he did

10   at or about the time of this incident -- okay, if

11   she said that, if she told the deputy that this

12   black male offered to sell them dope --

13       THE COURT:  Which report is this?

14       THE WITNESS:  I'm looking at the FDLE

15   investigative report.

16       THE COURT:  '99?

17       THE WITNESS:  That's correct.  Judge, she did

18   not tell me that.  That was not in any of her

19   reports, statements, or tape recordings.  In fact,

20   she adamantly denied -- well, this Mr. Flynn getting

21   out of the truck, and making the black male leave,

22   in none of the reports.

23       She grabbed the pistol while they were at

24   Holder Park, not at some time later, in the orange

25   grove.  In fact, they were sitting on it during

STATE vs. GREEN;   10/28/03 - 10/29/03                    264

1          their drive to the orange grove.  She was.

2              MR. WHITE:  Are we responding to go a question?

3              THE WITNESS:  I'm sorry, I thought you wanted

4      me to compare these two.

5              MR. GRUBER:  I did.

6              THE WITNESS:  That's what I was doing.

7              MR. WHITE:  I thought we were comparing them as

8      to the issue of whether or not there was any mention

9      of a possible drug deal.

10             THE COURT:  That's what I thought it was, too.

11             THE WITNESS:  I apologize.  There was, in the

12     report by FDLE.

13     BY MR. GRUBER:

14         Q.   With regard to either one, I have the issue of the

15     drug deal, and the issue of the hand tying.  Are both areas

16     where you would have used this information to impeach

17     Ms. Hallick, is that true?

18         A.   Yes.

19         Q.   Is there anything else there you would have used?

20         A.   She indicated that it was the same black male in the

21     1999 report, and FDLE returned --

22             MR. WHITE:  Let's clarify for the record.

23     Mr. Walker says that she says.  Is that what we're

24     referring to, just so we can keep the record clear?

25             THE WITNESS:  Mr. White, I believe that's what

1    this report indicates.  Mr. Walker is telling FDLE

2    this is what Ms. Hallick told him.

3             MS. WHITE:  Just for clarity.

4             THE WITNESS:  I forgot where I was.  It seems

5    to indicate that she had some basis, in fact, to

6    believe that those two events were involving the

7    same black male.

8             I don't recall that.  Even under the facts of

9    the case that I represented Mr. Green on, I don't

10   recall her being able to ever say that it was the

11   same black male.  Of course, the retrieval of the

12   pistol appeared at Holder Park, and not after Holder

13   Park, or at the grove.

14            That's pretty much all I can see is distinct,

15   or different, from what I recall.

16   BY MR. GRUBER:

17        Q.   Do you remember your deposition of Mr. Walker?

18        A.   Do I recall it?

19        Q.   Yes, sir.

20        A.   I don't have a picture of it in my mind's eye.  I

21   know now that I talked with him.

22        Q.   I have a copy of it.

23        A.   Or was it a her?  I don't recall.  Was it a male, or

24   female

25        Q.   Wade Walker.

1    A.    Wade, yeah.

2    Q.    He was the first officer on the scene, correct, and

3  he did maintain contact with Kim Hallick while the other two

4  officers, Rixie and Clark, I think, went out and investigated?

5    A.    I was thinking of Sergeant Clark.  That's the

6  female.

7    Q.    And he did speak with Ms. Hallick about what

8  happened.  In fact, it will be rather odd if he didn't.  He

9  indicated that he made contemporaneous notes of that

10  conversation.

11    And as I've indicated earlier, he talked about some notes

12  he did not have with him at the time of the deposition.  Does

13  that recitation of facts refresh your recollection about that

14  issue?

15    A.    I believe that's correct.

16    Q.    Then you said you did make some inquiry about

17  getting ahold of those notes, and there is no further

18  follow-up?

19    A.    I don't recall following up on that.  That doesn't

20  mean I didn't call, or make an attempt, I just don't recall.

21    Q.    That's what I have on him.  With regard to

22  depositions in general, what is your understanding of the duty

23  of defense counsel on the completion of a capital case, with

24  regard to preparation of the record, and processing the

25  appeal?

1    A.   Well, I know -- I think I know what I did.  Whether

2  or not that's some sort of written mandate, I'm not clear on

3  that, but I know that there was an appeal filed, that I filed

4  it, that I wrote down the judicial acts to be reviewed, that I

5  requested that the Public Defender's Office be appointed for

6  purposes of appeal because Mr. Green was indigent.

7    Whatever file I had, I should maintain it because in

8  light of the death penalty, it would be essential for

9  appellate review, and further collateral attacks.

10    Q.   So you filed a notice of appeal, you filed a

11  judicial act, you filed the designations, directions that they

12  were appropriate, and --

13    A.   I think I filed a motion for -- I don't recall.  I

14  know I did those things that I testified to.

