# Exhibit 36-B

1      Q.   Would it be consistent with the State's theory of

2   the case?

3      A.   Well it would be consistent that somebody attempted

4   to kill him, knew that he was alive by some way, and was going

5   to come and take care of it again.  So I suppose it could be.

6      Mr. Flynn was, I believe he was deceased at that time.

7      Q.   I think on the way in.

8      A.   Well, according to the testimony, he was -- there

9   was not much that could be done while he was there in the

10  orange grove.  It was some 45 minutes later that medical staff

11  arrived.  It was a real tragedy.

12      MR. GRUBER:  I'm going to ask about, just about

13      the circumstance of Sheila's affidavit.  That

14      shouldn't be too long.

15      THE COURT:  Okay.

16  BY MR. GRUBER:

17      Q.   The recanting affidavit from Sheila Green, you

18  recall that, of course?

19      A.   Yes, sir.

20      Q.   What were the circumstance of that?

21      A.   I received a call from Mr. Becker at the attorney --

22  I'm sorry, that he was handling the appeal.  He called

23  inquiring of whether or not -- he was handling the appeal.

24  The arguments had been made.  At some point in time, he called

25  me and said that he had this particular affidavit from Sheila

1  Green recanting.

2      I said, Holy cow, you know?  And then he asked me if I

3  had the original.

4      I said no, I do not have an original.  I don't know what

5  you're talking about, other than you calling me, and telling

6  me this.  I said, well, you need to file something so that we

7  can bring this to the Court's attention before there is some

8  sort of ruling.

9      I remember I was really disappointed.  He said, Well,

10  there is nothing I can do, or words to that effect.  I was

11  angry.  So I then said, Send it to me.  I filed some paperwork

12  in the Trial Court.  And at that time, Mr. White educated me

13  as to the jurisdictional problem.

14      We showed up in front of Judge Stein, I believe it was,

15  and there had been no relinquishment of jurisdiction from the

16  Supreme Court back to the Trial Court to hear any issue, at

17  this point in time, based on this recantation, and that the

18  Court, was evidently at a point in time where an opinion was

19  forthcoming, and I didn't proceed any further because I was

20  calling the Court about every three or four days, or five

21  days, or weekly, trying to find out where the opinion was, how

22  soon, that sort of thing.

23      So pretty much in terms of any further effort, at that

24  time, for a new trial, I didn't do anything.

25      Q.   You were off the case, as far as you were concerned,

1   at that point anyway?

2        A.   I was not officially assigned to the case, but in

3   terms of -- I was gratuitously -- I was angry, and felt like

4   this needed to be done, so I did it.

5        Q.   Did you actually receive the affidavit in question?

6        A.   I did, a copy.

7        Q.   A copy.  So do you know where the original went?

8        A.   Never saw the original.

9        Q.   Was there an issue about an affidavit disappearing,

10  of being destroyed, in some fashion, or flushed?

11       A.   You know, I'm sure that was an issue.  I recall

12  contacting the Federal prison in Kentucky, and speaking to the

13  person who then identified herself as Sheila.  I said, Where

14  is the original?  What happened?  I need this.  And I said,

15  Can you execute an original, and send it to me?

16       And she said, Yes.  I never got it.  I made attempts to

17  contact her again at the prison.  She would not take my calls,

18  or was precluded, or was stopped from taking my calls.

19       Q.   Did you have any official relationship with Sheila

20  Green as an attorney, or anything of that sort, to your

21  knowledge?

22       A.   No.  Other than the attorney representing her

23  brother, who cross-examined her.

24       Q.   Well at that point, did you still have a copy of the

25  affidavit?

1    A.   I believe I did.

2    Q.   What did you do with it?

3    A.   I filed it with the motion.   I filed a copy with the

4 motion, certified a copy to, I believe the State, certainly

5 would have done that, and retained a copy for my records.

6    Q.   Then you withdrew the motion because jurisdiction

7 still remained in the Florida Supreme Court?

8    A.   We got actually into the courtroom and Mr. White

9 showed me some cases.   I recognized it.   We explained that to

10 the judge, and it was deferred.   There was no prejudice to me

11 refiling the motion at a future date.

12        MR. GRUBER:   What I have here would probably

13    finish up, and would go longer than 15 minutes, in

14    the neighborhood of a half an hour, or so.

15        THE COURT:   You want to break now for lunch?

16        MR. GRUBER:   Sure.

17        THE COURT:   Let's get a lunch break, and come

18    back at 1:15.

19        (Whereupon, a lunch recess was had.)

20        THE COURT:   Ready to proceed?

21        MR. GRUBER:   Yes, sir.

22 BY MR. GRUBER:

23    Q.   Some follow-up questions I thought about.   How much

24 did you bill, per hour, in this case?

25    A.   Oh, my.

1      Q.   Was it $50.75, or something like that?

2      A.   I think it ended up being something like $50.00 an

3   hour.  That's my best guess.

4      Q.   There was some kind of challenge to the total.  Do

5   you know what that was about?

6      A.   I know that when they went through it, I had a

7   computer system, I did a lot of the typing of my own process,

8   and things of that nature.  When I billed it to them, they had

9   refused to pay it because they said that's not attorney's

10  work.  That kind of work had to be subsumed into your hourly.

11  I hit the ceiling.

12     Q.   Okay.

13     A.   They carved about $7,000 off the top.

14     Q.   In the Preston case that you talked about, it

15  appeared that the case, or at least the part you described it,

16  the way you described it, turned on the credibility of the dog

17  handler.  Is that an accurate statement?

18     A.   I believe, yes.

19     Q.   Did you request Internal Affairs, report Odell

20  Keiser?

21     A.   No.

22     Q.   When you went into this case, when you started the

23  trial, you were reasonably confident.  Is that a fair

24  statement?

25     A.   Yes.

1       Q.  Were there -- what could be described --

2       THE COURT:  Competent, or confident?

3       MR. GRUBER:  Excuse me, confident.

4       THE WITNESS:  I would like to think I was both,

5    Judge.  I was confident, yes.

6  BY MR. GRUBER:

7       Q.  Were there, what might be described as turning

8  points in the case?

9       A.  Well, Sheila's testimony, Mr. Karns' testimony,

10 that's what sticks out in my mind.

11      Q.  As a result, or at least after Sheila's testimony,

12 did you engage in plea discussions?

13      A.  I did.

14      Q.  Was that prompted by Sheila's testimony?

15      A.  It was.

16      Q.  Up until that time, had there been any plea

17 discussions in the case?

18      A.  The only plea discussions were had between myself,

19 and I think it was Mr. White, and Mr. Williams, when we would

20 go over to FDLE to depose some of the FDLE analysts.  They

21 were hinting at a plea as charged to 1st Degree murder,

22 waiving death, and I think I was somewhere around

23 manslaughter, and we were arguing, friendly argument, back and

24 forth about how they were going to lose the case.

25      Q.  After Sheila's testimony, some plea negotiations

1    occurred?

2        A.   That's correct.

3        Q.   Just before we reconvened here, I showed you some

4    excerpts from the trial.  Have you had a chance to look over

5    those?

6        A.   Yes, sir.

7        Q.   One of them concerned what we talked about an hour

8    or so ago, with regard to the dog, and the testimony of Odell

9    Keiser.  For the record, it's pages 1344 through 1346 of the

10   trial transcript.  Did that refresh your recollection, at all,

11   with regard to what occurred during the trial?

12       A.   Yes.

13       Q.   Apparently, and also the pages that I just cited

14   reflect examination that occurred out of the presence of the

15   jury, as I understand it.

16       A.   Okay.

17       Q.   Apparently at that time, there was -- Odell Keiser

18   indicated that he had some notes in his back pocket, or

19   something of that sort.

20       A.   Right.

21       Q.   Go ahead and say what you recall about this.  It

22   might shed some light.

23       A.   That he had notes in his back pocket regarding the

24   events that he wanted to testify to, but the notes in his back

25   pocket confirmed that the dog tracked to the intersection, the

STATE vs. GREEN;  10/28/03 - 10/29/03                    303

1   middle of the intersection.  However, the judge, Judge Antoon,

2   did a good job of rehabilitation on that, outside of the

3   presence of the jury, and established for the record, at least

4   in his mind, what Mr. Keiser actually meant.  Did I look at

5   those notes?

6        Q.   Yes.

7        A.   Probably, but I don't have a recollection of it.

8        Q.   So you wouldn't be able to say whether they were

9   something you received before, or not?

10       A.   No.

11       Q.   I also asked you to look at Jerome Murray's

12   testimony.

13       A.   Yes, sir.

14       Q.   And that concerned the part of his testimony that

15   dealt with his criminal history.

16       A.   Yes, sir.

17       Q.   Did you get a chance to look at that?

18       A.   I did.

19       Q.   Let me summarize that, and I'll ask you to say

20   whether or not that agrees with what you recall.  Mr. Murray

21   was examined on direct examination, evidence was brought out

22   that he had a previous misdemeanor conviction, that he had a

23   probation violation, unspecified, whether it was a misdemeanor

24   or otherwise, that arose after his original statement against

25   Crosley Green, and that the State Attorney's Office assisted

1   him in obtaining release on that probation violation.  I

2   believe that was the totality of evidence with regard to his

3   criminal history on direct examination.

4        And then on cross-examination, you attempted to impeach

5   him by asking a question to the affect that, are you the same

6   Jerome Murray who was convicted of a sexual assault at some

7   time, right?

8        A.   Right.

9        Q.   At some time, there was an objection to improper

10  impeachment, and a bench conference of some sort.  The

11  objection was sustained.  And then the judge gave an

12  instruction to the jury to disregard the previous question and

13  answer.

14       A.   Okay.

15       Q.   Okay.  Now, in general, you did get some decent

16  impeachment out of Mr. Murray.  Is that a correct statement?

17       A.   I thought.

18       Q.   Do you recall about what that was?

19       A.   That he said he had consumed two six packs of, I

20  believe it was malt liquor.

21       Q.   Bull?

22       A.   Bull, and that he was just, by chance, happened to

23  be down on Jump Street, or Easy Street, hanging out with a

24  bunch of crack monster.  He wasn't doing crack, he was just

25  hanging out with them.

1          He didn't know anybody's names.  And out of the crowd, as

2     fate would have it, the defendant came to him and just started

3     spilling his guts about how he needs to lose himself because

4     he was involved in a shooting, or something along those lines.

5          Q.    I believe he used the term rock heads, to refer to

6     the individuals he was with?

7          A.    Yes.

8          Q.    He said about 20 to 30 of them.  He could not

9     remember a single name?

10         A.    No.

11         Q.    He admitted that he was drunk at the time?

12         A.    Yes.

13         Q.    Did he deny using cocaine?

14         A.    He did deny using cocaine.  He did recall what he

15    was wearing that evening.

16         Q.    I'm sorry?

17         A.    He did recall what he was wearing that evening.

18         Q.    Beyond what I just described, are you aware of the

19    jury being given any information that Jerome Murray had a more

20    extensive criminal history?

21         A.    No.

22         MR. GRUBER:  I'm going to move into evidence,

23      or at least ask that a number of exhibits be

24      sequentially marked.  I'll come back to them.

25    BY MR. GRUBER:

1    Q.    First of all, the particular question that you asked

2    in an effort to impeach Mr. Murray, was that improper

3    impeachment?

4    A.    It was improperly formed.

5    Q.    How so?

6    A.    I think I should have asked, Isn't it true that

7    you're the Jerome Murray that was convicted of a crime,

8    punishable in excess of one year in the State prison system,

9    or by one involving deceit, or deception.

