UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CROSLEY ALEXANDER GREEN,

        Petitioner,

v.                               Case No: 6:14-cv-330-Orl-37TBS

SECRETARY, DEPARTMENT OF
CORRECTIONS and ATTORNEY
GENERAL, STATE OF FLORIDA,

        Respondents.
_____/

### <u>AMENDED ORDER</u>[1]

      This cause is before the Court on the Order (Doc. 41) entered by the U.S. Court of Appeals for the Eleventh Circuit ("**Eleventh Circuit**"), which reversed this Court's "dismissal of Mr. Green's § 2254 petition as time-barred and remand[ed the case] for further proceedings." (Doc. 41 at 10.)[2] The Court directed the parties to file additional briefing. (*See* Doc. 42). Respondents filed a Supplemental Response to Petition (Doc. 54 ("**Supplemental Response**")), and Petitioner filed a Reply (Doc. 57) to the Supplemental Response.

### I.    PROCEDURAL AND FACTUAL BACKGROUND

---

[1] This Amended Order modifies the entry of judgment from the Court's previous order (Doc. 70), which the Court vacated (Doc. 73).

[2] Specifically, the Court dismissed Petitioner's Amended Petition for Writ of Habeas Corpus (Doc. 10 ("**Amended Petition**")). Petitioner filed a Memorandum of Law (Doc. 11) in support of the Amended Petition.

The procedural background of this case is set forth in the Court's Order of January 20, 2016 (Doc. 37) and is incorporated herein.

On direct appeal, the Supreme Court of Florida set forth the factual summary of the underlying conviction:

> The record reflects these relevant facts:  Late in the evening of April 3, 1989, Kim Hallock and Flynn, whom she had dated, drove to a park in Flynn's pickup truck.  They parked near dunes in a wooded area and smoked marijuana.  As they smoked, a sheriff's car drove by and shined its spotlight, but did not stop at the truck.  After the sheriff's car passed, a man walked in front of the truck and stopped at the driver's door. He warned Hallock and Flynn to watch out for the police, then walked on.
>
> A few minutes later, Flynn stepped outside the truck to relieve himself. Hallock testified that she soon heard Flynn say nervously:  "Hold on. Wait a minute, man. Hold on.  Put it down."  She retrieved a gun from the truck's glove compartment and put it under some jeans on the seat next to her.  She testified that when she looked outside the truck, she saw the man she had seen earlier.  He was now walking around Flynn and carrying a gun.
>
> The man ordered Flynn to the ground, then asked if either of them had any money.  Hallock gave him five dollars, but Flynn said he had no money. The man then tied Flynn's hands behind his back with shoelaces.  While tying Flynn's hands, the man's gun went off but did not injure Flynn.  The man pulled Flynn off the ground, found a wallet in his pants, and threw it to Hallock, who counted $185.
>
> The man ordered Hallock to start the truck and to move to the center seat. He put Flynn in the passenger seat and started driving.  He forced Flynn and Hallock to ride with their heads down and held a gun to Hallock's side. During the ride, Flynn found the gun Hallock had hidden under the jeans. The man stopped the truck at an orange grove and tried to pull Hallock from the truck.  Hallock freed herself and ran around the truck, but the man caught her, threw her to the ground, put a gun to her head, and threatened to blow her brains out.  Flynn got out of the truck and fired a shot, but missed the man.  Hallock jumped into the truck and locked the doors.  She testified that she saw the man fire a shot.  Flynn yelled for her to escape, and Hallock drove to a friend's house and called the police.

2

> When police arrived at the orange grove, they found Flynn lying facedown with his hands tied behind his back.  Authorities found a loaded .22-caliber revolver nearby.  Flynn was alive when police arrived, but he stopped breathing several times and died of a single gunshot wound to the chest before paramedics arrived.  Hallock later identified Green as the man she saw in the park.

*Green v. State*, 641 So. 2d 391, 393-94 (Fla. 1994).

The Court notes that several individuals testified that Petitioner admitted his involvement in the crime.  Alan Jerome Murray testified that he knew Petitioner.  (Doc. 3-156 at 31.)  One night, Murray was hanging out on a street corner with "a lot of guys talking," and Petitioner "came and said he just killed a man."  (*Id*. at 31-32.)  Petitioner also told Murray that "I'm going to disappear."  (*Id*. at 32)

Sheila Shundra Green, Petitioner's sister, testified that she saw Petitioner the day after the shooting and confronted Petitioner about the rumors surrounding his involvement in the shooting.  (Doc. 3-152 at 56-57.)  Petitioner informed her "that the dude pulled the gun on him and motioned for the passenger, which is the girl to run for help."  (*Id*. at 58-59.)  Petitioner told her that he did not intentionally "kill that dude" but that, a struggle ensued and that it "was him or either the dude, but the dude had the gun."  (*Id*. at 59.)

Lonnie Hillery, who had known Petitioner for five years, testified that he saw Petitioner after the shooting and that Petitioner told him "I f*cked up, man."  (*Id*. at 74.)[3]

---

[3] Hillery's name is spelled as "Hillary" and "Hillery" in the record.  It appears, based on his affidavit, that the correct spelling is Hillery.  (Doc. 3-52).

3

When Hillery asked Petitioner what he meant, Petitioner stated that "some people came through and was trying to buy something from him and they tried to get him, and [Petitioner] said he just f*cked up."  (*Id*. at 75.)

Petitioner's trial counsel was John Robertson Parker.  Assistant State Attorneys Christopher R. White and Phillip R. Williams represented the State.

## II.   LEGAL STANDARDS

### A.   Standard of Review Under the Antiterrorism Effective Death Penalty Act ("AEDPA")

Pursuant to AEDPA, federal habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider."  *Maharaj v. Secretary for Dep't. of Corr.*, 432

4

F.3d 1292, 1308 (11th Cir. 2005).  The meaning of the clauses was discussed by the

Eleventh Circuit in *Parker v. Head*:

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts.  Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

244 F.3d 831, 835 (11th Cir. 2001). Even if the federal court concludes that the state court

applied federal law incorrectly, habeas relief is appropriate only if that application was

"objectively unreasonable."[4]  *Id*.

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the

state court's decision "was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding."   A determination of a factual

issue made by a state court, however, shall be presumed correct, and the habeas petitioner

shall have the burden of rebutting the presumption of correctness by clear and convincing

evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

---

[4] In considering the "unreasonable application" inquiry, the Court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of law must be assessed in light of the record before the state court. *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (*per curiam*); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

### B.     Standard for Ineffective Assistance of Counsel

To prevail on an ineffectiveness claim, the petitioner must satisfy the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner must demonstrate that counsel's performance was deficient. To meet this prong, the petitioner must show that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment. *Id.* at 687. There is a strong presumption that counsel's conduct fell within the range of reasonable professional assistance, and, consequently, counsel's performance is deficient only if it falls below the wide range of competence demanded of attorneys in criminal cases. *Id.* at 689. Next, the petitioner must demonstrate that prejudice was suffered as a result of that performance. *Id.* at 687. Prejudice is established when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both *Strickland* prongs, and a court need not address both prongs if the petitioner has made an insufficient showing on one. *See id.* at 697; *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001). Moreover, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington,* 562 U.S. 86, 105 (2011) (internal quotation marks and citations omitted).

## C.    Procedural Bar

The federal court must dismiss those claims or portions of claims that either (1) have been explicitly ruled procedurally barred by the highest state court considering the claims,[5] or (2) are not exhausted but would clearly be barred if returned to state court.[6] There are two exceptions to the procedural default bar.  The first is the "cause and prejudice" exception;[7] the second, which is a narrow one, is the "actually innocent" exception, also known as the "fundamental miscarriage of justice" exception, used in extraordinary circumstances.  *See Johnson v. Singletary*, 938 F.2d 1166, 1174-75 (11th Cir. 1991).