15    Q.   Motion for new trial?

16    A.   Yeah.

17    Q.   Normally, that would be filed after the verdict?

18    A.   That's correct.

19    Q.   Did you actually ever move to withdraw from this

20  case?

21    A.   No, not that I recall.

22    Q.   Was there ever any kind of --

23    A.   Other than when the case was concluded, of course,

24  and appointment of the public defender was established, I

25  believe I withdrew at that time.

STATE vs. GREEN;   10/28/03 - 10/29/03                     268

1       Q.    Do you know if you actually did?

2       A.    Now that you mention it, I don't know that I did.

3       Q.    Go ahead and say it.   I don't think you did.   I

4  think the public offender was appointed, but I don't think --

5            MR. WHITE:   Objection to the testimony from the

6       podium here.

7            THE COURT:   Sustained.

8  BY MR. GRUBER:

9       Q.    With regard to the preparation of the record for

10 direct appeal purposes, do you recall there ever being any

11 kind of formal, or informal meeting that involved you, the

12 purpose of which would have been to determine whether or not

13 the record was complete?

14      A.    A meeting with whom?   Well no, I don't recall that.

15      Q.    Do you know if depositions, any depositions, were

16 ever included in the record on direct appeal?

17           MR. WHITE:   Your Honor, objection to relevancy.

18           THE COURT:   Sustained.

19 BY MR. GRUBER:

20      Q.    I'm going to ask about the alibi defense now, and

21 that may go on for a while.

22           THE COURT:   Let's take a break, about 15.   Come

23      back about ten till.

24           (Whereupon, a brief recess was had.)

25 BY MR. GRUBER:

STATE vs. GREEN;  10/28/03 - 10/29/03                          269

1    Q.    You offered an affirmative defense?

2    A.    Correct.

3    Q.    I believe your only witness, in that regard, was

4    James Karns?

5    A.    There were other witnesses, I believe, after

6    Mr. Karns.  I believe after that meltdown, I didn't put any

7    other witnesses on though.

8    Q.    Did you have some others lined up?

9    A.    Yeah.

10   Q.    Who?

11   A.    There was a woman.  There were two women.  Mr. Karns

12   had gone to visit a woman where he was leaving work, and

13   ultimately, going to hook up with this female.

14   Q.    Carlene Brothers?

15   A.    Yes, I believe that's correct.  And then the fight

16   involving the knife, I believe, Mr. Karns found someone else

17   there at the house, left Ms. Brothers' home, and went over to

18   another woman's home.  I believe I was going to utilize her,

19   also.  But during the course of the -- well, there were two

20   others, but I don't believe I called them.

21   Q.    Carlene Brothers is the one I was going to ask you

22   about.  Was she actually present at the courthouse then?

23   A.    I'm pretty sure.

24   Q.    Can you state what the gist of the alibi was?

25   A.    That obviously, the defendant could not have

1  committed this particular crime because at the time that law

2  enforcement officials determined this actually occurred, based

3  on the circumstances, Mr. Crosley Green was at Ms. Brothers'

4  home, which would be verified by Mr. Karns, and Ms. Brothers.

5      And Mr. Karns, particular -- his testimony was

6  particularly good for me at the time because he was -- he had

7  never been convicted of a crime.  He was employed in a

8  business down in Rockledge, and he laid out, during

9  deposition, a time line that was believable, and apparently

10 air tight, to me.

11     Q.  It also was based on some work records.  Is that

12 true?

13     A.  That's correct.

14     Q.  And you had those?

15     A.  I did.

16     Q.  Was it also consistent with what Carlene would have

17 testified?

18     A.  Yes, but -- yes, it was consistent with what she

19 would have testified, but both witnesses were relying upon

20 Mr. Karns' presence.  That was the gist of their testimony.

21     Yes, Mr. Karns was present.  I don't know what time it

22 was, but he was present when this happened.  In terms of their

23 being able to set a separate time line, a time line in their

24 minds, I don't believe they could do that.  Am I clear?

25     Q.  Yes.  Mr. Karns, however, had work records that

STATE vs. GREEN;   10/28/03 - 10/29/03                    271

1   provided a point of departure as to when he did what he said

2   he did, thereafter?

3       A.   Or the time that he got off.

4       Q.   From work, he went to a Ulyssey Glover's residence?

5       A.   Yes.

6       Q.   Supposedly, there was a long distance phone call

7   from that residence?

8       A.   I believe so.

9       Q.   Is that where you felt that the alibi, as you said,

10  was a meltdown?

11      A.   He had confused, or at least on the stand, he had

12  confused some events.  During the deposition, the events and

13  the chronology of those events placed him at Ms. Brothers'

14  home, and having Mr. Green appear, and actually assist in

15  smoothing these ruffled feathers in the fight of Mr. Karns.