10    Q.    Okay.  At the time of the trial, did you know that

11    Mr. Murray had felony convictions?

12    A.    I did.

13    Q.    How did you come about that information?

14    A.    I suppose I had his prior record, Mr. Gruber.

15    Q.    Of the three witnesses, Sheila and Lonnie, okay, you

16    did not attempt to depose them, is that true?

17    A.    I did not.

18    Q.    There was a reason for that, correct?

19    A.    Yes.

20    Q.    Which was?

21    A.    After consulting with Mr. Green, we felt like it was

22    best to put her on the stand cold, without giving her some

23    sort of idea where we were going with cross-examination.

24    That's what we did.

25    Q.    In retrospect, did that work?

1      A.   In my mind, as I told Crosley, she basically -- her

2   testimony strapped him in.

3      Q.   In other words, no?

4      A.   No.

5      Q.   Jerome Murray, did you attempt to depose him?

6      A.   No.

7      Q.   You sure of that?

8      A.   It seems to me his name was given to me at some

9   point in time closer to the trial.  I don't think I deposed

10  him.  Did I attempt to, I don't remember deposing him.  Maybe

11  I did.

12          MR. WHITE:  Mr. Gruber, I have looked at that,

13      and I'll stipulate that he did, in fact, send out a

14      subpoena, and scheduled him for a deposition, if

15      that's what you're getting at.

16          MR. GRUBER:  Yes.  As I understand it, we would

17      have a stipulation that Mr. Parker did attempt to

18      depose Jerome Murray, and apparently, Murray failed

19      to appear for his scheduled deposition, and a

20      certificate of non-appearance was obtained.

21          THE WITNESS:  Okay.

22  BY MR. GRUBER:

23      Q.   Along with -- well, do you know, with anymore

24  specificity, about what information you have, what

25  documentation you had about Mr. Murray's criminal history at

STATE vs. GREEN;   10/28/03 - 10/29/03                    308

1    the point of trial?

2         A.   Do I recall what document it was that I reviewed,

3    that gave me that information, I do not.

4         Q.   What documents, if any, did you have?

5         A.   I do not.

6         Q.   Do you know where you may have gotten them?

7         A.   I do not.

8         Q.   Do you recall seeing rap sheets in your preparation

9    of this case?

10        A.   Do I have a specific recollection?

11        Q.   That's why I tried to make it general.  Do you

12   recall ever seeing rap sheets at all?

13        A.   I can assume I did, Mr. Gruber, but I don't

14   recollect it in my mind's eye right now.

15        Q.   Actually , is it not true that rap sheets can only

16   be obtained by law enforcement agencies?

17        A.   Generally.

18        Q.   As defense counsel, you can't call up someone and

19   just request it over the phone.  You need the assistance of

20   the State to obtain these rap sheets.

21        A.   Or the court.

22        Q.   Having said that, do you know where you received any

23   information regarding Murray's prior record?

24        A.   I do not.

25        Q.   But you did know that he had one?

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 15 of 83 PageID 1259

STATE vs. GREEN;   10/28/03 - 10/29/03                          309

1      A.   I did.

2      Q.   You did not ask him the specific questions, have you

3  been convicted of a felony, have you been convicted of a crime

4  involving dishonesty?

5      A.   That's correct.

6      Q.   Did you have any possession, at the time of trial, a

7  certified copy of a judgment of guilt and sentence?

8      A.   I think I would have, or I would not have asked the

9  question.

10      Q.   Well, did you attempt to introduce it?

11      A.   I did not.

12      Q.   Did you take any further steps proving to the jury

13  that Jerome Murray had a prior felony?

14      A.   Did not.

15      Q.   Why not?

16      A.   Well, you had to see Mr. Murray's testimony.  You

17  had to see him.  He looked drunk.  It just was -- frankly, I

18  was surprised that the prosecution put him on.

19      There again, evidently I was wrong.  It may have had some

20  impact in terms of the case, but I mean, it looked like a

21  complete broken down drunk that would say anything to get out

22  of jail.  I think the jury -- I hoped the jury would feel the

23  same way.

24      So his prior record, when I got out the fact it was a

25  sexual assault, the State reacted very forcefully.  To me,

1   that was communicating to the jury, okay, this guy, not only

2   is he a broken down drunk, he wanted to get out of jail, he

3   has not only a significant record, but one for sexual assault.

4        Q.    That entire discussion occurred off the record --

5   not off the record, but out of the presence of the jury,

6   right, subsequent to the objection?

7             MR. WHITE:  Your Honor, I have to object.  I

8        think the record, as he's established it clearly,

9        indicates this was a question he asked in front of

10       the jury.  Our objection was made, and sustained,

11       all in front of the jury.

12            I don't know why he's --

13            THE COURT:  So your legal objection is?

14            MR. WHITE:  I object, he's misleading the

15       witness, and falsely stating the evidence in this

16       case.

17            THE COURT:  I can't tell that.

18            MR. WHITE:  I'll withdraw that.

19            THE COURT:  What's the relevance?

20   BY MR. GRUBER:

21       Q.    This time, I think they're marked.  Actually, I

22   think I'll wait a little bit.  I think we're going to have

23   some discussion about each one of those exhibits.  It might be

24   easier to do it sometime thereafter.

25            What is the significance of the testimony that the

Case 6:14-cv-00330-RBD-GJK Document 3-40 Filed 02/27/14 Page 17 of 83 PageID 1261

STATE vs. GREEN; 10/28/03 - 10/29/03                    311

1    violation of probation occurred after Mr. Murray had given a

2    statement against Mr. Green, although prior to the trial?

3         A.    What was the significance?  Say that again.  As I

4    understand it --

5         Q.    Well, it's easier to lead you.  If he's already

6    given a statement without anything hanging over his head,

7    later on he has some sort of legal problem, the State helps

8    him with that legal problem, he then gives testimony that is

9    consistent with his statement, that would tend to rebutt any

10   argument that the assistance from the State induced him to

11   give false testimony?

12        A.    A violation of probation is a no bond warrant.

13        Q.    Whatever it might be?

14        A.    He received some benefit as a result of that.  Now,

15   as we sit here today, it seems that, and I can't recall when

16   the statement was given in terms of when he was released from

17   jail on that, so I don't know.  I don't recall that.

18        I mean, I don't recall when the statement was given, his

19   statement, allegedly to the police, or to the State in

20   relation to when he was actually arrested for violation of

21   probation.

22        For all I know, the State could have known he was in

23   violation at the time he gave the statement.  I don't know

24   when that was alleged to have been committed.  Am I making

25   sense?

1       Q.    Yeah, but I don't think it's responsive.  Let me

2   move on.

3           THE COURT:  I think what he's asking, is

4       Mr. Murray made a statement against Mr. Green's

5       interests before he had any legal problems.

6           THE WITNESS:  Before he was arrested for the

7       VOP?

8           THE COURT:  Then he gets a VOP before the

9       trial, he goes to trial, and basically says the same

10      thing he said in the statement.  He says, how does

11      that --

12          THE WITNESS:  The only thing I can imagine was

13      that he was in violation at the time that he gave

14      his statement, but hadn't been arrested for it yet.

15      That would be my only reason for doing that.

16  BY MR. GRUBER:

17      Q.    What I'm getting at, in fact, he did have some

18  serious legal problems at the time he gave his statement.

19  That would be important information.  Do you understand that?

20      A.    Yes, I do, Mr. Gruber.  It could be.  But like I

21  say, if you had seen the demeanor of the witness, believe me

22  when I tell you, I just -- he was unbelievable, no matter

23  what.

24      I'm sure I could have beat him to death, and impeached

25  him to death.  Maybe I should have done that.  In retrospect,

STATE vs. GREEN; 10/28/03 - 10/29/03                    313

1   maybe I should have, but I didn't do that.

2       Q.   Just in reading, have you ever heard a distinction

3   between the credibility of a witness, and the credibility of

4   the witnesses testimony?

5       A.   Well, I'm sure there is that distinction, and I --

6   you know, sure.

7       Q.   You indicated that we did have documentation with

8   regard to Murray's prior record, correct?

9       A.   I said that I wouldn't have asked the question if I

10  didn't have something that indicated a conviction.  Whether or

11  not I had a judgment and sentence, certified copy, I would

12  have to back off of that answer.  I don't know if I had that.

13      Q.   I'll show you what's been marked as Defendant's

14  Exhibit K. It's filed a felony request for pretrial release.

15  First I'll ask you if you have ever seen that document before.

16      A.   I don't recall.

17          MR. GRUBER:  I'll go ahead and move Defendant's

18      Exhibit K into evidence.  I anticipate an objection.

19          THE COURT:  Which one is K?

20          MR. WHITE:  May I?

21          THE COURT:  Yes, let Mr. White see it.

22          MR. WHITE:  No objection.

23          THE COURT:  Okay, that will be the next Defense

24      Exhibit.

25          MR. WHITE:  Judge, well I assume he's not

Case 6:14-cv-00330-RBD-GJK Document 3-40 Filed 02/27/14 Page 20 of 83 PageID 1264

1    introducing it as proof of a conviction.  It's not

2    that.  Do you have some other reason?  I'll do it

3    legally.  I object to relevance, unless he can state

4    some reason as to why it's relevant.  I think I know

5    why.

6          THE COURT:  What is it, Mr. Murray's

7    conviction?

8          MR. GRUBER:  No.  The argument I have with

9    regard to this one is that it is case number

10   88-3109-CFA.  That is a felony case.  This

11   particular document does not indicate which felony

12   is involved; however, it has a notation that it is,

13   first of all, a request for pretrial release, and a

14   notation that the release is requested by a homicide

15   barker, I guess, a law enforcement officer, but

16   also, Assistant State Attorney, Mike Hunt.  The date

17   on it is August 17, 1990.

18         What I'm arguing is that this document

19   reflects, or matches up, rather, to the trial

20   testimony that was elicited on direct examination

21   that Mr. Murray had a violation of probation, and

22   with the assistance of the State Attorney's Office,

23   was released on that violation of probation.  This

24   document, along with another one, will show that

25   that was a felony violation of probation, which

1  would indicate that the State Attorney at the time

2  knew that Mr. Murray did, in fact, have a felony

3  record.

4      That's the eventual argument I'm getting to on

5  this thing.

6      MR. WHITE: I see. May I look, for a minute,

7  see what else you're going to introduce? Are you

8  going to introduce the judgment and conviction that

9  deals with 88-3109?

10     MR. GRUBER: Let me make sure. Some of these

11  were pulled this morning. That was the one that

12  came in yesterday.

13     THE COURT: Came into evidence yesterday?

14     MS. GAYLORD: That's correct, your Honor.

15     MR. GRUBER: It's Defense Exhibit I.

16     MR. WHITE: Can I see that? May I have just a

17  moment to confer with my counsel over here?

18     THE COURT: Sure.

19     MR. WHITE: Your Honor, our posture is this,

20  and I'll state it as simply as I can.

21     THE COURT: Is that for my benefit?

22     MR. WHITE: No, for the record. For the

23  record, if we can go ahead and both agree the

24  admissibility of exhibit I, which has only been

25  marked for identification so far. I would have no

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 22 of 83 PageID 1266

1    objection to the admissibility of Defendant's

2    Exhibit K. The two of them need to come in together

3    to address the issue that he's raised for Mr. Murray

4    falsely saying that he was on --

5         THE COURT:  Misdemeanor.  All right.  Any

6    objection to that?

7         MR. GRUBER:  None, in principle.  I would hate

8    to see these labels being pulled off.

9         MR. WHITE:  I'm not saying they have to be one

10   exhibit, let's move I into evidence, as well --

11        THE COURT:  Then we would have numbers instead

12   of letters.