## III.    ANALYSIS

## A.    Claim One

Petitioner contends that he was denied due process under *Brady v. Maryland*, 373 U.S. 83 (1963) because the State improperly suppressed exculpatory and impeachment evidence and knowingly relied on false testimony.  (Doc. 1 at 5.)  Because Claim One presents five (5) issues, the Court will address each in turn.

---

[5] *Harris v. Reed*, 489 U.S. 255, 261 (1989).

[6] *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (explaining that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

[7] *See Engle v. Isaac*, 456 U.S. 107, 129 (1982) ("[W]hen a procedural default bars state litigation of a court claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice.").

7

1.     *Issue One*

Petitioner asserts that the "State withheld evidence from the defense that the police officers who first responded to the crime scene independently concluded early that morning that Hallock's description of events lacked credibility and that it was she, not 'a black guy,' who killed Flynn." (Doc. 11 at 29.)  According to Petitioner, the first police responders, Sergeant Diane Clarke and Deputy Mark Rixey, each concluded that Hallock shot Flynn.  (*Id*.)  Clarke and Rixey apparently told White that they believed Hallock killed Flynn, but White "purposefully concealed this exculpatory information:  he failed to disclose Clarke's and Rixey's investigatory conclusions and failed to turn over his notes to the defense." (*Id*. at 13.) Despite Petitioner's contention, the post conviction court denied the claim and found: (1) no showing of prejudice; and (2) that the "purported opinion of Deputies Rixey and Clarke that they suspected that Hallock murdered Flynn would not have been admissible at trial." (Doc. 54-2 at 666.)

During the investigation, White made some handwritten notes on August 28, 1989, including that "Mark & Diane suspect girl did it.  She changed her story couple times."  (Doc. 3-30 at 3.)  White also wrote that Rixey and Clarke were suspicious because Hallock never asked about Flynn's condition, would not go to the scene, and drove all the way to the trailer park to ask for help.  (*Id*. at 3-4.) In support, Petitioner submitted the 2010 affidavits of Rixey and Clarke, which "further detail their suspicions."  (Doc. 10 at 6.)  With this, Petitioner claims a *Brady* violation.

8

[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87. To establish a *Brady* violation, the defendant must show: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Brown v. City of Miami*, 386 F. App'x 861, 862 (11th Cir. 2010) ("To establish that a *Brady* violation occurred, the defendant must prove that (1) the prosecution suppressed evidence, (2) the suppressed evidence was favorable to the defense, and (3) the suppressed evidence was material."). To satisfy the prejudice or materiality prong, a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014) (citation omitted) (quotation omitted).  Evidence is material if:

> [T]here is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S. Ct. 3375; *see also Kyles v. Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Kennedy,* 890 F.2d 1056, 1058-59 (9th Cir. 1989). The final determination of materiality is based on the "suppressed evidence considered collectively, not item by item." *Kyles,* 514 U.S. at 436-37, 115 S. Ct. 1555.

*Paradis v. Arave*, 240 F.3d 1169, 1176 (9th Cir. 2001).

A "State's obligation is not to convict, but to see that, so far as possible, truth emerges." *Giles v. Maryland*, 386 U.S. 66, 98 (1967), (Fortas, J., concurring in judgment). "[T]he existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty. The private whys and wherefores of jury deliberations pose an impenetrable barrier to our ability to know just which piece of information might make, or might have made, a difference." *U.S. v. Bagley*, 473 U.S. 667, 693 (1985), (Marshall, J., concurring in judgment).

Here, the record reflects contradictory statements by law enforcement officers, Rixey and Clark. Parker deposed Clarke on February 12, 1990, and of Rixey on September 6, 1989. He questioned both Clarke and Rixey extensively about their involvement in this investigation. In their affidavits, executed more than twenty years after the crime, Clarke and Rixey, contradict certain statements made at their depositions, which were taken closely after the commission of the crime. In particular, both Clarke and Rixey stated at deposition that (1) they had no further involvement in the investigation of this case after the evening of the murder, and (2) they never had any contact with Hallock. Although they both state in their affidavits that no member of Petitioner's defense team "approached" them about the case prior to trial, the fact that Clarke and Rixey were deposed and questioned extensively by Parker about their involvement with the case is clearly established.

10

It is true that, prior to trial, Parker knew about much of the information relied on by Rixey and Clarke in suspecting Hallock's involvement in the crime. When asked about his defense at trial, Parker testified at the evidentiary hearing on the first Rule 3.850 motion that the "implication was that Ms. Hallick [sic] had, in fact, caused the death of Flynn." (Doc. 3-39 at 58.) Parker testified as to the information he was aware of that lead to this conclusion:

> There were several things. Number one, the manner in which the victim had been tied. He certainly appeared to have been tied for comfort purposes, as opposed to for security purposes. He was tied in a manner which, I couldn't envision another man, who was afraid for himself, potentially as Mr. Flynn was another male, I can't imagine another man tying him that way.
>
> Second of all, there was a broken glove box in the truck. In that particular glove box were many items, that when they would hit the floor, would make noise. Evidently, according to Ms. Hallick [sic], she had reached into the glove box, and there were tapes, and other items, that would have made considerable noise when they fell from the glove box. She testified, as I recall, that while the perpetrator had Mr. Flynn out on the ground is when she reached to the glove box to retrieve a loaded .22 caliber pistol.
>
> I found it unbelievable she could do that, and all of these things could fall out on the floor, and the defendant, who was standing there at the door, if she testified correctly, didn't hear that, look in there to determine what the heck was going on.
>
> I found it unbelievable that Ms. Hallick [sic] would drive to the killing field, if you will, when she had a loaded .22 caliber pistol under her, and not shoot the guy, when her testimony was that Mr. Flynn was, by eyes, and other movements, indicating, shoot this guy. I find it unbelievable that she would say, I'm too afraid.
>
> Her whole description of this person absolutely was not Crosley Green. She had lied about smoking marijuana, and she finally admitted

11

that at the suppression hearing.  She had been, in my opinion, spurned, because Chip had engaged in a sexual relationship with another woman subsequent to a relationship with her.  That was coming back to her, for whatever reason.

I found it incredibly unbelievable that she would drive that truck out of there, and not go to the hospital, which was approximately a mile up the road, and lit up like the shuttle launch pad, instead of going to some man's house, in some obscure neighborhood at this time in the morning, that she didn't know, for help.

There were clothes that were placed out on the ground.  They were matted down as if someone was going to go out in the woods, and make love.  These were two young people.  You know, the way that he was actually shot appeared to me to be more of a ricochet, than anything else.  It didn't appear to be, you know, some sort of fire fight where two people were shooting at each other like that.

Her story was unbelievable because she said he dove out of that truck, and would have, and by the way she described it, he would have slid across the ground on his chest.  No injury to his chest, no burns, no nothing.  It was a portion of a round that actually lodged in him, that caused his death.

I found it unbelievable that when the law enforcement finally arrived, that when they asked him who did it, he would say, I just want to go home, I just want to go home.

Everything about what she said, the fact that she jumped in the truck and sat there for some period of time, and this person didn't approach and grab her, and there was a wound on the deceased's leg.  I believe the tags of the wound indicated, at first, that he might have been run over.  Her position was, she ran over the guy.  That didn't happen, according to the medical examiner.