16      Now, I can't recall what those events were.  I remember

17  there was a phone call.  I also remember him talking about

18  taking a shower, cleaning clothes, pressing pants, knowing he

19  was going to go out, those sorts of things.  I can't recall

20  what that chronology was.

21      Q.   You spoke with Mr. Karns, obviously, before he

22  testified, correct?

23      A.   Several times.

24      Q.   He did give a deposition, or did you talk to him

25  before he gave his deposition?

1     A.    Yes.

2     Q.    Did the issue of phone records come up during the

3  course of the deposition?

4     A.    It did, now that I recall, yeah.

5     Q.    What, if anything, did you do in preparation of the

6  case, with regard to phone records?

7     A.    Let's see, we investigated -- he said he was

8  speaking with someone.  I want to say it was in Georgia, that

9  it was long distance, and we sought those phone records.

10  However, there was -- there seemed to be a glitch in

11  establishing a particular call he was talking about, in terms

12  of establishing that it actually occurred at the time that he

13  said it occurred, or that it actually occurred, at all.

14     I don't recall what the outcome of that portion of my

15  investigation was.  I don't recall.  Something to do with -- I

16  just don't recall.  I know that we looked into it, I don't

17  recall it being anything that helped us, and I believe

18  probably on cross-examination, it may have indeed hurt us to

19  some degree.

20     Q.    That's what I was going to ask.  Did the State use

21  phone records in impeaching Mr. Karns?

22     A.    I think so.

23     Q.    You said you did investigate it.  Did the State

24  introduce any evidence in trial, that you were unaware of?

25     A.    I have no recollection of being surprised by

1    anything that the State introduced, particularly, on that

2    issue.

3        Q.    What was the problem with Mr. Karns' testimony?

4        A.    He had consistently told this chronology.  It took

5    me so many minutes, and I got off at this time.  I went

6    directly to my car, or truck.  I drove directly to Ulysse's

7    home, where I was staying.  I then took a shower.  It took me

8    this long, you know, on and on.

9        When he was on the stand, and prior to going on the

10   stand, I said, Mr. Karns, because he was nervous, I said, All

11   you do is tell the truth.  I will never forget this as long as

12   I live.

13       When I asked him to go through the chronology, he

14   stopped, he looked around, and he said, You know, I'm sorry,

15   Mr. Parker, you told me to tell the truth, and you know what,

16   that's not the way it happened.  It happened this way.  There

17   is was.  That was it.  It was over.  That screwed the

18   chronology to the extent that he couldn't have been at

19   Ms. Brothers' house at the time he said he was.

20       Q.    This conversation occurred prior to his taking the

21   stand?

22       A.    No, while he was on the stand.  When I'm talking

23   about meltdown, I'm talking about that moment.

24       Q.    Was it connected with telephone records?

25       A.    I can't recall.

Case 6:14-cv-00330-RBD-GJK   Document 3-39   Filed 02/27/14   Page 79 of 100 PageID 1223

1      Q.    In essence, the phone call would occur from

2   Mr. Glover's residence, to this girlfriend, right, and it

3   would have occurred on April 3rd. Does that refresh your

4   recollection at all?

5      A.    I know there was a phone call.  I don't recall it

6   being a girlfriend.  I thought it was a relative, or

7   something, but it may have been a girlfriend.

8      I recall that there was a phone call, and it was on

9   Mr. Glovers, and I remember we were really after Mr. Glover's

10  records.  I remember that.  I don't remember that being the

11  particular event that he had switched around, or whatever.

12     Q.    Do you recall whether you, in fact, have records of

13  long distance toll calls to and from Mr. Glover's residence,

14  on April 3, 1989, prior to -- well, do you recall if you ever

15  had it?

16     A.    I believe I did.

17     Q.    Do you know whether you had it prior to the

18  deposition of Mr. Karns?

19     A.    I did not.  I don't believe I did.

20     Q.    Do you recall whether you had them prior to the

21  trial testimony of Mr. Karns?

22     A.    I'm pretty sure I did.

23     Q.    Do you recall a question, during the course of

24  cross-examination of Mr. Karns, to actually whether you had

25  secured phone records supporting the existence of such a call

1   on April 3rd?

2       A.   Like I said, I believe that whatever records I had,

3   did not support that.  I believe there may -- certainly, that

4   would have been an object of cross-examination.

5       Q.   Did you endeavor, yourself, to obtain such phone

6   records, or do you know if any were provided to you by the

7   State?

8       A.   It seems the State also provided me with records

9   pursuant to subpoena.  I want to say, Mr. Gruber, that

10  Mr. White and I talked about it, and he said, Well, listen,

11  save your money.

12      I said, Look, if we could save some money, you're going

13  to subpoena him, right?