13        MR. WHITE:  You haven't moved it in yet.  I

14   have no objection to K, as along as you have no

15   objection to I going in, as well.

16        MR. GRUBER:  Correct.

17        THE COURT:  Lets do it.  Mark those as the next

18   exhibits.

19        (Whereupon, Defendant's Exhibits I and K were

20   received in evidence as Defendant's Exhibits 7 and

21   8.)

22        MR. GRUBER:  What has been marked as Defense

23   Exhibit L is an order of revocation of probation,

24   case number 73-674, indicating that Mr. Murray was

25   on probation for -- well, it actually indicates --

1    What it indicates, it is a certified copy.  I will

2    move it in as a self contained document.

3         THE COURT:  Let me see it.

4         MR. WHITE:  But let me see what it is.  Judge,

5    I'm not sure what the purpose of this is.  I can't

6    tell from this whether or not he was actually

7    adjudicated guilty, therefore, I don't know that

8    this is relevant.

9         THE COURT:  Your objection is relevance?

10        MR. WHITE:  My objection would be relevance, at

11   this point.

12        THE COURT:  What would be the relevance of

13   that?

14        MR. GRUBER:  The relevance of all of this is

15   that ultimately, the jury knew only that Mr. Murray

16   had a misdemeanor conviction, period.

17        THE COURT:  You're back to his testimony about

18   that?

19        MR. GRUBER:  I'm back to that now.  Whether

20   that was --

21        THE COURT:  Is that the same case number?

22        MR. GRUBER:  I believe it's a different one.

23        MR. WHITE:  Judge, I would also point out that

24   may be a certified copy of a record.  The question

25   remains, because it isn't a true conviction with

STATE vs. GREEN;   10/28/03 - 10/29/03                    318

1   fingerprints, and so forth.  I don't think anyone

2   ever established whether this is this Jerome Allen

3   Murray, or not.

4       The other part of my objection was, I don't see

5   where in there it indicates whether he was

6   adjudicated.

7       THE COURT:  He was.  Well, it says, Probation

8   revoked, the defendant is hereby ordered to serve

9   five years DUR, consecutive to present sentence,

10  which is the one in Attica.  It doesn't say

11  adjudicated, but it sentenced him to five years in

12  prison, which you can't do unless you're

13  adjudicated.

14      MR. WHITE:  It would seem that you can't?

15      THE WITNESS:  Unless you're in New York.

16      THE COURT:  Well --

17      MR. WHITE:  Never mind.

18      THE COURT:  What happened is, the New York

19  conviction was the violation.

20      MR. WHITE:  I understand.  I understand.

21      THE COURT:  Your objection was relevance?

22      MR. WHITE:  My -- I'm sorry.

23      THE COURT:  Authenticity to the extent we don't

24  know whether that's the same Jerome Murray?

25      MR. WHITE:  That's correct.  It says Jerome

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 25 of 83 PageID 1269

1    Murray, but typically, we need a certified copy of

2    an order of revocation of probation.  This is not a

3    certified conviction.

4        The danger we run is that we're creating a

5    record that it's the Jerome Murray who testified

6    here.

7        THE COURT:  I'll sustain the objection.

8        MR. GRUBER:  Subject to that objection?

9        THE COURT:  Yes, without prejudice to you.

10       MR. GRUBER:  The next document I would move

11    into evidence is marked Defendant's Exhibit M. It is

12    styled a Judgment of Conviction and Imposition of

13    Sentence, the offense is aggravated assault under

14    Florida statutes, and the sentence is five years.

15    It is dated --

16       THE COURT:  Is that 73?

17       MR. GRUBER:  This one is 77.

18       MS. GAYLORD:  The case number is 73.

19       THE COURT:  Is the case number 73?

20       MR. GRUBER:  73-674-CFA.

21       THE COURT:  That's the same case.

22       MR. GRUBER:  It is?

23       THE COURT:  Yes.

24       MR. GRUBER:  I'll be darned.  This one has

25    fingerprints.

STATE vs. GREEN;  10/28/03 - 10/29/03                320

1          THE COURT:  That's the one that Mr. White was

2     looking for.

3          MR. WHITE:  So to speak.  This is, in fact, a

4     certified copy of the conviction.  The only

5     remaining issue is, it this Jerome Allen Murray?  Of

6     course, I know the name here is Jerome Murray.  I

7     don't know if we can dig up this file on --

8          THE COURT:  Do we have Mr. Murray's date of

9     birth anywhere?

10         MR. WHITE:  I don't know.  We can --

11         THE COURT:  That might be an indicator.

12         MR. GRUBER:  I do have a rap sheet.  It lists

13    two of them, 2/20 of '52, and 2/28 of '52.

14         THE COURT:  2/28/51, this one says here.

15         MR. GRUBER:  That one has fingerprints, anyway.

16         THE COURT:  There is no date of birth on that.

17    The transport order, who knows where we got that

18    from.

19         MR. WHITE:  Judge, just for the record, after

20    we began this post-conviction proceeding, I went and

21    tried to do some research to verify just what we had

22    in terms of criminal history.  My concern was that I

23    never found that conviction.

24         THE COURT:  You never found that one?

25         MR. WHITE:  I never found it.

1           THE COURT:  That 73 dash whatever it was?

2           MR. WHITE:  No, not that one.  I found a '73

3     case, but it had to do with a concealed firearm,

4     adjudication was withheld.  I found an '81

5     trespassing before, but it wouldn't be relevant to

6     impeachment.

7           I found the '81 case dealing with the sexual

8     assault that Mr. Parker did raise.  Then I found the

9     case that we just talked about a minute ago where he

10    ended up pleading to improper exhibition of a

11    weapon, and attempted aggravated assault.

12          That's all I'm aware of, and that's why I'm

13    expressing my concern.

14          MR. HOLMES:  Do you have fingerprints with the

15    sexual assault?

16          MR. GRUBER:  Yes.

17          MR. HOLMES:  They're the same, Judge.

18          THE COURT:  It's him?

19          MR. HOLMES:  I will not be an expert in it, but

20    the State cannot impose an objection for what

21    obviously are the same fingerprints on both

22    documents.

23          THE COURT:  Okay, so we'll receive that.  Are

24    you offering the whole works, the revocation of

25    probation?

1      MR. GRUBER:  Everything I talked about.

2      THE COURT:  It has to do with that conviction?

3      MR. GRUBER:  Yes, sir.

4      THE COURT:  So that would be received as the

5   next Defense Exhibit.

6      (Whereupon, Defendant's Exhibit M was received

7   into evidence as Defendant's Exhibits 10.)

8      MR. GRUBER:  Defendant's Exhibit O is a

9   certified copy of a misdemeanor case, 88-13574,

10   bearing a date of -- hold on a second.  Well,

11   whatever it is.  I'm sorry, December 21, 1988.  I

12   was just reading it wrong.  It's a retail theft.

13      I would move this in as a self admitting

14   document.

15      THE COURT:  On Mr. Murray?

16      MR. GRUBER:  Yes, sir, Allen Jerome Murray.

17   It's a misdemeanor, so it doesn't have all the other

18   accouchements (phonetic), and it doesn't have

19   fingerprints attached to it.

20      MR. WHITE:  Judge, I guess we're back to the

21   same issue that we had before, before he lent his

22   expertise.

23      THE COURT:  You can't tell it's the same Mr.

24   Murray?

25      MR. WHITE:  I'm not sure.  The name is the

1    same, so it's possible, but --

2         THE COURT:  Does it say Jerome Murray?

3         MR. WHITE:  When they wrote this, Mr. Holmes

4    is presuming that this means Allen Jerome Murray.

5    What it says is Allen Murray Jerome.  I suppose the

6    presumption is that the clerk's office writes it

7    Murray, no comma, Allen Jerome.  I hate to make that

8    presumption.  There's no date of birth, no

9    fingerprints, and there may be -- I think it's

10   possible for him to authenticate it, perhaps, by

11   getting the file.

12        THE COURT:  This isn't even a -- this is not a

13   conviction.  It's not even signed by the judge.

14   I'll sustain the objection.

15        MR. GRUBER:  Okay.  Finally, what has been

16   marked Defendant's Exhibit P, is style, Pretrial

17   Release Recommendations. It refers to Jerome Murray.

18   More importantly, it has the case number

19   88-3109-CFA, which I think is already in evidence.

20        MR. WHITE:  Can I look at it, and see what it

21   is, unless I lost track, which is possible.

22        I'll offer the objection that it's not a

23   certified conviction, it's another pretrial release

24   recommendation.  It contains hearsay statements.

25   Therefore, I object on that basis, as well.

STATE vs. GREEN;   10/28/03 - 10/29/03                    324

 1          THE COURT:  Okay.

 2          MR. GRUBER:  I think that's just part of the

 3     court file in 88-3109.

 4          THE COURT:  I'll sustain the objection to that.

 5  BY MR. GRUBER:.

 6     Q.   I'll ask you a few questions about Mr. Green's prior

 7  violent felony aggravator, and the New York conviction.  You

 8  know what I'm talking about, correct?

 9     A.   Oh, yeah.

10     Q.   And this refers to documents contained in Appendix

11  J, K, L and M, of the 3.850 motion.  First of all, as a

12  prosecutor, if you are proving up a defendant's prior

13  conviction for whatever purpose, it might be habitual felony

14  offender, or in this case, a capital case, a prior aggravator,

15  a prior felony aggravator, what's the standard procedure?

16     A.   I would seek certified copies of those convictions,

17  and I would produce a certified copy for purposes of

18  introduction of evidence.

19     It's a plea, at sentencing, if he testifies, I would have

20  them available to impeach him.  At trial, I would disclose

21  them to the defense attorney in advance so they could make

22  their affirmative objection, not the same guy, otherwise, they

23  would come in.

24     Q.   That was not done in this case with regard to

25  Crosley Green's purported New York robbery conviction, is that

1  true?

2      A.   My recollection is, they did not have a certified

3  copy of conviction, they proved it up differently.

4      Q.   You have reviewed the documents.  You know, I said

5  J, K, L and M. Those are correspondence between Mr. White and

6  some New York authorities.  There is a transcript of

7  proceedings that occurred in New York, there's a citation of

8  New York law in there, I believe a presentence investigation

9  in this case is in there.  Have you reviewed all those

10 documents?

11     A.   I'm familiar with them.  I can't quote the language,

12 but I'm familiar with them.

13     Q.   Do I need to show them to you?  I would have them

14 right here.

15     A.   I don't think so.  If I need them, I'll ask.

16     Q.   They appear to reflect that Mr. Green did not have

17 any criminal conviction emanating New York at all.  Isn't that

18 true?

19     A.   Under New York law, it appears that's correct.

20     Q.   It also appears that the prosecution, in this case,

21 did know that throughout the sentencing proceedings, isn't

22 that true?

23     A.   I don't know that they knew it.  I don't know that.

24     Q.   Did you, yourself, make any efforts to verify that

25 New York conviction?

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 32 of 83 PageID 1276

1      A.   Did I contact New York?

2      Q.   Right.

3      A.   I did not.

4      Q.   Is there any particular reason for not doing that?

5      A.   It was my opinion, at the time, based on the nature

6  of the offense, my conversations with Crosley, where he

7  admitted to me he did those acts.  The fact that he went to

8  prison, as opposed to some juvenile -- some alternative

9  juvenile --

10     Q.   Let me stop you there.  Did he admit committing the

11 crime, or did he admit going to prison?

12     A.   It's my recollection that we talked about the actual

13 ~~crime.~~

14     Q.   Do you recall, as a part of those documents that I

15 mentioned in the report by the probation officer in New York,

16 I think his name was Iverson, or something like that?

17     A.   The name sounds familiar, but I don't recall looking

18 at a document.  I just don't recall.