What happened was, that that wound was caused by a dragging motion, and it was consistent with her dragging him to get him to the truck, and not being able to.  The whole thing was consistent with this thing being an accident, and she not knowing what to do, and making up this story.  And I implied that, without explicitly saying it to the jury.

(*Id*. at 58-61.)

It was Parker's theory that Hallock committed the crime and that the incident was an accident.  In fact, during closing argument, Parker raised many of these issues.  (Doc. 36-3 at 1847-73.)  Thus, Parker already knew much of the information that gave rise to the suspicion of Rixey and Clarke that Hallock was involved in the crime, and he argued these matters to the jury.

Against this factual backdrop, the Court finds that it was contrary to established federal law, as set down in *Brady*, and objectively unreasonable for the State court to end the prejudice inquiry once it made an admissibility determination on the prosecutor's notes concerning the Deputies' suspicions that Hallock murdered Flynn. .  True enough, "a witness's opinion as to the guilt or innocence of the accused is not admissible  . . . on the grounds that its probative value is substantially outweighed by unfair prejudice . . . ."  *Martinez v. State*, 761 So. 2d 1074, 1079 (Fla. 2000).  "[T]here is an increased danger of prejudice when the investigating officer is allowed to express his or her opinion about the defendant's guilt."  *Id*. at 1080; *see also Louidor v. State*, 162 So. 3d 305, 310 (Fla. 3d DCA 2015) ("The Florida Supreme Court has made it clear that a police officer's opinion as to the guilt of the accused is inadmissible."). Of course, it is not only the admissibility of the note itself that determines the materiality of the withheld information, but what use might be made of its contents if known to the defense. Instead, it is only a starting point. *See Martinez*, 761 So. 2d at 1079 ("We begin . . . with the basic proposition that a witness's opinion as to the guilt or innocence of the accused is not admissible.")

Unlike *Martinez*, the issue here involves a suspicion or theory of innocence, not one of guilt. This difference is significant. The undue prejudice to the accused on a 403 balancing test in the case of a witness's opinion that the accused is guilty is not necessarily equivalent to a misgiving that the accused may be innocent. Certainly, it is not prejudicial to the accused, much less unduly so. While it may be prejudicial to the prosecution, testimony as to the role of other potential suspects is much less likely to be subject to exclusion on a 403 analysis when it is a statement of a law enforcement officer that someone else committed the offense.   *Rolle v. State*, 215 So. 3d 75 (Fla. 3d DCA 2016). Given the prosecution's failure to disclose its notes, it is unknown and unknowable whether counsel could have elicited the essence of the testimony from either of them in a fashion to avoid the "opinion of innocence" issue, by framing the question "isn't it true you believed the investigation should have focused on Hallock," or something to that effect. .

Whether being confronted with documentation of their prior misgivings would have influenced their deposition testimony is equally unknowable. What is known, is that the information that the first officers at the scene evaluated the evidence as implicating Hallock as a suspect went to the heart of the defense strategy. (Doc. 3-39 at 64.)

It is difficult to conceive of information more material to the defense and the development of defense strategy than the fact that the initial responding officers evaluated the totality of the evidence as suggesting that the investigation should be directed toward someone other than Petitioner. Thus, the withheld evidence was clearly

14

material and the failure to disclose it was a *Brady* violation which undermines confidence in the outcome of the trial. The *Brady* violation, however, did not end there.

Petitioner also mentions other matters referenced in White's notes that were not turned over to the defense. The trial court found that "[a]ll of the information in the above notes was disclosed and known by defense counsel before trial; therefore, the Defendant has shown no prejudice." (Doc. 54-2 at 666.)  Specifically,

> Deputy Rixey testified that he found a .22 revolver four to five feet from the victim (See Exhibit "B," Vol. III - p. 525 and Exhibit "J," Deposition Composite of Deputy Diane Clark, pgs. 10-11). Deputy Rixey testified at trial that when he found the victim, he was lying in blood. (See Exhibit "B," Vol. III - p. 524).  Deputy Rixey also testified that he found clothes items along the side of the road. (See Exhibit "B," Vol. III - p. 526).  In his deposition, Deputy Rixey testified that he found clothes near the body. (See Exhibit "K," Deposition Composite of Deputy Rixey, p. 12).  During his deposition, Deputy Rixey testified that also he found blood near the victim. (See Exhibit "K," p. 21-22).  The purported opinion of Deputies Rixey and Clark that they suspected that Hallock murdered Flynn would not have been admissible at trial.  The Defendant also alleges that Hallock gave bad directions, but that issue was also known by defense counsel as demonstrated by the deposition of Diane Clark. (See Exhibit "J," pgs. 4-7).  Furthermore, the allegation that evidence was suppressed regarding Hallock's failure to ask about the victim's welfare is without merit as Deputy Wade Walker's deposition demonstrates that counsel knew there was no reference to her asking how he was.  (See Exhibit "L," Deputy Wade's Deposition).  The fact that Hallock did not drive to the hospital after the shooting and refused to go back to the scene was a matter of record at trial. (See Exhibit "L," Deputy Wade Walker Deposition, pgs. 7, 9-10 and Exhibit "B," pgs. 616-619, pgs. 637, 696-699).  The hospital was an option as a place to go for help, but she turned off U.S. 1 and drove an equal distance to the home of a friend, David Stroup, to call for help.  During cross-examination of Hallock, Parker questioned her failure to stop at houses of other friends, her decision not to go to the hospital, and why she did not just drive to her parents' house.  During closing argument, Mr. Parker noted that she could have gone to houses along the roads near the orange grove and that she did not go to the hospital.  (See Exhibit "B," pgs. 696-699, 1863).

> Moreover, any suggestion that Kim Hallock was the murderer defense counsel knew both before and at trial and a pre-trial motion in which he requested Hallock's father's gun to see if it was the murder weapon. (See Exhibit "M," Motion to Compel). Parker knew at trial that no casings were found at the scene, as he specifically questioned Sergeant Russell Cockriel about this fact. (See Exhibit "B," Volume VI - pgs. 1155-1156). Moreover, Parker was aware that no bare footprints were at the scene, as evidenced by his cross-examination at trial of Sergeant Russell Cockriel as to this fact. (See Exhibit "B," Volume VI - p. 1137). Flynn's failure to identify the suspect while he was dying was also known to counsel as shown by the depositions of Deputy Rixey and Clark. (See Exhibit "K," pgs. 9-10 and Exhibit "J," p. 8-9).

(*Id*. at 666-67.) Conspicuously absent from this list is the information contained in the prosecutor's note that "[H ?] said she tied his hands behind his back." (Doc. 3-30 at 3.) Hallock was never cross examined as to whether she, as opposed to the assailant, tied Flynn's hands behind his back. This was a critical issue at trial as the defense focused instead on the theory that the hands were tied "for comfort." Defense counsel testified that this issue was "the heart of the defense" and that he would have used the information at trial, had he known of it. (Doc. 3-39 at 65.) This impeachment information contained in the prosecutor's notes was unquestionably material as it seriously undermined the testimony of Hallock that the assailant tied Flynn's hands behind his back and that the gun discharged in the process. (Doc. 3-149 at 63-66.) The initial suspicion that Hallock was the shooter coupled with this significant inconsistency in her story would have provided powerful impeachment material and a basis to argue that Hallock had some motivation to fabricate. The failure to disclose this information, was a *Brady* violation considering the totality of the circumstances and the absence of any direct evidence of

16

guilt beyond the identification by Hallock. The trial court's determination otherwise was contrary to, or an unreasonable application of *Brady*. Thus, Issue One is granted.