14      Yeah.

15      Okay, well let me know when you get him.  That seems to

16  me that might have been what happened, as opposed to me

17  sending an investigator, and actually giving the subpoena

18  myself.

19      Q.   As a matter of general strategy, is it true that in

20  working with Mr. Karns in preparation for any event in the

21  trial deposition, the trial itself, that in establishing the

22  time line for the alibi, that great emphasis was placed on

23  this long deposition phone call?

24      A.   I don't know that any more emphasis was placed on

25  the phone call than, say, the time that it took him to get

1   from his work, to Mr. Glover's house, or the time he was in

2   the shower, the time it took him to press his pants.  They

3   were all relatively important to me.  The problem became, with

4   the phone call, I believe, as I recall, there may have been --

5   there could have been a problem with the switching system in

6   that particular locale.  There was any number of reasons why

7   that might not have shown up on the phone records.

8        I don't remember thinking, as a matter of strategy, that

9   this was going to be so damning, that his testimony would be

10  unbelievable, as long as he stayed on that time line.

11       Q.   What I was asking was, did it, in fact, turn out to

12  be so damning?

13       A.   You know what, the jury found him guilty, and

14  recommended death by eight to four.  All I can tell you is, I

15  presume something was pretty damning in that trial.

16       I don't think it was the nonexistence of that.  I think

17  when Mr. Karns stopped in the middle of his answer, and said,

18  Wait a minute, Mr. Parker, that's not what happened.  I

19  remember now.  What happened was, I did this first, or, I mean

20  it was like the jury, you know, you could just -- the whole

21  thing to me went to pieces.

22       Q.   Would that event have been reproduced on the record,

23  do you know?

24       A.   Well, yeah, should have been.

25       Q.   By way of a pause, and some sort of retraction by

1   Mr. Karns?

2        A.    I'm sure.  As I really, he said, Wait a minute, wait

3   a minute, that's wrong, or something to that effect.

4        Q.    Do you recall whether that occurred during the

5   course of cross-examination, but after he was asked whether or

6   not you had secured certain phone records after the

7   deposition, but prior to the trial?

8        A.    Say that again, please.

9        Q.    Do you recall whether that particular event that

10  you're describing during the course of the trial --

11       A.    Right.

12       Q.    -- occurred during Mr. Karns' cross-examination, and

13  after he was asked a question about whether or not you had

14  secured telephone records after his deposition, but prior to

15  the trial?

16       A.    If we go to the trial, Mr. Karns' recollection

17  appeared to improve during direct examination by me, of him.

18  It went to hell on my direct examination.  I could do nothing.

19  I certainly didn't want to draw attention to it anymore than

20  it already was, but I just stood there, and tried to continue

21  as best I could, to establish that Mr. Green was, indeed, at

22  Ms. Brothers' house at that particular time, and we couldn't

23  do it.  Not on direct.

24       Q.    Did substance -- did the substance of Mr. Karns'

25  testimony about what occurred at Carlene Brothers' house

278

1  change?

2       A.    Un-un.

3       Q.    Was that consistent with what Carlene Brothers had

4  told you about, what occurred there?

5       A.    Yes, sir.

6       Q.    Not as far as the specific times that things

7  occurred --

8       A.    I understand.

9       Q.    The event that happened.

10       A.    I agree.

11       Q.    Well, why didn't you secure telephone records, prior

12  to Mr. Karns giving a deposition?

13       A.    I had telephone records, to my recollection, so I

14  believe I did.  Whether I did it by my own subpoena through

15  the Court, or whether I took records from the State and

16  verified the phone call from the people up north, I can't

17  recall whether that's what happened.

18       I want to say that I got records from the State, but I

19  just don't recall, Mr. Gruber, I'm sorry.

20       Q.    Generally, well, according to both Mr. Karns and

21  Carlene Brothers, there was some sort of argument that

22  occurred the night of April 3rd --

23       A.    Yes, sir.

24       Q.    -- and Crosley had some participation in that

25  argument?

1    A.   As I've testified before.

2    Q.   And then some events occurred later on that day,

3    which would be April the 3rd, that occurred at Carlene

4    Brothers' house.  Do you recall anything about what her

5    testimony would have been about that?

6    A.   You talking about the flat tire?

7    Q.   Yeah.

8    A.   I recall that there was testimony of the flat tire,

9    that she asked the defendant to assist in changing it, I

10   believe.  I believe that was done.

11        You know, I may be confusing it, but it seemed there was

12   something about the car having to be driven somewhere.  I

13   don't recollect.  I don't have a clear recollection of all the

14   facts regarding the car, and the changing of the tire.