19     Q.   Reporting that he did not think that he did --

20          MR. WHITE:  Objection, your Honor, to hearsay

21     from some fellow named Iverson in New York.

22          THE COURT:  Sustained.

23 BY MR. GRUBER:

24     Q.   Did any of the representations by the State have any

25 affect on your decision whether or not to investigate the

1  status of the conviction any further?

2      A.   (No response.)

3      Q.   Let me ask it more simply.  Did you rely on the

4  State's representations?

5      A.   To some degree.

6      Q.   There was a presentence investigation prepared in

7  this case, correct?

8      A.   I believe that's correct.

9      Q.   Did you review that presentence investigation?

10     A.   Yes.

11     Q.   It does list an armed robbery conviction out of New

12 York under the adult section.  I don't believe there was

13 anything under the juvenile section.  You did not challenge

14 that entry in the presentence investigation, is that true?

15     A.   I did not.

16     Q.   Was your understanding that there was a conviction,

17 an adjudication for armed robbery out of New York, affect any

18 decision, or advice that you may have given to Crosley with

19 regard to whether he would testify at any stage during these

20 proceedings?

21     A.   You know, Mr. Gruber, I don't have a recollection of

22 feeling that that in and of itself affected by decision about

23 not putting him on.  There were other matters that occurred

24 that led me not to put Mr. Green on.

25     Q.   Are you saying it had no affect?

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 34 of 83 PageID 1278

1       A.   No, I'm not, not at all.   I'm saying that wasn't the

2  major reason why I didn't put him on.

3       Q.   It was a factor?

4       A.   Yes.

5       Q.   The evidentiary presentation by the State in the

6  penalty phase of this case, the presentation of evidence by

7  the State, that was entirely concerning this conviction, is

8  that not true?

9       A.   The entire evidentiary presentation by the State was

10 concerning the prior conviction?

11      Q.   The New York conviction?

12      A.   Yes, sir.

13      Q.   The State introduced no evidence during the penalty

14 phase, other than what pertained to this New York conviction.

15 Is that not true?

16      A.   In the penalty phase?

17      Q.   I'm not talking about argument, I'm talking about

18 witnesses.

19      A.   They called witnesses, Mr. Gruber.   I'm sorry, I

20 just don't understand what you're asking me.

21      Q.   The witnesses called were Bob Rubin?

22      A.   Yes, parole officer.

23      Q.   He was the local parole officer?

24      A.   That's correct.

25      Q.   His testimony concerned a transfer, I think, some

1  sort of transfer of -- I'm not sure exactly what, but some

2  sort of transfer from the State of New York, to the State of

3  Florida.

4       A.   Whatever transfer it was, it ended up in our parole

5  division.

6       Q.   What he said was that he helped Crosley register in

7  the State of Florida as a convicted felon, so he could get an

8  identification card?

9       A.   Right.

10      Q.   As it happened, Crosley needed some sort of

11 identification card to get work, correct?

12      A.   I presume so.

13      Q.   The State also called an Officer Hopper, who was

14 from New York, also?

15      A.   That's correct.

16      Q.   And he testified about what he knew, or what he had

17 heard about this case in New York, correct?

18      A.   I thought he was the arresting officer, but I may be

19 wrong.

20      Q.   Did you ever interpose a hearsay objection to any of

21 that testimony?

22      A.   I can't recall.

23      Q.   Were you tipped off -- well, back then, did you know

24 of the procedure that the State would ordinarily follow, in

25 proving up a defendant's prior record?

STATE vs. GREEN;   10/28/03 - 10/29/03                    330

1      A.    Yes.

2      Q.    Did the fact that the State did not follow that

3   procedure, in this case, suggest anything to you at the time?

4      A.    Suggest that they didn't have a copy of a prior

5   conviction for armed robbery, certified copy.

6      Q.    Yes, sir, that's it.   Did you think about that at

7   the time?

8      A.    Sure.

9      Q.    Did that prompt you to investigate the matter any

10   further?

11      A.    Not any further than I did.

12      Q.    Did you ever ask them whether they had a certified

13   copy of the judgment, and sentence?

14      A.    I don't recall that.   I don't recall.

15      Q.    Obviously, they never provided you with one because

16   they never had one.

17      A.    That's correct.   Well, they didn't provide me one.

18   I presume they didn't have one.

19      Q.    Do you have that attorney's fee affidavit there?

20      A.    Yes.

21      Q.    Going into the trial, were you fairly confident that

22   the case would not result in a penalty phase?

23      A.    Yes.

24      Q.    And your view about that changed during the course

25   of the trial, isn't that true?

1    A.    Dramatically.

2    Q.    You had about three weeks between conviction and a

3    penalty phase, isn't that right?

4    A.    That's correct.

5    Q.    Did you request any additional time?

6    A.    I did not.

7    Q.    How much -- there was one point in the record, it's

8    in Volume XII, page 2182, where you asked for a recess to talk

9    to witnesses because they had not shown up for conference the

10   day before.   Do you recall that episode?

11   A.    I don't recall that, no.

12   Q.    As it was, you called two witnesses in the penalty

13   phase, being Shirley Allen, and David Jones, correct?

14   A.    That's correct.

15   Q.    You had talked with Celestine Peterkin prior to the

16   penalty phase.   Is that correct?

17   A.    That's correct.

18   Q.    You did not call her as a witness?

19   A.    I did not.

20   Q.    Shirley testified about Crosley's father, that is

21   Booker, shooting his mother, and then himself.   You introduced

22   that testimony?

23   A.    Yes.

24   Q.    And then David Jones was offered to testify that

25   Crosley had saved him from drowning on occasion?

STATE vs. GREEN;   10/28/03 - 10/29/03                                    332

1    A.   That's correct.

2    Q.   That was the extent of background mitigation that

3    was presented during the penalty phase?

4    A.   Yes, sir.

5    Q.   I believe that was the extent presented during the

6    penalty phase by you?

7    A.   Yes, sir.

8    Q.   Let me play a little bit of a numbers game.  I tried

9    to count this out.  If I'm right, the entirety of your

10   evidentiary presentation, with regard to mitigation, consisted

11   of about eight pages of transcript.  Does that sound about

12   right?

13   A.   It was relatively short.

14   Q.   So, it was less than an hour, in any event?

15   A.   I guess I don't dispute that.

16   Q.   The closing argument that you offered runs from page

17   2305, of the trial transcript, through 17.  In other words,

18   about 12 pages of transcript.  It was actually longer than

19   your penalty phase evidentiary presentation, if I calculated

20   that right.  Is that okay?

21   A.   Yes.

22   Q.   During the closing argument, you touched on the two

23   witnesses for the evidence that they offered, and moved on to

24   other things?

25   A.   Yes.

1      Q.   You did indicate that your attorney's fee

2   affidavit -- well, the amount of time that you spent working

3   on the penalty phase, I assume all the time indicated on here,

4   at that point, obviously, would have been directed to the

5   penalty phase only, right?  So this would be a fairly accurate

6   record of the amount of time that you did spend?

7      A.   I may have -- there may be some things that I did

8   that aren't on that particular affidavit regarding contacting

9   certain witnesses, and what was told to me during the course

10  of those, and the time required to talk with them.  I believe

11  I did list the number of people, and those that I called and

12  talked with, I think that is on there.

13     Q.   I believe so, too.

14         MR. WHITE:  Objection, your Honor.

15  BY MR. GRUBER:

16     Q.   This is normally placed in the court file, this

17  attorney fee affidavit, is it not?

18     A.   I have to tell you, I don't know where it goes after

19  I submit it for payment.

20     Q.   I know it's not part of the record on appeal.  You

21  have your copy in front of you?

22     A.   Yes, sir.

23     Q.   There are a number of names that are listed here,

24  and I tried to find those who were identifiably background

25  mitigation, potential witnesses, or at least sources of

1   information.

2       A.    Yes, sir.  What page are you on?  Do you mind me

3   asking, or does it matter?

4       Q.    It starts at page 21, and goes through to -- well,

5   to the next page.  On September 27th of 1990, it starts with

6   the court appearance, and the penalty phase, so basically, the

7   bottom half of 21, over to the top half of 22.

8       A.    I got you.

9       Q.    You are speaking to someone who possibly could be a

10  penalty phase witness.  I really didn't see anybody on here,

11  other than Celestine Peterkin.

12          MR. WHITE:  Objection to his testimony, your

13  Honor.

14          THE COURT:  Sustained.

15  BY MR. GRUBER:

16      Q.    Who on here, as far as background mitigation, okay,

17  is on here?  What name is on here?  Take a look at September

18  10th.  There is Daymon Jones.

19      A.    I talked with several people.  I don't recall their

20  names.  I sat down with Crosley, and I asked him, All right,

21  we're moving into this phase.  This is what you need to do.

22  You need to tell me who can I go to.  We need to dissect your

23  background, in other words, and I need some folks that are

24  going to say good things about you.  He gave me some names,

25  one of whom was a retired school teacher, a female, and a very

1   elderly one, of whom was, I believe, a coach at a local

2   school.

3       I know that there was this person, I forget his name, you

4   mentioned it earlier, that believes the defendant actually

5   saved his life.  There was Ms. Peterkin, who I wanted to

6   testify about the way Crosley was with his child, and what he

7   was as a brother.

8       When I talked -- when I attempted to call Ms. Peterkin to

9   the stand, she began laughing.  I told her to calm down, she

10  can't laugh in there, you have to stop laughing.  She

11  continued to laugh.  She could not control the laughter.

12  Whether it was a nervous laugh, I don't know what it was, I

13  determined, at that point in time, Ms. Peterkin -- I was not

14  going to call Ms. Peterkin.

15      I then resolved to speak more with the coach, and the

16  teacher.  The teacher flat out refused to get involved, and

17  the coach said, There is nothing good I can say about that

18  boy.

19      None of them would come forward and say anything good

20  about Mr. Green.  Those were the people that Mr. Green --

21  those people whose names he gave me.

22      I was left with Ms. Allen.  I believe Ms. Allen took the

23  stand and testified about the tragedy involving his parents.

24  The judge found there was no weight to give to that, really,

25  because the defendant was in prison at the time his parents

1   killed themselves.

2        In essence, I couldn't find anybody that would say good

3   things about Mr. Green.

4        Q.   When you prepared this document, the attorney's fee

5   affidavit, one thing, it's a pretty extensive and detailed

6   document, is it not?

7        A.   Yes, sir.

8        Q.   And it's also the basis for your getting paid in

9   this case, right?

10       A.   Yes, sir.

11       Q.   You certainly have a motivation to include

12  everything that you did, correct?

13       A.   Yes, sir.

14       Q.   And to make it as accurate as possible?

15       A.   Yes, to all of it.

16       Q.   So let me go to page 21.  You recorded a telephone

17  conference with Daymon Jones, who was a witness that you did

18  call, and indicated that that took point two hours, right?

19       A.   Right.

20       Q.   And then again on that date, you had an office

21  conference, or interview, with C. Peterkin, regarding

22  mitigating circumstances, and that lasted two hours, correct?

23       A.   Right.

24       Q.   Is there anything else on this page that would

25  clearly address the issue of -- well, let me restate that --

1   that would reflect your speaking to a potential background

2   mitigation witness?

3        A.   I see a Fred Vickers, and I see an M. Fields.

4        Q.   Is Fred Vickers one of the potential witnesses?

5        A.   I can't recall.  It's like I testified earlier, I

6   can't recall the two people that I spoke with regarding the

7   penalty phase, one of whom was a coach, one of whom was a

8   teacher.  I believe the M. Fields would have been the female

9   teacher, a very elderly woman.  Mr. Vickers, I'm thinking, was

10  the gentleman, the coach that I spoke to.