        2.    *Issue Two*

Petitioner contends that "the State failed to maintain or disclose the audio tape of Hallock's 911 call shortly after the murder, which would have also served as key impeachment evidence against her." (Doc. 11 at 33.) Petitioner also states that the State failed to disclose an audio recording of Hallock recounting her story to Flynn's father. (*Id*. at 34.) This issue was not raised with the state courts and is procedurally defaulted.

Petitioner fails to demonstrate cause and actual prejudice excusing his default. Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception. Consequently, Issue Two is procedurally defaulted and barred from federal review.

        3.    *Issue Three*

Petitioner states that the State induced false testimony from Sheila Green, Hillery, and Murray and that the State failed to disclose this information to the defense. In particular, Petitioner states that the State "induced Sheila Green to testify against Mr. Green by threatening the loss of custody over her four young children." (Doc. 11 at 35.) In addition, Sheila Green was awaiting sentencing on federal drug charges, and "she was led to believe she would receive leniency if she cooperated." (*Id*. at 36.) Petitioner also states that the State afforded Sheila Green and Hillery, who was "a co-conspirator in [Sheila Green's] drug case, her fiancé, and the father of two of her children—special

treatment in exchange for their testimony." (*Id.*) Petitioner alleges that White arranged for Sheila Green and Hillery to speak privately on his telephone twice a week from his office and permitted them to converse in private before either testified and again after Sheila Green testified. (*Id.*) Moreover, Petitioner states that White induced Hillery to testify by threatening to take away Hillery's children, to re-prosecute him for drug charges, and to impose a lengthy jail sentence on Sheila Green. (*Id.* at 37.) Finally, Petitioner states that "there was a warrant outstanding for Murray's arrest and he thus felt compelled to cooperate." (*Id.*)

This issue was not raised with the state courts, and it is procedurally defaulted. Petitioner fails to demonstrate cause and actual prejudice excusing his default. Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception. Consequently, Issue Three is procedurally defaulted and barred from federal review.

Alternatively, the Court will discuss the merits of this issue. Sheila Green acknowledged at trial that she was awaiting sentencing in federal court after being convicted on drug charges. (Doc. 3-152 at 61.) She also stated that the prosecutor had agreed to speak on her behalf at sentencing, that it was her attorney who made contact about her testifying in the case, and that she did not want to be away from her children. (*Id.* at 61-66.) Hillery stated at trial that he had been charged in the same federal case as Sheila Green and that he had been offered as follows in exchange for his testimony: "Drop charges on Sheila Green, give her probation and drop my charges down to state,

18

and I'd have to do a year in prison." (*Id*. at 80.) Hillery declined the offer, proceeded to trial, and was found not guilty. (*Id*.) However, Hillery acknowledged that he was testifying so that Sheila Green would receive favorable treatment in her federal case. (*Id*. at 82.) Murray acknowledged at trial that White had asked "the judge on [his] behalf to allow [him] out on bond on the warrant." (Doc. 3-156 at 38.)[8]

Clearly, Petitioner was aware that these individuals had received inducements to testify in this case, and this information had been disclosed to him. Parker impeached these witnesses on their reasons for testifying at trial. Under the circumstances, the Court finds that Issue Three is without merit.

### 4.   *Issue Four*

Petitioner contends the State "elicited or allowed to go uncorrected critical false testimony from key witnesses in violation of *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), which was clearly established at the time of Mr. Green's trial." (Doc. 11 at 38.) Petitioner indicates that the State "clearly relied on the false testimony of" Sheila Green, Hillery, and Murray. (*Id*. at 40.) This issue appears to be based on these witnesses' recantation of their trial testimony. The trial court held an evidentiary hearing on the recantation issue.

Sheila Green testified at the evidentiary hearing on Petitioner's first Rule 3.850 motion that her testimony at trial was not true and that Petitioner never confessed to her

---

[8] Although Murray denied that he had been using cocaine when he heard Petitioner confess to the killing, he admitted to being drunk. (*Id*. at 40.)

19

that he murdered Flynn.  (Doc. 3-37 at 19-20.)  Sheila Green stated that she presented perjured testimony because she feared she would never see her children again and because she was provided with the opportunity to converse with Hillery over the telephone.  (*Id.* at 22-23.)

Hillery testified at the same evidentiary hearing that he testified falsely against Petitioner and that he never had a conversation with Petitioner regarding the murder of Flynn.  (*Id.* at 77-79.)  He did so because he "wanted to help my child's mother at the time."  (*Id.* at 77.)

At the same evidentiary hearing, Petitioner introduced three out-of-court statements by Murray in which he allegedly recanted his trial testimony.  However, Murray also stated that he did not remember making these statements because he was either tired or drunk.  (*Id.* at 21-25.)  Murray exercised his Fifth Amendment privilege against self-incrimination when questioned about whether his post-trial statements were inconsistent with his trial testimony.  (Doc. 3-37 at 27, 30-31.)

"To establish a *Giglio* claim, a habeas petitioner must prove:  (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, *i.e.*, that there is any reasonable likelihood that the false testimony could . . . have affected the judgment."  *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011).

The trial court found that, as to Murray, the outcome of the trial would not have changed if Murray's statement were introduced as substantive evidence on re-trial. (Doc.

20

28-4 at 28.)  In particular, the trial court found that "the recanted testimony would only become impeachment to the original testimony of" Murray.  (*Id*.).  The trial court also found that there was not a reasonable probability that this would produce an acquittal on re-trial given the other evidence presented at trial.  (*Id*).  The Supreme Court of Florida agreed that Murray's "out of court recantation would not likely produce an acquittal on retrial because it would only serve as impeachment to his original testimony."  *Green*, 975 So. 2d at 1100.

> The trial court found that, as to Sheila Green, it
>
> was obvious to this Court that based upon her responses, demeanor, and body language, Sheila Green was not being forthright at the evidentiary hearing regarding the alleged falsification of her trial testimony.  The Court does not find Sheila Green's testimony at the evidentiary hearing to be credible at all.  It was obvious to this Court that Sheila Green was presenting this unbelievable testimony at the evidentiary hearing in an effort now to please her brother (the Defendant) and her family.

(Doc. 28-4 at 29-30.)

The trial court found that Hillery's testimony at the evidentiary hearing "was not credible."  (*Id*. at 31.)  The trial court found that, based on the other evidence presented by the State at trial, "the outcome of the trial would not have been different if Lonnie Hillery had not testified."  (*Id*.)

The Supreme Court of Florida determined that, when weighed against the other admissible evidence, the recantations of Murray, Sheila Green, and Hillery did not create a reasonable probability of acquittal on retrial.  *Green*, 975 So. 2d at 1101.  In addition, the Supreme Court of Florida discussed that the trial court "found both Sheila Green's and

21

Lonnie Hillery's recantations incredible based on their responses, demeanor, and body language.   We generally defer to the trial judge regarding these credibility determinations."  (*Id.*)

Special deference is due when a trial court's findings are based on the credibility of witnesses, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985).  Here, the trial court's credibility determination and implicit factual findings are supported in the record. Petitioner has not presented clear and convincing evidence that the trial court's findings were unreasonable.