15   Q.   It is your recollection that Crosley Green was

16   present at that house during the course of the day.  I forget

17   whether I said what date that was, but that would have been on

18   April 4th correct?

19   A.   He slept, and woke up, and was there until, I

20   believe, two in the afternoon.  I think the gist of it was

21   that law enforcement officers had driven through the parking

22   lot, actually looking for him, and that he was there.  The

23   implication was, I need to rebutt the fact that he had fled,

24   and he was actually there, or would have been there at the

25   time that these deputies came through, if I think that's

1   correct.

2        Q.   Well, does the name, Officer Copenhaver --

3        A.   Yeah, that does ring a bell.

4        Q.   Do you recall what his participation would have been

5   in those particular events?

6        A.   He was the deputy, I believe, that came through the

7   parking lot.  He was familiar with that area.  He would drive

8   through, often.

9        I believe there has been testimony that Mr. Green had

10  been wearing, in April, a field jacket, some sort of Army

11  field jacket.  That particular type of wear was very common in

12  that particular community, it wasn't unique.  He had seen

13  several people wear that kind of garment before.

14       Q.   Is it your recollection that Copenhaver was showing

15  this composite that had been prepared earlier?

16       A.   I don't have a recollection, but that could be true.

17       Q.   In fact, perhaps that was the purpose of his being

18  there.

19       A.   That may, indeed, be the case.

20       Q.   The testimony from Carlene would have been that

21  Crosley was there, correct?

22       A.   That's correct.

23       Q.   Generally, Carlene's testimony would have been

24  consistent with Karns' testimony about what occurred earlier

25  at Carlene's house.

1    A.    About those events, absolutely.

2    Q.    So -- well, two points.  First of all, through

3  Officer Copenhaver, you -- well, you generally have testimony

4  that would have been consistent with your overall theory of

5  alibi?

6    A.    Sure.

7    Q.    And also, you had testimony through Officer

8  Copenhaver, and through Carlene, that would have addressed the

9  issue of flight.  Isn't that true?

10    A.    Yes.

11    Q.    Why did you not call Officer Copenhaver?

12    A.    I don't know that I didn't.  I don't know.  I don't

13  recall.

14    Q.    I can be wrong.

15    A.    It seems to me, he was called.  Whether I call him,

16  or the State did, I'm not sure.

17    Q.    I would have hated to make a mistake like that, but.

18    A.    It may have been at deposition.

19    Q.    At this point, you simply could not give an answer

20  to the question of why you did not call Copenhaver?

21    A.    I can't recall other than no, I can't.  You know,

22  thinking about it, it was my impression that Mr. Karns

23  meltdown was so damaging, that to pursue -- to continue to

24  pursue this, just didn't carry any validity with the jury.

25  That's my recollection.

STATE vs. GREEN;   10/28/03 - 10/29/03

282

1     That's why I didn't call the other two ladies, which may
2 have been the reason why I didn't call the deputy.
3     Q.    Two ladies, was one Brenda Barry?
4     A.    I don't recall.  I don't recall her name.  I can see
5 her, but I don't recall her name.
6     Q.    Does the name ring any bells, at all?
7     A.    Brenda, but Brenda was working with me at the trial,
8 so.
9     Q.    Did you anticipate the flight instruction?
10    A.    Uh-huh.  I anticipated the request.  I'm not sure
11 that I believed the judge would give it, but he did.
12    Q.    What, if anything, did you do as far as factual
13 preparation to challenge the flight instruction?
14    A.    I don't recall, Mr. Gruber.  I just don't recall.
15 Well, that's not true.  We traveled -- is it Bennell that's
16 north of here, up through Daytona?  I got in my car with my
17 investigator, we traveled up and down the coast, and all the
18 orange groves, because it's my recollection that Mr. Green and
19 I spoke about him leaving the area to pick fruit as a migrant
20 worker.  That's why he left, and that's why he went up the
21 coast.

22     I believe he told me it was Bennell, and Mr. Cook and I
23 got in our vehicle, we went to the law enforcement authorities
24 at Bennell, on up into Volusia, I believe, and they designated
25 all of the migrant workers, or as many of the migrant camps as

1   they could, gave us directions, and we went out and spoke with

2   these people, took statements from everybody, showed

3   Mr. Green's photograph, asked if they knew him, if they

4   remembered him, if they talked with him, and we found nothing.

5        Q.   Let me ask, generally, did you ever obtain, if you

6   recall, any type of police reports, virtually any names here

7   that would indicate any, I'll call it a Crosley sighting,

8   after the events of April 3rd and 4th?

9        A.   I don't recall.  It seems in my mind's eye, I have

10  some recollection of Bob Rubin, who was his parole officer,

11  involved in what may have been a sighting of this person, of

12  Mr. Green, but that person got away, it seems, like on the

13  violation of parole, or whatever.

14       Q.   You know when that would have occurred?

15       A.   During the course of my investigation.  I don't

16  recall when it would have occurred.