11       Q.   Either of them point two hours a piece, correct?

12       A.   They didn't want to talk to me.  They told me, here

13  is what it is, and hung up.

14       Q.   Anything further on that page?

15       A.   Nothing on that page.  Do you want me to look over

16  page 22?

17       Q.   Yes, please.  If you go down to September 26th, you

18  indicated a consultation with the client, at jail, lasting one

19  hour.  That would be the day before the penalty phase.

20  Anything else on that page?

21       A.   No.

22            MR. GRUBER:  Let me have one quick moment.

23            THE COURT:  Okay.

24  BY MR. GRUBER:

25       Q.   In preparation for the penalty phase, what, if any

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 44 of 83 PageID 1288

1    records, or documentation, did you obtain?

2         A.    Did I obtain?

3         Q.    Regarding Crosley Green's background.

4         A.    I don't know.  I don't recall.

5              MR. GRUBER:  No further questions.

6              THE COURT:  Okay.  Mr. White,

7    cross-examination?

8              MR. WHITE:  Thank you, your Honor.

9                        CROSS EXAMINATION

10   BY MR. WHITE:

11        Q.    Let me ask you, with regard to your experience in

12   capital cases, we spoke about a case on Wilbur Aaron Lam.

13   Defense counsel asked you if that case was reversed. Do you

14   remember why it was reversed?

15        A.    The Supreme Court readdressed certain types of

16   aggravators, I believe, and found that that aggravator would

17   no longer apply.  As a result, directed a resentencing,

18   directed that resentencing, or resentencing hearing, I

19   believe, to Judge Harris.

20        Without that particular aggravator, it's my recollection,

21   Mr. White, that in weighing process, the judge then imposed a

22   life sentence.

23        Q.    We can check the opinion and make sure whether

24   you're right, or wrong.  Was there a resentencing?

25        A.    Yes, there was.

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 45 of 83 PageID 1289

1      Q.   Did you participate in that, as well?

2      A.   Gosh, I don't know if I was with the office then.  I

3  probably would have, if I was still with the office, but I

4  left the office in May of '87.  I don't know when he was

5  resentenced.  I just don't recall, Mr. White.

6      One other thing on Mr. Lam, there was a co-defendant.  In

7  seeking the death penalty, we offered the co-defendant a 2nd

8  Degree Murder plea, and I believe there was a substantial

9  parity issue regarding -- or disparity issue regarding John's

10  -- I keep wanting to say it Haskins, or Haskell.  I forget

11  what his name was, but it seemed to me that that carried great

12  weight with Judge Harris.  I may, indeed, have handled that

13  resentencing.

14      Q.   Do you have any recollection of Court TV being there

15  because the sentencing of juveniles to death had become such a

16  hot issue?  Do you remember that?

17      A.   Yes.  In fact, I was in private practice at that

18  time.  I do recall that.  I recall watching that.  I believe

19  Mr. Onek was the defense lawyer.  You're right.

20      Q.   You think you were in private practice when that all

21  went down?

22      A.   Yes, sir.

23      Q.   Now, let's talk a little bit about, and let me show

24  you this to make sure you know what I'm talking about.

25  Exhibit J, which the defense produced.

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 46 of 83 PageID 1290

1      A.    Three by five cards.

2      Q.    Three by five cards.  Now, these cards, if they are

3  what Mr. Gruber says they are, would appear to be some sort of

4  cards created at the time Kim Hallick was going through a

5  bunch of photos.  Is that your understanding?

6      A.    It's my understanding that his inquiry regarded

7  those cards and notes taken by law enforcement officers, as a

8  result of conversations they had with her during that process.

9      Q.    Now, you knew she had gone through, I think we

10  referred to it as a box of photos?

11      A.    Correct.

12      Q.    Sixty-something photos.  Is that what was

13  represented to you by Mr. Fair, and Mr. Nyquist?

14      A.    It seems like it was 60, or so.

15      Q.    So it wasn't news to you that she went through a

16  bunch of photos?

17      A.    No.

18      Q.    In fact, you used that, and to the best you could,

19  in a suppression hearing, didn't you?

20      A.    I did.

21      Q.    It wasn't news to you that she saw some photos that

22  she thought looked similar to the man who had done this, isn't

23  that true?

24      A.    That's correct.

25      Q.    That's not news to you that some of the photos were

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 47 of 83 PageID 1291

STATE vs. GREEN;   10/28/03 - 10/29/03                          341

1    picked out as being this man looks like him, or maybe has

2    hair, or things like that?

3         A.    Sure.

4         Q.    So none of that is new.  That appears to be what

5    these refer to.  In one of them it says, possibly look alike,

6    photo pulled by victim.  That's not new, is it?

7         A.    No, in terms of whether or not Ms. Hallick --

8         Q.    Today, it's not the fist time you knew Ms. Hallick

9    pulled a photo and said, Hey, that kind of looks like him?

10        A.    I found that out during the discovery process.

11        Q.    You did work to try and develop another suspect, or

12   suspects that might have committed this offense, didn't you?

13        A.    Yes.

14        Q.    Did you try to persuade the umpire from Holder Park,

15   that maybe he had seen this Wilfred Mitchell that night?

16        A.    I did inquire of that, and --

17        Q.    So you tried, as best you could, to develop the

18   possibility that there might be another suspect, someone who

19   looks similar to him, might have been in the area, might have

20   had the opportunity?

21        A.    I tried to develop a suspect.  I have to tell you

22   that the way this person that allegedly perpetrated the crime

23   looked, and was described by Ms. Hallick, in no way resembled

24   the defendant by hair style.  It didn't.

25        In terms of developing any kind of suspect that may have

STATE vs. GREEN;   10/28/03 - 10/29/03

342

1  looked like the defendant, I found I was looking for people

2  that wore their hair that way, particularly the ringlets in

3  the hair at the time this particular crime occurred.

4  Mr. Green had a buzz cut.

5      Q.   I think I recall -- let me see if I can find it real

6  quick.  With regard to Deputy Walker --

7      A.   What?

8      Q.   Wade Walker?

9      A.   Yes.

10     Q.   Was that one of your concerns?  I know we're

11 reconstructing something you don't have a direct recollection

12 of, but do you recollect whether or not Walker had stated, in

13 his depo, or report, that she had told him his hair was short?

14     A.   No, I don't have a recollection of that.

15     Q.   If, in fact, he had recorded that, or had testified

16 to that in his depo, would you have wanted to put Mr. Walker

17 on the stand, and perhaps highlight that the very first person

18 she talked to, she said, the hair was short?

19     A.   I probably would not have wanted to put him on the

20 stand to say that because all the evidence indicated -- all of

21 her testimony subsequent to that time indicated it was long,

22 and certainly, that helped my case, I thought.

23     Q.   Well, it's all a question of developing a strategy,

24 and trying to figure out what was best for your client, is

25 that correct?

1    A.    Yes.

2    Q.    You attempted to do that?

3    A.    I did.

4    Q.    You felt very strongly about this case back then?

5    A.    I did.

6    Q.    You felt like you could obtain an acquittal in that

7    case, and that you did everything you could to do so.  Isn't

8    that correct?

9    A.    That was my intent.

10    Q.    Now, with regard to whether or not you deposed

11    Sheila, let's start with Sheila.  You indicated you spoke to

12    your client about it, Crosley Green.  What was it he told you

13    about whether or not you should deposed Sheila?

14    A.    He doesn't know.  In fact, I believe it was pretty

15    much his idea.  I told him we can ask for a continuance, I

16    could ask for an opportunity to speak with his sister.  He

17    didn't believe that's necessary.  He believes she would fold

18    in court, and we should go forward and do a cold

19    cross-examination of her.  I said, Okay.

20    Q.    From a strategic point of view, if you took the

21    deposition, might you lock her into a posture?  Now you have a

22    sworn statement under oath from her, another one, and she's

23    faced you, and she's taken this position.  Was that a

24    consideration?

25    A.    Well, any time you do a deposition, that's a

STATE vs. GREEN;   10/28/03 - 10/29/03

344

1   consideration, you know, but it also lets them know where

2   you're coming from.  It also lets the State know where you're

3   coming from, in terms of your inquiry.

4        I didn't disagree with Mr. Green.  In fact, I probably

5   agreed with him that that might be the best way to approach

6   his sister.

7        Q.   Did he feel confident that in the end, she would not

8   testify against him?

9        A.   Yes.

10       Q.   Did you have a sworn statement from her that had

11  been taken by, I can't remember who, but I think, perhaps,

12  Mr. Williams was present, her attorney was present, and

13  members from the US Attorney's Office?

14       A.   I recall, yes.

15       Q.   So you knew what she had committed to in terms of

16  what she was going to say?

17       A.   That's correct.

18       Q.   Isn't the same true with Lonnie?

19       A.   Yes.

20       Q.   You had a statement from him?

21       A.   That's correct.

22       Q.   It was under oath, and you knew what he pretty much

23  had to say, or else you were going to beat the dickens out of

24  him, right?

25       A.   I knew what the disclosed testimony was.

STATE vs. GREEN;  10/28/03 - 10/29/03

345

1    Q.   Again, it was a strategic decision whether or not

2  you go ahead, take the deposition, perhaps commit him.  Now,

3  he's given one sworn statement.  Is there a consideration that

4  if he's going to go into court, that he's going to switch

5  horses, and get on your team, that you might not want to set

6  him up with possibly two perjury charges by making him go

7  under oath, make him say what he's going to say?

8      Who knew what he was going to say.  Is he going to stick

9  to the State's side at that point, and maybe commit perjury

10 again?  Do you want to put him to that, or not?  Do all those

11 things go through your head?

12    A.   You know, probably, but I can tell you that because

13 Sheila's child was Mr. Hillary's, and because she was looking

14 at a significant amount of prison in the Federal system, and

15 because this statement of hers and his did not occur until

16 after her conviction, to me, those were the primary

17 motivations for me, in terms of cross-examination.

18     Worried about Mr. Hillary's potential perjury, I don't

19 think was something that I gave too much thought to.

20    Q.   If you hook him into another sworn statement prior

21 to trial, do you make it more difficult for him to come into

22 court, and deny what he said, if he's down twice under oath?

23    A.   Sure.

24    Q.   Do you believe that Lonnie's cooperation with the

25 State hinged on Sheila?

STATE vs. GREEN;   10/28/03 - 10/29/03                      346

1        A.    Yes.

2        Q.    Sheila was the issue, was she not?

3        A.    Yes.

4        Q.    Crosley Green told you, when it got down to it, she

5   wouldn't testify?

6        A.    Yes.

7        Q.    As to Jerome Murray, I just asked, you also had a

8   statement from him, did you not?

9        A.    I did.

10       Q.    I believe it's entitled SAI of Jerome Murray?

11       A.    Something like that.  I don't recall, specifically.

12       Q.    Which was a sworn statement he gave to me?

13       A.    Yes.

14       Q.    Would you have a real recollection of how many

15   peremptories you used?

16       A.    I accept what Mr. Gruber told me as true.  I don't

17   have a clear recollection.

18       Q.    Well --

19       A.    As he asked, Mr. White, I know I did not use all of

20   my peremptories.

21       Q.    I'm going to show him a copy of the trial

22   transcript, it's numbered page 364, up in the right-hand

23   corner.  Let me ask you to take a look at this page here, page

24   364.  See if you can determine from that, and refresh your

25   recollection as to whether or not, in fact, it was six

Case 6:14-cv-00330-RBD-GJK  Document 3-40  Filed 02/27/14  Page 53 of 83 PageID 1297

STATE vs. GREEN;  10/28/03 - 10/29/03

347

1   peremptories that you used.