Under the circumstances, the Court finds that Petitioner has failed to establish a *Giglio* violation.  Therefore, Issue Four is without merit.[9]

e.   *Issue Five*

Petitioner states that the State "allowed Tim Curtis to testify that he could not identify the juror who had made the throat-slashing gesture in the courtroom parking lot during the trial, despite knowing his testimony was false."  (Doc. 11 at 40.)  At trial, Parker moved for a mistrial because Tim Curtis, who testified at trial, saw a male juror when

---

[9] Petitioner also mentions that Layman Lane recanted his testimony.  Lane did not testify at Petitioner's trial but testified at the evidentiary hearing on Petitioner's first Rule 3.850 motion that Petitioner told him that he (Petitioner) "shot somebody."  (Doc. 3-62 at 74.)  Lane later stated that Petitioner never told him that he had shot someone.  Since Lane was not a witness at Petitioner's trial, his recanted testimony that he gave at the evidentiary hearing would not have changed the outcome of the trial.

22

leaving the courthouse, and the juror made a throat slashing gesture, which Parker understood as the juror having already made up his mind about Petitioner's guilt. (Doc. 3-159 at 7-11.) The trial court brought Curtis in to testify as to the matter, and Curtis testified that the man who made the gesture was not a member of the jury. (Doc. 3-160 at 35.) The trial court denied the request for a mistrial. (*Id*. at 49.) Curtis later executed a document entitled "Affidavit" stating that, in fact, the male who made the slashing gesture was a member of the jury. (Doc. 54-3 at 5.) The trial court denied the issue because the statement allegedly made by Curtis was not sworn to under oath, Curtis denied making the statement, and the issue was based on "gross speculation" that the gesture meant that the juror was expressing belief in Petitioner's guilt. (Doc. 54-2 at 650.)

The Court notes that Curtis was asked at his deposition whether he executed the Affidavit. (Doc. 54-3 at 13.) Curtis stated "No," and his attorney then invoked Curtis' Fifth Amendment privilege. (*Id*.) Curtis also stated that he did not know "who wrote the affidavit." (*Id*. at 16.)

The Affidavit was not sworn to by Curtis. Curtis stated that he did not know who wrote the statement, and he refused to acknowledge whether he signed the statement. (*Id*. at 16). He also refused to answer questions when placed under oath about allegedly recanting testimony. (*Id*. at 17-20). The Court also agrees that it is speculation regarding whether the slashing gesture meant that the juror was expressing his belief that Petitioner was guilty. Under the circumstances, Petitioner has failed to demonstrate that the State presented false testimony with regard to Curtis, and Issue Five is without merit.

As to Issues Two, Three, Four, and Five, the Court finds that Petitioner has failed to demonstrate that the state court's decision rejecting these issues as contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, Issues Two, Three, Four, and Five are denied.

**B.      Claim Two**

Petitioner asserts that the trial court failed "to suppress his out-of-court photographic identification and subsequent in-court identification." (Doc. 10 at 10.)  This claim was raised on direct appeal, and the Supreme Court of Florida found that "the police did not use an unnecessarily suggestive procedure to obtain Hallock's out-of-court identification of Green . . . ." *Green*, 641 So. 2d at 394.

At the suppression hearing held prior to trial, the evidence revealed that Hallock was presented with a photo lineup with six pictures that included a recent picture of Petitioner.[10]  (Doc. 3-20 at 18-20; Doc. 3-150 at 24.)  The photographs depicted men with similar characteristics and physical features, and Hallock was told that a suspect was in the lineup.  (Doc. 3-19 at 62; Doc. 3-20 at 19.)  However, Hallock was not pressured to pick someone out of the lineup, and she picked Petitioner's photograph out of the lineup in a very short period of time.  (Doc. 3-19 at 63; Doc. 3-20 at 20.)  Hallock first stated she was "pretty sure" that Petitioner was her assailant but then stated "I'm sure" with regard to

---

[10] The photographic lineup is in the record at Doc. 3-86 and Doc. 10-2 at 7.

her identification.  (Doc. 3-19 at 65; Doc. 3-150 at 25.)  After identifying Petitioner, the police told her that Petitioner was "the suspect."  (Doc. 3-19 at 66.)  At trial, Hallock identified Petitioner as the perpetrator of the crime.  (Doc. 3-150 at 26.)

Petitioner argues that Hallock's identification through the photo lineup was unnecessarily suggestive and should have been suppressed.  He also argues that Hallock's in-court identification should have been suppressed.

The test to determine whether a suggestive identification procedure should be excluded has two prongs:  "(1) did the police employ an unnecessarily suggestive procedure in obtaining an out-of-court identification; [and] (2) if so, considering all the circumstances, did the suggestive procedure give rise to a substantial likelihood of irreparable misidentification."  *Simmons v. State*, 934 So. 2d 1100, 1118 (Fla. 2006) (citation omitted) (quotation omitted); *see also Cikora v. Dugger*, 840 F.2d 893, 899 (11th Cir. 1988) (the test is "whether an identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification) (quotation omitted).

In the present case, law enforcement officials showed Hallock six photographs, all of which were the same size and depicted men with similar characteristics and physical features.  (Doc. 3-151 at 56; Doc. 3-86.)  Although Petitioner's photograph was darker than the others, (Doc. 3-151 at 61), there is no indication that the law enforcement officials directed Hallock's attention to any particular photograph.



(Doc. 3-86.)

The Supreme Court of Florida "has held that photographic arrays can consist of photographs that differ in background color, clothing, hair color, and pose, and that these differences alone do not make the arrays suggestive." *State v. Styles*, 962 So. 2d 1031, 1034 (Fla. 3d DCA 2007) (citing *Lewis v. State*, 572 So.2d 908 (Fla.1991)).  In *Johnson v. State*, 438 So. 2d 774 (Fla. 1984), the Supreme Court of Florida upheld the use of a photographic array where the defendant was the only individual pictured with a suntan and blonde hair and the defendant's prison uniform was a lighter blue than the other photographs. The court explicitly stated "we do not find that the complained-of items made the line-up impermissibly suggestive." *Id.* at 777.

26

In the present case, there is no evidence that the darkness of Petitioner's picture influenced Hallock's selection of Petitioner's photograph.[11]   Indeed, Hallock identified Petitioner's picture based on other factors, including Petitioner's nose, complexion, face, and eyes, which all matched Hallock's recollection of the shooter.  (Doc. 3-20 at 5-6.)  In fact, Hallock specifically stated that she made her photo lineup identification of Petitioner "based upon his face."  (*Id.* at 5.)[12]   At trial, Hallock reiterated that when looking at the photograph she focused on "his face . . . his nose, his eyes and his mouth."  (Doc. 3-151 at 40.)  Hallock was able to observe Petitioner for about seven to ten minutes while they were at Holder Park.  (Doc. 3-10 at 140.)  Hallock looked at Petitioner while she was seated in the truck and when he told her to scoot over.  (Doc. 3-149 at 60.)  Hallock also observed Petitioner's face after she got out of the truck.  (Doc. 3-10 at 141.)  Hallock further observed Petitioner's profile for about sixty seconds while he was tying the victim's hands.  (Doc. 3-149 at 65-66.) [13]

---

[11] Moreover, the Court notes that Picture #5 in the photographic lineup was clearly a mugshot, and it contains the wording "Sheriff's Office" at the bottom of the photograph. As a result, Picture #5 appears to stand out and be suggestive when compared with the other photographs.

[12] Further, the issues mentioned by Petitioner were matters to be considered by the jury in deciding what weight to give the identification testimony but did not necessarily render the identification procedure unduly suggestive. *Evans v. State*, 781 So. 2d 493, 493 (Fla. 3d DCA 2001).