17       Q.   When the so called sighting would have occurred with

18  Mr. Rubin?

19       A.   No, I don't.

20       Q.   Let me show you what's in the record as Appendix G,

21  which is a police report that appears to indicate such a

22  sighting on April 9th.

23       A.   By Mr. Curtis?

24       Q.   Is that what it is?

25       A.   Let me see.  Let me read it.  To answer your

Case 6:14-cv-00330-RBD-GJK   Document 3-39   Filed 02/27/14   Page 89 of 100 PageID 1233

1    question, I don't believe I had this information.

2              MR. WHITE:   Could I see that, Mr. Gruber?

3              MR. GRUBER:   Sure.

4    BY MR. GRUBER:

5         Q.   As I said, that's the one from the appendix.   You

6    did call Celestine Peterkin, right?

7         A.   I attempted to.

8         Q.   You did?

9         A.   Did I call her?

10        Q.   According to the transcript, yes.

11        A.   During the guilt phase?

12        Q.   Yes.   Do you recall why you called her?   It looks as

13   if it was to affect some sort of rebuttal of Sheila Green's

14   testimony.

15        A.   If that's what the record establishes, then that's

16   what it would have been.

17        Q.   Did you speak with Celestine prior to the trial?

18        A.   Oh, yeah.

19        Q.   Did you ever discuss with her the issue of flight?

20        A.   I don't know.

21        Q.   Let me ask you about the dog track evidence.   You

22   did litigate that pretty vigorously?

23        A.   Tried to.

24        Q.   Generally, what do you think was the outcome of your

25   efforts to challenge that evidence?

STATE vs. GREEN;  10/28/03 - 10/29/03                              285

1        A.    The outcome, in terms of?

2        Q.    Whether it was persuasive on behalf of the State, or

3   not?

4        A.    I didn't find it so, particularly in light of the

5   other circumstances, because the dog tracked all the way

6   around the field, basically followed the tracks of this

7   purported person to the intersection where about the time the

8   dog -- there was some other dogs in Ms. Peterkin's driveway,

9   this dog started barking, and this dog reacted to that.

10       That was in conjunction with the fact that they took

11  either that same dog, or another dog, out to the orange grove.

12  There was no scent picked out at the orange grove.  It

13  sounded, in my mind, that it would be faulty information.  I

14  didn't believe the jury would rely upon it.

15       Plus, understand that my point was that they couldn't

16  establish whose scent pad that actually was.  And without

17  that, particularly in light of the fact that Ms. Hallick had

18  described brown work boots as the perpetrator was wearing, and

19  these were obviously tennis shoe prints, it was -- I just

20  didn't believe it hurt, helped, did anything, for anybody.

21       Q.    Was it your recollection that it was the same dog

22  that was brought out to the orange grove, and detected

23  nothing?

24       A.    I think that's what it was, but I can't recall.

25       Q.    The dog's name was Czar?

1    A.   I remember Czar.

2    Q.   During the course of -- well, before the testimony

3  was admitted, you made an objection to the introduction of the

4  testimony, correct?

5    A.   I did.

6    Q.   And there was a fairly extensive discussion of that

7  out of the presence of the jury?

8    A.   Yes.

9    Q.   And the judge ruled against you on the objection?

10   A.   Right.

11   Q.   During the course of that, do you recall the judge

12  making a comment about bringing the matter up pretrial?

13   A.   He did.

14   Q.   Why didn't you?

15   A.   I did.  I filed a motion, and I withdrew the motion

16  prior to the trial, and I did that tactically because I felt

17  like I had a really good shot at keeping that out.  I withdrew

18  the motion in an attempt to put some pressure on the State and

19  the judge at that time.

20       The judge then heard the motion, in spite of the fact

21  that I withdrew it.  I'm not sure what good that actually did

22  anybody, but I knew that I had presented what I thought was

23  overwhelming reasons to suppress the identification, and that

24  by litigating this well ahead of time, that the judge ruled

25  against me.  I was hopeful that if I could strike, and put

STATE vs. GREEN;   10/28/03 - 10/29/03                    287

1   some pressure on him, maybe I would get a favorable ruling.

2   Why I was thinking that, I can't tell you.

3       I knew that they didn't have a scent pad.  Again, I was

4   -- well, I disagreed with the Court's ruling, obviously.

5       Q.   Odell Keiser was the dog handler at the time, right?

6       A.   He was.

7       Q.   You deposed him prior to trial, correct?

8       A.   I did.

9       Q.   During the course of the deposition, there was a

10  discussion about what records you had, and what didn't have.

11  Mr. White was present.  Do you recall that?

12      A.   I seem to.

13      Q.   It appears that some records you did have, and some

14  you did not.  Is that true?

15      A.   You know, whatever is on that particular transcript,

16  would be the answer.  I don't recall.

17      Q.   There's a place called, I think, the Criminal

18  Justice Institute, or something like that, that involved the

19  training of the dog?