2        A.    It appears by this that I made at least nine

3   peremptory challenges, without reading further.

4        Q.    Okay, I think that may be it, but you had what, ten?

5        A.    Capital, yes.

6        Q.    It appears you used at least nine?

7        A.    Yes.

8        Q.    Let that not confuse you.  I almost forgot something

9   I wanted to ask you.  Do you recall, in this case, if we had

10  filled up the box with perspective jurors?

11       A.    It's my recollection we did.

12       Q.    So, however many we got up there, would you quarrel

13  with me if I told you there were only 18 when we began?

14       A.    I have no reason to doubt that.

15       Q.    If we have that many folks up in the box, when we

16  got down there towards the end, we were doing peremptories, do

17  you know whether or not you knew who was going to come up

18  next, if you struck Mr. Guiles?

19       A.    Sure, I was very well aware of that.

20       Q.    In fact, as you read here, did you get to the part

21  where you started talking about alternates?

22       A.    I did not.

23       Q.    On page 367, if you go down to line 18, I believe

24  they started talking about that.  Why don't you read that

25  transcript so it refreshes your recollection a little bit.

1      A.    How far do you want me to go Mr. White?

2      Q.    As far as you need to, to determine whether or not

3    there were folks up in the box to become the 12th juror, if

4    you excused Mr. Guiles.

5      A.    Okay.

6      Q.    While you're looking, see if you objected to any of

7    the prospective alternates that came up.

8      A.    What I'm gleaning from this is the judge asked those

9    who we had requested peremptory strikes for, to step away, and

10   then we started discussing whether or not -- I may be wrong,

11   Mr. White, whether or not any of those we struck peremptorily

12   were accepted as alternates.

13     Q.    Can you see where we discussed whether or not people

14   who were not struck, but who had come up for the rotation for

15   alternates, were there any folks who left, that had become

16   alternates?

17     A.    I'm sorry, if they're there, if it's there, I missed

18   it.

19     Q.    That's fine.

20     A.    Wait a minute, I'm sorry.  Yes, he's talking -- oh

21   yeah, here we go.  The jury was sworn.  He is talking to the

22   jury about it's difficult to sit through, even though you're

23   not in the jury box.  It's more interesting when you're up in

24   the jury box, and you're being inquired.

25        When we pick smaller juries, we don't need to take as

STATE vs. GREEN; 10/28/03 - 10/29/03

349

1    much time.  He's thanking those in the venire who did not get

2    chosen, who were in the venire, and called into the box.

3         Q.   I know you're not meaning to be nonresponsive.

4    You're looking through to see if you might find it.  May I

5    look at the exhibit, maybe, if it's there, I can find it.

6         A.   Okay.

7         Q.   Let's move on.  The record will resolve that.  With

8    regard to the issue of Mr. Guiles, do you recall the testimony

9    that, I guess, it's his testimony that he gave at the actual

10   proceeding regarding his niece?

11        A.   I recall it because it's written down in the

12   transcript.

13        Q.   Have you read it recently?

14        A.   Yes.  Well, I read excerpts from it.

15        Q.   Okay.  You remember?

16        A.   That was marked.  I just marked it.

17        Q.   Okay.  So you have offered your opinion that you

18   believe that you should have moved to excuse him for cause

19   based on what he said about having a niece that had been

20   murdered three years ago, in Naples.  Is that correct?

21        A.   If I was going to make a for cause objection of

22   Mr. Guiles, and I only made it because of pretrial publicity,

23   then I should have also made the objection based on the

24   homicide involving his niece.  That's all I was saying.

25        Q.   Got you.  Let's talk a little bit about venue,

STATE vs. GREEN;   10/28/03 - 10/29/03

350

1    motion for change of venue.  I think you were discussing the

2    issue, you thought this case was moved to Melbourne, and you

3    thought that, in fact, the venire was pulled from Melbourne.

4         A.    I believe that's correct.

5         Q.    Now, in order to obtain a change of venue, wouldn't

6    you be required to convince the court that there had been so

7    much adverse publicity, that you could not seek a fair

8    impartial jury?

9         A.    That's correct.

10        Q.    I suppose another way to do it would be to try and

11   show that the community was in such an outrage, that you

12   couldn't seek a fair and impartial jury?

13        A.    That's correct.

14        Q.    When you moved to Melbourne, that took care of the

15   minority issue, because Melbourne and Titusville are 40 miles

16   apart, in separate communities, aren't they?

17        A.    Yes.

18        Q.    The only reason you'd move for a change of venue is

19   that you could argue that there had been so much publicity,

20   you couldn't get a fair jury.

21        A.    Either that, or if the jurors began explaining, or

22   expressing concerns about the publicity, and things of that

23   nature.  That wasn't the case, as I recall.

24        Q.    In fact, there were very few jurors who had read, or

25   heard anything about the case.

STATE vs. GREEN;   10/28/03 - 10/29/03                    351

1    A.   That's correct.

2    Q.   Do you remember whether or not, in fact, as you
3    suspect, these jurors were selected from the south end of the
4    county?

5    A.   You know, I'm thinking it was a regional selection
6    in the county, and I would like to say that yes, that's what I
7    believe, but I can't remember.

8    Q.   Let me ask you if it might refresh your recollection
9    from page 145 and 146, and perhaps 147 of this transcript,
10   from the trial.  It starts down here towards the bottom,
11   probably about line 17.

12   A.   Okay.

13   Q.   What does that seem to reflect?

14   A.   It reflects that you inquired of each individual
15   juror as to where they actually lived, and all of them lived
16   in Melbourne, Melbourne Beach, or cities south.

17   Q.   Which would seem to comport with the belief that the
18   venire was from the south end only?

19   A.   Yes.

20   Q.   Have you reviewed the transcript, with regard to
21   Mr. Karns, or Karn, whichever it is, your alibi witness?

22   A.   Which one, the trial?

23   Q.   I'm sorry, the transcript of the trial.

24   A.   I have not.

25   Q.   So your testimony about how you believe his

STATE vs. GREEN;   10/28/03 - 10/29/03

352

1   testimony kind of broke down on you during the course of the

2   trial is based on your recollection of some 13 years ago?

3       A.   Yes.

4       Q.   Would you be willing to abide by whatever the record

5   shows, if it may differ from your recollection, in some

6   respect?

7       A.   Absolutely.   Whatever the record says is what

8   happened.

9       Q.   The key thing was, based on your review,

10  Ms. Brothers could corroborate that Green was there, and about

11  at different times?

12      A.   Yes.

13      Q.   But the problem was, you had to try and show that he

14  was there at a fairly specific time, didn't you?

15      A.   That's correct.

16      Q.   Because the place that they were, which was in, I

17  guess, what we might call the projects, up in Mims?

18      A.   I think it was government housing, yeah.

19      Q.   Is really about a mile from the grove where the

20  shooting took place in this case, isn't that right?

21      A.   I believe that's correct, and about, maybe, a little

22  longer to Holder Park.   It was relatively close,

23  geographically.

24      Q.   Correct, you're right.   Holder Park would have been

25  from there, to the best of your recollection, probably, west a

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 59 of 83 PageID 1303

1    couple miles?

2         A.   Yes, west, and I think it was around three miles.

3         Q.   So the alibi is an attempt to alibi him from being

4    able to be at a place that's pretty darn close?

5         A.   No question, it was.  The times were tight.

6         Q.   If Mr. Karns could not tie that down for you

7    tightly, then you had the possibility that he might have been

8    over there, might have left, done the crime, come back, fallen

9    back again?

10        A.   That's correct.

11        Q.   In fact, that's what my recollection, I think that's

12   what the State portrayed is that's when it, in fact, happened.

13        A.   Okay.

14        Q.   But Ms. Brothers couldn't help you with any Definity

15   about the time line, could she?

16        A.   No.

17        Q.   Only Mr. Karns could seem to be definite?

18        A.   Yes.

19        Q.   Did you have knowledge that Mr. Green said he had

20   also been around other people that night, at different times,

21   like Aretha Griffin, or Lori Rains, any of those names?

22        A.   I remember Ms. Rains.

23        Q.   Did you attempt to develop her as a witness, as

24   well?

25        A.   Oh, yes.

STATE vs. GREEN;   10/28/03 - 10/29/03                        354

1      Q.   Let's talk about the flight issue.  If I heard
2  right, you were testifying about Deputy Copenhaver supposedly
3  having gone to this government housing where Carlene Brothers
4  lived the morning after the murder.  Is that right?

5      A.   That's my recollection at this time.

6      Q.   Well, isn't it true that Mr. Green did not become
7  the suspect in this case for a day or two after that.  Isn't
8  that true?

9      A.   Whenever it was, Mr. Curtis stepped forward and
10 said, That looks like Crosley Green.  Whenever that occurred,
11 I think that's when everybody focused on Mr. Green, if I'm not
12 -- I think that's what happened.

13     Q.   Perhaps it would tie into when Kim Hallick actually
14 made an identification of Mr. Green?

15     A.   Right.

16     Q.   Whenever that occurred?

17     A.   Okay.

18     Q.   There is a period of time, frankly, when the police
19 did not know who their suspect was, wasn't it?

20     A.   It was a period of time until Ms. Hallick identified
21 him.

22     Q.   During that period of time, frankly, the police were
23 not looking for Crosley Green, were they?

24     A.   You know, I don't know the answer to that, Mr.
25 White, only because I believe Mr. Curtis, by his telling the

1   police that this is the person that's in that lineup, I don't

2   know that the police, at the same time they were trying to

3   find a photo of him, weren't looking for him at the same time.

4   I just don't know that.

5       Q.   Well, let's put it this way.  Let's look at it

6   differently.  Until such time the news broke that Crosley

7   Green was a suspect, Crosley Green had no way of knowing he

8   was a suspect, to your knowledge, did he?

9       A.   Not from publication, not from that.

10      Q.   So if he's in the community, as far as he knows,

11  until it hits the paper, and certainly until the police

12  develop him as a suspect, he would have no reason to think

13  that the police were hot after him, would he?

14      A.   That's my -- I agree with that.

15      Q.   There was such a period, however long it might have

16  been?

17      A.   You're correct.

18      Q.   But it probably was in existence the very morning

19  after the murder, wasn't it?

20      A.   I'm sorry, it probably wasn't?

21      Q.   It was.  It was probably a state of affairs the

22  morning after the murder.

23      A.   I'm sorry, maybe I'm missing you, but.

24      Q.   That's okay, let me try and restate it.  As of the

25  time that Mr. Copenhaver went over to Ms. Brothers', that

1  would have been within eight hours, ten hours of the murder,

2  correct?

3       A.   Yes.

4       Q.   As of that time, to your knowledge, had Kim Hallick,

5  Tim Curtis, or anybody else, point out Crosley Green as being

6  the suspect in this case?

7       A.   I don't believe so.

8       Q.   Until such time as that happens, Mr. Green was not

9  being searched for, specifically him, by the police, was he?

10      A.   I presume not.

11      Q.   Mr. Green indicated to us that he told you that he

12  did leave the area.

13      A.   Yes.

14      Q.   What did he tell you about what he had done within

15  the days following the murder, do you remember?

16      A.   Yeah, he said he went and worked as a fruit picker

17  for a harvester.  I can't recall whether it was US1, up along

18  US1, or whether it was 95, but he traveled up that way, and

19  worked his way, and I believe he said -- I think he said he

20  went to Daytona Beach, stayed there for a while, and then came

21  back.

22      Q.   Do you have any recollection as to how soon after

23  the murder he said he left?

24      A.   I don't have a specific date or time in mind.  I

25  can't recall.  It was close to that time.