[13] Interestingly, Parker testified at the first Rule 3.850 evidentiary hearing that he was pleased with the photograph and believed it was actually helpful to the defense:

27

In addition, although the law enforcement officers told Hallock that a suspect was in the lineup before she viewed it, Hallock was not told which picture to choose, and she was left alone while reviewing the photographs.[14] *See State v. Styles*, 962 So. 2d 1031 (Fla. 3d DCA 2007) ("Even if the detective had told the victim that his assailant was pictured in the array, he did not tell him which picture to choose."); *Evans v. State*, 781 So.2d 493, 493 (Fla. 3d DCA 2001)("'[a]lthough police indicated the suspect was in the photo lineup . . . there is no indication that officers directed [the victim's] attention to any particular photograph.'") (quoting *Green*, 641 So. 2d at 394).

Hallock's in-court identification was based on her observation of Petitioner at the crime scene.  (Doc. 3-150 at 25-26.)  Hallock testified that she was "absolutely sure" that Petitioner was the perpetrator.  (Doc. 3-151 at 48.)  Hallock's testimony reflects that there was sufficient time and light for her to view Petitioner at the crime scene.  (Doc. 3-149 at 59-75.)  In fact, Hallock was able to provide law enforcement with a physical description of the perpetrator, a description of the perpetrator's clothing, and assist in putting

---

That photograph of Crosley Green in that lineup, in my opinion, was the best thing that ever happened to the defense because Ms. Hallick [sic] described a man that had ringlets, big hair.  And there she was picking this man out, in its obvious position and color in the lineup.  To be in a position like that, and that argument, I thought—I was pleased to have that photograph . . . .

(Doc. 3-38 at 92.)

[14] (Doc. 3-150 at 25.)

together a sketch.  (Doc. 3-150 at 21-24.)  Therefore, Petitioner has failed to demonstrate that the in-court identification should have been suppressed.

Consequently, Petitioner has failed to demonstrate that the trial court erred in refusing to suppress the photo lineup identification or the in-court identification.  Under the circumstances, Petitioner has failed to show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, Claim Two is denied.

### C.      Claim Three

Petitioner states that his constitutional rights were violated by the admission of unreliable dog-tracking evidence.  (Doc. 10 at 12.)  Petitioner relies on the testimony of Dr. Warren Woodford during the first Rule 3.850 evidentiary hearing to support his contention that the dog-tracking evidence was unreliable.  On direct appeal the Supreme Court of Florida found that there was a proper predicate for the admission of the scent-tracking evidence. *Green v. State*, 641 So. 2d 391, 394 (Fla. 1994).   During the first Rule 3.850 proceedings, the trial court found the testimony of Bobby Mutter, who also testified at the first Rule 3.850 evidentiary hearing and was a retired Titusville Police Department Commander, more credible as to the reliability of the dog-tracking evidence.  (Doc. 28-4 at 36-41.)  The Supreme Court of Florida determined that the trial court's finding on the credibility of Mutter was supported by competent, substantial evidence. *Green*, 975 So. 2d at 1107.

29

In the present case, "[w]ithin hours of the murder, a police dog tracked footprints from the dunes area to a house where Green's sister lived." *Green*, 691 So. 2d at 694.  At trial, the State called as a witness Officer O'Dell Kiser, who was the canine handler for the Brevard County Sheriff's Department and worked with a dog named Czar.  (Doc. 3-156 at 106-07.)  Czar was involved in Petitioner's case.  (*Id*. at 126.)  Parker objected to the admissibility of the testimony, and the trial court conducted an extensive proffer of the testimony.  (*Id*. at 112-141; Doc. 3-157 at 1-17.)  At the conclusion of the proffer, the trial court ruled that the character and reliability of the dog had been established, that the officer who handled the dog was certified and well-trained, that a sufficient predicate had been laid, and that the evidence was relevant.  (Doc. 3-157 at 18-20.)  The trial court found that, although scent tracking was the only evidence "tending to establish" identity, corroboration included the fact that Petitioner was identified at the scene of the crime, admissions by Petitioner, and Petitioner's presence at his sister's house earlier that day. (*Id*. at 40-41.)

> As discussed by the Supreme Court of Florida,
>
> there were indicia of reliability: the tracking occurred within hours of the crime and the area had been secured shortly after the crime occurred, both of which greatly reduced the danger of a trail being left after the crime and a mistaken scent, and there was a continuous track to the home of Green's sister.

*Green*, 641 So. 2d at 394.

Petitioner argues that Dr. Woodford's testimony demonstrates the unreliability of the dog-track evidence.  Dr. Woodford stated that a dog track without a scent object and

30

a track started on a footprint in sand are unreliable.  (Doc. 10 at 12.)  The trial court discussed at length the testimony of both Dr. Woodford and Mutter.[15]  Mutter had worked with FDLE in training and certifying dogs.  (Doc. 30-1 at 24.)  He had personal knowledge of Deputy Kiser and Czar (the working dog involved in the case), and he had helped them in their initial training.  (*Id*. at 24-25.)  He often observed Deputy Kiser working with the dog afterwards.  (*Id*. at 25.)  Mutter disagreed with various opinions of Dr. Woodford related to the dog-tracking evidence in this case, and Mutter believed that Czar had received appropriate training and was fully capable of following a trail such as the one used in this case.  (*Id*. at 28-34.)   The trial court specifically found as follows:

> After hearing all of the testimony presented at the evidentiary hearing and reviewing the evidence, the Court finds Mr. Mutter more credible as Mr. Mutter had actual extensive experience with the training of police dogs to do human scent tracking in addition to actual police dog tracking of human scents.  The Court accepts Mr. Mutter's testimony in its entirety.

(Doc. 28-4 at 41.)

As discussed above, special deference is due when a trial court's findings are based on the credibility of witnesses.  Here, the trial court's credibility determination and implicit factual findings are supported in the record.  Petitioner has not presented clear and convincing evidence that the trial court's findings were unreasonable.

The Court finds that Petitioner has failed to demonstrate that the dog-tracking evidence was improperly admitted.  Under the circumstances, Petitioner has failed to

---

[15] Mutter testified at Petitioner's trial.  (Doc. 28-4 at 36.)

31

show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Applying the AEDPA's deferential standard, Claim Three is denied.

### D.  Claim Four

Petitioner claims that he received ineffective assistance of counsel because of the following:  (1) counsel failed to investigate and present Petitioner's alibi defense; (2) counsel failed to present alibi witnesses; (3) counsel failed to investigate and present evidence that Hallock may have committed the crime; (4) counsel failed to investigate the prosecution's key witnesses; (5) counsel failed to present expert testimony; (6) counsel failed to challenge a juror; and (7) the cumulative deficiencies of counsel prejudiced Petitioner.

#### 1.  *Issues One and Two*

Petitioner states that Parker failed to investigate and present his alibi (Issue One) and to present available alibi witnesses (Issue Two).  Petitioner mentions Tyrone Torres, Lori Rains, Cheryl Anderson, Carleen Brothers, Brandon Wright, Reginald Peters, Randy Brown, Kerwin Hepburn, and James Carn as potential alibi witnesses.

In the first Rule 3.850 motion, Petitioner argued that Parker was ineffective for failing to investigate or call Rains as an alibi witness.  Petitioner did not discuss Parker's failure to investigate or call any of the other individuals in the first Rule 3.850 motion. The trial court found that there was no showing that counsel was deficient in failing to

call Rains as a witness and that there was no showing of prejudice.  (Doc. 28-4 at 23.) Petitioner did not appeal the denial of this issue.  In his second Rule 3.850 motion, Petitioner argued that Parker was ineffective for failing to investigate or call Peters, Wright, and Brown as alibi witnesses.  The trial court found that the issue of whether Parker was ineffective for failing to investigate or call Peters, Wright, and Brown was procedurally barred and, alternatively, was without merit because there was no showing of prejudice.  (Doc. 26-8 at 59.)