20      A.   Okay.

21      Q.   Do you recall anything about that?

22      A.   I remember that there was another place in Florida,

23  or somewhere else, where the dog was actually trained outside

24  of Brevard County.

25      Q.   There is an indication that there were records there

1    that were not available -- were not in the possession of

2    either you, or Mr. White.

3        A.   As I understand it.  You know, Mr. Gruber, we have

4    had this discussion, to some degree, before.  I don't know

5    whether I'm recollecting that discussion with you, or whether

6    or not I have a clear recollection of those records, me

7    knowing that they were somewhere else at the time of the

8    deposition of Mr. Cook, or thereafter, or before.

9        Q.   Well, in any event, if, in fact, there was some

10   records out there that you did not have, do you recall making

11   any effort to get those additional records?

12       A.   I don't have a recollection of that.

13       Q.   During the course of the testimony, Odell Keiser's

14   testimony, do you recall a discrepancy between what his

15   testimony was, and what was in his report that you had?

16       A.   To answer your question, I do not recall any

17   discrepancy between what he said and what was in the report.

18   I don't have a recollection of that.

19       Q.   You don't recall cross-examining him on that issue?

20       A.   I recall cross-examining him, but as to that point,

21   I don't recall.  I can't tell you what it was I cross-examined

22   him on, what the issue was.

23       Q.   Do you recall him saying that he had written the

24   report in a hurry, and he had his original notes in his back

25   pocket?

1    A.   Was this at deposition, or during the trial?  That

2 may indeed be the case.  If you can tell me more, maybe it

3 would refresh my recollection.  Is there a transcript?  I can

4 look at that.

5    Q.   Unfortunately, I didn't make a note of the location,

6 so.  I might be able to come back to that in a little bit.

7    A.   Okay.

8    Q.   Do you recall any testimony regarding whether it

9 looked as if the individual that the dog was tracking had

10 either gotten into, or come out of a vehicle?

11    A.   There was some discussion about that.  I believe Ms.

12 Hallick testified there was a car she heard stop, something

13 she recognized to be a car.  That information, as I recall,

14 was, if I'm correct, was introduced to show that -- I do

15 recall that.

16    I don't know anything more than that, at this time,

17 without looking at those, the transcript.

18    Q.   The State's theory was that Crosley Green was at

19 Holder Park earlier that day, and presumably he went back to

20 Celestine Peterkin's, and the dog tracked in that area.  Is

21 that a fair statement?

22    A.   I think so, yeah.

23    Q.   The State introduced testimony that there was a

24 Robert Lewis who lived, I think, a house away from Celestine

25 Peterkin.

1      A.    That's correct.

2      Q.    Robert Lewis had been seen with Crosley Green.   Did

3  you operate on a theory that the dog may have been tracking

4  Mr. Lewis?

5      A.    I didn't operate on that theory, necessarily, as I

6  did that it might have been, actually, Mr. Lewis that did this

7  act.  Mr. Lewis was mentally challenged, as I recall.  I went

8  to speak with him because evidently, there had been some

9  statements that he had made, allegedly, that he recalled the

10 color of the truck.

11     There was some other information that seemed to be

12 emanating from him that indicated that he may have been the

13 one that actually did this.  The more I talked with the young

14 man, the more I realized that he was just -- he would say

15 whatever.  He just -- I ruled him out based on my

16 conversations with him, and parents, and/or the caretaker,

17 whoever it was.

18     Q.    So as far as the theory that the dog was actually

19 tracking Mr. Lewis, you did not pursue that theory?

20     A.    I did not do that, no, sir.

21     Q.    What evidence that the individual that the dog was

22 tracking, got either in or out of the vehicle, been

23 inconsistent with the State's theory of the case?

24     A.    Say that one more time.

25     Q.    What evidence that whatever individual was being



1    tracked by the dog, got into or out of the vehicle, would that

2    have been inconsistent with the State's theory in the case?

3         A.    Which vehicle?

4         Q.    A vehicle.

5         A.    Well, not necessarily.  Particularly, if, in fact,

6    the State was correct that Mr. Green was the perpetrator,

7    Mr. Green had actually worked the game, that evening, I

8    believe.  He was an umpire.

9         That was a common cut through.  That was where everybody

10   from that neighborhood would cut through going to Holder Park.

11   It was common that people would park there.  Mr. Green, if it

12   were indeed him going through and back to Celestine Peterkin's

13   house, could have occurred earlier, I don't know.

14        I can't recall right now what the car was all about.  It

15   had some importance to the State, the noise of the car.

16        Q.    Well, the point I'm trying to make is --

17        A.    He could have walked through there a bunch of times,

18   if it were indeed him, and still met up with some people, saw

19   them there, got in a car, come back, and the dog could still

20   track to Celestine Peterkin's house, not withstanding the fact

21   that someone delivered him in a car, at some point in time.