STATE vs. GREEN;  10/28/03 - 10/29/03                         357

1    Q.   Okay.  Did you ever discuss with him whether or not

2   he knew, in fact, he was a suspect, and the police were

3   looking for him in that murder?

4    A.   I did.

5    Q.   What did he say?

6    A.   He said he was working as a migrant worker up the

7   coast, and didn't realize it.  I can't recall whether he

8   turned himself in, or whether he was picked up, approximately,

9   a month later, I believe.  I'm not sure.

10   Q.   It's been so long ago, I hate to offer my

11  recollection.  We'll just leave it that you're not sure.

12   A.   Okay.

13   Q.   Well, that would tend to indicate, then, that he

14  left before it hit the headlines that Crosley Green is wanted

15  in the murder of Charles Flynn.

16   A.   It was after.  It's my recollection, he left after

17  Mr. Flynn's death, and before it was public knowledge.

18   Q.   That he was the suspect?

19   A.   That's correct.

20   Q.   At least, that's what he told you.  He didn't know

21  it, none of his family, none of his friends told him, didn't

22  see it in the papers, didn't see it on TV, he just decided it

23  was time to leave and pick fruit up there in Bennell for a

24  while?

25   A.   Yeah.

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 64 of 83 PageID 1308

1      Q.   There was a question about whether or not you ever

2   got the Criminal Justice Institute records, earlier, remember

3   that?

4      A.   Oh, yeah.

5      Q.   Now, having had some time to sort through all of

6   this, would you agree that there were, perhaps, two sets of

7   records in this case, and that one set were records that were

8   created by Odell Keiser when he did local training with his

9   dog, and another set were records created at the CJI, when he

10  and the dog were trained together, initially, and perhaps

11  later for recertification?

12     A.   Now that you say that, it seems to me that I did

13  review records, and had records of Mr. Keiser's initial work

14  with the dog, initially, and I believe I recollect that, you

15  know --

16     Q.   Well, maybe this will -- did you go down to, I think

17  it was West Palm?  Did you depose Bob Cook, with CJI?

18     A.   Yes.

19     Q.   Was he, in fact, the man who trained Odell Keiser

20  and his dog, together?

21     A.   I believe so.

22     Q.   I was thinking a minute ago, do you recall, is Odell

23  Keiser --

24     A.   Pretty much summed it up, right there.

25     Q.   Is Mr. Keiser quite southern in his speech?

STATE vs. GREEN;   10/28/03 - 10/29/03

359

1    A.    Yes.

2    Q.    Do you recall him expressing to you the problems

3   this German dog had understanding him?

4    A.    As I recall, there was some problems with the

5   initial training of the dog in German, and now they had to

6   deal with him.

7    Q.    In terms of preparing to meet that, did you examine

8   the reports and photographs, and everything that you could

9   find that was available, as to how the dog tracking was

10  done --

11   A.    Yes.

12   Q.    -- in that particular case?

13   A.    Yes.

14   Q.    Did you prepare a strategy for attacking?

15   A.    I did.

16   Q.    Did it have to do, to some degree, with the fact

17  that Odell Keiser, in his report, said the dog stopped

18  tracking --

19   A.    In the intersection.

20   Q.    Well, let me see.

21   A.    I recall that because when I reviewed the

22  transcript -- I believe you're getting ready to show me the

23  judge's participation.

24   Q.    Well, let's see, on page 1344, beginning at line 3,

25  I think that is.

1          "Question:  Do you also recall saying in your

2     statement, and then you quote, "Does this say here

3     Czar then turned West on Briar Cliff Way, Czar

4     continued to track to near the intersection of Briar

5     Cliff and Belvadere, where he stopped tracking?

6          A.   That's correct.

7          Q.   That's the real language, not the middle of the

8     intersection, not in the intersection, but near the

9     intersection.  That's what you impeached him with was his

10    report, right?

11         A.   Right.

12         Q.   The judge went ahead and asked him -- what did the

13    judge ask.

14         A.   He said, Is that what your notes say?

15         He said, No, that's not what my notes say.

16         Q.   Okay.  That's on the next page.  He pulled them out

17    of his back pocket, says that he stops at the intersection,

18    correct?

19         A.   Okay.

20         Q.   So he was testifying at trial that, in fact, the dog

21    went into the yard of Celestine Peterkin?

22         A.   That's correct.

23         Q.   Did you bring forth the idea that there were some

24    dogs barking up there?

25         A.   Yes.

1      Q.    They may have distracted this dog?

2      A.    Yes.

3      Q.    Maybe his dog would have continued tracking on down

4   the road, but for the fact that a dog drew him up there?

5      A.    I did.

6      Q.    You did all that, right?

7      A.    I did.

8      Q.    There was a question of you regarding whether or not

9   this New York youthful adjudication, which, first of all, at

10  the time that occurred, what's your understanding as to how

11  old Crosley Green was, or more specifically, was he a juvenile

12  at the time that he committed that offense?

13     A.    He was of majority, according to Florida law, which

14  was 18 or 19 at the time.

15     Q.    Did Mr. Green ever tell you anything about this

16  being some sort of a possible juvenile conviction, or even

17  that it was a youthful offender conviction?

18     A.    Youthful offender, I'm not sure, Mr. White, but we

19  never -- I was never advised that it was handled in our type

20  of juvenile court, or in juvenile court.

21     Q.    And at the time that you were considering all of

22  this, were you aware that the law in Florida seemed to

23  indicate that if it had been a juvenile adjudication of

24  delinquency, it still could have been used to prove up this

25  aggravator?

STATE vs. GREEN;  10/28/03 - 10/29/03                    362

1     A.    I was aware.

2           MR. GRUBER:  I'll object to that being offered

3     to the truth of the status of the law.

4           THE COURT:  Sustained.  The law is the way of

5     the law.  This Court determines the law issues,

6     correct?  You're asking him what his mental

7     impression is?

8           MR. WHITE:  I asked him --

9           THE COURT:  You're not saying that's what the

10    law was.  The law is for the Court.

11          MR. WHITE:  I understand.  I think what I asked

12    him was, is it his recollection that at the time the

13    law seemed to be in Florida, that a juvenile

14    adjudication delinquency could be used to prove up.

15          THE COURT:  In other words, if that's what he

16    thought it was.

17          THE WITNESS:  That's what I thought.

18          THE COURT:  You thought that's what it was?

19          THE WITNESS:  Yes.

20    BY MR. WHITE:

21    Q.    So, if a juvenile adjudication of delinquency could

22    be used, would a youthful offender adjudication, for which

23    your client, he was 18 at the time, got a four-year sentence

24    to prison, is there anything about that that would raise red

25    flags, and make you think that this can't be used to prove

1    that my client has committed a prior felony?

2         A.    Not now, and even looking back at the Statute, I

3    would have felt that New York can't dictate to Florida how

4    that prior conviction, or withheld adjudication, whatever it

5    was, how that could be used.  I'm still not sure I agree that

6    Florida couldn't treat it the way I thought it would be

7    treated, but.

8         Q.    All right.

9         A.    As I recall the Statute, it says, This cannot be

10   treated -- this will be treated as a -- this will be, for

11   purposes of certain times, certain types of jobs, and

12   participation in government in the State of New York, this

13   particular, under this Statute, will not be treated as an

14   adjudication.

15        To me, that means within the confines of the New York

16   Statute for those specific purposes, it will not be treated as

17   an adjudication.  Now, in Florida, for purposes of penalty

18   phase, I still -- my first impression would be, it's going to

19   count.

20        Q.    Now, let's talk for a minute about that conviction,

21   okay?  First of all, do you understand the law to be, and to

22   have been at that time, that if I, the prosecutor, could have

23   used that conviction to impeach him during the guilt phase, if

24   he took the stand, that I could not have brought forth that it

25   was a robbery unless he denied the conviction, and I have got

STATE vs. GREEN;   10/28/03 - 10/29/03

364

1  to do that in order to try and refresh his recollection, or in

2  order to prove it up, I actually introduced the conviction?

3      A.   Right.

4      Q.   So, if he were going to be impeached, it would be

5  only by the fact that he's been convicted of prior felony.  He

6  had other prior felonies, didn't he?

7      A.   There was the prior cocaine possession, and I

8  believe I was aware of an indictment for either sale of

9  heroine, or not, but the State could not properly prove up the

10 identity of the person in that indictment.

11     Q.   But there was at least one Florida conviction,

12 because you were aware he had just gotten out of prison for

13 that one?

14     A.   Yes.

15     Q.   So if anything, you were considering whether or not

16 having a second felony conviction, as opposed to just one, was

17 really going to make it unfeasible to put him on the stand.

18     A.   Certainly, that was a consideration.  I didn't want

19 to expose him to that.

20     Q.   Was the bigger issue what he had told you about what

21 he had been doing that night?

22     A.   Yes.

23     Q.   What had he told you he had been doing that night?

24     A.   As I debriefed him about what our defense could be,

25 he said that he had been at Lori Rains' house.  He said he was

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 71 of 83 PageID 1315

1   at Lori Rains' house during the course of the night and

2   evening.

3        Of course, Lori Rains lives in the same general area as

4   these orange groves were located.  He said that he and Lori

5   were having a sexual relationship, that her husband was not

6   there, and that they were selling cocaine out of her house.

7        I said, Well, okay.  That's against the law, but it sure

8   beats the heck out of being convicted of homicide.  Let's get

9   our times firmed up.

10       I tried to do that, and he said, Listen, you know, we

11  were smoking crack, doing crack.  I would fall asleep.  I

12  can't tell you the times.  I can't be specific.  I just don't

13  know.  And so there was no way that I was going to try and

14  utilize that as an alibi.

15       I could see him testifying, Well, I was cracked out of my

16  mind.  I don't remember, really, what happened, but you talk

17  to Lori.

18       Well, I tried to talk to Lori, couldn't find her.  She

19  wouldn't do anything, she wouldn't come.  I couldn't get in

20  her house.  I don't know how many times we went to her house.

21  Crosley reported to me, Well, you know, she doesn't want her

22  husband to know I was sleeping with her.

23       So I never was able to get in touch with her such that

24  she would testify regarding that particular explanation of

25  events.

1      Q.   Okay.  Now, with regard to mitigation, I know this

2    is in your affidavit, there is a couple of entries about

3    contacting Dr. Greenblum, reviewing things with him on the

4    telephone, bills, etcetera.  What role did Dr. Greenblum have

5    in this?

6      A.   I sought to have Dr. Greenblum evaluate Mr. Green in

7    attempt to determine there was any mitigation that I might

8    find is useable in the penalty phase.

9      Q.   Did you, in fact, call Dr. Greenblum?

10     A.   I did.

11     Q.   I don't mean on the phone.  You did call him on the

12   phone, right?

13     A.   I did not call Dr. Greenblum.

14     Q.   At trial, as a witness, is what I meant.  That's my

15   fault.  Why not?

16     A.   Because through our discussions, he was diagnosed as

17   a sociopath.  He had no remorse for this particular event, and

18   that that would come out.  I didn't want that to come out.  I

19   didn't find that as a mitigator.  I understand that now it

20   might be, but I didn't want that to come out, so I didn't call

21   him.

22     Q.   Do you recollect whether he did offer you anything

23   else that you thought might be mitigating?  Did he offer you

24   an opinion, himself, as to whether or not he thought he could

25   help you?