The issue of Parker's ineffectiveness with regard to failing to investigate and call Torres, Anderson, Brothers, Hepburn, and Carn was not raised with the state courts, and it is therefore procedurally barred.[16]  The issue of Parker's ineffectiveness with regard to failing to investigate and call Rains was not raised in the appeal of the denial of his first 3.850 motion, and it is procedurally barred.  The issue of Parker's ineffectiveness with regard to failing to investigate and call Peters, Wright, and Brown was found to be procedurally barred by the trial court.

Petitioner fails to demonstrate cause and actual prejudice excusing his default. Furthermore, he has not shown that he is entitled to the fundamental miscarriage of

---

[16] Parker did call Carn as an alibi witness at trial.  (Doc. 3-160 at 74.)  Carn initially testified that he saw Petitioner at Brothers' home around the time of the murder but later he changed his testimony as to when he actually saw Petitioner.  (Doc. 3-160 at 86-88, 97-99.)  Petitioner states that Brothers would have confirmed Petitioner's presence at her house at the time of the murder.  (Doc. 11 at 53.)

justice exception.  Consequently, Issue Four is procedurally defaulted and barred from federal review.

Moreover, the Court finds that, as to Parker's failure to investigate and call Rains, Parker testified at the evidentiary hearing that he attempted to locate Rains but was unable to do so.  (Doc. 3-40 at 71.)  Moreover, Petitioner told Parker that he (Petitioner) and Rains had been "smoking crack" on the evening of the murder and that they had been selling cocaine out of her house.  (*Id*. at 70-71.)  Petitioner could provide no specifics as to the when he was with Rains, and Parker stated that "there was no way that I was going to try and utilize that as an alibi."  (*Id*. at 71.)

In addition, Wright, a convicted felon, testified at the evidentiary hearing that he was selling drugs at Rains' home on the evening of the murder, and he saw Petitioner at Rains' home at 11:15 p.m.  (Doc. 3-114 at 31.)  Peters, who was incarcerated at the Brevard County Jail at the time of the evidentiary hearing, testified that he was at Rains' home on the evening of the murder, and he saw Petitioner at Rains' home at "Ten or 11."  (*Id*. at 64-65.)  Petitioner was "doing drugs."  (*Id*. at 67.)  Brown did not testify at the evidentiary hearing but attested in an affidavit that he saw Petitioner at Rains' home "off and on" from about 9:00 p.m. or 10:00 p.m. until about 1:30 a.m. or 2:00 a.m. on the evening of the murder.  (Doc. 26-8 at 51.)[17]

---

[17] The trial court found that "Wright and Peters are convicted felons who have committed numerous felonies, admittedly were selling drugs the evening of the crime as juveniles, and given their demeanor at the evidentiary hearing before the undersigned judge, their credibility and memory recall is questionable at best."  (Doc. 26-8 at 52.)

Parker testified at the evidentiary hearing on Petitioner's first Rule 3.850 motion about the issue of alibi witnesses.  Parker noted that Carn appeared to be a good witness because he had never been convicted of a crime.  (Doc. 3-39 at 75.)  However, Parker recalled that Carn's testimony at trial was troublesome:

> When I asked him to go through the chronology, he stopped, he looked around, and he said, You know, I'm sorry Mr. Parker, you told me to tell the truth, and you know what, that's not the way it happened.  It happened this way.  There it was.  That was it.  It was over.  That screwed the chronology to the extent that he couldn't have been at Ms. Brothers' house at the time he said he was.

(*Id.* at 78.)   Parker had other alibi witnesses "lined up," including Brothers.   (*Id.*) However, Parker stated that, as a result of Carn's "meltdown" at trial, he decided not to introduce any further alibi witnesses.  (*Id.* at 74.)  The testimony of the other witness relied on Carn's presence, and Parker did not believe that their testimony would have been beneficial.  (*Id.* at 75.)  In fact, Parker reiterated that Carn's "meltdown was so damaging, that to pursue—to continue to pursue this, just didn't carry any validity with the jury." (*Id.* at 86.)

It is apparent that Parker presented an alibi witness, investigated other alibi witnesses, and then made a strategic decision not to present further alibi witnesses. Further, as discussed by the trial court, the testimony of these alibi witnesses placing Petitioner "in the Mims projects during the early morning hours of the murder is damning and further implicates [Petitioner] by putting him near the crime scene right after the crime was completed."  (Doc. 26-8 at 58.)  The Court finds that Parker did not

act deficiently with regard to this matter and that there has been no showing of prejudice. Consequently, Issues One and Two are denied on the merits.

        2.     *Issue Three*

Petitioner states that Parker failed to investigate and present evidence that Hallock may have committed the crime.  (Doc. 11 at 54.)

This issue was raised in Petitioner's first Rule 3.850 motion; however, it was not raised in the appeal of the denial of the motion.  Any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine, because a second appeal is unavailable, and any further attempt to raise the claims in another Rule 3.850 motion would be subject to dismissal as successive.  *See* Fla. R. Crim. P. 3.850(f).  Petitioner fails to demonstrate cause and actual prejudice excusing his default. Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception. Consequently, Issue Three is procedurally defaulted and barred from federal review.[18]

        3.     *Issue Four*

Petitioner contends that Parker failed to investigate key witnesses and, therefore, could not properly impeach them at trial.  (Doc. 11 at 56.)  Petitioner states that, through further investigation, counsel would have been able to (a) present Hallock's inconsistent

---

[18] In addition, the trial court discussed that Parker argued several facts to the jury that implied that Hallock caused the death of the victim.  (Doc. 28-4 at 16.)  Parker also discussed in closing argument in detail the facts that implicated Hallock as the shooter. (*Id*. at 17.)  As a result, Petitioner has failed to demonstrate that Parker acted deficiently with regard to this matter or that he sustained prejudice, and this issue is without merit.

statements to the jury, (b) impeach the testimony of Sheila Green and Hillery, and (c) present evidence that Murray had been convicted of multiple felonies. Sub-issue (a) was raised in Petitioner's Rule 3.850 motion and on the appeal of the denial. Sub-issue (b) was not raised with the state trial court, and sub-issue (c) was not raised with the state courts. In fact, the Supreme Court of Florida found that sub-issue (b) was procedurally barred because it was not raised in the Rule 3.850 motion. *Green*, 975 So. 2d at 1104.

Parker impeached Hallock with numerous inconsistent statements. For example, during cross-examination, Hallock acknowledged these statements to law enforcement about the perpetrator: "I really just saw him—it was just blur because of—it just scared me"; and "I really didn't even get a good look at him." (Doc. 3-150 at 69, 75). Parker's examination also revealed inconsistencies in Hallock's testimony with regard to when she and the victim arrived at Holder Park, whether the perpetrator had ringlets and gel in his hair, whether the perpetrator had facial hair, whether the perpetrator had flared nostrils, and whether she saw the perpetrator with the gun shooting. (*Id*. at 70-73, 77, 87-88, 93-95, 103). Hallock also lied to law enforcement about using marijuana on the night of the murder. (*Id*. at 101.) During closing argument, Parker argued extensively to the jury with regard to the inconsistencies in Hallock's testimony. (Doc. 3-162 at 47-52, 58-62.) Under the circumstances, no prejudice resulted from Parker's failure to present cumulative evidence of inconsistent statements. As a result, there has been no showing of ineffective assistance of counsel, and sub-issue (a) is without merit.