22        Q.    In introducing this evidence, the State -- if you

23   recall, did the State generally propound that the dog had been

24   through a great deal of training, and had been certified, and

25   things of that nature?

1     A.   Sure, they laid the appropriate record.

2     Q.   Did you challenge that testimony at all?

3     A.   Whatever the record says, Mr. Gruber, it would be

4  what I did.

5     Q.   You recall looking at these dog track records during

6  the deposition that we had back in 2001, correct?

7     A.   Yes.

8     Q.   They're voluminous, right?

9     A.   Yes.

10     Q.   It looks like there are some points during the

11  records, at any rate, it looks as if the dog failed, at least

12  the word failed is used on several occasions.  Do you recall

13  that?

14     A.   What I recall is the dog stopping, reorienting

15  himself, and then pursuing the track.  That's what I recall

16  those records showing.  Anything that indicated to me that the

17  dog failed in the track, but that there were interruptions,

18  and that the dog had to reorient himself until he picked up

19  that track again, and would follow that track.

20     Q.   Do you recall the use of the word fail in these

21  records, either fail, or failed, or some form of speech?

22     A.   If I said that, if that's in my testimony, Mr.

23  Gruber, than I did.

24     Q.   In the records themselves, is what I'm asking, if

25  you recall the use of that word.

1      A.    I have no recollection of that.

2      Q.    You thought you consulted with Sam Bardwell on this

3  matter?

4      A.    I thought I did.

5      Q.    Well you said that you did.

6      A.    I did.

7      Q.    Did you show him any of the records related to the

8  dog?

9      A.    I can't recall.

10     Q.    Do you recall running --

11     A.    I probably would have, but I just don't recall.

12     Q.    Mr. Bardwell is an attorney, correct?

13     A.    Yes, sir.

14     Q.    I mean, I don't know him.  Was he involved in a case

15  involving dog tracking, or some other form of litigation like

16  that?

17     A.    He's relatively notorious in our community because a

18  young woman was brutally stabbed to death by an alleged

19  person, and there was a dog tracker by the name of

20  Mr. Preston.

21        Mr. Preston had, I believe, a German Shepherd.

22  Mr. Preston had traveled the country using the dog in solving

23  cases.

24        In any event, Mr. Bardwell, I believe it's before Judge

25  Goshborn (phonetic) at the time, litigated that issue really,

1   really well.  Found out that Mr. Preston, evidently, had

2   perpetrated certain frauds on his resume.  During the course

3   of watching the dog work versus a dog that was trained to do

4   such a thing, you know, in laymen's terms, it appeared the dog

5   wasn't tracking.  It was going wherever Mr. Preston took it.

6        So ultimately that, as I recall, the dog was asked to

7   sniff various knives brought into a courtroom, and evidently,

8   picked out an appropriate knife that belonged to, or was found

9   with the defendant, and solved the case.  Ultimately, it was

10  reversed.

11       Q.   Do you know if Bardwell utilized an expert at all

12  with the dog track evidence?

13       A.   I believe he did.

14       Q.   Did he refer to that when you consulted him with

15  regard to this case?

16       A.   I knew that he had consulted with an expert.

17  Whether or not he offered up and said, you need to get this

18  guy, I don't recall that, but you know, I certainly had that

19  opportunity, was aware of the person, and did not seek to have

20  him hired, if you will.

21       Q.   Do you know anything about an anonymous call to Jess

22  Parrish Hospital?

23       A.   I recall now.

24       Q.   Do you recall the gist of it?

25       A.   It seemed to me that after Chip had been transported

1    to the hospital, there was a telephone call, allegedly to Jess

2    Parrish, and the gist of it was, going to come there, and

3    finish the job, or something like that.

4        Q.   So you do now.  Did you know about it then?

5        A.   You know, I don't think so, Mr. Gruber.  You know, I

6    may have been aware.  I may have been.  I don't recollect,

7    though.

8        Q.   The report came from an Officer Mike Boil.  Does

9    that refresh your memory at all?

10       A.   No.

11       Q.   Do you recall ever seeing a police report of any

12   kind by Officer Boyle?

13       A.   You know, it seems like I did see a police report.

14   Whether or not it's from Officer Boil, I don't recall.

15       Q.   Do you recall when you saw that in the course of the

16   proceedings, when he denied he showed it to you?

17       A.   That's what I may be confusing.  I just don't

18   recall.

19       Q.   Knowing what you know about the case, if that were

20   true, would that be inconsistent with other facts in the case?

21       A.   Well, as I sit here today, I can tell you that my

22   initial thought is, you know, I don't see that as being

23   something that's going to fit into my defense, as I knew it,

24   there was a telephone call, okay, I'm going to come and finish

25   the job.  That in and of itself, I just know.