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 73 of 83 PageID 1317

```
 1        A.   Yes, he said there is nothing he can tell me.

 2        Q.   That would be of assistance?

 3        A.   Right.

 4             MR. WHITE:  One moment.

 5             THE COURT:  Yes, sir.

 6   BY MR. WHITE:

 7        Q.   I know it's been a long time since this case

 8   happened, so if you don't remember, you don't remember.  But

 9   do you recall -- first, let me focus you.  Do you recall what

10   physical evidence was in this case, if any?

11        A.   Uh-huh.

12        Q.   Do you recall that the crime scene folks did a

13   vacuuming, or sweeping of the victim's truck?

14        A.   Yes.

15        Q.   I'm trying to remember this, too, so if you

16   disagree, let me know.  In that vacuuming, do you recall there

17   were two Negroid hairs found?

18        A.   I did.

19        Q.   Did you ever discuss that with Mr. Green?

20        A.   I did.

21        Q.   Did you discuss it in the context of should we maybe

22   see if we can get these tested for DNA?

23        A.   I did.

24        Q.   What did Mr. Green tell you?

25             MR. GRUBER:  I'm going to object.  It's outside
```

1          of the pleadings entirely.  I know where it's going.

2          It's completely outside of any of the issues in

3          these proceedings.

4                    THE COURT:  Overruled.

5                    THE WITNESS:  I told him that DNA technology

6          was newly forming.  I'm not sure whether it met the

7          Fry standard at the time.  I didn't talk to him

8          about that, but it was new.  They did have these

9          Negroid hairs, and because his fingerprints, because

10         there were unknown fingerprints on the car, not his,

11         would he like me to send these particular -- we

12         might need to send these hairs off to say that if,

13         indeed, mitochondrial was working, we would some way

14         know it's not his.  I inquired him, does he want me

15         to do that, and he said, no.

16    BY MR. WHITE:

17         Q.    All right, you did not seek to have that done?

18         A.    I did not.

19         Q.    Did you involve Mr. Green, throughout the course of

20    your preparation, and throughout the trial, involve him in the

21    decisions that you were making, and get his input?

22         A.    Absolutely.

23         Q.    During the course, for instance, of jury selection,

24    did you and he discuss the prospective jurors?  Did you take

25    into account how he felt about the prospective jurors?

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 75 of 83 PageID 1319

1      A.    Absolutely.

2            MR. WHITE:  No further questions, your Honor.

3            THE COURT:  Okay.  Mr. Gruber, redirect?

4            MR. GRUBER:  Yes.

5                     REDIRECT EXAMINATION

6    BY MR. GRUBER:

7      Q.    Was Lori Rains' place, where she was living, across

8    the street from Carlene Brothers, as you recall?

9      A.    That's not my -- I don't recall that.  That's -- I

10   don't think that's correct.

11     Q.    Do you recall if they were very, very close?

12     A.    I believe they were all geographically very close.

13     Q.    In other words, it would be a minute walk, or

14   something of that sort?

15     A.    Yeah.

16     Q.    Do you recall the last page of Dr. Greenblum's

17   report?

18     A.    No, I don't.

19     Q.    Do you recall if it says anything about hoping that

20   the court would take into account the circumstances of Crosley

21   Green's life, in mitigation?

22     A.    Yes.

23     Q.    Did it say something to that effect?

24     A.    I think so.

25     Q.    You referred to some discussions that you had with

STATE vs. GREEN;  10/28/03 - 10/29/03                    370

1    Crosley during the course of your representation.  Do you have

2    any log, notes, contemporaneous record, of what those

3    discussions were?

4         A.   Do I have them, no, I don't have those.

5         Q.   Do you believe they were destroyed along with the

6    other parts of the file that were destroyed?

7         A.   I do.

8              MR. GRUBER:  That's all, thank you.

9              THE COURT:  Thank you, Mr. Parker.

10             MR. GRUBER:  I'm sorry.

11   BY MR. GRUBER:

12        Q.   Did you know anything about Sheila being on suicide

13   watch?

14        A.   I did not.  At no time did I ever have any

15   indication she was on suicide watch.

16        Q.   Aside from the statements that you got from the

17   witnesses, in particular Lonnie and Sheila, aside from those

18   statements, those records of -- I'm trying to remember what

19   they were.  Well, the recorded statements they gave to the

20   State authorities at one time or another, did you have any

21   other documentation with regard to those witnesses, at all?

22        A.   No.

23             MR. GRUBER:  Okay, that's all.

24             THE COURT:  Okay, thank you, Mr. Parker.  Is

25        that it for witnesses?

1    MR. GRUBER:  That's all we have, your Honor.

2    MR. WHITE:  Judge, I'm sure the Court may

3    recall, but we had agreed, basically, that if we had

4    a rebuttal to this, we weren't going to present it

5    today.  I don't know how we're going to go from

6    here.

7    THE COURT:  Let's figure that out.

8    MR. WHITE:  They're the moving party.  I don't

9    know if they have additional witnesses that they

10   need to call.  I think they do, as to their other

11   claims.  They may or may not have been included in

12   the testimony we have heard so far.

13   And then, of course, the issue is, the State

14   would have some rebuttal to, I believe, some of

15   those things that we want to present.  We need to

16   figure out --

17   THE COURT:  Mr. Gruber, we're trying to get it

18   done by the end of the year, as I recall.  We need

19   another -- are there more witnesses you have got to

20   call?

21   MR. GRUBER:  Yes.  I realized this topic would

22   come up.  I don't have a really well thought out

23   answer.  Does the Court have any idea?

24   THE COURT:  An eighty percent answer would be

25   all right.  Do we need another two days of time,

1    would you say?

2         MR. GRUBER:  I know for a fact the mitigation

3    we would present would easily cover a day, if not

4    more, and that's in and of itself.  We have, I would

5    really think, about four days, allowing for some

6    sort of cross-examination.  Probably, let me say

7    four or five days for us to present our case.

8         THE COURT:  Another four or five days?

9         MR. GRUBER:  Yes.  I have a feeling I'm cutting

10   it short.

11        THE COURT:  That's going to be hard to get in

12   between now, and the end of the year.  Does it work

13   to do it two days at a time?  Does that work for

14   you, or would you prefer to have a straight block?

15        The reason I say that, how much time do we need

16   to get ready?  I have a trial docket, January 19th.

17   It's a nine day docket, civil trial docket.  It

18   doesn't have many cases.  It's got two big cases.  I

19   didn't load it.

20        Chances are awfully good that those cases will

21   probably settle.  I may have a lot of time during

22   that period of time to do that.  It might be a

23   possibility that we can give you four days, or

24   something like that, maybe even five in that block

25   of time.

Case 6:14-cv-00330-RBD-GJK  Document 3-40  Filed 02/27/14  Page 79 of 83 PageID 1323

1       MR. GRUBER:  If we're going to do it, I'll tell

2  you, I personally like doing it in stages, and I

3  suspect the State does too, because it's a little

4  bit easier on the lawyers.

5       THE COURT:  That's true.  So you prefer, like,

6  to have a two-day block type thing?

7       MR. GRUBER:  I'm not pushing for that so much.

8  If the Court does have a -- basically, a week block

9  available, then do that.  But what you haven't said

10  is when that's coming up.

11       THE COURT:  It's January 19th.

12       MR. GRUBER:  Okay.

13       THE COURT:  It's that week.  I think the 19th

14  is a holiday.  I've got nine days.  I may be wrong.

15  I'm not wrong about the date, but the trials may go,

16  too.  If it does, then I'm done.

17       MR. WHITE:  I hate to be the bearer of bad

18  tidings, of course you can make the bad tidings my

19  own, but I have scheduled to go for a week long

20  cruise, starting the week of January 17th.

21       THE COURT:  That counts.  It's too hard to get

22  vacation.

23       MR. HOLMES:  We're trying to.

24       MR. WHITE:  Just ignore him.

25       THE COURT:  That's one thing I know, it's hard

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 80 of 83 PageID 1324

1    for everybody to get time to take off.  That's

2    important.  I guess what I'm saying is, would you

3    prefer to do it like we did this time, have a couple

4    of days?  It's probably easier for me to schedule.

5    I can go -- because I usually go two hearing days,

6    three trial days, is what my schedule is.  You know,

7    two hearing days, and three non-jury trial days.  I

8    probably could accommodate you in there somehow,

9    just to get it done.

10        Which would you prefer?  I'll try to

11   accommodate you, all of you, really.

12        MR. GRUBER:  Simply put, my client would like

13   to do it all in a block.

14        THE COURT:  Let me work on doing that.

15        MR. GRUBER:  However, if not, if there are a

16   couple of days that become available, we're ready to

17   do that, too.

18        THE COURT:  Let me get with her.  So we have

19   got some legal arguments to make, we have rebuttal

20   by the State, we have a lot of things.

21        MR. GRUBER:  The only thing --

22        THE COURT:  Your experts will be in the area of

23   what now?

24        MR. GRUBER:  I'm thinking.  I need to check

25   with them.  I haven't checked with them in a long

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 81 of 83 PageID 1325

1    time.  I'm thinking two days for the experts, a day

2    and a half for mitigation, and possibly other lay

3    witnesses.  I'm sorry, that's about -- I'm sort of

4    thinking out loud here.  A basic block of four to

5    five days.  Two day statements would work.  Even a

6    one day statement would work.

7         The one thing I know that would move on very

8    quickly would probably be mitigation of witnesses.

9    That would be -- two days should be given for that,

10   at least a day and a half.

11        THE COURT:  Okay, let me work on -- I'll maybe

12   give you some options, okay?

13        MR. GRUBER:  The one thing I have a severe

14   problem with is for the rest of this month.

15        MR. WHITE:  That would mean tomorrow, wouldn't

16   it.

17        THE COURT:  November?

18        MR. GRUBER:  Yes, sir.

19        THE COURT:  I've got trial dockets and

20   everything else.

21        MR. GRUBER:  One additional matter, we have a

22   copy of a fingerprint card in 88-13574, MM, which is

23   the retail theft, which would be a crime involving

24   dishonesty.  It has fingerprints on it.

25        THE COURT:  Is that the one that goes with

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 82 of 83 PageID 1326

1    that?

2         MR. GRUBER:  The Court sustained an objection

3    based on lack of fingerprints.  Maybe Mr. Holmes can

4    look at it.

5         MR. HOLMES:  If you wish to pull the other two,

6    I'll be glad to look at the fingerprint cards.

7    Preliminarily, it appears to be the same.

8         MR. WHITE:  You don't have to look at the

9    copies?  I'm objecting to his opinion until he at

10   least looks at the other ones.

11        MR. GRUBER:  My client wishes to be returned to

12   DCI as quickly as possible.

13        MR. HOLMES:  Your Honor, based on my

14   examination, the State would not raise an objection.

15        THE COURT:  Very good.  That would make the

16   exhibit, Exhibit O. We'll attach the fingerprints

17   and receive it in evidence, is that all right, Mr.

18   Gruber?

19        MR. GRUBER:  Thank you, sir.

20        THE COURT:  So that will be the next numbered

21   exhibit.  So overrule the objection based on

22   Mr. Holmes' examination of fingerprints.

23        (Whereupon, Defendant's Exhibit O was received

24   in evidence as Defendant's Exhibit Number 12.)

25        (Whereupon, these proceedings were concluded.)

Case 6:14-cv-00330-RBD-GJK   Document 3-40   Filed 02/27/14   Page 83 of 83 PageID 1337

1

2

3

4          THE CERTIFICATE OF REPORTER.

5

6

7      I, Jennifer J. Zanmiller, Court Reporter, do

8  hereby certify that I was authorized to and did

9  report the foregoing proceedings, and that pages 1

10  through 376 are a true and correct record of my

11  stenographic notes.

12

13

14      Dated this 4th day of November, 2002.

15

16

17

18

19

20          JENNIFER J. ZANMILLER

21          COURT REPORTER

22

23

24

25

Brevard Associated Court Services, Inc.
321/242-8080
www.kingreporting.com