Sub-issues (b) and (c) are procedurally barred. Petitioner fails to demonstrate cause and actual prejudice excusing his default. Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception. Consequently, sub-issue (b) and (c) are barred from federal review.[19]

       4.    *Issue Five*

Petitioner contends that Parker was ineffective for failing to obtain experts regarding (a) ballistics, and (b) dog-tracking evidence.  (Doc. 11 at 57.)  He states that a ballistics expert would have shown that Hallock's version of events could not have been true.  Petitioner does not provide specific allegations regarding a dog-tracking expert.

Sub-issue (a) was not raised in the state courts.  Sub-issue (b) was found by the Supreme Court of Florida to be procedurally barred, *Green v. State*, 975 So. 2d 1090, 1105 (Fla. 2008), although the merits were addressed in the alternative.  Although sub-issue (b) was addressed on the merits, it still is procedurally barred.  *See Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.)  ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.").  As a result, Issue Five is procedurally barred.

Petitioner has not shown either cause or prejudice that would excuse the default.

---

[19] In addition, the Court finds that there has been no showing of prejudice with regard to sub-issues (b) and (c), and that, therefore, there has been no showing of ineffective assistance of counsel.

Likewise, Petitioner has not shown the applicability of the actual innocence exception.  A review of the record reveals that the Petitioner is unable to satisfy either of the exceptions to the procedural default bar.  Therefore, Issue Five is denied as procedurally barred.[20]

>    5.    *Issue Six*

Petitioner asserts that Parker was ineffective for failing "to challenge Juror Guiles, whose niece had recently been murdered."  (Doc. 11 at 58.)  This issue was raised in Petitioner's first Rule 3.850 motion and was denied because Parker made a strategic decision not to challenge Guiles.  The Supreme Court of Florida affirmed the trial court's denial of this issue because Petitioner failed to meet both prongs of the *Strickland* standard.  *Green v. State*, 975 So. 2d 1090, 1104 (Fla. 2008).

During *voir dire*, Harold Guiles mentioned that his niece "was murdered."  (Doc. 28-6 at 58.)  However, Guiles specifically informed the trial court that he would "be able to set it aside and not let it affect this case."  (*Id.* at 59.)

Moreover, at the evidentiary hearing on Petitioner's first Rule 3.850 motion, Parker testified that he had moved to have Guiles removed because of pretrial publicity;

---

[20] Further, the Court finds that Petitioner has failed to establish prejudice as to either sub-issue (a) or (b) under the *Strickland* standard and, therefore, Issue Five is without merit.  The Court notes that the Supreme Court of Florida, in addressing the merits of sub-issue (b), found no showing of prejudice.  *Green*, 975 So. 2d at 1107.  The Court agrees that there was no showing of prejudice.  The State's expert at the evidentiary hearing, Bobby Mutter, had more experience in training police dogs than the defense's expert, Dr. Warren James Woodford, and Mutter had personal knowledge of this matter as he had worked with Deputy Kiser and Czar.  The trial court found Mutter more credible, and its finding was supported by competent, substantial evidence.

however, the trial court denied the motion.  (Doc. 3-39 at 39.)  Parker did not exercise a peremptory challenge to strike Guiles because he was quite pleased that eight women were on the jury, and he feared that more men could end up on the jury.  (*Id*. at 43.)  Parker also testified that he discussed "heavily" with Petitioner whether Guiles should be removed from the jury.  (*Id*. at 46.)  After discussion with Petitioner, they "were satisfied that Mr. Guiles would be able to follow the law regarding the weighing of the evidence, separate himself from the fact that his niece had been killed."  (*Id*.)

This issue is without merit.  First, Guiles informed the trial court the he would be able to set aside his feelings and not let them affect his decision-making.  Second, Parker made a strategic decision not to challenge Guiles.  Under the circumstances, there has been no showing that Parker acted deficiently with regard to this matter or that Petitioner sustained prejudice.  Consequently, Issue Six is denied.

   6. *Issue Seven*

Petitioner states that the cumulative deficiencies of Parker's ineffective assistance resulted in prejudice.  However, none of Petitioner's individual claims of error or prejudice has any merit, and therefore the Court has nothing to accumulate.  The Eleventh Circuit Court of Appeals has made clear that when "[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit."  *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012).  Moreover, the Court has considered the cumulative effect of Petitioner's ineffective assistance claims and concludes that he cannot demonstrate

cumulative error sufficient to entitle him to habeas relief.   Consequently, issue seven is denied.[21]

### E.      Claims Five and Six

Petitioner alleges in Claim Five that the State made "repeated improper references to [his] race and [made] knowingly false representations of the facts and the evidence to the jury and to the court."  (Doc. 10 at 18.)  Petitioner alleges in Claim Six that "the jury prejudged him guilty based on their exposure to external publicity."  (*Id.* at 21.)

Claim Five was not raised with the state courts and is procedurally barred.   Claim Six was raised in Petitioner's second Rule 3.850 motion, but the trial court found it to be procedurally barred.   In the present case, Petitioner has not shown either cause or prejudice that would excuse the procedural bar.  Likewise, Petitioner has not shown the applicability of the actual innocence exception.   A review of the record reveals that the Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, Claims Five and Six are denied as procedurally barred.

----

[21] Petitioner mentions that there is "newly discovered evidence [that] includes a post-trial analysis by the Florida Department of Law Enforcement concluding that the .22 caliber bullet recovered from Flynn was compared to Flynn's revolver and was determined to have similar characteristics." (Doc. 11 at 16.)  At trial, Greg Scala, a forensic firearm and tool mark examiner testified on behalf of the State.  On direct examination, he stated that the bullet taken from the victim's body had manufacturing characteristics that differed from the unfired cartridges in the victim's gun.  (Doc. 3-153 at 55.)  However, on cross-examination, Scala specifically admitted that the bullet that came from the victim could have been fired from the victim's gun.  (Doc. 3-154 at 16.)  Consequently, Petitioner has not demonstrated that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" based on this new evidence.  *See Schlup v. Delo*, 513 U.S. 298, 327 (1995).

## IV.   SUMMARY

The Court finds that Petitioner is entitled to habeas relief as to Issue One of Claim One.  None of the remaining claims raised in the Amended Petition has merit or requires a hearing.   Any of Petitioner's allegations not specifically addressed herein are determined to be without merit.  The Court determines that the Amended Petition is conditionally granted as to Issue One of Claim One and is denied as to the remaining claims.

## V.   CERTIFICATE OF APPEALABILITY

This Court should grant an application for a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009). However, the petitioner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

As to all claims apart from Issue One of Claim One, Petitioner fails to demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. Moreover, Petitioner cannot demonstrate that jurists of reason would find this Court's procedural rulings debatable. Petitioner fails to make a substantial showing of the denial of a constitutional right. Thus, the Court will deny Petitioner a certificate of appealability.

42

## VI.   CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.      The Amended Petition for Writ of Habeas Corpus (Doc. 10) is **GRANTED** in part and **DENIED** in part.

2.      The writ of habeas corpus will be conditionally **GRANTED** as to Issue One of Claim One for the reasons discussed above, within **NINETY (90) DAYS** from the date of this Order, unless the State of Florida initiates new trial proceedings in state court consistent with the law.

3.      The Court determines that all remaining claims are without merit and that habeas relief is **DENIED with prejudice** as to these claims.

4.      A certificate of appealability is **DENIED** as to all remaining claims.

5.      The Clerk of the Court is directed to enter judgment conditionally granting relief in favor of Petitioner as to Claim One, Issue One and in favor of Respondents on all remaining claims and close this case.

    **DONE** and **ORDERED** in Orlando, Florida on July 27, 2018.

ROY B. DALTON JR.
United States District Judge

Copies furnished to:

Counsel of Record
OrlP-2 7/27